UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| VALERIE KLOOSTERMAN, <br><br> Plaintiff, <br><br> v. <br><br> METROPOLITAN HOSPITAL, d/b/a University of Michigan Health-West; RAKESH PAI, individually and in his official capacity as President, Medical Group & Chief Population Health Officer at University of Michigan Health-West; RHAE-ANN BOOKER, individually and in her official capacity as Vice President of Diversity, Equity, and Inclusion at University of Michigan Health-West; MARLA COLE, individually and in her official capacity as Director of Human Resources at University of Michigan Health-West; THOMAS PIERCE, individually and in his official capacity as Diversity, Equity & Inclusion Coordinator at University of Michigan Health-West, and CATHERINE SMITH, individually and in her official capacity as a member of the Advanced Practice Providers' Council at University of Michigan Health-West, <br><br> Defendants. | No. _____ <br><br> **COMPLAINT** <br><br> JURY DEMANDED |

COMES NOW Plaintiff Valerie Kloosterman, by and through counsel, and for her complaint against Defendants, hereby states as follows:

### INTRODUCTION

1.     In 2004, Metropolitan Hospital (hereinafter "University of Michigan Health-West") hired Valerie Kloosterman, MPAS, PA-C, as a physician assistant.  For the next 17 years, Ms. Kloosterman—the third generation in her family to work for her local health care system, and

1

a married mother of four, including triplets—received nothing but positive reviews and accolades from her superiors, her colleagues, and her patients.

2.     Throughout all but the final months of Ms. Kloosterman's tenure, the hospital treated her with appreciation and respect, and it did not seek to compel her to violate her religious beliefs or her independent medical judgment.  But that changed in 2021 shortly after Metropolitan Hospital culminated its affiliation with the University of Michigan Health System, rebranded itself University of Michigan Health-West, and then fired Ms. Kloosterman for no reason other than her sincerely held religious beliefs.

3.     Through a mandatory diversity training and hostile discussions that followed it, the newly branded University of Michigan Health-West attempted to compel Ms. Kloosterman to pledge, against her sincerely held religious convictions and her medical conscience, that she would speak biology-obscuring pronouns and make referrals for "gender transition" drugs and procedures.  Yet during the entire duration of her employment, no patient ever asked her for a referral for such drugs or procedures, and she never used pronouns contrary to a patient's wishes.

4.     This dispute about hypotheticals became all too real when Ms. Kloosterman requested a religious accommodation.  University of Michigan Health-West officials summoned her to a meeting, during which they denigrated her religious beliefs, called her "evil" and a "liar," mockingly told her that she could not take the Bible or her religious beliefs to work with her, and blamed her for gender dysphoria-related suicides.  They fired her on August 24, 2021, without even allowing her to finish her patients' charts for that day, to collect her belongings, or to say farewell to beloved colleagues and patients.

5.     At the same time that University of Michigan Health-West denied Ms. Kloosterman any form of religious accommodation, it accommodated, for other staff, a vast array of other personal preferences, secular objections, and independent medical judgment.  A male doctor who wished to abstain from performing pelvic exams on female patients was never scheduled to do so, and many providers with personal objections to prescribing controlled substances—opioids—or diet pills were easily accommodated by other providers who filled in for them, such that the

objecting providers were not even placed in a situation that might call for a referral.  Despite offering others many non-religious accommodations for far more common drugs and procedures—including some that obviated the need for referrals—University of Michigan Health-West did not consider or provide to Ms. Kloosterman any accommodation for her religious beliefs.

6.      University of Michigan Health-West violated Title VII of the Civil Rights Act of 1964 when it denied Ms. Kloosterman a religious accommodation and fired her because of her religious beliefs.  The letter explaining her termination listed three reasons for firing Ms. Kloosterman, all of which directly related to her sincerely held religious beliefs about gender identity and to her conscientious objection to assisting in the provision of certain "gender reassignment" drugs and procedures.  If not for Ms. Kloosterman's religious beliefs about gender and sexuality, she would not have been fired.  The hospital officials' explicit attack on her religious beliefs provides direct evidence that her termination was the result of unlawful religious discrimination.

7.      Moreover, during Ms. Kloosterman's employment at University of Michigan Health-West, the 17-year absence of any incident—and the availability of multiple accommodations for others, for secular reasons—foreclose any argument that University of Michigan Health-West could not accommodate Ms. Kloosterman.  When it learned of her religious beliefs, and when its pressure on her to betray those beliefs failed, University of Michigan Health-West had no interest in working toward a cooperative, religiously tolerant solution.  Instead, it summarily fired her.

8.      University of Michigan Health-West also violated the First and Fourteenth Amendments to the United States Constitution in multiple ways.

9.      By exhibiting open hostility toward Ms. Kloosterman's religious beliefs, University of Michigan Health-West officials violated the Free Exercise Clause, as construed by the Supreme Court in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), and in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022).

10.     By accommodating secular preferences while refusing to grant a religious accommodation to Ms. Kloosterman, University of Michigan Health-West's actions trigger and fail strict scrutiny under the Free Exercise Clause, as construed in the Supreme Court's decisions in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), and *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), and therefore violate the Free Exercise Clause.

11.     By seeking to compel Ms. Kloosterman to speak biology-obscuring pronouns that would violate her conscience and her medical judgment, as doing so could cause patients to miss potentially life-saving screenings, University of Michigan Health-West also violated the Free Speech Clause, as construed by the Sixth Circuit in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

12.     When it engaged in the aforementioned actions and fired Ms. Kloosterman, University of Michigan Health-West also violated the Fourteenth Amendment's Equal Protection Clause, as well as Article I, §§ 2, 4, and 5 of the Michigan Constitution and the Elliott-Larsen Civil Rights Act of 1976, Mich. Comp. Laws § 37.2202.

13.     It was unlawful, unconstitutional, and intolerant of University of Michigan Health-West to demand that Ms. Kloosterman abandon her religious beliefs and her medical ethics to remain employed.  The Court must hold University of Michigan Health-West and the individual Defendants accountable for their blatant religious discrimination and other violations of Ms. Kloosterman's legal rights, and must make Ms. Kloosterman whole by ordering her reinstatement; payment of her lost wages and benefits; declaratory and injunctive relief; actual, punitive, and nominal damages; and all other applicable remedies, as prayed for below.

### JURISDICTION AND VENUE

14.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

15.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

17.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and costs and attorneys' fees under 42 U.S.C. §§ 1988 and 2000e-5(k).

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims, detailed in this complaint, occurred within the Western District of Michigan, and on information and belief, at least one Defendant resides in the Western District of Michigan, all Defendants reside in the State of Michigan, and all Defendants are subject to this Court's personal jurisdiction.

19.     Suit is timely against University of Michigan Health-West under 42 U.S.C. § 2000e-5(e)(1) because Ms. Kloosterman filed a timely charge of discrimination against University of Michigan Health-West on May 16, 2022, Exhibit A amended that charge of discrimination on June 17, 2022, Exhibit B; and received on July 14, 2022, from the U.S. Equal Employment Opportunity Commission ("EEOC"), notice of her right to bring this suit, Exhibit C.

## IDENTIFICATION OF PARTIES

20.     Plaintiff Valerie Kloosterman is a Christian female who worked at the University of Michigan Health-West from 2004 until her termination in 2021, with a brief interlude following the birth of her triplets in 2009.  Ms. Kloosterman was at all times material to this action a resident of Caledonia, Michigan.

21.     On information and belief, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, is affiliated with, and is a subsidiary of, Michigan Health Corporation (a/k/a the "University of Michigan Health System," d/b/a "Michigan Medicine"), a nonprofit corporation operated by the University of Michigan Board of Regents with its principal place of business in Ann Arbor, Michigan.  University of Michigan Health-West maintains its corporate headquarters at 5900 Byron Center Ave, Wyoming, MI 49519.

22.     At all relevant times, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, codified at 42 U.S.C. § 2000e-(b), (g), and (h).

23.     At all relevant times, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, has continuously been an employer under Mich. Comp. Laws § 37.2201.

24.     At all relevant times, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, has continuously had more than 500 employees.

25.     Defendant Rakesh Pai is the President and the Medical Group & Chief Population Health Officer at University of Michigan Health-West.  He is sued in his official and individual capacities.  He is domiciled in Michigan.

26.     Defendant Rhae-Ann Booker is the Vice President of Diversity, Equity, and Inclusion at University of Michigan Health-West.  She is sued in her official and individual capacities.  She is domiciled in Michigan.

27.     Defendant Marla Cole is the Director of Human Resources at University of Michigan Health-West.  She is sued in her official and individual capacities.  She is domiciled in Michigan.

28.     Defendant Thomas Pierce is the Diversity, Equity & Inclusion Program Coordinator at University of Michigan Health-West.  He is sued in his official and individual capacities.  He is domiciled in Michigan.

29.     Defendant Catherine Smith is a Nurse Practitioner and a member of the Advanced Practice Providers' Council at University of Michigan Health-West.  She is sued in her official and individual capacities.  She is domiciled in Michigan.

30.     Defendants Rakesh Pai, Rhae-Ann Booker, Marla Cole, Thomas Pierce, and Catherine Smith are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

**FACTUAL BACKGROUND**

**<u>Ms. Kloosterman's Sincere Religious Beliefs</u>**

31.     Ms. Kloosterman is a devout Christian and longtime member of a United Reformed Church, which she has attended since her baptism as an infant.  Ms. Kloosterman's church is part of a denomination called the United Reformed Churches in North America.  She is a faithful and involved member of the church, attending regularly with her husband and their four children, as well as her parents and other members of her extended family.

32.     Ms. Kloosterman's vibrant faith informs how she does her work as a medical professional, through her humility, her love for others, and her desire to use the gifts and training that God has given her to help others.  Below is a photograph of Ms. Kloosterman.



33.     According to her coworkers, Ms. Kloosterman's conduct reflects her character and her servant's heart, as she seeks to treat others the way that Jesus would, which is one reason why her patients always loved her.

34.     Ms. Kloosterman and her church believe that the Bible is the inspired Word of God, and they also hold to several confessions that they believe faithfully summarize Biblical teachings:

the Belgic Confession of 1561, the Heidelberg Catechism of 1563, and the Canons of Dort of 1618-19.

35.     Ms. Kloosterman believes, consistent with the teachings of the Bible and her church, that all humans are created in God's image and thus deserving of love and respect.

36.     Ms. Kloosterman also believes that God created humans male and female as a unique expression of His image.  These beliefs derive from the Bible, specifically Genesis 1:26-27.

37.     These and other beliefs—shared by Ms. Kloosterman and her church and denomination—are described in a document called Affirmations Regarding Marriage, which reflects beliefs that Christians have held for two millennia.[1]

38.     As a devout Christian, Ms. Kloosterman believes that one's sex is ordained by God, that one should love and care for the body that God gave him or her, and that one should not attempt to erase or to alter his or her sex, especially through drugs or surgical means.

39.     Ms. Kloosterman believes that she must not speak against these truths by using pronouns that contradict a person's biological sex.

40.     Ms. Kloosterman also believes that God has ordained the sexual function for procreation, that children are a gift from God, and that "gender reassignment" drugs and procedures have a permanently sterilizing effect that cannot be justified by the desire to erase or alter one's sex.

41.     As a Christian medical professional, Ms. Kloosterman believes that it would be sinful to assist a patient in procuring sterilizing drugs or surgical procedures designed to erase or alter his or her sex.  This religious objection has nothing to do with the background or identity of the patient, but rather the nature of the drugs and procedures that the patient might request.

---

[1] *Affirmations Regarding Marriage*, United Reformed Churches in North America (2018), https://www.urcna.org/file_retrieve/63166.

**Ms. Kloosterman's Sincere Religious Belief that She Must Honor Her Hippocratic Oath**

42.     Ms. Kloosterman, a Christian medical professional, also has religious beliefs that are intertwined with her medical judgment.

43.     Ms. Kloosterman has taken the Hippocratic oath to "do no harm" to her patients. Her Christian faith compels her both to honor her Hippocratic oath and to be honest and compassionate in her dealings with others.  She therefore believes that it would be dishonest and sinful to violate her conscience and oath by knowingly facilitating a drug or procedure that—in her independent medical judgment—will bring to a patient more harm than benefit.

44.     Indeed, during the duration of Ms. Kloosterman's employment, her employment contract required her to "exercise [her] independent medical judgment consistent with the clinical needs and consent of each patient," and it stated that "the Hospital shall not have the right to direct [her] to take or omit any act which conflicts with such medical judgment in the care of patients." Exhibit D.

45.     Ms. Kloosterman's independent medical judgment is that "puberty blockers," "hormone therapy," and "gender reassignment surgery" are experimental, lack validation in methodologically rigorous long-term studies, and often lead to negative clinical outcomes such as bone density loss, infection, nerve damage, chronic pain, loss of sexual and urinary functions, psychological trauma, and other serious complications.

46.     Ms. Kloosterman's medical judgment also counsels against entering in documentation pronouns that obscure or misrepresent a person's biological sex, as doing so can cause patients to miss potentially life-saving screenings and procedures like pregnancy tests, mammograms, and testicular exams.

47.     Therefore, Ms. Kloosterman believes that it would be dishonest and sinful to violate her conscience and Hippocratic oath by acting against her medical judgment to prescribe or to refer patients for "puberty blockers," "hormone therapy," or "gender reassignment surgery," or by entering in documentation pronouns that obscure or misrepresent a patient's biological sex.  This

religious objection has nothing to do with the background or identity of the patient, but rather the nature of the drugs and procedures that the patient might request.

**Ms. Kloosterman's Exemplary Employment Record**

48.    Ms. Kloosterman worked for Metropolitan Hospital ever since her graduation in 2004, long before its 2016 affiliation with the University of Michigan Health System that resulted in University of Michigan Health-West becoming a subsidiary of the University of Michigan Health System (now called "Michigan Medicine"), which in turn is operated by the University of Michigan Board of Regents.[2]

49.    Ms. Kloosterman performed her duties at Metro Health Caledonia, which is an outpatient clinic specializing in Internal, Family, and Pediatric Medicine.

50.    Metro Health Caledonia (now called Caledonia Health Center) is operated by Metropolitan Hospital, d/b/a University of Michigan Health-West, which has its principal place of business as a hospital located about 15 minutes away in Wyoming, Michigan.

51.    Ms. Kloosterman's mother and grandmother both worked in that local health care system for over 40 years, and Ms. Kloosterman worked there for her entire career.  Thus, Ms. Kloosterman is a third-generation healthcare professional serving her local community.

52.    During Ms. Kloosterman's 17-year employment as a physician assistant for Michigan Health, she cared for patients of all ages and backgrounds.  She was especially popular with younger patients, including children.  Some of her pediatric patients were second-generation, because she treated their parents when they were children.

---

[2] *See Upshaw v. SSJ Group, LLC*, No. 1:19-cv-341-PLM-PJG, ECF No. 126, Defendants University of Michigan Board of Regents and University of Michigan Health System's Amended Motion to Dismiss (filed July 31, 2020), at ECF pg. 13, n.1 ("The University of Michigan Health System is operated by the University of Michigan Board of Regents, which itself is a State entity. . . .  For clarity, Metropolitan Hospital . . . is a subsidiary of the Regents, a separate legal entity, governed by an independent board of directors."); *see also* Mary Masson, *U-M Health System, Metro Health Moving Forward with Affiliation*, The University Record (Sept. 15, 2016), https://perma.cc/DPF3-FQBN (describing affiliation agreement between Metropolitan Hospital and the Board of Regents, and quoting the chair of the Board of Regents as stating that "the affiliation 'sends a message that as a health system and a university, we are eager to expand'").

53.     Ms. Kloosterman consistently received exemplary performance reviews and was never once subject to discipline.

54.     In one typical performance review, her supervisor commented: "Valerie goes way beyond the call of duty when dealing with patients, follow up and professional responsibility.  She is *very* ethical [and] responsible and treats all with respect."  Exhibit E (emphasis in original).

55.     Another typical performance review described Ms. Kloosterman as "[a] pleasure to work with[,] excellent knowledge, ethics, respect, communication, and skills."  Exhibit E.

56.     Ms. Kloosterman's reputation among her patients was stellar.  She was widely known to be a very patient, caring provider.  She would spend very generous amounts of time with her patients because she cared about them.

57.     Many patients would specifically request Ms. Kloosterman and were willing to wait for an appointment with her if her schedule was full.  Even many months after she was fired, Ms. Kloosterman's former patients have continued to ask about her and to express how much they miss her.

58.     Ms. Kloosterman also had an excellent reputation among her fellow staff members.  She was known for being thorough, exact, and knowledgeable about her medicine.  And when she was unsure how to handle something, she would ask her supervising physician for guidance.  She also had strong working relationships with everyone on staff at her clinic.

59.     As her excellent performance reviews indicate, Ms. Kloosterman gladly served people of all beliefs and backgrounds and was committed to giving the best possible care to all her patients, including those who identified as lesbian, gay, or experiencing gender dysphoria.

60.     For instance, she provided ongoing care for approximately a dozen patients whom she knew to identify as lesbian.

61.     Ms. Kloosterman also treated two patients who may have used preferred pronouns other than those that would correspond to the patients' biological sex.

62.     These patients came to Ms. Kloosterman for a potential brain tumor and a respiratory issue, and she cared for both of them to the best of her ability.

63.     Neither patient requested a different provider or otherwise expressed dissatisfaction with the excellent care that Ms. Kloosterman provided.

64.     For both patients, in both her medical notes and in the examination room, Ms. Kloosterman used the patient's name (without pronouns) without any disruption to the patient's care.  She also conducted at least one follow-up phone call and one follow-up visit with one of the patients, while the other did not need a follow--up visit.

65.     In medical charts, Ms. Kloosterman never changed or edited the pre-filled sex or gender field, nor did she ever have the ability to change that information as any such change could only be done by administrative office staff, not medical providers.

66.     Ms. Kloosterman never used pronouns that went against a patient's wishes.

67.     Moreover, during the entire duration of her employment, no patient ever asked her for a referral to another provider for "gender reassignment" drugs or procedures.

68.     Throughout Ms. Kloosterman's employment, she never discussed with any patient her views—religious or otherwise—on human gender or sexuality.

**University of Michigan Health-West Targets Ms. Kloosterman for Her Religious Beliefs**

69.     In 2016, twelve years after Ms. Kloosterman began working at her local clinic, Metropolitan Hospital began the process of affiliating with the University of Michigan Health System.

70.     The affiliation was a gradual process, culminating in the name change to its current name—University of Michigan Health-West—in June 2021.  Since the affiliation, both the hospital and the outpatient clinic where Ms. Kloosterman worked have been a subsidiary of the University of Michigan Board of Regents, which operates Michigan Medicine (formerly the University of Michigan Health System).[3]

---

[3] *See Upshaw v. SSJ Group, LLC*, No. 1:19-cv-341-PLM-PJG, ECF No. 126, Defendants University of Michigan Board of Regents and University of Michigan Health System's Amended Motion to Dismiss (filed July 31, 2020), at ECF pg. 13, n.1 ("The University of Michigan Health System is operated by the University of Michigan Board of Regents, which itself is a State entity. . . .  For clarity, Metropolitan Hospital . . . is a subsidiary of the Regents, a separate legal entity, governed by an independent board of directors.").

71.     On information and belief, the University of Michigan Board of Regents, by virtue of the affiliation agreement or otherwise, has the authority to direct or to require the creation and implementation of policies at University of Michigan Health-West, and has exercised that authority.  On information and belief, the University of Michigan Board of Regents, by virtue of the affiliation agreement or otherwise, has the authority to direct or to require the creation and implementation of the University of Michigan Health-West policies at issue in this case—including any diversity, equity, and inclusion policies—and has in fact exercised that authority. On information and belief, University of Michigan Health-West holds itself out to the public as a state entity by its affiliation with the University of Michigan Board of Regents, by its status as a subsidiary of the University of Michigan Board of Regents, by its use of the "University of Michigan" name, and by other means.

72.     The University of Michigan Board of Regents is a state actor under Michigan law.

73.     In 2018, University of Michigan Health-West required Ms. Kloosterman to do a training segment on serving LGBTQ+ patients.  Ms. Kloosterman had no religious objection to this, as she was not required to affirm any statement during the training, which was merely for education purposes.

74.     Between May and June 2021, University of Michigan Health-West required Ms. Kloosterman to complete another mandatory training module.  This time, the module contained a requirement to affirm statements concerning sexual orientation and gender identity that her Christian faith prohibited her from affirming.

75.     Ms. Kloosterman could not complete the training unless she checked boxes that affirmed the statements and essentially pledged her agreement with University of Michigan Health-West's express and implied positions on gender, sex, and sexual orientation.  There was no option within the training for her to explain her position or to request a religious accommodation. The training was due on June 30, 2021, and if Ms. Kloosterman did not complete the training module by July 15, 2021, she would be terminated.

76.     Ms. Kloosterman consulted with Defendant Smith, who was in a liaison role connecting the providers with HR, her supervising physician, and her office manager, and she prayed about the matter for three weeks.

77.     Both Defendant Smith and Ms. Kloosterman's supervising physician told her to do what she felt was right in her heart.

78.     Amy DeGood, the office manager for the Caledonia clinic, told Ms. Kloosterman to talk with University of Michigan Health-West representatives from the Department of Diversity, Equity, and Inclusion (DEI).

79.     In mid-June, Ms. Kloosterman contacted Defendant Dr. Rhae-Ann Booker, the vice president of the DEI Department, and requested a meeting. But Defendant Booker was not available to meet until July 1, after the training was due, so Ms. Kloosterman decided to complete the training module and to explain her position to University of Michigan Health-West separately.

80.     Ms. Kloosterman arranged a meeting with Defendant Booker to inform University of Michigan Health-West that her faith precluded her from agreeing with the statements.

81.     Ms. Kloosterman's faith compelled her to seek a reasonable accommodation for her religious beliefs.

82.     On or about July l, 2021, Ms. Kloosterman met with Defendant Booker to request a religious accommodation and explained why her faith precluded her from affirming the statements in the training module.

83.     When Defendant Booker indicated her assumption that Ms. Kloosterman was "uncomfortable" seeing gay and lesbian patients, Ms. Kloosterman corrected her and explained that she had seen several LGBTQ patients during her 17 years of employment and that she would gladly continue seeing these patients. Defendant Booker indicated that she would speak with HR.

84.     On or about July 29, 2021, Ms. Kloosterman met with University of Michigan Health-West representatives from both the HR and DEI Departments: Defendant Marla Cole, HR Director; Defendant Thomas Pierce, DEI Program Director; and Defendant Catherine Smith, a member of the Advanced Practice Providers' Council.

85.     Defendant Smith is a Nurse Practitioner whose role was to serve as a liaison for Ms. Kloosterman when interacting with Human Resources.

86.     Although Ms. Kloosterman had previously met Defendant Smith, who had shadowed in her clinic as a student, Ms. Kloosterman had never previously met Defendant Cole or Defendant Pierce.

87.      These attendees indicated that Amy DeGood also attended the meeting by listening over the phone.

88.     This meeting, which lasted over an hour, focused on whether Ms. Kloosterman would use gender identity-based pronouns and be willing to refer patients for "gender reassignment surgery."

89.     When Ms. Kloosterman respectfully indicated that she could not do so because of her religious beliefs and because of her independent medical judgment, but that she would use patients' names in place of pronouns to respect their wishes, Defendant Pierce grew hostile, visibly angry with tight fists and a flushed demeanor, and attacked Ms. Kloosterman's religious beliefs.

90.     Among other things, Defendant Pierce told Ms. Kloosterman that she could not take the Bible or her religious beliefs to work with her, either literally or figuratively; and that she was abusing her power as a health care provider to manipulate patients.   Defendant Pierce also rhetorically asked if Ms. Kloosterman knew "what would happen if we let every provider" take their religious beliefs to work, suggesting that religious beliefs do not belong in the workplace.

91.     Ms. Kloosterman respectfully explained that she never sought power over a patient but merely served as part of each patient's care team with his or her best interests in mind. Defendant Pierce interrupted her and called her "evil" for not giving patients exactly what they wanted because of her religious beliefs.

92.     Ms. Kloosterman respectfully explained that medical providers have multiple ways of treating most conditions and are not necessarily obligated to give patients everything they asked for, such as antibiotics for viral infections, opioids, or surgery for non-chronic back pain, if doing so went against the providers' medical judgment.

15

93.     During the meeting, Ms. Kloosterman respectfully explained some of the reasons behind her medical conscience objection to facilitating "gender reassignment surgeries."

94.     When Ms. Kloosterman respectfully explained that she had treated patients who were gay and lesbian for several years without any complaints, Defendant Pierce called her a "liar" and said if he came to Ms. Kloosterman as a patient and she used his name rather than his preferred pronoun, he would never come back to see her.

95.     Defendant Pierce also asked Ms. Kloosterman whether she knew that by using a patient's name instead of his or her preferred pronouns, she would cause him or her to commit suicide.   When he said that this assertion was well-documented, Ms. Kloosterman cited some scientific studies that showed otherwise.

96.     In a hostile tone, Defendant Pierce—who, on information and belief, has no formal medical training or education and is not licensed to practice medicine—told Ms. Kloosterman that he had studies that would disprove her studies.

97.     When the representatives asked Ms. Kloosterman what she would do about pronouns on patient charts, she explained that pronouns are not always given for charting and if there were any pre-formulated pronouns, she could use the patient's first name, as she had done in the past without any complaints or disruption to patient service.   Ms. Kloosterman also explained that other providers would not become aware of her beliefs when reading her charts.   In other words, Ms. Kloosterman was not seeking to impose her beliefs on, or to proselytize, anyone.

98.     Ms. Kloosterman also explained that she did not even have the ability to change a patient's sex or gender on his or her chart because only administrative office staff had that ability, rather than medical providers.

99.     After an hour, Defendant Pierce left the meeting.   Defendant Cole then said that the discussion with Defendant Pierce had been intense and that everyone should take a breath.   Ms. Kloosterman indicated that she would be glad to continue the conversation, if it would be helpful.

100.     Despite Defendant Smith's role as Advanced Providers' Practice Liaison to help Ms. Kloosterman during interactions with Human Resources, Defendant Smith did nothing to support Ms. Kloosterman or to contradict the hostile statements by Defendant Pierce.

**University of Michigan Health-West Fires Ms. Kloosterman Because of Her Religious Beliefs**

101.     After the July 29 meeting, Ms. Kloosterman heard nothing further until August 23, when a meeting for August 24 appeared on her calendar, with the meeting scheduled for a time when she would normally be seeing patients. The meeting was at University of Michigan Health-West Hospital with Defendants Cole and Smith, not at the clinic where Ms. Kloosterman worked, and the subject line merely said: "touch base."

102.     Ms. Kloosterman left a voicemail with Defendant Cole and an instant message with Defendant Smith inquiring about the purpose of the meeting, but those communications went unanswered. Ms. Kloosterman also asked Ms. DeGood about this meeting, and Ms. DeGood said that she did not know what the meeting was about.

103.     Ms. Kloosterman called HR and asked if she needed to reschedule her appointments with patients so that she could make it to the meeting. Hearing no response, she finished her appointments with patients and left her charts undone to finish afterward.

104.     Ms. Kloosterman had no prior notice that she would be terminated at this meeting.

105.     That day, on August 24, 2021, when Ms. Kloosterman walked into the meeting room at the hospital, Defendant Cole was present, and there was an envelope on the table that contained Ms. Kloosterman's termination notice, which indicated an effective termination date of November 22, 2021. Exhibit F. The notice did not disavow the statements that Defendant Pierce made in attacking Ms. Kloosterman's religious beliefs at the July 29 meeting.

106.     Defendant Smith entered the room and said that, because Ms. Kloosterman refused to use preferred pronouns and because she refused to refer for "gender reassignment surgeries," she no longer worked at University of Michigan Health-West.

107.     Ms. Kloosterman responded: "If this is about my Christian beliefs, I cannot abandon them. But I will always treat patients appropriately."

17

108.    Defendant Smith responded by saying that despite the fact that Ms. Kloosterman had a "work around" for preferred pronouns, it had been decided that "today" was her last day, that she no longer worked at University of Michigan Health-West, and that she was not allowed on its property.  They told her to give them her badge and that her patient charts would be completed for her. Ms. Kloosterman mentioned that she had promised some patients she would call them to follow up with test results from that day's appointments, and she was told only, "You no longer work for University of Michigan."

109.    Ms. Kloosterman was not allowed to return to the clinic where she had worked for 17 years.  Defendants Cole and Smith told her that Ms. DeGood would call her when her personal items were boxed up.

110.    It is the policy and practice of University of Michigan Health-West to not accommodate, and to silence, employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda.

111.    The University of Michigan Health-West maintains a speech code whereby medical providers and employees may not use pronouns associated with a patient's biological sex if the patient prefers different pronouns.

112.    The University of Michigan Health-West maintains a speech code that allows for heckler's vetoes of the speech of medical providers.

113.    It is the policy and practice of University of Michigan Health-West to require employees to use pronouns as preferred by patients, regardless of whether they correspond with biological sex.

114.    It is the policy and practice of University of Michigan Health-West to interfere with the independent medical judgment of its professional medical employees by requiring them to prescribe, to recommend, or to give referrals for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical judgment.

115.    On information and belief, Defendants Pai, Pierce, and Booker implement and enforce the university's speech code for University of Michigan Health-West.

116.    The evening of August 24, 2021, after Ms. Kloosterman was fired, Ms. DeGood sent a group text to eight of the providers at her clinic, calling for a mandatory meeting the next morning.

117.    Nurse Practitioner Julie Stinton noticed that one provider was missing, so she texted Ms. Kloosterman, who called her in tears telling her about the termination.

118.    Nurse Practitioner Stinton immediately texted Ms. DeGood to ask why she had left Ms. Kloosterman off the chain, but Ms. DeGood did not give a straight answer.

119.    The 7:00 a.m. mandatory meeting on August 25 was conducted over WebEx with three University of Michigan Health-West administrators—Defendant Rakesh "Raki" Pai, Defendant Marla Cole, and a female staff member from the DEI office—who had never previously met Ms. Kloosterman's coworkers.

120.    Defendant Smith was also on the August 25 call.  All she said was that "Valerie no longer works for the University of Michigan."  Then she asked if there were any questions.

121.    Nurse Practitioner Stinton asked Defendant Pai, the one who had made the ultimate decision to fire Ms. Kloosterman and signed the termination letter, if he had made any effort to find out what Ms. Kloosterman was like before he fired her, if he had ever met her, or even if he knew what she looked like.

122.    Defendant Pai responded that, no, he had never met Ms. Kloosterman.  He said: "She had a clear violation, but I cannot tell you what that violation was."

123.    A DEI staff member spoke up and said that Ms. Kloosterman violated something in her contract, but none of the administrators would say what the violation was.

124.    Dr. Michael Kogut and Nurse Practitioner Stinton were the only staff who asked questions at this meeting. Defendant Cole, Defendant Pai, Defendant Smith, and the other DEI staff member refused to give any meaningful information or to directly answer their questions.

125.    Defendants attempted to damage—and in fact damaged—Ms. Kloosterman's reputation by communicating to her former coworkers that Ms. Kloosterman had done something so egregious as to justify her termination, by refusing to elaborate on what that was, and by concealing the truth about what had prompted her termination.

126.    Ms. Kloosterman's former coworkers were upset enough about her termination that an additional staff meeting in person was held. This meeting did not satisfy the concerns or answer the questions that Ms. Kloosterman's former coworkers had about why such a beloved provider had been suddenly fired.

127.    The week after Ms. Kloosterman was fired, Ms. DeGood sent an email to her coworkers, expressing: "[T]his is a huge loss to our team. [Valerie] was/is an amazing provider. She will be missed tremendously."

128.    Ms. DeGood also expressed: "I can not disclose many of the details surrounding this decision," and "I know Valerie is very saddened by the fact that she can not say goodbye to all of you." The complete email is attached as Exhibit G.

129.    On September 3, 2021, ten days after Ms. Kloosterman was fired, she received a letter memorializing the reasons for her termination, which was signed by Defendant Smith on University of Michigan Health letterhead. Defendant Smith listed her unwillingness to refer "gender transitioning" patients for certain drugs and procedures, her unwillingness to use pronouns that do not correspond to a patient's biological sex, and a newly fabricated and baseless allegation that Ms. Kloosterman had altered medical records to change patients' templated pronouns (a false charge that Ms. Kloosterman continues to deny). Exhibit H.

130.    While Defendant Smith had signed the September 3, 2021 letter, on information and belief, all Defendants conferred about and contributed to the letter, including its newly fabricated and baseless allegation that Ms. Kloosterman had altered patients' medical records.

131.    Like the termination notice, the September 3, 2021 letter did not disavow the statements that Defendant Pierce made in attacking Ms. Kloosterman's religious beliefs at the July 29 meeting.

132.    Ms. Kloosterman has never received any communication from any of the Defendants disavowing Defendant Pierce's July 29 statements attacking her religious beliefs.  On information and belief, in making the decision to terminate Ms. Kloosterman, all Defendants shared the same anti-religious motives that Defendant Pierce made explicit during the July 29 meeting.

133.    On information and belief, Defendants Pai, Booker, Cole, Pierce, and Smith participated in the decision to terminate Ms. Kloosterman's employment.

134.    On information and belief, Defendants Pai, Booker, Cole, and Smith shared the anti-religious animus that Defendant Pierce made explicit during the July 29, 2021, meeting.

**University of Michigan Health-West's Ability and Willingness to Accommodate Common Non-Religious Preferences**

135.    In contrast to University of Michigan Health-West's complete refusal to consider any sort of religious accommodation for Ms. Kloosterman, University of Michigan Health-West and the clinic where Ms. Kloosterman worked have long accommodated non-religious personal and medical objections to performing or referring for certain procedures and to prescribing or referring for certain medications—without any negative consequences for the objecting provider.  These accommodations were easily accomplished given the clinic's patient intake and scheduling process, which ensures that staff know ahead of time the reason for a patient's visit and can schedule an appropriate staff member to see the patient.

136.    Many providers at the Metro Health Caledonia clinic had personal or medical objections to performing certain procedures, such as hemorrhoid removals; and these objections were accommodated without any issues.  They would simply delegate conducting any such procedure to another provider who was willing to perform that procedure, and the patients never experienced any interruption in care.

137.    None of the providers at the clinic are willing to perform toenail removals. The office staff directs patients with toenail-removal needs directly to a podiatrist.  No patient has ever complained about this practice.

138.    As another example, Dr. Michael Kogut is a male doctor who does not perform female pelvic exams, breast exams, or prescribe hormones.  On information and belief, Dr. Kogut's objection is personal, not based on religious beliefs.

139.    In the six years that Dr. Kogut has worked at the clinic, he has not had to do these exams.  The office staff knows about his objection and will often schedule female patients to meet with him for their physical but then to meet with a female provider for their pelvic and/or breast exam.  No patients have ever complained about this arrangement.

140.    Many providers at the clinic have medical objections to prescribing certain stimulant diet pills.  Only two providers are willing to prescribe them.

141.    If a patient expresses interest in this type of treatment for weight loss, he or she is told to schedule an appointment with Nurse Practitioner Stinton, who explains the benefits and drawbacks of diet pills.

142.    The providers who are not willing to prescribe diet pills have never had to prescribe them.  And a patient who seeks diet pills never even knows if there was a schedule or provider change, let alone the reason for the change.   The office staff merely switches the patient's appointment to be with Nurse Practitioner Stinton instead of with the providers who object to prescribing diet pills.

143.    For all the examples listed above, the clinic's practice of accommodating providers' non-religious objections, by scheduling patients with other providers, meant that the objecting provider would not be asked to give a referral.

144.    Had it been willing to consider Ms. Kloosterman's accommodation request, University of Michigan Health-West easily could have made an accommodation without disruption to the clinic's operations.

145.    Given the clinic's patient intake and scheduling procedures—in which office staff learned the reason for patient visits before patients spoke to a provider, and in which office staff were able to choose which provider would initially meet with each patient—had the issue ever arisen, University of Michigan Health-West easily could have accommodated Ms. Kloosterman

by not scheduling her for any patient visit that related to "puberty blockers," "hormone therapy," or "gender reassignment surgery."  Nurse Practitioner Stinton and Ms. Kloosterman's other coworkers would happily have stood in for Ms. Kloosterman during the extraordinarily rare instances when such an accommodation might have become necessary.

146.    University of Michigan Health-West also easily could have accommodated Ms. Kloosterman by posting a notice that welcomes patients who missed any requested services to call the Wyoming or Ann Arbor hospitals for assistance.

147.    And given that Ms. Kloosterman's practice of using patients' names rather than biology-obscuring pronouns had been successful and had not caused any disruption to patient care or changed any other provider's views concerning the patient, University of Michigan Health-West easily could have permitted Ms. Kloosterman to continue that practice.

148.    University of Michigan Health-West's supervisory practices for employees like Ms. Kloosterman provide further evidence that it easily could have accommodated her.

149.    Because Ms. Kloosterman's title was Physician Assistant, and because she was not a supervising physician, there were certain tasks that were considered outside her range of expertise.

150.    Physician assistants at the clinic had specific responsibilities, but they possessed only as much authority as their supervising physicians felt comfortable giving to them.

151.    For example, Advanced Practice Providers such as Ms. Kloosterman were either not allowed to prescribe controlled substances or could prescribe them only with a supervisor's approval.

152.    University of Michigan Health-West could easily have accommodated Ms. Kloosterman's religious beliefs by allowing her supervising physician to meet with any patients who wished to receive referrals for "gender reassignment" drugs or procedures.

153.    While Ms. Kloosterman cared for many patients regularly over the course of her career and had many patients specifically request to see her, she was not formally listed as anyone's "primary care provider" because of her status as a physician assistant. Thus, every patient she saw

23

also had a primary care provider that he or she could have easily seen to discuss "gender reassignment" drugs or procedures.

154.     The other providers at the Metro Health Caledonia clinic would also often exercise their medical judgment to say no to requests that patients may have, when the providers believed that such requests were medically inappropriate or not in the patient's best interest.

155.     For example, many patients would ask for narcotics, and the providers would send them to a pain clinic instead.  But if they refused to go and came back asking for medication refills, the provider would sometimes say no because he or she was concerned that the patient was becoming dependent on highly addictive medications.

156.     If a patient asked for psychiatric medication refills but was not willing to follow up with a psychiatrist for the care that he or she needed, that was another situation where a provider might exercise his or her medical judgment to say no to the patient's request.

157.     If a patient asked for a referral to a surgeon when the provider thought that surgery was not necessary, the provider would make very clear that he or she did not think a referral was medically appropriate.  It would be the provider's decision whether to make the referral at that point.

158.     Referrals are much more than just checking a box.  They require thoughtful consideration and are an exercise of the provider's independent medical judgment in agreeing that the referral is necessary and appropriate.

159.     At the time Ms. Kloosterman was working at the clinic, only administrative office staff had the ability to change the sex or gender templated fields on patients' medical records. Medical providers, including Ms. Kloosterman, did not have that ability.  Since Ms. Kloosterman was fired, however, the policy has changed so that medical providers are able to make those changes.

160.     In any event, in the rare instances when its pronoun policy might have had application to Ms. Kloosterman's duties, University of Michigan Health-West easily could have

accommodated her by allowing her to use patients' names instead of biology-obscuring pronouns, as she had done in the past without any incident or patient complaint.

**Ms. Kloosterman's Religious Beliefs Are Shared by Thousands of Medical Professionals**

161.    Thousands of religious healthcare professionals share Ms. Kloosterman's views, which are grounded in both her religious faith and her medical judgment.

162.    Ms. Kloosterman is a member of the Christian Medical and Dental Association ("CMDA"), which is an organization of over 19,000 Christian healthcare professionals.

163.    CMDA's position statement on transgender identification is attached as Exhibit I.

164.    CMDA believes that "healthcare professionals should not be forced to violate their conscientious commitment to their patients' health and welfare by being required to accept and participate in harmful gender-transition interventions, especially on the young and vulnerable." *Id.*

165.    "CMDA affirms the obligation of Christian healthcare professionals caring for patients struggling with gender identity to do so with sensitivity and compassion, consistent with the humility and love that Jesus modeled and commanded us to show all people."  *Id.*

166.    "CMDA holds that attempts to radically reconstruct one's body surgically or hormonally for psychological indications, however, are medically, ethically, and psychologically inappropriate.  These measures alter healthy tissue and increasingly are not supported by scientific research evaluating behavioral, medical, and surgical outcomes."  *Id.*

**Ms. Kloosterman's Medical Judgment Is Supported by Scientific Research**

167.    Given her beliefs regarding human sexuality, Ms. Kloosterman believes that it would be sinful to prescribe or give referrals for "puberty blockers," "hormone therapy," or "gender reassignment surgery," regardless of what medical benefit those drugs and procedures might bring.  She believes likewise with respect to the use of biology-obscuring pronouns.

168.    However, as explained above, Ms. Kloosterman also believes that it would be dishonest and sinful to violate her conscience and Hippocratic oath by knowingly facilitating a

drug or procedure that—in her independent medical judgment—will bring to a patient more harm than benefit, and by using biology-obscuring pronouns that place patients at risk of missing important, sex-specific screenings.  That others might reach a different conclusion on these matters does not relieve Ms. Kloosterman of her religious duty to honor her conscience, her oath, and her duty to compassionately care for her patients by honestly following her studied and independent medical judgment.

169.    Ms. Kloosterman's studied and independent medical judgment is that referring patients for "puberty blockers," "hormone therapy," or "gender reassignment surgery" would cause more harm than benefit.  Her medical judgment counsels the same conclusion with respect to using pronouns that obscure or misrepresent a patient's biological sex.

170.    Ms. Kloosterman's medical judgments find support in relevant scientific literature.

171.    A growing body of scientific literature documents the significance of biological sex for effective medical treatment.  According to the Endocrine Society in 2021, "[d]iseases that affect both sexes often have different frequencies, presentations, and responses to treatments in males and females; therefore, different preventative, diagnostic, and treatment approaches may be required for males and females."[4]

172.    For this reason, Ms. Kloosterman is concerned that using biology-obscuring pronouns could cause patients to miss health-supporting or even life-saving screenings such as mammograms, pregnancy tests, prostate exams, and exams for sexually-transmitted diseases that differ based on biological sex. Using biology-obscuring pronouns could also result in potentially inappropriate prescriptions, such as medications that are harmful during pregnancy.

173.    International studies make clear that the overwhelming majority of patients with gender dysphoria are also suffering from underlying mental health issues, adverse childhood events, neuro-developmental problems, and family issues.  This is especially prevalent in

---

[4] Aditi Bhargava, Arthur P Arnold, Debra A Bangasser, Kate M Denton, Arpana Gupta, Lucinda M Hilliard Krause, Emeran A Mayer, Margaret McCarthy, Walter L Miller, Armin Raznahan, Ragini Verma, *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement*, Endocrine Reviews, Vol. 42, No. 3 (June 2021), pp. 219–258, https://doi.org/10.1210/endrev/bnaa034.

adolescents.  A 2018 parental survey found that 62.5% of gender dysphoric adolescents had "a psychiatric disorder or neurodevelopmental disability (before) the onset of gender dysphoria," and 48.4% had experienced a traumatic or stressful prior event.[5]

174.    Medical literature reports that prematurely affirming a patient's perceived gender identity is unhelpful and can cause harm to sexual minority patients.  According to the American Psychiatric Association and multiple scientific studies, for minors with gender dysphoria, an average of 85% of the cases resolve by adulthood—unless the perceived gender identity is affirmed and puberty blockers, cross-sex hormones, or other interventions are done.[6]

175.    According to the *APA Handbook on Sexuality and Psychology*: "Premature labeling of gender identity should be avoided." "This approach runs the risk of neglecting individual problems the child might be experiencing. . . ." "An adolescent's gender identity concerns must not become a reason for failure to address all her/his other relevant problems in the usual way."[7]

176.    Cross-sex hormones have numerous known risks.  Estrogen use in male biology strongly increases the risks of blood clots, heart attacks, strokes, breast cancer, insulin resistance, and more.[8]

---

[5] Littman, L. *Rapid-onset gender dysphoria in adolescents and young adults: A study of parental reports*, PLOS ONE (Aug. 16, 2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330.

[6] *Diagnostic and statistical manual of mental disorders*, AMERICAN PSYCHIATRIC ASSOCIATION (2013) (5th ed.), p. 455 (rates of persistence translate to rates of desistance in natal males of 70 to 97.8% and natal females of 50 to 88%.); Singh, D., Bradley, S.J., and Zucker, K.J., *A Follow-Up Study of Boys With Gender Identity Disorder*, FRONT. PSYCHIATRY 12:632784, https://www.frontiersin.org/articles/10.3389/fpsyt.2021.632784/full (87.8% desistance noted in the "largest sample to date of boys clinic-referred for gender dysphoria"); Cohen-Kettenis, P.Y., et al. *The treatment of adolescent transsexuals: changing insights,* J. SEX MED. (Aug. 2008); 5(8):1892-7. doi: 10.1111/j.1743-6109.2008.00870 (80-95% of gender dysphoric pre-pubertal children desist by the end of adolescence); Ristori, J., Steensma, T.D., *Gender dysphoria in childhood*, INT REV PSYCHIATRY (2016) ;28(1):13-20 (finding a desistance rate of 61-98% of GD cases by adulthood.).

[7] W. Bockting, *Ch. 24: Transgender Identity Development*, in AMERICAN PSYCHOLOGICAL ASSOCIATION HANDBOOK ON SEXUALITY AND PSYCHOLOGY, p. 750 (D. Tolman & L. Diamond eds., 2014).

[8] Getahun, D., Nash, R., Flanders, W.D., et al., *Cross-sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, ANN INTERN MED (2018); 169(4): 205-13, doi: 10.7326/M17-2785.

177.     Testosterone use in female biology strongly increases the risks of heart attacks, strokes, breast and uterine cancer, hypertension, severe acne, and more.[9]

178.     "Gender transitioning" healthcare has not been proven safe, effective, or of more benefit than harm.  This was emphasized in the 2020 UK High Court *Bell v Tavistock* case,[10]  the UK's Cass Interim Report of 2022,[11] and the UK's 2020 National Institute for Health and Care Excellence reviews of puberty blockers and cross-sex hormones."[12]

179.     In 2022, the UK's National Health Service abruptly closed the world's largest pediatric gender clinic, due to findings in the *Bell v. Tavistock* case that minors were facing lasting harm from cross-sex hormones and gender-transition surgeries that did not help their underlying mental health challenges.[13]

180.     Sweden, Finland, and France have all made recent dramatic changes to their gender dysphoria treatment models, emphasizing mental health treatment rather than hormones and, in many cases, banning sex-altering procedures for minors.[14]

---

[9] Susan R Davis, et al, *Global Consensus Position Statement on the Use of Testosterone Therapy for Women*, THE JOURNAL OF CLINICAL ENDOCRINOLOGY & METABOLISM, Vol. 104, No. 10, (Oct. 2019), pp. 4660–4666, https://doi.org/10.1210/jc.2019-01603.

[9] *Id.*

[10] *Bell v. Tavistock*, https://www.judiciary.uk/wp-content/uploads/2020/12/Bell-v-Tavistock-Judgment.pdf.

[11] *The Cass Review, Independent review of gender identity services for children and young people: Interim report* (Feb. 2022), https://cass.independent-review.uk/publications/interim-report/.

[12] *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria* (Oct. 2020), https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_Gender-affirming-hormones_For-upload_Final.pdf.

[13] Jasmine Andersson & Andre Rhoden-Paul, "NHS to close Tavistock child gender identity clinic," BBC NEWS (July 28, 2022), https://www.bbc.com/news/uk-62335665.

[14] *See, e.g., Gender dysphoria in children and adolescents: an inventory of the literature*, SWEDISH AGENCY FOR HEALTH TECHNOLOGY ASSESSMENT AND ASSESSMENT OF SOCIAL SERVICES (Dec. 20, 2019), https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/; *Policy Change Regarding Hormonal Treatment of Minors with Gender Dysphoria at Tema Barn – Astrid Lindgren Children's Hospital* (March 2021), https://segm.org/sites/default/files/Karolinska%20Policy%20Change%20K2021-3343%20March%202021%20%28English%2C%20unofficial%20translation%29.pdf; Finland's COHERE 2020 policy reform, *Medical treatment methods for dysphoria associated with variations in gender identity in minors –*

181.  The medical research does not show that cross-sex hormones or sex-obscuring surgery decreases the likelihood of suicide. A 2020 study by Bränström and Pachankis, claiming to be the first total population study of 9.7 million Swedish residents, ultimately showed neither "gender-affirming hormone treatment" nor "gender-affirming surgery" improved mental health benchmarks, including suicide rates.[15]

182.  Given this research, the lack of medical consensus about how best to treat gender dysphoria, and the growing international consensus that mandatory affirmation of a patient's perceived gender identity, cross-sex hormones, and "gender transition" procedures cause more harm than good, Ms. Kloosterman's medical judgment is well-founded and well-documented.

### FIRST CAUSE OF ACTION
**Defendants Pai, Booker, Cole, Pierce, and Smith,**
**in Both Their Official and Individual Capacities**
**Violation of the First and Fourteenth Amendments: Free Exercise of Religion**
**42 U.S.C. § 1983**

183.  Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

184.  Ms. Kloosterman brings this cause of action against Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

185.  Government decisionmakers violate the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they express or harbor animus toward religion and when that animus accompanies an official action that burdens religious exercise.

---

*recommendation*, (June 16, 2020), https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en.pdf/aaf9a6e7-b970-9de9-165c-abedfae46f2e/Summary_minors_en.pdf; and the French National Academy of Medicine's press release (Feb. 25, 2022), https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/.

[15] Bränström, R., Pachankis, J.E., *Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study*, AM. J. PSYCHIATRY 2020; 177:727–734, https://doi.org/10.1176/appi.ajp.2019.19010080.

186.    When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise . . . the Court has 'set aside such policies without further inquiry.'" *Kennedy v. Bremerton Sch. Dist*. 142 S. Ct. 2407, 2422 n.1 (2022) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018)).

187.    The unanimous Supreme Court has held that "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

188.    Under the First Amendment, the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rights Comm'n*, 138 S. Ct. 1719, 1731-32 (2018) (commissioner violated Free Exercise Clause when he called cake shop owner's faith "despicable" and "merely rhetorical"; this demonstrated "a clear and impermissible hostility toward [his] sincere religious beliefs").

189.    Defendants violated the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they openly mocked and condemned Ms. Kloosterman's religious beliefs or tacitly approved of or shared their colleagues' animus toward Ms. Kloosterman's religious beliefs.

190.    Defendants expressed and harbored even more unconstitutional religious animus against Ms. Kloosterman than the animus that the Court sharply condemned in *Masterpiece Cakeshop*.

191.    Defendants have expressly stated or adopted views hostile to the religious faith of Ms. Kloosterman and acted pursuant to such hostile views.  These views include Defendant Pierce's statements that Ms. Kloosterman is "evil" because of her religious beliefs, that she is a "liar," that she cannot bring the Bible or her beliefs to work with her, and that she is to blame for gender-dysphoria-related suicides.

192.    The other Defendants did not disavow any of these hostile statements, and on information and belief, they share the anti-religious animus that Defendant Pierce made explicit.

193.     In the termination letter, Defendants also falsely accused Ms. Kloosterman of altering templated pronouns on patients' medical records, *see* Exhibit H, even though she had explained that she was unable to do so because only office staff could make such changes.

194.     This newly fabricated and baseless accusation is further evidence of animus toward Ms. Kloosterman's religious beliefs.

195.     The tarnishing of Ms. Kloosterman's reputation and concealment of the facts surrounding her termination during the August 25, 2021, mandatory staff meeting are further evidence of animus toward Ms. Kloosterman's religious beliefs.

196.     Defendants have unconstitutionally targeted Ms. Kloosterman for disparate treatment because of her religious beliefs.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993).

197.     In accordance with these views, Defendants have targeted Ms. Kloosterman for disparate treatment, including by their refusal to accommodate her religious beliefs and their decision to terminate her because of her religious beliefs, despite having written policies prohibiting religious discrimination.[16]

198.     Defendants' actions reflect animus toward Ms. Kloosterman's religious beliefs.

199.     Defendants' discriminatory treatment has exposed Ms. Kloosterman to substantial consequences for her religious exercise, including the loss of her job, the disruption of her career, lost wages and benefits, and loss of reputation, because of Defendants' hostility and animus toward her religious beliefs.

200.     Defendants targeted Ms. Kloosterman for termination because she requested an accommodation for her religious beliefs.

---

[16] *See, e.g.*, "Non Discrimination Notice," University of Michigan Health-West (2022), https://perma.cc/EH37-ZBCZ ("University of Michigan Health-West complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. UM Health-West does not exclude people or treat them differently because of race, color, national origin, age, disability, sex, sexual orientation, gender identity or religion.").

201.    Defendants also violated the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they granted secular accommodations to other employees regarding common drugs and medical procedures while failing to grant a religious accommodation to Ms. Kloosterman regarding much more rare drugs and medical procedures.

202.    Under the First Amendment, government policies and practices that substantially burden the free exercise of religion are subject to strict scrutiny unless they are neutral and generally applicable. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).

203.    A government policy or practice "is not neutral and generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

204.    A government policy or practice is not neutral and generally applicable when it treats secular conduct more favorably than religious exercise. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (regulations "trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise"); *Kennedy v. Bremerton Sch. Dist.* 142 S. Ct. 2407, 2422 (2022).

205.    Under the Free Exercise Clause, "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).

206.    Defendants have created categorical exemptions and individualized exemptions from their policies and procedures that accommodate other providers' non-religious objections.

207.    Defendants easily accommodate other medical professionals who have non-religious objections to far more common procedures, and these accommodations often shield the objecting professionals from having to make referrals.

208.    For example, a male provider who did not wish to perform female pelvic examinations was not scheduled to see those patients.  Likewise, doctors unwilling to perform toenail removals or prescribe diet pills were not scheduled to see patients requesting those services.  And a provider who refused to prescribe opioids was permitted to tell patients that opioids are clinically unnecessary or that he does not prescribe them, without referring patients to another provider.  Even when patients specifically requested referrals for services that providers thought medically inappropriate, providers could refuse the referral request and instead discuss other treatment options.

209.    Thus, Defendants respect the secular consciences and independent medical judgment of University of Michigan Health-West's other health care providers relating to common drugs and procedures—but not the religious conscience and independent medical judgment of Ms. Kloosterman, which relate to rarely performed procedures and rarely prescribed drugs.

210.    Ms. Kloosterman's sincerely held religious beliefs require her to abstain from using biology-obscuring pronouns, prescribing cross-sex hormones, or referring for "gender reassignment" surgeries.  Her compliance with these beliefs is a religious exercise.

211.    Defendants' policies and practices of accommodating non-religious preferences of other providers while denying religious accommodations to Ms. Kloosterman; of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; and of interfering with the independent medical judgment of its professional medical employees by requiring them to prescribe, recommend, or give referral for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical judgment, are not neutral, and these policies and practices were the moving force of the violation of Ms. Kloosterman's right to the free exercise of religion.

212.    Defendants' policies and practices of accommodating non-religious preferences of other providers while denying religious accommodations to Ms. Kloosterman; of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own

agenda; and of interfering with the independent medical judgment of its professional medical employees by requiring them to prescribe, recommend, or give referral for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical judgment, are not generally applicable, and these policies and practices were the moving force of the violation of Ms. Kloosterman's right to the free exercise of religion.

213.    Under *Fulton* and *Tandon*, Defendants' willingness to accommodate for secular reasons but not religious reasons triggers strict scrutiny.

214.    Defendants' myriad secular exceptions for far more common drugs and procedures undermine any argument that they must deny similar accommodations to Ms. Kloosterman for far more rare drugs and procedures.  As in *Fulton*, "[t]he creation of a system of exceptions under the contract undermine[d] the City's contention that its non-discrimination policies can brook no departures." 141 S. Ct. at 1882.

215.    Defendants' discriminatory treatment and selective accommodation practices create government-imposed coercive pressure on Ms. Kloosterman to change or violate her religious beliefs.

216.    Defendants' discriminatory treatment chills Ms. Kloosterman's religious exercise.

217.    Defendants' discriminatory treatment has exposed Ms. Kloosterman to substantial consequences for her religious exercise, including but not limited to the loss of her job, the disruption of her career, lost wages and benefits, and loss of reputation.

218.    Because of her religion, Defendants denied Ms. Kloosterman an accommodation that they would have afforded for comparable non-religious expression and conduct.

219.    Despite being informed in detail of Ms. Kloosterman's beliefs, Defendants declined to give her accommodations that would allow her to comply both with her beliefs and Michigan Health's policies.

220.    Defendants have no legitimate basis for denying Ms. Kloosterman a religious accommodation.

221.    Defendants have no compelling interest in their violations of Ms. Kloosterman's religious exercise.  Even if there were a compelling government interest, Defendants have not shown that their actions are the least restrictive means of achieving that interest.

222.    Defendants' actions, taken under color of state law, have denied Ms. Kloosterman rights and privileges secured under the U.S. Constitution's First Amendment, as applied to the states through the Fourteenth Amendment.  Because of Defendants' actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of equitable relief.

223.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Kloosterman is entitled to a declaration that Defendants violated her right under the First and Fourteenth Amendments to free exercise of religion, to an order against Defendants directing them to reinstate Ms. Kloosterman, and an injunction prohibiting future such acts by Defendants.  Additionally, Ms. Kloosterman is entitled to the reasonable costs of this lawsuit, including her reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**Defendants Pai, Booker, Cole, Pierce, and Smith,**
**in Both Their Official and Individual Capacities**
**<u>Violation of the First and Fourteenth Amendments: Freedom of Speech</u>**
**<u>42 U.S.C. § 1983</u>**

224.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

225.    Ms. Kloosterman brings this cause of action against Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

226.    Defendants Pai, Booker, Cole, Pierce, and Smith violated the Free Speech Clause of the First Amendment, as incorporated against the states through the Fourteenth Amendment, by compelling Ms. Kloosterman to speak biology-obscuring pronouns.

227.    Government officials may not compel citizens to speak messages that violate their sincerely held religious beliefs. *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or

petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

228.    Government officials may not condition a public benefit on affirming or abjuring a specific set of beliefs or policy statement.  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) ("By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient.").

229.    The government cannot compel individuals to mouth support for views that they find objectionable, because this violates the Free Speech Clause of the First Amendment.  *See Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018).

230.    The Supreme Court reiterated this principle in *National Institute of Family and Life Advocates (NIFLA) v. Becerra*, 138 S. Ct. 2361, 2371 (2018), ruling that the pro-abortion notice requirement imposed on pregnancy resource clinics was an unconstitutional content-based restriction on speech, and concluding that the California law at issue there was "a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression."

231.    A public university may not censor speech that the First Amendment protects. *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1182-84 (6th Cir. 1995); *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) ("What the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed.").

232.    Because the government cannot compel people to support messages that they disagree with or that violate their convictions, requiring the use of preferred pronouns is compelled speech that violates the First Amendment.  And this is no less true with respect to government compulsion of its employees than for government compulsion of other citizens.

233.    In the Sixth Circuit, public universities violate the First Amendment when they coerce their employees to use sex-obscuring pronouns while performing job duties that require freedom of expression.  *See Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) (holding that a public university violated a professor's freedom of speech when it compelled him to speak against his conscience by addressing students with gender-identity-based pronouns).  In that context, the general rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006) does not apply.  *See Meriwether*, 992 F.3d at 505–07.

234.    Instead, the Sixth Circuit heeds the First Amendment's fundamental command that "the government 'may not compel affirmance of a belief with which the speaker disagrees.'" *Meriwether*, 992 F.3d at 503 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)).

235.    Just as the academic enterprise is inconsistent with a speech code for professors, *see Meriwether*, 992 F.3d at 507–12, the practice of medicine is inconsistent with a speech code for medical professionals.

236.    The stakes are much higher in medicine than in the university context.  When universities coerce professors to use sex-obscuring pronouns, the consequences are "ideological conformity" and a loss of the free exchange of ideas.  *Id.* at 506.  But when universities coerce medical professionals to use sex-obscuring pronouns, the consequences can be confusion over a patient's biological sex and missed life-saving screenings such as mammograms, testicular exams, and pregnancy tests, or potentially inappropriate prescriptions, such as medications that are harmful during pregnancy.  Therefore, by conditioning Ms. Kloosterman's employment on the use of biology-obscuring pronouns, University of Michigan Health-West violated her freedom of speech.

237.    Defendants' actions violate Ms. Kloosterman's right to be free from compelled speech as secured to her by the First and Fourteenth Amendments to the U.S. Constitution. Defendants' policies and practices of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; of maintaining a speech code whereby providers

and employees may not use pronouns associated with a patient's biological sex if the patient prefers different pronouns, of requiring employees to use pronouns as preferred by patients; and of maintaining a speech code that allows for heckler's vetoes of medical providers' speech, were the moving force of Defendants' violation of Ms. Kloosterman's right to be free from compelled speech.

238.    Defendants' speech code violates the First Amendment to the U.S. Constitution because it is content and viewpoint based, overbroad, and vague.

239.    Defendants have no compelling interest in their attempt to compel Ms. Kloosterman to speak messages that she disagrees with or else lose her job.  Even if there were a compelling government interest, Defendants have not shown that their actions are the least restrictive means of achieving that interest.

240.    Defendants' actions, taken under color of state law, have denied Ms. Kloosterman rights and privileges secured under the U.S. Constitution's First Amendment as applied to the states through the Fourteenth Amendment.  Because of Defendants' actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of equitable relief.

241.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Kloosterman is entitled to a declaration that Defendants violated her First and Fourteenth Amendment right to be free from being compelled to speak a message with which she disagrees and an injunction prohibiting future such acts by Defendants.  Additionally, Ms. Kloosterman is entitled to an order against Defendants directing them to reinstate Ms. Kloosterman, and to the reasonable costs of this lawsuit, including her reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**
**Defendants Pai, Booker, Cole, Pierce, and Smith,**
**in Both Their Official and Individual Capacities**
**Violation of the Fourteenth Amendment: Equal Protection**
**42 U.S.C. § 1983**

242.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Amended Complaint as if fully set forth herein.

243.    Ms. Kloosterman brings this cause of action against Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

244.    The Fourteenth Amendment to the U.S. Constitution provides, *inter alia*, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV.

245.    The Equal Protection Clause prohibits discrimination on the basis of religion.

246.    Under the Equal Protection Clause, government officials may not treat someone differently as compared to similarly situated persons, when such disparate treatment burdens the exercise of a fundamental right such as the First Amendment's free exercise of religion and freedom of speech.

247.    Defendants violated the Equal Protection Clause by intentionally discriminating against Ms. Kloosterman because of her religion.

248.    Defendants violated the Equal Protection Clause by refusing to accommodate Ms. Kloosterman's religious beliefs while providing numerous accommodations for other employees' non-religious preferences.  Defendants' policies and practices of accommodating non-religious preferences of other providers while denying religious accommodations to Ms. Kloosterman; of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; and of interfering with the independent medical judgment of its professional medical employees by requiring them to prescribe, recommend, or give referral for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical

judgment, were the moving force of Defendants' violation of Ms. Kloosterman's right to enjoy equal protection of the laws.

249.    By treating Ms. Kloosterman differently on the basis of a suspect classification, religion, and by violating her fundamental rights, the Defendants' actions trigger strict scrutiny.

250.    Defendants' actions in discriminating against Ms. Kloosterman were not narrowly tailored to serve a compelling governmental interest, nor did they use the least restrictive means when they refused to grant her an accommodation and terminated her instead.

251.    Defendants' actions, taken under color of state law, have denied Ms. Kloosterman rights and privileges secured under the Fourteenth Amendment to the U.S. Constitution.  Because of Defendants' actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of equitable relief.

252.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Kloosterman is entitled to a declaration that Defendants violated her Fourteenth Amendment right to enjoy the equal protection of the laws and an injunction prohibiting future such acts by Defendants.  Additionally, Ms. Kloosterman is entitled to an order against Defendants directing them to reinstate Ms. Kloosterman, and to the reasonable costs of this lawsuit, including her reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
### Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West
### <u>Violation of Title VII: Religious Discrimination, Disparate Treatment</u>
### <u>42 U.S.C. § 2000e</u>

253.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

254.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West.

255.    University of Michigan Health-West is an employer within the meaning of Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e(b).

256.    Under Title VII, it is an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his

[or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... religion."  42 U.S.C. § 2000e-2(a)(1).

257.    "Religion" is defined as including "all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j).

258.    The Equal Opportunity Employment Commission defines "religious practices" to "include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views."  29 C.F.R. § 1605.1.

259.    "[R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated."  *EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S 768, 774-75 (2015).

260.    University of Michigan Health-West violated Title VII when it terminated Ms. Kloosterman because of her sincerely-held religious beliefs and failed to provide her a reasonable religious accommodation.

261.    Ms. Kloosterman is a devout Christian who holds biblically-based, traditional Christian beliefs that God created humans in His image as male and female, and that male and female are defined by biological difference between the sexes.

262.    Ms. Kloosterman was an outstanding employee, well-qualified for her position and beloved by her patients and coworkers.  No complaints were ever raised about her performance.

263.    University of Michigan Health-West violated Title VII when it terminated Ms. Kloosterman because of her religious beliefs and exercise.

264.    University of Michigan Health-West staff made very clear to Ms. Kloosterman at the HR and DEI meetings that its reason for questioning her and terminating her was her religious beliefs, even going so far as to mock and deride her religious beliefs.

265.    The letter explaining her termination also made this clear, listing three reasons for firing Ms. Kloosterman, all of which directly related to her sincerely held religious beliefs about gender identity and her conscientious objection to assisting in the provision of certain "gender reassignment" drugs and procedures.  Exhibit H.

266.    If not for Ms. Kloosterman's religious beliefs about gender and sexuality, she would not have been fired.  Thus, religion was a but-for cause of her termination.  *Bostock*, 140 S. Ct. at 1739.

267.    If Ms. Kloosterman had not disclosed her religious beliefs about gender and sexuality and requested a religious accommodation, she would not have been fired.  Thus, religion was a but-for cause of her termination.

268.    In the alternative, religion was a motivating factor in Ms. Kloosterman's termination.

269.    University of Michigan Health-West's officials' hostile statements to Ms. Kloosterman constitute direct evidence of discrimination in violation of Title VII.

270.    Title VII demands more than "mere neutrality with regard to religious practices" but requires "favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775.

271.    Employers are affirmatively required to "reasonably accommodate" an employee's religious beliefs, observances, and practices unless the accommodation would pose an "undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

272.    An employee's "sincerely held" religious objection to a workplace policy or job duty qualifies for a religious accommodation.  EEOC Religion Guidance § 12- I-A-2 (citing *United States v. Seeger*, 380 U.S. 163, 184-85 (1965)); EEOC Religion Guidelines, 29 C.F.R. § 1605.2.

273.    The burden is on the employer to "demonstrate" undue hardship based on "objective information," not hypothetical concerns, to show that the burden is more than "de minimis."  EEOC Religion Guidance § 12-IV-B-1.

274.    If an employer grants accommodations for non-religious reasons but not religious reasons, this gives rise to an inference of pretextual religious discrimination.  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71 (1986) ("unpaid leave is not a reasonable accommodation when paid

leave is provided for all purposes *except* religious ones . . . . [because] [s]uch an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness").

275.    Under Title VII, Ms. Kloosterman was entitled to a reasonable religious accommodation.

276.    University of Michigan Health-West violated Title VII when it failed to provide— or even to consider—reasonable accommodations that would respect Ms. Kloosterman's religious beliefs.

277.    University of Michigan Health-West did not grant Ms. Kloosterman the reasonable religious accommodation that she was entitled to by Title VII, but instead denigrated her religious beliefs and then summarily terminated her.

278.    Yet multiple reasonable accommodations could have permitted University of Michigan Health-West to pursue its interests while respecting Ms. Kloosterman's beliefs: permitting the use of patients' names in place of pronouns, which she had previously done without incident, scheduling other providers to see patients when they seek "gender reassignment" drugs or procedures, or posting a written notice to all patients allowing them to obtain referrals for any missed services by calling a phone number for the Wyoming or Ann Arbor hospitals.

279.    As described above, *supra* ¶¶ 135-160, University of Michigan Health-West accommodated the independent medical judgment and secular objections of other providers in Ms. Kloosterman's office but refused to accommodate her independent medical judgment and religious conscience concerning much rarer drugs and procedures.

280.    This practice of granting accommodations for non-religious reasons but not religious reasons constitutes religious discrimination under *Ansonia Board of Education*, 479 U.S. at 71.

281.    Any concerns from University of Michigan Health-West about potential disruptions to patient service were merely hypothetical, and a myriad of potential accommodations existed, as shown by University of Michigan Health-West's ability to accommodate other

employees' secular objections to—and independent medical judgments concerning—far more common drugs and procedures.

282.     University of Michigan Health-West's conduct constitutes discrimination on the basis of religion under 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-2(m).

283.     Because of University of Michigan Health-West's actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm. She is entitled to an award of monetary damages and equitable relief.

284.     Pursuant to 42 U.S.C. § 2000e-5(g), Ms. Kloosterman is entitled to a declaration that University of Michigan Health-West violated her right to be free from religious discrimination under 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-2(m) and an injunction against University of Michigan Health-West to prohibit future such acts. Additionally, pursuant to 42 U.S.C. § 2000e-5(g) and (k), Ms. Kloosterman is entitled to reinstatement, backpay and front pay with interest, value of lost benefits, actual and nominal damages, costs, and attorneys' fees.

285.     University of Michigan Health-West's conduct was intentional, and it acted with malice, oppression, or reckless indifference to the protected rights of Ms. Kloosterman. She is thus entitled to punitive damages in an amount to be determined at trial. 42 U.S.C. § 1981a.

**FIFTH CAUSE OF ACTION**
**Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West**
<u>**Violation of Title VII: Religious Discrimination, Disparate Impact**</u>
<u>**42 U.S.C. § 2000e**</u>

286.     Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

287.     Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West.

288.     University of Michigan Health-West is an employer within the meaning of Title VII. 42 U.S.C. § 2000e(b).

289.    Under Title VII, it is an unlawful employment practice for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion."  42 U.S.C. § 2000e-2(a)(2); *see also* 42 U.S.C. § 2000e-2(k).

290.    University of Michigan Health-West has the following nondiscrimination policy: "University of Michigan Health-West complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex.  UM Health-West does not exclude people or treat them differently because of race, color, national origin, age, disability, sex, sexual orientation, gender identity or religion."[17]

291.    University of Michigan Health-West violated its own policy when it excluded Ms. Kloosterman and treated her differently because of her religion.

292.    University of Michigan Health-West had a policy or practice of disciplining employees for expressing, mentioning, or suggesting that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity.

293.    University of Michigan Health-West maintained a rule against respecting independent medical judgment on "gender reassignment" treatments, which rule disproportionately impacts those with traditional religious beliefs concerning sex and gender.

294.    University of Michigan Health-West's practice of respecting medical judgment on myriad treatment issues but not on "gender reassignment" treatments disparately impacts employees with traditional religious beliefs about the biological differences between the sexes. *See Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); 42 U.S.C. § 2000e-2(k).

295.    University of Michigan Health-West's policy or practice was neither job-related for the position in question nor consistent with business necessity.

---

[17] "Non Discrimination Notice," University of Michigan Health-West (2022), https://perma.cc/EH37-ZBCZ.

296.    Less discriminatory alternatives existed to achieve Defendants' stated business purposes, including but not limited to permitting the use of patients' names in place of pronouns, which Ms. Kloosterman had previously done without incident, scheduling other providers to see patients when they seek "gender reassignment" drugs or procedures, or posting a written notice to all patients allowing them to obtain referrals for any missed services by calling a phone number for the Wyoming or Ann Arbor hospitals.

297.    This policy has a disparate impact on religious employees and Christian employees, including Ms. Kloosterman.

298.    This policy has a disparate impact on employees like Ms. Kloosterman with traditional religious views on sex or gender.

299.    As a direct, legal and proximate result of the discrimination, Ms. Kloosterman has sustained, and will continue to sustain, economic injuries, resulting in damages in an amount to be proven at trial.

300.    Because of University of Michigan Health-West's policies and actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of monetary damages and equitable relief.

301.    Pursuant to 42 U.S.C. § 2000e-5(g), Ms. Kloosterman is entitled to a declaration that University of Michigan Health-West violated her right to be free from religious discrimination under 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-2(k) and an injunction prohibiting future such policies and actions by University of Michigan Health-West.  Additionally, pursuant to 42 U.S.C. § 2000e-5(g) and (k), Ms. Kloosterman is entitled to reinstatement, backpay and front pay with interest, value of lost benefits, actual and nominal damages, costs, and attorneys' fees.

## SIXTH CAUSE OF ACTION
### All Defendants
### <u>Violation of the Michigan Constitution: Free Exercise of Religion</u>

302. Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

303. Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

304. Defendants violated the Michigan Constitution when they compelled Ms. Kloosterman to make referrals for medical procedures that violate her religious conscience.

305. Article I, § 4 of the Michigan Constitution provides that "[e]very person shall be at liberty to worship God according to the dictates of his own conscience." M.C.L.A. Const. Art. I, § 4. This "guarantee of religious freedom" "is at least as protective of religious liberty as the United States Constitution." *Winkler by Winkler v. Marist Fathers of Detroit, Inc.,* 500 Mich. 327, 338 (2017) (quoting *People v. DeJonge (After Remand)*, 442 Mich. 266, 273 n. 9, 501 N.W.2d 127 (1993)).

306. The Michigan Constitution is even more protective than the federal Free Exercise Clause, because Michigan courts subject burdens on religious exercise to the "compelling state interest test developed by the United States Supreme Court in *Wisconsin v. Yoder* and *Sherbert v. Verner*." *McCready v. Hoffius*, 459 Mich. 131, 143–44 (1998), *opinion vacated in part*, 459 Mich. 1235 (1999) (finding Free Exercise right under state and federal law for religious landlord to decline renting to unmarried couples).

307. This test examines whether the party's belief is "sincerely held" and "religious in nature," whether the state has "imposed a burden" on that religious belief or exercise, whether a "compelling state interest justifies the burden," and "whether there is a less obtrusive form of regulation available to the state." *Id.* (citing *Wisconsin v. Yoder*, 406 U.S. 205, 214–30 (1972)).

308.    Here, under the Michigan Supreme Court's compelling-interest test, there is no question that Ms. Kloosterman's beliefs are sincerely held and religious in nature.

309.    Defendants substantially burdened Ms. Kloosterman's religious exercise by denigrating her religion, refusing to provide an accommodation, attempting to coerce her to violate her religious convictions, and ultimately terminating her because of her religious beliefs.

310.    Defendants cannot show a compelling interest in imposing these substantial burdens, and less intrusive solutions abound.

311.    During Ms. Kloosterman's 17 years of employment by University of Michigan Health-West, no patient ever asked her for a referral for "gender reassignment surgery" or other related drugs or procedures.  Nor did any patient ask her to use gender-identity-based pronouns.

312.    Defendants therefore cannot show that it is likely Ms. Kloosterman ever would be placed in a situation calling for such referrals or pronouns.

313.    But even if they could show that such a situation would arise, Defendants could have granted any of several possible accommodations, such as allowing the use of patients' names instead of pronouns, modifying Ms. Kloosterman's schedule for patient visits to obviate the need for any referrals (as University of Michigan Health-West does for employees with secular objections to far more common drugs and procedures), or posting notices that allow patients to call the Wyoming or Ann Arbor hospitals for referrals.

314.    The absence of any past incident and the availability of these accommodations preclude Defendants from justifying their substantial burdens on Ms. Kloosterman's religious exercise.   Thus, Defendants' actions and policies violated Article I, § 4 of the Michigan Constitution.

315.    Punishing Ms. Kloosterman for her religious beliefs is not narrowly tailored to serve a compelling governmental interest, nor did Defendants use the least restrictive means when they refused to grant an accommodation and terminated her instead.

316.    Because of Defendants' actions and policies, Ms. Kloosterman has suffered, and continues to suffer, irreparable harm.  She is entitled to an award of equitable relief.

317.    Ms. Kloosterman is entitled to a declaration that Defendants violated her liberty to worship God under Article I, § 4 of the Michigan Constitution, to an order against Defendants directing them to reinstate Ms. Kloosterman, and to an injunction prohibiting future such actions by Defendants.

### SEVENTH CAUSE OF ACTION
### All Defendants
### Violation of the Michigan Constitution: Freedom of Speech

318.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

319.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker Cole, Pierce, and Smith, in both their individual and official capacities.

320.    Article I, § 5 of the Michigan Constitution provides: "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press." M.C.L.A. Const. Art. I, § 5.

321.    The Michigan Court of Appeals and the Sixth Circuit have held that "[t]he rights of free speech under the Michigan and federal constitutions are coterminous." *In re Contempt of Dudzinsk*i, 667 N.W.2d 68, 72 (Mich. Ct. App. 2003) (citing *Woodland v. Michigan Citizens Lobby*, 378 N.W.2d 337 (Mich. Ct. App. 1985)); *Lucas v. Monroe Cnty.*, 200 F. 3d 964, 972 n.4 (6th Cir. 2000).

322.    For all the reasons detailed above, *supra* ¶¶ 224-241, Defendants violated Article I, § 5 of the Michigan Constitution, by compelling Ms. Kloosterman to speak biology-obscuring pronouns.

323.    Compelling Ms. Kloosterman to speak messages that she disagrees with is not narrowly tailored to serve a compelling governmental interest, nor did Defendants use the least restrictive means when they refused to grant an accommodation and terminated her, instead.

324.    Because of Defendants' actions and policies, Ms. Kloosterman has suffered, and continues to suffer, irreparable harm.  She is entitled to an award of equitable relief.

325.    Ms. Kloosterman is entitled to a declaration that Defendants violated her freedom of speech under Article I, § 5 of the Michigan Constitution, to an order against Defendants directing them to reinstate Ms. Kloosterman, and to an injunction prohibiting future such actions by Defendants.

**EIGHTH CAUSE OF ACTION**
**All Defendants**
**<u>Violation of the Michigan Constitution: Equal Protection</u>**

326.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Amended Complaint as if fully set forth herein.

327.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

328.    Article I, § 2 of the Michigan Constitution provides: "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."  M.C.L.A. Const. Art. I, § 2.

329.    The Michigan Supreme Court has held that "Michigan's equal protection provision is coextensive with the Equal Protection Clause of the United States Constitution."  *Shepherd Montessori Ctre. Milan v. Ann Arbor Charter Twp.*, 783 N.W.2d 695, 698 (Mich. 2010) ("Michigan case law makes it clear that [§ 2] was intended to afford the same rights as the Federal equal protection clause.").

330.    Michigan's equal protection provision also "goes beyond [the federal Equal Protection Clause] and further proclaims that no person is to be discriminated against."  *Smith v. Gibson*, 524 F. Supp. 664, 670 (E.D. Mich. 1981).

331.   The anti-discrimination provision of Article I, § 2 contains no intent requirement. *Berry v. Sch. Dist. of City of Benton Harbor*, 467 F. Supp. 721, 732 (W.D. Mich. 1978) ("If this court were to read an intent requirement into the anti-discrimination clauses of Article I, section 2, and Article VIII, section 2, it would violate basic principles of constitutional interpretation which require that this court give effect to the plain meaning of the words used in the constitutional provision, as these words were understood by the people who adopted the Constitution.").

332.   Defendants violated Article I, § 2, by discriminating against Ms. Kloosterman because of her religion.

333.   In the alternative, Defendants violated Article I, § 2, by enforcing their non-discrimination policies in such a way that disparately impacted religious employees including Ms. Kloosterman.

334.   By treating similarly situated employees disparately on the basis of a suspect classification, religion, the Defendants' actions trigger strict scrutiny.

335.   Defendants' actions in discriminating against Ms. Kloosterman were not narrowly tailored to serve a compelling governmental interest, nor did they use the least restrictive means when they refused to grant an accommodation and terminated her instead.

336.    Because of Defendants' actions and policies, Ms. Kloosterman has suffered, and continues to suffer, irreparable harm.  She is entitled to an award of equitable relief.

337.   Ms. Kloosterman is entitled to a declaration that Defendants violated her right to equal protection under Article I, § 2 of the Michigan Constitution, to an order against Defendants directing them to reinstate Ms. Kloosterman, and to an injunction prohibiting future such actions by Defendants.

### NINTH CAUSE OF ACTION
### Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West
### Violation of the Elliott-Larsen Civil Rights Act of 1974

338.   Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

339.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West.

340.    The Elliott-Larsen Civil Rights Act prohibits employers from "discharg[ing], or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  Mich. Comp. Laws § 37.2202.

341.    Courts find Title VII precedent "highly persuasive when interpreting this statute," finding direct evidence of discrimination or using the *McDonnell Douglas* burden-shifting framework where the evidence is circumstantial.  *Meyer v. City of Center Line*, 619 N.W.2d 182, 188 (2000); *Robinson v. JCIM, LLC*, No. 342487, 2018 WL 6185570, at *5 (Mich. Ct. App. Nov. 27, 2018).

342.    Section 37.2701(a) prohibits employers from retaliating against employees engaged in protected activity such as requesting religious accommodations, and it prohibits employers from "[c]oerc[ing], indimidat[ing], threaten[ing], or interfer[ing] with a person in the exercise or enjoyment of . . . any right granted or protected by this act," including religious rights. Mich. Comp. Laws § 37.2701(a), (f); *see also Meyer*, 619 N.W.2d at 188 (finding retaliation where employee engaged in protected activity known by employer, and employer took adverse action that was causally connected to that protected activity); *Robinson*, 2018 WL 6185570, at *7.

343.    Section 37.2102 defines "[t]he opportunity to obtain employment . . . without discrimination because of religion" as a "civil right."  Mich. Comp. Laws § 37.2102.

344.    Here, University of Michigan Health-West violated Section 37.2202 when it terminated Ms. Kloosterman because of her religious beliefs.  Her termination and the conversations leading up to it constitute direct evidence of discrimination.

345.    University of Michigan Health-West also violated Section 37.2701(a) when it retaliated against Ms. Kloosterman for requesting a religious accommodation after she completed the mandatory training segment on gender identity training.

346.     Because she disclosed her religious beliefs and requested an accommodation, University of Michigan Health-West held hostile meetings and set her termination process in motion.

347.     By depriving Ms. Kloosterman of her employment and future employment opportunities, University of Michigan Health-West violated Section 37.2102, subjecting her to religious discrimination that violated her civil right to access employment and employment opportunities.

348.     Because of University of Michigan Health-West's policies and actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of monetary damages and equitable relief.

349.     Pursuant to Mich. Comp. Laws § 37.2801, Ms. Kloosterman is entitled to a declaration that University of Michigan Health-West violated her right rights under Mich. Comp. Laws §§ 37.2102 and 37.2701, and an injunction prohibiting future such policies and actions by University of Michigan Health-West.  Additionally, pursuant to Mich. Comp. Laws §§ 37.2801, 37.2802, Ms. Kloosterman is entitled to front pay, back pay, restitution, compensatory damages, and reinstatement.  Additionally, Ms. Kloosterman is entitled to the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Kloosterman prays for relief and judgment as follows:

A.     Declare that the acts and practices of all Defendants complained of herein are in violation of Title VII of the Civil Rights Act of 1964, the United States Constitution, the Michigan Constitution, and the Elliott-Larsen Civil Rights Act, as set forth above;

B.     Enjoin and permanently restrain these violations of Title VII, the United States Constitution, the Michigan Constitution, and the Elliott-Larsen Civil Rights Act, to prohibit all Defendants from future violations;

C.     Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in their official and individual capacities, to comply with their legal obligations and fully consider religious accommodation requests from employees, and to eradicate the effects of their past and present unlawful employment practices;

D.     Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in their official and individual capacities, to place Ms. Kloosterman in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment of her.

E.     Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, to place Ms. Kloosterman in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment of her, and award to Ms. Kloosterman all earnings that she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, reinstatement, backpay and front pay with interest, seniority, and other lost benefits, including interest pre-judgment and post-judgment, in amounts to be determined at trial;

F.      Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, to inform its employees of its violation of the law and also inform its employees of their right to request and receive religious accommodations;

G.      Award to Ms. Kloosterman, against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, compensation for past and future pecuniary losses resulting from the unlawful employment practices complained of herein, including relocating expenses and job search expenses, in amounts to be determined at trial;

H.      Award nominal damages to Ms. Kloosterman against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, in recognition of its violations of Ms. Kloosterman's rights;

I.      Award actual and compensatory damages to Ms. Kloosterman against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, for its violations of Ms. Kloosterman's rights;

J.      Award punitive damages to Ms. Kloosterman against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, for its malicious, oppressive, or reckless conduct, in amounts to be determined at trial;

K.      Award Ms. Kloosterman the costs of this action together with reasonable attorneys' fees, against all Defendants, jointly and severally, as provided by 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), Mich. Comp. Laws § 37.802, and any other legal provisions that authorize fees and costs; and

L.      Grant such other and further relief as this Court may deem just and proper in the public interest.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 11th day of October, 2022.

_/s/  James R. Wierenga_

David J. Williams
Michigan Bar # P76932
Bossenbrook Williams PC
1600 Abbot Road, Ste. 200
East Lansing, MI 48823
Tel. (517) 333-5789
david@bossenbrook.com

James R. Wierenga
Michigan Bar # P48946
99 Monroe Ave, NW
Suite 1210
Grand Rapids, MI 49503
Tel. (616) 454-3883
jim@dwlawpc.com

Michael D. Berry *
Michigan Bar # P69206
David J. Hacker *
First Liberty Institute
2001 W. Plano Pkwy. #1600
Plano, TX 75075
Tel. (972) 941-4444
mberry@firstliberty.org
dhacker@firstliberty.org

Jordan E. Pratt
Kayla Toney
First Liberty Institute
227 Pennsylvania Ave. SE
Washington, DC 20003
Tel. (972) 941-4444
jpratt@firstliberty.org
ktoney@firstliberty.org

_Counsel for Plaintiff_

_* Application for W.D. Mich.
Admission forthcoming_