UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| VALERIE KLOOSTERMAN,<br><br>         Plaintiff,<br><br>   v.<br><br>METROPOLITAN HOSPITAL, d/b/a University of Michigan Health-West, d/b/a Metro Health – University of Michigan Health; RAKESH PAI, individually and in his official capacity as President, Medical Group & Chief Population Health Officer at University of Michigan Health-West; RHAE-ANN BOOKER, individually and in her official capacity as Vice President of Diversity, Equity, and Inclusion at University of Michigan Health-West; MARLA COLE, individually and in her official capacity as Director of Human Resources at University of Michigan Health-West; THOMAS PIERCE, individually and in his official capacity as Diversity, Equity & Inclusion Coordinator at University of Michigan Health-West, and CATHERINE SMITH, individually and in her official capacity as a member of the Advanced Practice Providers' Council at University of Michigan Health-West,<br><br>         Defendants. | No. 1:22-CV-944<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY DEMANDED |

COMES NOW Plaintiff Valerie Kloosterman, by and through counsel, and for her first amended complaint against Defendants, hereby states as follows:

## INTRODUCTION

1.      In 2004, Metropolitan Hospital (hereinafter "University of Michigan Health-West") hired Valerie Kloosterman, MPAS, PA-C, as a physician assistant.  For the next 17 years, Ms. Kloosterman—the third generation in her family to work for her local health care system, and

1

a married mother of four, including triplets—received nothing but positive reviews and accolades from her superiors, her colleagues, and her patients.

2.      Throughout all but the final months of Ms. Kloosterman's tenure, the hospital treated her with appreciation and respect, and it did not seek to compel her to violate her religious beliefs or her independent medical judgment.  But that changed in 2021 shortly after Metropolitan Hospital culminated its affiliation with the University of Michigan Health System, rebranded itself University of Michigan Health-West, and then fired Ms. Kloosterman for no reason other than her sincerely held religious beliefs.

3.      Through a mandatory diversity training and hostile discussions that followed it, the newly branded University of Michigan Health-West and its officials attempted to compel Ms. Kloosterman to pledge, against her sincerely held religious convictions and her medical conscience, that she would speak biology-obscuring pronouns and make referrals for "gender transition" drugs and procedures.  Yet during the entire duration of her employment, no patient ever asked her for a referral for such drugs or procedures, and she never used pronouns contrary to a patient's wishes.

4.      This dispute about hypotheticals became all too real when Ms. Kloosterman requested a religious accommodation.  University of Michigan Health-West officials summoned her to a meeting, during which they denigrated her religious beliefs, called her "evil" and a "liar," mockingly told her that she could not take the Bible or her religious beliefs to work with her, and blamed her for gender dysphoria-related suicides.  They fired her on August 24, 2021, without even allowing her to finish her patients' charts for that day, to collect her belongings, or to say farewell to beloved colleagues and patients.

5.      At the same time that University of Michigan Health-West and its officials denied Ms. Kloosterman any form of religious accommodation, they accommodated, for other staff, a vast array of other personal preferences, secular objections, and independent medical judgment.  A male doctor who wished to abstain from performing pelvic exams on female patients was never scheduled to do so, and many providers with personal objections to prescribing controlled

2

substances—opioids—or diet pills were easily accommodated by other providers who filled in for them, such that the objecting providers were not even placed in a situation that might call for a referral. Despite offering others many non-religious accommodations for far more common drugs and procedures—including some that obviated the need for referrals—University of Michigan Health-West and its officials did not consider or provide to Ms. Kloosterman any accommodation for her religious beliefs.

6. University of Michigan Health-West violated Title VII of the Civil Rights Act of 1964 when it denied Ms. Kloosterman a religious accommodation and fired her because of her religious beliefs. The letter explaining her termination listed three reasons for firing Ms. Kloosterman, all of which directly related to her sincerely held religious beliefs about gender identity and to her conscientious objection to assisting in the provision of certain "gender reassignment" drugs and procedures. If not for Ms. Kloosterman's religious beliefs about gender and sexuality, she would not have been fired. The hospital officials' explicit attack on her religious beliefs provides direct evidence that her termination was the result of unlawful religious discrimination.

7. Moreover, during Ms. Kloosterman's employment at University of Michigan Health-West, the 17-year absence of any incident—and the availability of multiple accommodations for others, for secular reasons—foreclose any argument that University of Michigan Health-West could not accommodate Ms. Kloosterman. When it learned of her religious beliefs, and when its pressure on her to betray those beliefs failed, University of Michigan Health-West had no interest in working toward a cooperative, religiously tolerant solution. Instead, it summarily fired her.

8. University of Michigan Health-West and its officials also violated the First and Fourteenth Amendments to the United States Constitution in multiple ways.

9. By exhibiting open hostility toward Ms. Kloosterman's religious beliefs, University of Michigan Health-West officials violated the Free Exercise Clause, as construed by the Supreme

Court in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), and in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022).

10.     By accommodating secular preferences while refusing to grant a religious accommodation to Ms. Kloosterman, University of Michigan Health-West's officials' actions trigger and fail strict scrutiny under the Free Exercise Clause, as construed in the Supreme Court's decisions in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), and *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), and therefore violate the Free Exercise Clause.

11.     By seeking to compel Ms. Kloosterman to speak biology-obscuring pronouns that would violate her conscience and her medical judgment, as doing so could cause patients to miss potentially life-saving screenings, University of Michigan Health-West's officials also violated the Free Speech Clause, as construed by the Sixth Circuit in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

12.     When it engaged in the aforementioned actions and fired Ms. Kloosterman, University of Michigan Health-West's officials also violated the Fourteenth Amendment's Equal Protection Clause, as well as Article I, §§ 2, 4, and 5 of the Michigan Constitution and the Elliott-Larsen Civil Rights Act of 1976, Mich. Comp. Laws § 37.2202.

13.     It was unlawful, unconstitutional, and intolerant of University of Michigan Health-West and its officials to demand that Ms. Kloosterman abandon her religious beliefs and her medical ethics to remain employed.  The Court must hold University of Michigan Health-West and the individual Defendants accountable for their blatant religious discrimination and other violations of Ms. Kloosterman's legal rights, and must make Ms. Kloosterman whole by ordering her reinstatement; payment of her lost wages and benefits; declaratory and injunctive relief; actual, punitive, and nominal damages; and all other applicable remedies, as prayed for below.

## JURISDICTION AND VENUE

14.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

15.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

17.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and costs and attorneys' fees under 42 U.S.C. §§ 1988 and 2000e-5(k).

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims, detailed in this complaint, occurred within the Western District of Michigan, and on information and belief, at least one Defendant resides in the Western District of Michigan, all Defendants reside in the State of Michigan, and all Defendants are subject to this Court's personal jurisdiction.

19.     Suit is timely against University of Michigan Health-West under 42 U.S.C. § 2000e-5(e)(1) because Ms. Kloosterman filed a timely charge of discrimination against University of Michigan Health-West on May 16, 2022, Exhibit A; amended that charge of discrimination on June 17, 2022, Exhibit B; and received on July 14, 2022, from the U.S. Equal Employment Opportunity Commission ("EEOC"), notice of her right to bring this suit, Exhibit C.

## IDENTIFICATION OF PARTIES

20.     Plaintiff Valerie Kloosterman is a Christian female who worked at the University of Michigan Health-West from 2004 until her termination in 2021, with a brief interlude following the birth of her triplets in 2009. Ms. Kloosterman was at all times material to this action a resident of Caledonia, Michigan.

21.     On information and belief, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, is affiliated with, and is a subsidiary of, Michigan Health Corporation

(a/k/a the "University of Michigan Health System," d/b/a "Michigan Medicine"), a nonprofit corporation operated by the University of Michigan Board of Regents with its principal place of business in Ann Arbor, Michigan. University of Michigan Health-West maintains its corporate headquarters at 5900 Byron Center Ave, Wyoming, MI 49519.

22. At all relevant times, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, codified at 42 U.S.C. § 2000e-(b), (g), and (h).

23. At all relevant times, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, has continuously been an employer under Mich. Comp. Laws § 37.2201.

24. At all relevant times, Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, has continuously had more than 500 employees.

25. Defendant Rakesh Pai is the President and the Medical Group & Chief Population Health Officer at University of Michigan Health-West. He is sued in his official and individual capacities. He is domiciled in Michigan.

26. Defendant Rhae-Ann Booker is the Vice President of Diversity, Equity, and Inclusion at University of Michigan Health-West. She is sued in her official and individual capacities. She is domiciled in Michigan.

27. Defendant Marla Cole is the Director of Human Resources at University of Michigan Health-West. She is sued in her official and individual capacities. She is domiciled in Michigan.

28. Defendant Thomas Pierce is the Diversity, Equity & Inclusion Program Coordinator at University of Michigan Health-West. He is sued in his official and individual capacities. He is domiciled in Michigan.

29. Defendant Catherine Smith is a Nurse Practitioner and a member of the Advanced Practice Providers' Council at University of Michigan Health-West. She is sued in her official and individual capacities. She is domiciled in Michigan.

30.    Defendants Rakesh Pai, Rhae-Ann Booker, Marla Cole, Thomas Pierce, and Catherine Smith are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

<div align="center">

**FACTUAL BACKGROUND**

</div>

**<u>Ms. Kloosterman's Sincere Religious Beliefs</u>**

31.    Ms. Kloosterman is a devout Christian and longtime member of a United Reformed Church, which she has attended since her baptism as an infant.  Ms. Kloosterman's church is part of a denomination called the United Reformed Churches in North America.  She is a faithful and involved member of the church, attending regularly with her husband and their four children, as well as her parents and other members of her extended family.

32.    Ms. Kloosterman's vibrant faith informs how she does her work as a medical professional, through her humility, her love for others, and her desire to use the gifts and training that God has given her to help others.  Below is a photograph of Ms. Kloosterman.



33.     According to her coworkers, Ms. Kloosterman's conduct reflects her character and her servant's heart, as she seeks to treat others the way that Jesus would, which is one reason why her patients always loved her.

34.     Ms. Kloosterman and her church believe that the Bible is the inspired Word of God, and they also hold to several confessions that they believe faithfully summarize Biblical teachings: the Belgic Confession of 1561, the Heidelberg Catechism of 1563, and the Canons of Dort of 1618-19.

35.     Ms. Kloosterman believes, consistent with the teachings of the Bible and her church, that all humans are created in God's image and thus deserving of love and respect.

36.     Ms. Kloosterman also believes that God created humans male and female as a unique expression of His image.  These beliefs derive from the Bible, specifically Genesis 1:26-27.

37.     These and other beliefs—shared by Ms. Kloosterman and her church and denomination—are described in a document called Affirmations Regarding Marriage, which reflects beliefs that Christians have held for two millennia.[1]

38.     As a devout Christian, Ms. Kloosterman believes that one's sex is ordained by God, that one should love and care for the body that God gave him or her, and that one should not attempt to erase or to alter his or her sex, especially through drugs or surgical means.

39.     Ms. Kloosterman believes that she must not speak against these truths by using pronouns that contradict a person's biological sex.

40.     Ms. Kloosterman also believes that God has ordained the sexual function for procreation, that children are a gift from God, and that "gender reassignment" drugs and procedures have a permanently sterilizing effect that cannot be justified by the desire to erase or alter one's sex.

---

[1]  *Affirmations Regarding Marriage*, United Reformed Churches in North America (2018), https://www.urcna.org/file_retrieve/63166.

8

41.     As a Christian medical professional, Ms. Kloosterman believes that it would be sinful to assist a patient in procuring sterilizing drugs or surgical procedures designed to erase or alter his or her sex.  This religious objection has nothing to do with the background or identity of the patient, but rather the nature of the drugs and procedures that the patient might request.

**Ms. Kloosterman's Sincere Religious Belief that She Must Honor Her Hippocratic Oath**

42.     Ms. Kloosterman, a Christian medical professional, also has religious beliefs that are intertwined with her medical judgment.

43.     Ms. Kloosterman has taken the Hippocratic oath to "do no harm" to her patients. Her Christian faith compels her both to honor her Hippocratic oath and to be honest and compassionate in her dealings with others.  She therefore believes that it would be dishonest and sinful to violate her conscience and oath by knowingly facilitating a drug or procedure that—in her independent medical judgment—will bring to a patient more harm than benefit.

44.     Indeed, during the duration of Ms. Kloosterman's employment, her employment contract required her to "exercise [her] independent medical judgment consistent with the clinical needs and consent of each patient," and it stated that "the Hospital shall not have the right to direct [her] to take or omit any act which conflicts with such medical judgment in the care of patients." Exhibit D.

45.     Ms. Kloosterman's independent medical judgment is that "puberty blockers," "hormone therapy," and "gender reassignment surgery" are experimental, lack validation in methodologically rigorous long-term studies, and often lead to negative clinical outcomes such as bone density loss, infection, nerve damage, chronic pain, loss of sexual and urinary functions, psychological trauma, and other serious complications.

46.     Ms. Kloosterman's medical judgment also counsels against entering in documentation pronouns that obscure or misrepresent a person's biological sex, as doing so can cause patients to miss potentially life-saving screenings and procedures like pregnancy tests, mammograms, and testicular exams.

47.     Therefore, Ms. Kloosterman believes that it would be dishonest and sinful to violate her conscience and Hippocratic oath by acting against her medical judgment to prescribe or to refer patients for "puberty blockers," "hormone therapy," or "gender reassignment surgery," or by entering in documentation pronouns that obscure or misrepresent a patient's biological sex.  This religious objection has nothing to do with the background or identity of the patient, but rather the nature of the drugs and procedures that the patient might request.

**Ms. Kloosterman's Exemplary Employment Record**

48.     Ms. Kloosterman worked for Metropolitan Hospital ever since her graduation in 2004, long before its 2016 affiliation with the University of Michigan Health System that resulted in University of Michigan Health-West becoming a subsidiary of the University of Michigan Health System (now called "Michigan Medicine"), which in turn is operated by the University of Michigan Board of Regents.[2]

49.     Ms. Kloosterman performed her duties at Metro Health Caledonia, which is an outpatient clinic specializing in Internal, Family, and Pediatric Medicine.

50.     Metro Health Caledonia (now called Caledonia Health Center) is operated by Metropolitan Hospital, d/b/a University of Michigan Health-West, which has its principal place of business as a hospital located about 15 minutes away in Wyoming, Michigan.

51.     Ms. Kloosterman's mother and grandmother both worked in that local health care system for over 40 years, and Ms. Kloosterman worked there for her entire career.  Thus, Ms. Kloosterman is a third-generation healthcare professional serving her local community.

---

[2] *See Upshaw v. SSJ Group, LLC*, No. 1:19-cv-341-PLM-PJG, ECF No. 126, Defendants University of Michigan Board of Regents and University of Michigan Health System's Amended Motion to Dismiss (filed July 31, 2020), at ECF pg. 13, n.1 ("The University of Michigan Health System is operated by the University of Michigan Board of Regents, which itself is a State entity. . . .  For clarity, Metropolitan Hospital . . . is a subsidiary of the Regents, a separate legal entity, governed by an independent board of directors."); *see also* Mary Masson, *U-M Health System, Metro Health Moving Forward with Affiliation*, The University Record (Sept. 15, 2016), https://perma.cc/DPF3-FQBN (describing affiliation agreement between Metropolitan Hospital and the Board of Regents, and quoting the chair of the Board of Regents as stating that "the affiliation 'sends a message that as a health system and a university, we are eager to expand'").

52.     During Ms. Kloosterman's 17-year employment as a physician assistant for Michigan Health, she cared for patients of all ages and backgrounds.  She was especially popular with younger patients, including children.  Some of her pediatric patients were second-generation, because she treated their parents when they were children.

53.     Ms. Kloosterman consistently received exemplary performance reviews and was never once subject to discipline.

54.     In one typical performance review, her supervisor commented: "Valerie goes way beyond the call of duty when dealing with patients, follow up and professional responsibility.  She is *very* ethical [and] responsible and treats all with respect."  Exhibit E (emphasis in original).

55.     Another typical performance review described Ms. Kloosterman as "[a] pleasure to work with[,] excellent knowledge, ethics, respect, communication, and skills."  Exhibit E.

56.     Ms. Kloosterman's reputation among her patients was stellar.  She was widely known to be a very patient, caring provider.  She would spend very generous amounts of time with her patients because she cared about them.

57.     Many patients would specifically request Ms. Kloosterman and were willing to wait for an appointment with her if her schedule was full.  Even many months after she was fired, Ms. Kloosterman's former patients have continued to ask about her and to express how much they miss her.

58.     Ms. Kloosterman also had an excellent reputation among her fellow staff members.  She was known for being thorough, exact, and knowledgeable about her medicine.  And when she was unsure how to handle something, she would ask her supervising physician for guidance.  She also had strong working relationships with everyone on staff at her clinic.

59.     As her excellent performance reviews indicate, Ms. Kloosterman gladly served people of all beliefs and backgrounds and was committed to giving the best possible care to all her patients, including those who identified as lesbian, gay, or experiencing gender dysphoria.

60.     For instance, she provided ongoing care for approximately a dozen patients whom she knew to identify as lesbian.

11

61.     Ms. Kloosterman also treated two patients who may have used preferred pronouns other than those that would correspond to the patients' biological sex.

62.     These patients came to Ms. Kloosterman for a potential brain tumor and a respiratory issue, and she cared for both of them to the best of her ability.

63.     Neither patient requested a different provider or otherwise expressed dissatisfaction with the excellent care that Ms. Kloosterman provided.

64.     For both patients, in both her medical notes and in the examination room, Ms. Kloosterman used the patient's name (without pronouns) without any disruption to the patient's care.  She also conducted at least one follow-up phone call and one follow-up visit with one of the patients, while the other did not need a follow--up visit.

65.     In medical charts, Ms. Kloosterman never changed or edited the pre-filled sex or gender field, nor did she ever have the ability to change that information as any such change could only be done by administrative office staff, not medical providers.

66.     Ms. Kloosterman never used pronouns that went against a patient's wishes.

67.     Moreover, during the entire duration of her employment, no patient ever asked her for a referral to another provider for "gender reassignment" drugs or procedures.

68.     Throughout Ms. Kloosterman's employment, she never discussed with any patient her views—religious or otherwise—on human gender or sexuality.

**University of Michigan Health-West Targets Ms. Kloosterman for Her Religious Beliefs**

69.     In 2016, twelve years after Ms. Kloosterman began working at her local clinic, Metropolitan Hospital began the process of affiliating with the University of Michigan Health System.

70.     The affiliation was a gradual process, culminating in the name change to its current name—University of Michigan Health-West—in June 2021.  Since the affiliation, both the hospital and the outpatient clinic where Ms. Kloosterman worked have been a subsidiary of the

University of Michigan Board of Regents, which operates Michigan Medicine (formerly the University of Michigan Health System).[3]

71.     On information and belief, the University of Michigan Board of Regents, by virtue of the affiliation agreement or otherwise, has the authority to direct or to require the creation and implementation of policies at University of Michigan Health-West, and has exercised that authority.  On information and belief, the University of Michigan Board of Regents, by virtue of the affiliation agreement or otherwise, has the authority to direct or to require the creation and implementation of the University of Michigan Health-West policies at issue in this case— including any diversity, equity, and inclusion policies—and has in fact exercised that authority. On information and belief, University of Michigan Health-West holds itself out to the public as a state entity by its affiliation with the University of Michigan Board of Regents, by its status as a subsidiary of the University of Michigan Board of Regents, by its use of the "University of Michigan" name, and by other means.

72.     The University of Michigan Board of Regents is a state actor under Michigan law.

73.     In 2018, University of Michigan Health-West required Ms. Kloosterman to do a training segment on serving LGBTQ+ patients.  Ms. Kloosterman had no religious objection to this, as she was not required to affirm any statement during the training, which was merely for education purposes.

74.     Between May and June 2021, University of Michigan Health-West required Ms. Kloosterman to complete another mandatory training module.  This time, the module contained a requirement to affirm statements concerning sexual orientation and gender identity that her Christian faith prohibited her from affirming.

---

[3] *See Upshaw v. SSJ Group, LLC*, No. 1:19-cv-341-PLM-PJG, ECF No. 126, Defendants University of Michigan Board of Regents and University of Michigan Health System's Amended Motion to Dismiss (filed July 31, 2020), at ECF pg. 13, n.1 ("The University of Michigan Health System is operated by the University of Michigan Board of Regents, which itself is a State entity. . . .  For clarity, Metropolitan Hospital . . . is a subsidiary of the Regents, a separate legal entity, governed by an independent board of directors.").

75.     Ms. Kloosterman could not complete the training unless she checked boxes that affirmed the statements and essentially pledged her agreement with University of Michigan Health-West's express and implied positions on gender, sex, and sexual orientation.  There was no option within the training for her to explain her position or to request a religious accommodation. The training was due on June 30, 2021, and if Ms. Kloosterman did not complete the training module by July 15, 2021, she would be terminated.

76.     Ms. Kloosterman consulted with Defendant Smith, who was in a liaison role connecting the providers with HR, her supervising physician, and her office manager, and she prayed about the matter for three weeks.

77.     Both Defendant Smith and Ms. Kloosterman's supervising physician told her to do what she felt was right in her heart.

78.     Amy DeGood, the office manager for the Caledonia clinic, told Ms. Kloosterman to talk with University of Michigan Health-West representatives from the Department of Diversity, Equity, and Inclusion (DEI).

79.     In mid-June, Ms. Kloosterman contacted Defendant Dr. Rhae-Ann Booker, the vice president of the DEI Department, and requested a meeting. But Defendant Booker was not available to meet until July 1, after the training was due, so Ms. Kloosterman decided to complete the training module and to explain her position to University of Michigan Health-West separately.

80.      Ms. Kloosterman arranged a meeting with Defendant Booker to inform University of Michigan Health-West that her faith precluded her from agreeing with the statements.

81.     Ms. Kloosterman's faith compelled her to seek a reasonable accommodation for her religious beliefs.

82.     On or about July l, 2021, Ms. Kloosterman met with Defendant Booker to request a religious accommodation and explained why her faith precluded her from affirming the statements in the training module.

83.     When Defendant Booker indicated her assumption that Ms. Kloosterman was "uncomfortable" seeing gay and lesbian patients, Ms. Kloosterman corrected her and explained

14

that she had seen several LGBTQ patients during her 17 years of employment and that she would gladly continue seeing these patients.  Defendant Booker indicated that she would speak with HR.

84.     On or about July 29, 2021, Ms. Kloosterman met with University of Michigan Health-West representatives from both the HR and DEI Departments: Defendant Marla Cole, HR Director; Defendant Thomas Pierce, DEI Program Director; and Defendant Catherine Smith, a member of the Advanced Practice Providers' Council.

85.     Defendant Smith is a Nurse Practitioner whose role was to serve as a liaison for Ms. Kloosterman when interacting with Human Resources.

86.     Although Ms. Kloosterman had previously met Defendant Smith, who had shadowed in her clinic as a student, Ms. Kloosterman had never previously met Defendant Cole or Defendant Pierce.

87.      These attendees indicated that Amy DeGood also attended the meeting by listening over the phone.

88.     This meeting, which lasted over an hour, focused on whether Ms. Kloosterman would use gender identity-based pronouns and be willing to refer patients for "gender reassignment surgery."

89.     When Ms. Kloosterman respectfully indicated that she could not do so because of her religious beliefs and because of her independent medical judgment, but that she would use patients' names in place of pronouns to respect their wishes, Defendant Pierce grew hostile, visibly angry with tight fists and a flushed demeanor, and attacked Ms. Kloosterman's religious beliefs.

90.     Among other things, Defendant Pierce told Ms. Kloosterman that she could not take the Bible or her religious beliefs to work with her, either literally or figuratively; and that she was abusing her power as a health care provider to manipulate patients.  Defendant Pierce also rhetorically asked if Ms. Kloosterman knew "what would happen if we let every provider" take their religious beliefs to work, suggesting that religious beliefs do not belong in the workplace.

91.     Ms. Kloosterman respectfully explained that she never sought power over a patient but merely served as part of each patient's care team with his or her best interests in mind.

15

Defendant Pierce interrupted her and called her "evil" for not giving patients exactly what they wanted because of her religious beliefs.

92.     Ms. Kloosterman respectfully explained that medical providers have multiple ways of treating most conditions and are not necessarily obligated to give patients everything they asked for, such as antibiotics for viral infections, opioids, or surgery for non-chronic back pain, if doing so went against the providers' medical judgment.

93.     During the meeting, Ms. Kloosterman respectfully explained some of the reasons behind her medical conscience objection to facilitating "gender reassignment surgeries."

94.     When Ms. Kloosterman respectfully explained that she had treated patients who were gay and lesbian for several years without any complaints, Defendant Pierce called her a "liar" and said if he came to Ms. Kloosterman as a patient and she used his name rather than his preferred pronoun, he would never come back to see her.

95.     Defendant Pierce also asked Ms. Kloosterman whether she knew that by using a patient's name instead of his or her preferred pronouns, she would cause him or her to commit suicide.  When he said that this assertion was well-documented, Ms. Kloosterman cited some scientific studies that showed otherwise.

96.     In a hostile tone, Defendant Pierce—who, on information and belief, has no formal medical training or education and is not licensed to practice medicine—told Ms. Kloosterman that he had studies that would disprove her studies.

97.     When the representatives asked Ms. Kloosterman what she would do about pronouns on patient charts, she explained that pronouns are not always given for charting and if there were any pre-formulated pronouns, she could use the patient's first name, as she had done in the past without any complaints or disruption to patient service.  Ms. Kloosterman also explained that other providers would not become aware of her beliefs when reading her charts.  In other words, Ms. Kloosterman was not seeking to impose her beliefs on, or to proselytize, anyone.

98.     Ms. Kloosterman also explained that she did not even have the ability to change a patient's sex or gender on his or her chart because only administrative office staff had that ability, rather than medical providers.

99.     After an hour, Defendant Pierce left the meeting.  Defendant Cole then said that the discussion with Defendant Pierce had been intense and that everyone should take a breath.  Ms. Kloosterman indicated that she would be glad to continue the conversation, if it would be helpful.

100.    Despite Defendant Smith's role as Advanced Providers' Practice Liaison to help Ms. Kloosterman during interactions with Human Resources, Defendant Smith did nothing to support Ms. Kloosterman or to contradict the hostile statements by Defendant Pierce.

**University of Michigan Health-West Fires Ms. Kloosterman Because of Her Religious Beliefs**

101.    After the July 29 meeting, Ms. Kloosterman heard nothing further until August 23, when a meeting for August 24 appeared on her calendar, with the meeting scheduled for a time when she would normally be seeing patients.  The meeting was at University of Michigan Health-West Hospital with Defendants Cole and Smith, not at the clinic where Ms. Kloosterman worked, and the subject line merely said: "touch base."

102.    Ms. Kloosterman left a voicemail with Defendant Cole and an instant message with Defendant Smith inquiring about the purpose of the meeting, but those communications went unanswered.  Ms. Kloosterman also asked Ms. DeGood about this meeting, and Ms. DeGood said that she did not know what the meeting was about.

103.    Ms. Kloosterman called HR and asked if she needed to reschedule her appointments with patients so that she could make it to the meeting.  Hearing no response, she finished her appointments with patients and left her charts undone to finish afterward.

104.    Ms. Kloosterman had no prior notice that she would be terminated at this meeting.

105.    That day, on August 24, 2021, when Ms. Kloosterman walked into the meeting room at the hospital, Defendant Cole was present, and there was an envelope on the table that contained Ms. Kloosterman's termination notice, which indicated an effective termination date of November 22, 2021.  Exhibit F. The notice was signed by Defendant Pai, and it did not disavow

the statements that Defendant Pierce made in attacking Ms. Kloosterman's religious beliefs at the July 29 meeting.

106. Defendant Smith entered the room and said that, because Ms. Kloosterman refused to use preferred pronouns and because she refused to refer for "gender reassignment surgeries," she no longer worked at University of Michigan Health-West.

107. Ms. Kloosterman responded: "If this is about my Christian beliefs, I cannot abandon them. But I will always treat patients appropriately."

108. Defendant Smith responded by saying that despite the fact that Ms. Kloosterman had a "work around" for preferred pronouns, it had been decided that "today" was her last day, that she no longer worked at University of Michigan Health-West, and that she was not allowed on its property. They told her to give them her badge and that her patient charts would be completed for her. Ms. Kloosterman mentioned that she had promised some patients she would call them to follow up with test results from that day's appointments, and she was told only, "You no longer work for University of Michigan."

109. Ms. Kloosterman was not allowed to return to the clinic where she had worked for 17 years. Defendants Cole and Smith told her that Ms. DeGood would call her when her personal items were boxed up.

110. It is the policy and practice of University of Michigan Health-West to not accommodate, and to silence, employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda. On information and belief, Defendant Pai is the final decisionmaker with regard to the policy and practice, and he implements and enforces it through his own personnel actions and through the personnel actions of his subordinates; Defendants Booker and Cole created this policy and practice, and they implement and enforce it through their personnel actions; and Defendants Pierce and Smith implement and enforce this policy and practice through their recommendations on personnel actions.

111. University of Michigan Health-West maintains a speech code whereby medical providers and employees may not use pronouns associated with a patient's biological sex if the

patient prefers different pronouns.  On information and belief, Defendant Pai is the final decisionmaker with regard to the speech code, and he implements and enforces it through his own personnel actions and through the personnel actions of his subordinates; Defendants Booker and Cole created the speech code, and they implement and enforce it through their personnel actions; and Defendants Pierce and Smith implement and enforce the speech code through their recommendations on personnel actions.

112.   University of Michigan Health-West maintains a speech code that allows for heckler's vetoes of the speech of medical providers.  On information and belief, Defendant Pai is the final decisionmaker with regard to the speech code, and he implements and enforces it through his own personnel actions and through the personnel actions of his subordinates; Defendants Booker and Cole created the speech code, and they implement and enforce it through their personnel actions; and Defendants Pierce and Smith implement and enforce the speech code through their recommendations on personnel actions.

113.   It is the policy and practice of University of Michigan Health-West to require employees to use pronouns as preferred by patients, regardless of whether they correspond with biological sex.  On information and belief, Defendant Pai is the final decisionmaker with regard to the policy and practice, and he implements and enforces it through his own personnel actions and through the personnel actions of his subordinates; Defendants Booker and Cole created this policy and practice, and they implement and enforce it through their personnel actions; and Defendants Pierce and Smith implement and enforce this policy and practice through their recommendations on personnel actions.

114.   It is the policy and practice of University of Michigan Health-West to interfere with the independent medical judgment of its professional medical employees by requiring them to prescribe, to recommend, or to give referrals for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical judgment.  On information and belief, Defendant Pai is the final decisionmaker with regard to the policy and practice, and he

19

implements and enforces it through his own personnel actions and through the personnel actions of his subordinates; Defendants Booker and Cole created this policy and practice, and they implement and enforce it through their personnel actions; and Defendants Pierce and Smith implement and enforce this policy and practice through their recommendations on personnel actions.

115.    The evening of August 24, 2021, after Ms. Kloosterman was fired, Ms. DeGood sent a group text to eight of the providers at her clinic, calling for a mandatory meeting the next morning.

116.    Nurse Practitioner Julie Stinton noticed that one provider was missing, so she texted Ms. Kloosterman, who called her in tears telling her about the termination.

117.    Nurse Practitioner Stinton immediately texted Ms. DeGood to ask why she had left Ms. Kloosterman off the chain, but Ms. DeGood did not give a straight answer.

118.    The 7:00 a.m. mandatory meeting on August 25 was conducted over WebEx with three University of Michigan Health-West administrators—Defendant Rakesh "Raki" Pai, Defendant Marla Cole, and a female staff member from the DEI office—who had never previously met Ms. Kloosterman's coworkers.

119.    Defendant Smith was also on the August 25 call.  All she said was that "Valerie no longer works for the University of Michigan."  Then she asked if there were any questions.

120.    Nurse Practitioner Stinton asked Defendant Pai, the one who had made the ultimate decision to fire Ms. Kloosterman and signed the termination letter, if he had made any effort to find out what Ms. Kloosterman was like before he fired her, if he had ever met her, or even if he knew what she looked like.

121.    Defendant Pai responded that, no, he had never met Ms. Kloosterman.  He said: "She had a clear violation, but I cannot tell you what that violation was."

122.    A DEI staff member spoke up and said that Ms. Kloosterman violated something in her contract, but none of the administrators would say what the violation was.

123.    Dr. Michael Kogut and Nurse Practitioner Stinton were the only staff who asked questions at this meeting. Defendant Cole, Defendant Pai, Defendant Smith, and the other DEI staff member refused to give any meaningful information or to directly answer their questions.

124.    Defendants attempted to damage—and in fact damaged—Ms. Kloosterman's reputation by communicating to her former coworkers that Ms. Kloosterman had done something so egregious as to justify her termination, by refusing to elaborate on what that was, and by concealing the truth about what had prompted her termination.

125.    Ms. Kloosterman's former coworkers were upset enough about her termination that an additional staff meeting in person was held. This meeting did not satisfy the concerns or answer the questions that Ms. Kloosterman's former coworkers had about why such a beloved provider had been suddenly fired.

126.    The week after Ms. Kloosterman was fired, Ms. DeGood sent an email to her coworkers, expressing: "[T]his is a huge loss to our team.  [Valerie] was/is an amazing provider. She will be missed tremendously."

127.    Ms. DeGood also expressed: "I can not disclose many of the details surrounding this decision," and "I know Valerie is very saddened by the fact that she can not say goodbye to all of you."  The complete email is attached as Exhibit G.

128.    On September 3, 2021, ten days after Ms. Kloosterman was fired, she received a letter memorializing the reasons for her termination, which was signed by Defendant Smith on University of Michigan Health letterhead.  Defendant Smith listed her unwillingness to refer "gender transitioning" patients for certain drugs and procedures, her unwillingness to use pronouns that do not correspond to a patient's biological sex, and a newly fabricated and baseless allegation that Ms. Kloosterman had altered medical records to change patients' templated pronouns (a false charge that Ms. Kloosterman continues to deny).  Exhibit H.

129.    While Defendant Smith had signed the September 3, 2021 letter, on information and belief, all Defendants conferred about and contributed to the letter, including its newly fabricated and baseless allegation that Ms. Kloosterman had altered patients' medical records.

21

130.   Like the termination notice, the September 3, 2021 letter did not disavow the statements that Defendant Pierce made in attacking Ms. Kloosterman's religious beliefs at the July 29 meeting.

131.   Ms. Kloosterman has never received any communication from any of the Defendants disavowing Defendant Pierce's July 29 statements attacking her religious beliefs.  On information and belief, in making the decision to terminate Ms. Kloosterman, all Defendants shared the same anti-religious motives that Defendant Pierce made explicit during the July 29 meeting.

**Each Defendant's Role in Ms. Kloosterman's Termination and the Hospital's Policies**

132.   On information and belief, as president of University of Michigan Health-West, Defendant Pai is the final decision-maker and policy-maker for its policies—including the unlawful policies at issue in this case—and he implements and enforces those policies through his own personnel actions and through the personnel actions of his subordinates.  Defendant Pai signed Ms. Kloosterman's termination notice and thus bears final responsibility for the unlawful termination.  On information and belief, in signing the termination notice and enforcing the hospital's unlawful policies against Ms. Kloosterman, Defendant Pai was aware of Ms. Kloosterman's religious beliefs and acted with the motive to discriminate against her because of them.  Because Defendant Pai had never met Ms. Kloosterman, her termination was set into motion and determined by the other Defendants before Defendant Pai ratified it, as described below.

133.   On information and belief, as heads of the hospital's DEI and HR departments, respectively, Defendants Booker and Cole together created—and are responsible for implementing and enforcing—the unlawful policies at issue in this case.  On information and belief, Defendants Booker and Cole required the training that prompted Ms. Kloosterman's religious accommodation request, they convened the July 29 and August 24 meetings, and they made the decision not to grant the request and to terminate Ms. Kloosterman's employment.  Their termination decision was then ratified by Defendant Pai.  On information and belief, they undertook these actions

22

against Ms. Kloosterman with the motive to discriminate against Ms. Kloosterman's religious beliefs.

134.   Defendant Booker made her discriminatory motive explicit when she falsely accused Ms. Kloosterman of wishing not to treat LGBTQ patients, thereby equating with discrimination Ms. Kloosterman's sincerely held religious beliefs about the immutable, biological nature of sex and against facilitating sex-obscuring drugs and procedures.

135.   At the July 29 meeting, Defendants Cole, Pierce, and Smith directly pressured Ms. Kloosterman to comply with the hospital's unlawful policies and to abandon her religious convictions.

136.   On information and belief, as evidenced by his participation in the July 29 meeting, Defendant Pierce has authority to implement and enforce the unlawful policies at issue.

137.   On information and belief, together with Defendant Smith, Defendant Pierce set Ms. Kloosterman's termination into motion by recommending to Defendants Cole and Booker that Ms. Kloosterman's accommodation request be denied and that her employment be terminated.  As described above, at the July 29 meeting, Defendant Pierce openly mocked and derided Ms. Kloosterman's sincerely held religious beliefs and intensely pressured her to abandon them and comply with the hospital's unlawful policies.  In his actions against Ms. Kloosterman, Defendant Pierce acted with the manifest motive to discriminate against Ms. Kloosterman's religious beliefs.

138.   On information and belief, together with Defendant Pierce, Defendant Smith set Ms. Kloosterman's termination into motion by recommending to Defendants Cole and Booker that Ms. Kloosterman's accommodation request be denied and that her employment be terminated.  On information and belief, at all relevant times, Ms. Smith failed to advocate for Ms. Kloosterman as she would have for other employees requesting secular accommodations for comparable procedures, and she treated Ms. Kloosterman unfavorably because of Ms. Kloosterman's religious beliefs.  On information and belief, at all relevant times, Defendant Smith acted with the motive to discriminate against Ms. Kloosterman's religious beliefs.  Defendant Smith's discriminatory motive was evidenced by her signature on the September 3 letter, which made clear that Ms.

Kloosterman's religious beliefs were the reason for her termination, and which baselessly and falsely accused Ms. Kloosterman of altering patient records.

139.   On information and belief, in recommending the denial of, in denying, and in ratifying the denial of Ms. Kloosterman's religious accommodation request, and in recommending the termination of, in terminating, and in ratifying the termination of Ms. Kloosterman's employment, Defendants Pai, Booker, Cole, Pierce, and Smith treated her less favorably than they would treat employees who request secular accommodations to comparable drugs and procedures. On information and belief, Defendants Pai, Booker, and Cole have granted such secular accommodation requests, and Defendants Pierce and Smith have recommended that such secular accommodation requests be granted, without any negative consequences to the providers who requested the accommodations.

140.   On information and belief, at all relevant times, Defendants Pai, Booker, Cole, and Smith acted with the same anti-religious animus that Defendant Pierce made explicit during the July 29, 2021, meeting.

141.   On information and belief, Defendants Pai, Booker, and Cole have the authority to reinstate Ms. Kloosterman, to rescind the unlawful policies at issue, to ensure that the hospital's policies are not enforced or implemented in a discriminatory manner against religious employees, and to grant employees' religious accommodation requests.

### University of Michigan Health-West's Ability and Willingness to Accommodate Common Non-Religious Preferences

142.   In contrast to University of Michigan Health-West's complete refusal to consider any sort of religious accommodation for Ms. Kloosterman, University of Michigan Health-West and the clinic where Ms. Kloosterman worked have long accommodated non-religious personal and medical objections to performing or referring for certain procedures and to prescribing or referring for certain medications—without any negative consequences for the objecting provider.  These accommodations were easily accomplished given the clinic's patient

intake and scheduling process, which ensures that staff know ahead of time the reason for a patient's visit and can schedule an appropriate staff member to see the patient.

143.     Many providers at the Metro Health Caledonia clinic had personal or medical objections to performing certain procedures, such as hemorrhoid removals; and these objections were accommodated without any issues.  They would simply delegate conducting any such procedure to another provider who was willing to perform that procedure, and the patients never experienced any interruption in care.

144.     None of the providers at the clinic are willing to perform toenail removals. The office staff directs patients with toenail-removal needs directly to a podiatrist.  No patient has ever complained about this practice.

145.     As another example, Dr. Michael Kogut is a male doctor who does not perform female pelvic exams, breast exams, or prescribe hormones.  On information and belief, Dr. Kogut's objection is personal, not based on religious beliefs.

146.     In the six years that Dr. Kogut has worked at the clinic, he has not had to do these exams.  The office staff knows about his objection and will often schedule female patients to meet with him for their physical but then to meet with a female provider for their pelvic and/or breast exam.  No patients have ever complained about this arrangement.

147.     Many providers at the clinic have medical objections to prescribing certain stimulant diet pills.  Only two providers are willing to prescribe them.

148.     If a patient expresses interest in this type of treatment for weight loss, he or she is told to schedule an appointment with Nurse Practitioner Stinton, who explains the benefits and drawbacks of diet pills.

149.     The providers who are not willing to prescribe diet pills have never had to prescribe them.  And a patient who seeks diet pills never even knows if there was a schedule or provider change, let alone the reason for the change.   The office staff merely switches the patient's appointment to be with Nurse Practitioner Stinton instead of with the providers who object to prescribing diet pills.

150. For all the examples listed above, the clinic's practice of accommodating providers' non-religious objections, by scheduling patients with other providers, meant that the objecting provider would not be asked to give a referral.

151. Had it been willing to consider Ms. Kloosterman's accommodation request, University of Michigan Health-West easily could have made an accommodation without disruption to the clinic's operations.

152. Given the clinic's patient intake and scheduling procedures—in which office staff learned the reason for patient visits before patients spoke to a provider, and in which office staff were able to choose which provider would initially meet with each patient—had the issue ever arisen, University of Michigan Health-West easily could have accommodated Ms. Kloosterman by not scheduling her for any patient visit that related to "puberty blockers," "hormone therapy," or "gender reassignment surgery."  Nurse Practitioner Stinton and Ms. Kloosterman's other coworkers would happily have stood in for Ms. Kloosterman during the extraordinarily rare instances when such an accommodation might have become necessary.

153. University of Michigan Health-West also easily could have accommodated Ms. Kloosterman by posting a notice that welcomes patients who missed any requested services to call the Wyoming or Ann Arbor hospitals for assistance.

154. And given that Ms. Kloosterman's practice of using patients' names rather than biology-obscuring pronouns had been successful and had not caused any disruption to patient care or changed any other provider's views concerning the patient, University of Michigan Health-West easily could have permitted Ms. Kloosterman to continue that practice.

155. University of Michigan Health-West's supervisory practices for employees like Ms. Kloosterman provide further evidence that it easily could have accommodated her.

156. Because Ms. Kloosterman's title was Physician Assistant, and because she was not a supervising physician, there were certain tasks that were considered outside her range of expertise.

26

157.    Physician assistants at the clinic had specific responsibilities, but they possessed only as much authority as their supervising physicians felt comfortable giving to them.

158.    For example, Advanced Practice Providers such as Ms. Kloosterman were either not allowed to prescribe controlled substances or could prescribe them only with a supervisor's approval.

159.    University of Michigan Health-West could easily have accommodated Ms. Kloosterman's religious beliefs by allowing her supervising physician to meet with any patients who wished to receive referrals for "gender reassignment" drugs or procedures.

160.    While Ms. Kloosterman cared for many patients regularly over the course of her career and had many patients specifically request to see her, she was not formally listed as anyone's "primary care provider" because of her status as a physician assistant. Thus, every patient she saw also had a primary care provider that he or she could have easily seen to discuss "gender reassignment" drugs or procedures.

161.    The other providers at the Metro Health Caledonia clinic would also often exercise their medical judgment to say no to requests that patients may have, when the providers believed that such requests were medically inappropriate or not in the patient's best interest.

162.    For example, many patients would ask for narcotics, and the providers would send them to a pain clinic instead.  But if they refused to go and came back asking for medication refills, the provider would sometimes say no because he or she was concerned that the patient was becoming dependent on highly addictive medications.

163.    If a patient asked for psychiatric medication refills but was not willing to follow up with a psychiatrist for the care that he or she needed, that was another situation where a provider might exercise his or her medical judgment to say no to the patient's request.

164.    If a patient asked for a referral to a surgeon when the provider thought that surgery was not necessary, the provider would make very clear that he or she did not think a referral was medically appropriate.  It would be the provider's decision whether to make the referral at that point.

165.   Referrals are much more than just checking a box.  They require thoughtful consideration and are an exercise of the provider's independent medical judgment in agreeing that the referral is necessary and appropriate.

166.   At the time Ms. Kloosterman was working at the clinic, only administrative office staff had the ability to change the sex or gender templated fields on patients' medical records. Medical providers, including Ms. Kloosterman, did not have that ability.  Since Ms. Kloosterman was fired, however, the policy has changed so that medical providers are able to make those changes.

167.   In any event, in the rare instances when its pronoun policy might have had application to Ms. Kloosterman's duties, University of Michigan Health-West easily could have accommodated her by allowing her to use patients' names instead of biology-obscuring pronouns, as she had done in the past without any incident or patient complaint.

**Ms. Kloosterman's Religious Beliefs Are Shared by Thousands of Medical Professionals**

168.   Thousands of religious healthcare professionals share Ms. Kloosterman's views, which are grounded in both her religious faith and her medical judgment.

169.   Ms. Kloosterman is a member of the Christian Medical and Dental Associations ("CMDA"), which is an organization of over 19,000 Christian healthcare professionals.

170.   CMDA's position statement on transgender identification is attached as Exhibit I.

171.   CMDA believes that "healthcare professionals should not be forced to violate their conscientious commitment to their patients' health and welfare by being required to accept and participate in harmful gender-transition interventions, especially on the young and vulnerable." *Id.*

172.   "CMDA affirms the obligation of Christian healthcare professionals caring for patients struggling with gender identity to do so with sensitivity and compassion, consistent with the humility and love that Jesus modeled and commanded us to show all people."  *Id.*

173.    "CMDA holds that attempts to radically reconstruct one's body surgically or hormonally for psychological indications, however, are medically, ethically, and psychologically inappropriate.  These measures alter healthy tissue and increasingly are not supported by scientific research evaluating behavioral, medical, and surgical outcomes."  *Id.*

174.    CMDA members, including Ms. Kloosterman, are protected by a federal court's permanent injunction that has been affirmed on appeal.  The order permanently enjoins the U.S. Department of Health and Human Services and its agents, officers, employees, and others "from interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), or any implementing regulations thereto against Plaintiffs, their current and future members, and those acting in concert or participation with them . . . in a manner that would require them to perform or provide insurance coverage for [gender-transition] procedures . . ., including by denying Federal financial assistance because of their failure to perform or provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions."  *Franciscan Alliance, Inc., et al. v. Becerra*, 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021), *aff'd*, 47 F.4th 368 (5th Cir. 2022).

**Ms. Kloosterman's Medical Judgment Is Supported by Scientific Research**

175.    Given her beliefs regarding human sexuality, Ms. Kloosterman believes that it would be sinful to prescribe or give referrals for "puberty blockers," "hormone therapy," or "gender reassignment surgery," regardless of what medical benefit those drugs and procedures might bring.  She believes likewise with respect to the use of biology-obscuring pronouns.

176.    However, as explained above, Ms. Kloosterman also believes that it would be dishonest and sinful to violate her conscience and Hippocratic oath by knowingly facilitating a drug or procedure that—in her independent medical judgment—will bring to a patient more harm than benefit, and by using biology-obscuring pronouns that place patients at risk of missing important, sex-specific screenings.  That others might reach a different conclusion on these matters does not relieve Ms. Kloosterman of her religious duty to honor her conscience, her oath, and her

29

duty to compassionately care for her patients by honestly following her studied and independent medical judgment.

177.   Ms. Kloosterman's studied and independent medical judgment is that referring patients for "puberty blockers," "hormone therapy," or "gender reassignment surgery" would cause more harm than benefit.  Her medical judgment counsels the same conclusion with respect to using pronouns that obscure or misrepresent a patient's biological sex.

178.   Ms. Kloosterman's medical judgments find support in relevant scientific literature.

179.   A growing body of scientific literature documents the significance of biological sex for effective medical treatment.  According to the Endocrine Society in 2021, "[d]iseases that affect both sexes often have different frequencies, presentations, and responses to treatments in males and females; therefore, different preventative, diagnostic, and treatment approaches may be required for males and females."[4]

180.   For this reason, Ms. Kloosterman is concerned that using biology-obscuring pronouns could cause patients to miss health-supporting or even life-saving screenings such as mammograms, pregnancy tests, prostate exams, and exams for sexually-transmitted diseases that differ based on biological sex. Using biology-obscuring pronouns could also result in potentially inappropriate prescriptions, such as medications that are harmful during pregnancy.

181.   International studies make clear that the overwhelming majority of patients with gender dysphoria are also suffering from underlying mental health issues, adverse childhood events, neuro-developmental problems, and family issues.  This is especially prevalent in adolescents.  A 2018 parental survey found that 62.5% of gender dysphoric adolescents had "a

---

[4] Aditi Bhargava, Arthur P Arnold, Debra A Bangasser, Kate M Denton, Arpana Gupta, Lucinda M Hilliard Krause, Emeran A Mayer, Margaret McCarthy, Walter L Miller, Armin Raznahan, Ragini Verma, *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement*, ENDOCRINE REVIEWS, Vol. 42, No. 3 (June 2021), pp. 219–258, https://doi.org/10.1210/endrev/bnaa034.

psychiatric disorder or neurodevelopmental disability (before) the onset of gender dysphoria," and 48.4% had experienced a traumatic or stressful prior event.[5]

182.    Medical literature reports that prematurely affirming a patient's perceived gender identity is unhelpful and can cause harm to sexual minority patients.  According to the American Psychiatric Association and multiple scientific studies, for minors with gender dysphoria, an average of 85% of the cases resolve by adulthood—unless the perceived gender identity is affirmed and puberty blockers, cross-sex hormones, or other interventions are done.[6]

183.    According to the *APA Handbook on Sexuality and Psychology*: "Premature labeling of gender identity should be avoided." "This approach runs the risk of neglecting individual problems the child might be experiencing. . . ." "An adolescent's gender identity concerns must not become a reason for failure to address all her/his other relevant problems in the usual way."[7]

184.    Cross-sex hormones have numerous known risks.  Estrogen use in male biology strongly increases the risks of blood clots, heart attacks, strokes, breast cancer, insulin resistance, and more.[8]

---

[5] Littman, L. *Rapid-onset gender dysphoria in adolescents and young adults: A study of parental reports*, PLOS ONE (Aug. 16, 2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330.

[6] *Diagnostic and statistical manual of mental disorders*, AMERICAN PSYCHIATRIC ASSOCIATION (2013) (5th ed.), p. 455 (rates of persistence translate to rates of desistance in natal males of 70 to 97.8% and natal females of 50 to 88%.); Singh, D., Bradley, S.J., and Zucker, K.J., *A Follow-Up Study of Boys With Gender Identity Disorder*, FRONT. PSYCHIATRY 12:632784, https://www.frontiersin.org/articles/10.3389/fpsyt.2021.632784/full (87.8% desistance noted in the "largest sample to date of boys clinic-referred for gender dysphoria"); Cohen-Kettenis, P.Y., et al. *The treatment of adolescent transsexuals: changing insights,* J. SEX MED. (Aug. 2008); 5(8):1892-7. doi: 10.1111/j.1743-6109.2008.00870 (80-95% of gender dysphoric pre-pubertal children desist by the end of adolescence); Ristori, J., Steensma, T.D., *Gender dysphoria in childhood*, INT REV PSYCHIATRY (2016) ;28(1):13-20 (finding a desistance rate of 61-98% of GD cases by adulthood.).

[7] W. Bockting, *Ch. 24: Transgender Identity Development*, in AMERICAN PSYCHOLOGICAL ASSOCIATION HANDBOOK ON SEXUALITY AND PSYCHOLOGY, p. 750 (D. Tolman & L. Diamond eds., 2014).

[8] Getahun, D., Nash, R., Flanders, W.D., et al., *Cross-sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, ANN INTERN MED (2018); 169(4): 205-13, doi: 10.7326/M17-2785.

185.    Testosterone use in female biology strongly increases the risks of heart attacks, strokes, breast and uterine cancer, hypertension, severe acne, and more.[9]

186.    "Gender transitioning" healthcare has not been proven safe, effective, or of more benefit than harm.  This was emphasized in the 2020 UK High Court *Bell v Tavistock* case,[10]  the UK's Cass Interim Report of 2022,[11] and the UK's 2020 National Institute for Health and Care Excellence reviews of puberty blockers and cross-sex hormones."[12]

187.    In 2022, the UK's National Health Service abruptly closed the world's largest pediatric gender clinic, due to findings in the *Bell v. Tavistock* case that minors were facing lasting harm from cross-sex hormones and gender-transition surgeries that did not help their underlying mental health challenges.[13]

188.    Sweden, Finland, and France have all made recent dramatic changes to their gender dysphoria treatment models, emphasizing mental health treatment rather than hormones and, in many cases, banning sex-altering procedures for minors.[14]

---

[9] Susan R Davis, et al, *Global Consensus Position Statement on the Use of Testosterone Therapy for Women*, THE JOURNAL OF CLINICAL ENDOCRINOLOGY & METABOLISM, Vol. 104, No. 10, (Oct. 2019), pp. 4660–4666, https://doi.org/10.1210/jc.2019-01603.

[9] *Id.*

[10] *Bell v. Tavistock*, https://www.judiciary.uk/wp-content/uploads/2020/12/Bell-v-Tavistock-Judgment.pdf.

[11] *The Cass Review, Independent review of gender identity services for children and young people: Interim report* (Feb. 2022), https://cass.independent-review.uk/publications/interim-report/.

[12] *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria* (Oct. 2020),        https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_Gender-affirming-hormones_For-upload_Final.pdf.

[13] Jasmine Andersson & Andre Rhoden-Paul, "NHS to close Tavistock child gender identity clinic," BBC NEWS (July 28, 2022), https://www.bbc.com/news/uk-62335665.

[14] *See, e.g., Gender dysphoria in children and adolescents: an inventory of the literature*, SWEDISH AGENCY FOR HEALTH TECHNOLOGY ASSESSMENT AND ASSESSMENT OF SOCIAL SERVICES (Dec. 20, 2019), https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/; *Policy Change Regarding Hormonal Treatment of Minors with Gender Dysphoria at Tema Barn – Astrid Lindgren        Children's        Hospital        (March        2021),* https://segm.org/sites/default/files/Karolinska%20Policy%20Change%20K2021-3343%20March%202021%20%28English%2C%20unofficial%20translation%29.pdf; Finland's COHERE 2020 policy reform, *Medical treatment methods for dysphoria associated with variations in gender identity in minors –*

189.    The medical research does not show that cross-sex hormones or sex-obscuring surgery decreases the likelihood of suicide.  A 2020 study by Bränström and Pachankis, claiming to be the first total population study of 9.7 million Swedish residents, ultimately showed neither "gender-affirming hormone treatment" nor "gender-affirming surgery" improved mental health benchmarks, including suicide rates.[15]

190.    Given this research, the lack of medical consensus about how best to treat gender dysphoria, and the growing international consensus that mandatory affirmation of a patient's perceived gender identity, cross-sex hormones, and "gender transition" procedures cause more harm than good, Ms. Kloosterman's medical judgment is well-founded and well-documented.

### FIRST CAUSE OF ACTION
**Defendants Pai, Booker, Cole, Pierce, and Smith,
in Both Their Official and Individual Capacities
<u>Violation of the First and Fourteenth Amendments: Free Exercise of Religion
42 U.S.C. § 1983</u>**

191.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

192.    Ms. Kloosterman brings this cause of action against Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

193.    Government decisionmakers violate the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they express or harbor animus toward religion and when that animus accompanies an official action that burdens religious exercise.

---

*recommendation*, (June 16, 2020), https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en.pdf/aaf9a6e7-b970-9de9-165c-abedfae46f2e/Summary_minors_en.pdf; and the French National Academy of Medicine's press release (Feb. 25, 2022), https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/.

[15] Bränström, R., Pachankis, J.E., *Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study*, Am. J. Psychiatry 2020; 177:727–734, https://doi.org/10.1176/appi.ajp.2019.19010080.

194.   When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise . . . the Court has 'set aside such policies without further inquiry.'" *Kennedy v. Bremerton Sch. Dist*. 142 S. Ct. 2407, 2422 n.1 (2022) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018)).

195.   The unanimous Supreme Court has held that "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

196.   Under the First Amendment, the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rights Comm'n*, 138 S. Ct. 1719, 1731-32 (2018) (commissioner violated Free Exercise Clause when he called cake shop owner's faith "despicable" and "merely rhetorical"; this demonstrated "a clear and impermissible hostility toward [his] sincere religious beliefs").

197.   Defendants violated the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they openly mocked and condemned Ms. Kloosterman's religious beliefs or tacitly approved of or shared their colleagues' animus toward Ms. Kloosterman's religious beliefs while participating in the decision to terminate Ms. Kloosterman's employment.

198.   As set forth above, Defendants Pierce and Smith set Ms. Kloosterman's accommodation denial and termination into motion by recommending to Defendants Cole and Booker that Ms. Kloosterman's accommodation request be denied and that her employment be terminated; Defendants Booker and Cole made the decision to deny Ms. Kloosterman's accommodation request and terminate her employment; and Defendant Pai ratified the decision that Defendants Booker and Cole made.  In taking each of these actions against Ms. Kloosterman, each Defendant discriminated against Ms. Kloosterman because of her sincerely held religious beliefs.  Therefore, each Defendant violated the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment.

199.    Defendants expressed and harbored even more unconstitutional religious animus against Ms. Kloosterman than the animus that the Court sharply condemned in *Masterpiece Cakeshop*.

200.    Defendants have expressly stated or adopted views hostile to the religious faith of Ms. Kloosterman and acted pursuant to such hostile views.  These views include Defendant Pierce's statements that Ms. Kloosterman is "evil" because of her religious beliefs, that she is a "liar," that she cannot bring the Bible or her beliefs to work with her, and that she is to blame for gender-dysphoria-related suicides.  They also include Defendant Booker's suggestion that Ms. Kloosterman's sincerely held religious beliefs equate with discrimination.

201.    The other Defendants did not disavow any of these hostile statements, and on information and belief, they share the anti-religious animus that Defendant Pierce made explicit.

202.    In the termination letter, Defendants also falsely accused Ms. Kloosterman of altering templated pronouns on patients' medical records, *see* Exhibit H, even though she had explained that she was unable to do so because only office staff could make such changes.

203.    This newly fabricated and baseless accusation is further evidence of animus toward Ms. Kloosterman's religious beliefs.

204.    The tarnishing of Ms. Kloosterman's reputation and concealment of the facts surrounding her termination during the August 25, 2021, mandatory staff meeting are further evidence of animus toward Ms. Kloosterman's religious beliefs.

205.    Defendants have unconstitutionally targeted Ms. Kloosterman for disparate treatment because of her religious beliefs.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993).

206.    Defendants have targeted Ms. Kloosterman for disparate treatment, including by their refusal to accommodate her religious beliefs and their decision to terminate her because of her religious beliefs, despite having written policies prohibiting religious discrimination.[16]

207.    Defendants' actions reflect animus toward Ms. Kloosterman's religious beliefs.

208.    Defendants' discriminatory treatment has exposed Ms. Kloosterman to substantial consequences for her religious exercise, including the loss of her job, the disruption of her career, lost wages and benefits, and loss of reputation, because of Defendants' hostility and animus toward her religious beliefs.

209.    Defendants targeted Ms. Kloosterman for termination because she requested an accommodation for her religious beliefs.

210.    Defendants also violated the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they recommended and granted secular accommodations to other employees regarding common drugs and medical procedures while failing to grant a religious accommodation to Ms. Kloosterman regarding much more rare drugs and medical procedures.

211.    As set forth above, in recommending the denial of, in denying, and in ratifying the denial of Ms. Kloosterman's religious accommodation request, and in recommending the termination of, in terminating, and in ratifying the termination of Ms. Kloosterman's employment, Defendants Pai, Booker, Cole, Pierce, and Smith treated her less favorably than they would treat employees who request secular accommodations for comparable drugs and procedures.  As set forth above, Defendants Pai, Booker, and Cole have granted such secular accommodation requests, and Defendants Pierce and Smith have recommended that such secular accommodation requests

---

[16] *See, e.g.*, "Non Discrimination Notice," University of Michigan Health-West (2022), https://perma.cc/EH37-ZBCZ ("University of Michigan Health-West complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. UM Health-West does not exclude people or treat them differently because of race, color, national origin, age, disability, sex, sexual orientation, gender identity or religion.").

be granted, without any negative consequences to the providers who requested the accommodations.

212. Under the First Amendment, government policies and practices that substantially burden the free exercise of religion are subject to strict scrutiny unless they are neutral and generally applicable. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).

213. A government policy or practice "is not neutral and generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

214. A government policy or practice is not neutral and generally applicable when it treats secular conduct more favorably than religious exercise. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (regulations "trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise"); *Kennedy v. Bremerton Sch. Dist*. 142 S. Ct. 2407, 2422 (2022).

215. Under the Free Exercise Clause, "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).

216. Defendants have created categorical exemptions and individualized exemptions from their policies and procedures that accommodate other providers' non-religious objections.

217. Defendants easily accommodate other medical professionals who have non-religious objections to far more common procedures, and these accommodations often shield the objecting professionals from having to make referrals.

218. For example, a male provider who did not wish to perform female pelvic examinations was not scheduled to see those patients. Likewise, doctors unwilling to perform toenail removals or prescribe diet pills were not scheduled to see patients requesting those services. And a provider who refused to prescribe opioids was permitted to tell patients that opioids are

clinically unnecessary or that he does not prescribe them, without referring patients to another provider.  Even when patients specifically requested referrals for services that providers thought medically inappropriate, providers could refuse the referral request and instead discuss other treatment options.

219.    Thus, Defendants respect the secular consciences and independent medical judgment of University of Michigan Health-West's other health care providers relating to common drugs and procedures—but not the religious conscience and independent medical judgment of Ms. Kloosterman, which relate to rarely performed procedures and rarely prescribed drugs.

220.    Ms. Kloosterman's sincerely held religious beliefs require her to abstain from using biology-obscuring pronouns, prescribing cross-sex hormones, or referring for "gender reassignment" surgeries.  Her compliance with these beliefs is a religious exercise.

221.    Defendants' policies and practices of accommodating non-religious preferences of other providers while denying religious accommodations to Ms. Kloosterman; of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; and of interfering with the independent medical judgment of its professional medical employees by requiring them to prescribe, recommend, or give referral for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical judgment, are not neutral, and these policies and practices were the moving force of the violation of Ms. Kloosterman's right to the free exercise of religion.

222.    Defendants' policies and practices of accommodating non-religious preferences of other providers while denying religious accommodations to Ms. Kloosterman; of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; and of interfering with the independent medical judgment of its professional medical employees by requiring them to prescribe, recommend, or give referral for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical

judgment, are not generally applicable, and these policies and practices were the moving force of the violation of Ms. Kloosterman's right to the free exercise of religion.

223.    Under *Fulton* and *Tandon*, Defendants' willingness to accommodate for secular reasons but not religious reasons triggers strict scrutiny.

224.    Defendants' myriad secular exceptions for far more common drugs and procedures undermine any argument that they must deny similar accommodations to Ms. Kloosterman for far more rare drugs and procedures.  As in *Fulton*, "[t]he creation of a system of exceptions under the contract undermine[d] the City's contention that its non-discrimination policies can brook no departures."  141 S. Ct. at 1882.

225.    Defendants' discriminatory treatment and selective accommodation practices create government-imposed coercive pressure on Ms. Kloosterman to change or violate her religious beliefs.

226.    Defendants' discriminatory treatment chills Ms. Kloosterman's religious exercise.

227.    Defendants' discriminatory treatment has exposed Ms. Kloosterman to substantial consequences for her religious exercise, including but not limited to the loss of her job, the disruption of her career, lost wages and benefits, and loss of reputation.

228.    Because of her religion, Defendants denied Ms. Kloosterman an accommodation that they would have afforded for comparable non-religious expression and conduct.

229.    Despite being informed in detail of Ms. Kloosterman's beliefs, Defendants declined to give her accommodations that would allow her to comply both with her beliefs and Michigan Health's policies.

230.    Defendants have no legitimate basis for denying Ms. Kloosterman a religious accommodation.

231.    Defendants have no compelling interest in their violations of Ms. Kloosterman's religious exercise.  Even if there were a compelling government interest, Defendants have not shown that their actions are the least restrictive means of achieving that interest.

232.     Defendants' actions, taken under color of state law, have denied Ms. Kloosterman rights and privileges secured under the U.S. Constitution's First Amendment, as applied to the states through the Fourteenth Amendment.  Because of Defendants' actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of equitable relief.

233.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Kloosterman is entitled to a declaration that Defendants violated her right under the First and Fourteenth Amendments to free exercise of religion, to an order against Defendants directing them to reinstate Ms. Kloosterman, and an injunction prohibiting future such acts by Defendants.  Additionally, Ms. Kloosterman is entitled to nominal damages in recognition of Defendants' violation of her right to free exercise of religion, and to the reasonable costs of this lawsuit, including her reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**Defendants Pai, Booker, Cole, Pierce, and Smith,**
**in Both Their Official and Individual Capacities**
**Violation of the First and Fourteenth Amendments: Freedom of Speech**
**42 U.S.C. § 1983**

234.     Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

235.     Ms. Kloosterman brings this cause of action against Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

236.     Defendants Pai, Booker, Cole, Pierce, and Smith violated the Free Speech Clause of the First Amendment, as incorporated against the states through the Fourteenth Amendment, by compelling Ms. Kloosterman to speak biology-obscuring pronouns.

237.     Defendants Booker and Cole compelled Ms. Kloosterman to speak biology-obscuring pronouns by denying Ms. Kloosterman's religious accommodation request and by making her failure to speak such pronouns a basis for their decision to terminate Ms. Kloosterman's employment.   Defendant Pai compelled Ms. Kloosterman to speak biology-obscuring pronouns by ratifying the accommodation denial and termination decision of Defendants

40

Booker and Cole.  Defendant Pierce compelled Ms. Kloosterman to speak biology-obscuring pronouns by threatening and berating her for not using such pronouns at the July 29 meeting, and by recommending to Defendants Booker and Cole the denial of Ms. Kloosterman's accommodation request and the termination of her employment.  Defendant Smith compelled Ms. Kloosterman to speak biology-obscuring pronouns by recommending to Defendants Booker and Cole the denial of Ms. Kloosterman's accommodation request and the termination of her employment.

238.   Government officials may not compel citizens to speak messages that violate their sincerely held religious beliefs.  *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

239.   Government officials may not condition a public benefit on affirming or abjuring a specific set of beliefs or policy statement.  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) ("By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient.").

240.   The government cannot compel individuals to mouth support for views that they find objectionable, because this violates the Free Speech Clause of the First Amendment.  *See Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018).

241.   The Supreme Court reiterated this principle in *National Institute of Family and Life Advocates (NIFLA) v. Becerra*, 138 S. Ct. 2361, 2371 (2018), ruling that the pro-abortion notice requirement imposed on pregnancy resource clinics was an unconstitutional content-based restriction on speech, and concluding that the California law at issue there was "a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression."

242.   A public university may not censor speech that the First Amendment protects. *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1182-84 (6th Cir. 1995); *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) ("What the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed.").

243.   Because the government cannot compel people to support messages that they disagree with or that violate their convictions, requiring the use of preferred pronouns is compelled speech that violates the First Amendment.  And this is no less true with respect to government compulsion of its employees than for government compulsion of other citizens.

244.   In the Sixth Circuit, public universities violate the First Amendment when they coerce their employees to use sex-obscuring pronouns while performing job duties that require freedom of expression.  *See Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) (holding that a public university violated a professor's freedom of speech when it compelled him to speak against his conscience by addressing students with gender-identity-based pronouns).  In that context, the general rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006) does not apply.  *See Meriwether*, 992 F.3d at 505–07.

245.   Instead, the Sixth Circuit heeds the First Amendment's fundamental command that "the government 'may not compel affirmance of a belief with which the speaker disagrees.'" *Meriwether*, 992 F.3d at 503 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)).

246.   Just as the academic enterprise is inconsistent with a speech code for professors, *see Meriwether*, 992 F.3d at 507–12, the practice of medicine is inconsistent with a speech code for medical professionals.

247.   The stakes are much higher in medicine than in the university context.  When universities coerce professors to use sex-obscuring pronouns, the consequences are "ideological conformity" and a loss of the free exchange of ideas.  *Id.* at 506.  But when universities coerce medical professionals to use sex-obscuring pronouns, the consequences can be confusion over a

patient's biological sex and missed life-saving screenings such as mammograms, testicular exams, and pregnancy tests, or potentially inappropriate prescriptions, such as medications that are harmful during pregnancy.  Therefore, by conditioning Ms. Kloosterman's employment on the use of biology-obscuring pronouns, Defendants Pai, Booker, Cole, Pierce, and Smith violated her freedom of speech.

248.    Defendants' actions violate Ms. Kloosterman's right to be free from compelled speech as secured to her by the First and Fourteenth Amendments to the U.S. Constitution. Defendants' policies and practices of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; of maintaining a speech code whereby providers and employees may not use pronouns associated with a patient's biological sex if the patient prefers different pronouns; of requiring employees to use pronouns as preferred by patients; and of maintaining a speech code that allows for heckler's vetoes of medical providers' speech, were the moving force of Defendants' violation of Ms. Kloosterman's right to be free from compelled speech.

249.    Defendants' speech code violates the First Amendment to the U.S. Constitution because it is content and viewpoint based, overbroad, and vague.

250.    Defendants have no compelling interest in their attempt to compel Ms. Kloosterman to speak messages that she disagrees with or else lose her job.  Even if there were a compelling government interest, Defendants have not shown that their actions are the least restrictive means of achieving that interest.

251.    Defendants' actions, taken under color of state law, have denied Ms. Kloosterman rights and privileges secured under the U.S. Constitution's First Amendment as applied to the states through the Fourteenth Amendment.  Because of Defendants' actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of equitable relief.

252.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Kloosterman is entitled to a declaration that Defendants violated her First and Fourteenth Amendment right to be free from

being compelled to speak a message with which she disagrees and an injunction prohibiting future such acts by Defendants.  Additionally, Ms. Kloosterman is entitled to an order against Defendants directing them to reinstate Ms. Kloosterman, to nominal damages in recognition of Defendants' violation of her right to be free from being compelled to speak a message with which she disagrees, and to the reasonable costs of this lawsuit, including her reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
### Defendants Pai, Booker, Cole, Pierce, and Smith,
### in Both Their Official and Individual Capacities
### <u>Violation of the Fourteenth Amendment: Equal Protection</u>
### <u>42 U.S.C. § 1983</u>

253.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Amended Complaint as if fully set forth herein.

254.    Ms. Kloosterman brings this cause of action against Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

255.    The Fourteenth Amendment to the U.S. Constitution provides, *inter alia*, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV.

256.    The Equal Protection Clause prohibits discrimination on the basis of religion.

257.    Under the Equal Protection Clause, government officials may not treat someone differently as compared to similarly situated persons, when such disparate treatment burdens the exercise of a fundamental right such as the First Amendment's free exercise of religion and freedom of speech.

258.    Defendants violated the Equal Protection Clause by intentionally discriminating against Ms. Kloosterman because of her religion.

259.    As set forth above, Defendants Pierce and Smith set Ms. Kloosterman's accommodation denial and termination into motion by recommending to Defendants Cole and Booker that Ms. Kloosterman's accommodation request be denied and that her employment be

terminated; Defendants Booker and Cole made the decision to deny Ms. Kloosterman's accommodation request and terminate her employment; and Defendant Pai ratified the decision that Defendants Booker and Cole made.  In taking each of these actions against Ms. Kloosterman, each Defendant discriminated against Ms. Kloosterman because of her sincerely held religious beliefs.  Therefore, each Defendant violated the Equal Protection Clause of the Fourteenth Amendment.

260.  Defendants also violated the Equal Protection Clause by refusing to accommodate Ms. Kloosterman's religious beliefs while providing numerous accommodations for other employees' non-religious preferences.  As set forth above, in recommending the denial of, in denying, and in ratifying the denial of Ms. Kloosterman's religious accommodation request, and in recommending the termination of, in terminating, and in ratifying the termination of Ms. Kloosterman's employment, Defendants Pai, Booker, Cole, Pierce, and Smith treated her less favorably than they would treat employees who request secular accommodations to comparable drugs and procedures.  As set forth above, Defendants Pai, Booker, and Cole have granted such secular accommodation requests, and Defendants Pierce and Smith have recommended that such secular accommodation requests be granted, without any negative consequences to the providers who requested the accommodations. Therefore, each Defendant violated the Equal Protection Clause of the Fourteenth Amendment.

261.  Defendants' policies and practices of accommodating non-religious preferences of other providers while denying religious accommodations to Ms. Kloosterman; of silencing employees who hold religious beliefs about gender and sexuality that are contrary to its own agenda; and of interfering with the independent medical judgment of its professional medical employees by requiring them to prescribe, recommend, or give referral for "gender transition" drugs and procedures based on University of Michigan Health-West's view of gender and sexuality rather than the best interest of the patient as determined by the provider's independent medical judgment, were the moving force of Defendants' violation of Ms. Kloosterman's right to enjoy equal protection of the laws.

262.    By treating Ms. Kloosterman differently on the basis of a suspect classification, religion, and by violating her fundamental rights, the Defendants' actions trigger strict scrutiny.

263.    Defendants' actions in discriminating against Ms. Kloosterman were not narrowly tailored to serve a compelling governmental interest, nor did they use the least restrictive means when they refused to grant her an accommodation and terminated her instead.

264.    Defendants' actions, taken under color of state law, have denied Ms. Kloosterman rights and privileges secured under the Fourteenth Amendment to the U.S. Constitution.  Because of Defendants' actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of equitable relief.

265.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Kloosterman is entitled to a declaration that Defendants violated her Fourteenth Amendment right to enjoy the equal protection of the laws and an injunction prohibiting future such acts by Defendants.  Additionally, Ms. Kloosterman is entitled to an order against Defendants directing them to reinstate Ms. Kloosterman, to nominal damages in recognition of Defendants' violation of her right to enjoy the equal protection of the laws, and to the reasonable costs of this lawsuit, including her reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
### Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West
### Violation of Title VII: Religious Discrimination, Disparate Treatment
### 42 U.S.C. § 2000e

266.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

267.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West.

268.    University of Michigan Health-West is an employer within the meaning of Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e(b).

269.    Under Title VII, it is an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his

[or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... religion."  42 U.S.C. § 2000e-2(a)(1).

270.    "Religion" is defined as including "all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j).

271.    The Equal Opportunity Employment Commission defines "religious practices" to "include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views."  29 C.F.R. § 1605.1.

272.    "[R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated."  *EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S 768, 774-75 (2015).

273.    University of Michigan Health-West violated Title VII when it terminated Ms. Kloosterman because of her sincerely-held religious beliefs and failed to provide her a reasonable religious accommodation.

274.    Ms. Kloosterman is a devout Christian who holds biblically-based, traditional Christian beliefs that God created humans in His image as male and female, and that male and female are defined by biological difference between the sexes.

275.    Ms. Kloosterman was an outstanding employee, well-qualified for her position and beloved by her patients and coworkers.  No complaints were ever raised about her performance.

276.    University of Michigan Health-West violated Title VII when it terminated Ms. Kloosterman because of her religious beliefs and exercise.

277.    University of Michigan Health-West staff made very clear to Ms. Kloosterman at the HR and DEI meetings that its reason for questioning her and terminating her was her religious beliefs, even going so far as to mock and deride her religious beliefs.

278.    The letter explaining her termination also made this clear, listing three reasons for firing Ms. Kloosterman, all of which directly related to her sincerely held religious beliefs about gender identity and her conscientious objection to assisting in the provision of certain "gender reassignment" drugs and procedures.  Exhibit H.

279.    If not for Ms. Kloosterman's religious beliefs about gender and sexuality, she would not have been fired.  Thus, religion was a but-for cause of her termination.  *Bostock*, 140 S. Ct. at 1739.

280.    If Ms. Kloosterman had not disclosed her religious beliefs about gender and sexuality and requested a religious accommodation, she would not have been fired.  Thus, religion was a but-for cause of her termination.

281.    In the alternative, religion was a motivating factor in Ms. Kloosterman's termination.

282.    University of Michigan Health-West's officials' hostile statements to Ms. Kloosterman constitute direct evidence of discrimination in violation of Title VII.

283.    Title VII demands more than "mere neutrality with regard to religious practices" but requires "favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775.

284.    Employers are affirmatively required to "reasonably accommodate" an employee's religious beliefs, observances, and practices unless the accommodation would pose an "undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

285.    An employee's "sincerely held" religious objection to a workplace policy or job duty qualifies for a religious accommodation.  EEOC Religion Guidance § 12- I-A-2 (citing *United States v. Seeger*, 380 U.S. 163, 184-85 (1965)); EEOC Religion Guidelines, 29 C.F.R. § 1605.2.

286.    The burden is on the employer to "demonstrate" undue hardship based on "objective information," not hypothetical concerns, to show that the burden is more than "de minimis."  EEOC Religion Guidance § 12-IV-B-1.

287.    If an employer grants accommodations for non-religious reasons but not religious reasons, this gives rise to an inference of pretextual religious discrimination.  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71 (1986) ("unpaid leave is not a reasonable accommodation when paid

leave is provided for all purposes *except* religious ones . . . . [because] [s]uch an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness").

288.    Under Title VII, Ms. Kloosterman was entitled to a reasonable religious accommodation.

289.    University of Michigan Health-West violated Title VII when it failed to provide—or even to consider—reasonable accommodations that would respect Ms. Kloosterman's religious beliefs.

290.    University of Michigan Health-West did not grant Ms. Kloosterman the reasonable religious accommodation that she was entitled to by Title VII, but instead denigrated her religious beliefs and then summarily terminated her.

291.    Yet multiple reasonable accommodations could have permitted University of Michigan Health-West to pursue its interests while respecting Ms. Kloosterman's beliefs: permitting the use of patients' names in place of pronouns, which she had previously done without incident, scheduling other providers to see patients when they seek "gender reassignment" drugs or procedures, or posting a written notice to all patients allowing them to obtain referrals for any missed services by calling a phone number for the Wyoming or Ann Arbor hospitals.

292.    As described above, University of Michigan Health-West accommodated the independent medical judgment and secular objections of other providers in Ms. Kloosterman's office but refused to accommodate her independent medical judgment and religious conscience concerning much rarer drugs and procedures.

293.    This practice of granting accommodations for non-religious reasons but not religious reasons constitutes religious discrimination under *Ansonia Board of Education*, 479 U.S. at 71.

294.    Any concerns from University of Michigan Health-West about potential disruptions to patient service were merely hypothetical, and a myriad of potential accommodations existed, as shown by University of Michigan Health-West's ability to accommodate other

employees' secular objections to—and independent medical judgments concerning—far more common drugs and procedures.

295.    University of Michigan Health-West's conduct constitutes discrimination on the basis of religion under 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-2(m).

296.    Because of University of Michigan Health-West's actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of monetary damages and equitable relief.

297.    Pursuant to 42 U.S.C. § 2000e-5(g), Ms. Kloosterman is entitled to a declaration that University of Michigan Health-West violated her right to be free from religious discrimination under 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-2(m) and an injunction against University of Michigan Health-West to prohibit future such acts.  Additionally, pursuant to 42 U.S.C. § 2000e-5(g) and (k), Ms. Kloosterman is entitled to reinstatement, backpay and front pay with interest, value of lost benefits, actual and nominal damages, costs, and attorneys' fees.

298.    University of Michigan Health-West's conduct was intentional, and it acted with malice, oppression, or reckless indifference to the protected rights of Ms. Kloosterman.  She is thus entitled to punitive damages in an amount to be determined at trial.  42 U.S.C. § 1981a.

### FIFTH CAUSE OF ACTION
**Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West**
**<u>Violation of Title VII: Religious Discrimination, Disparate Impact</u>**
**<u>42 U.S.C. § 2000e</u>**

299.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

300.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West.

301.    University of Michigan Health-West is an employer within the meaning of Title VII. 42 U.S.C. § 2000e(b).

302.     Under Title VII, it is an unlawful employment practice for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion."  42 U.S.C. § 2000e-2(a)(2); *see also* 42 U.S.C. § 2000e-2(k).

303.     University of Michigan Health-West has the following nondiscrimination policy: "University of Michigan Health-West complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex.  UM Health-West does not exclude people or treat them differently because of race, color, national origin, age, disability, sex, sexual orientation, gender identity or religion."[17]

304.     University of Michigan Health-West violated its own policy when it excluded Ms. Kloosterman and treated her differently because of her religion.

305.     University of Michigan Health-West had a policy or practice of disciplining employees for expressing, mentioning, or suggesting that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity.

306.     University of Michigan Health-West maintained a policy or practice against respecting independent medical judgment on "gender reassignment" treatments, which policy or practice disproportionately impacts those with traditional religious beliefs concerning sex and gender.

307.     University of Michigan Health-West's policy or practice of respecting medical judgment on myriad treatment issues but not on "gender reassignment" treatments disparately impacts employees with traditional religious beliefs about the biological differences between the sexes. *See Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); 42 U.S.C. § 2000e-2(k).

308.     University of Michigan Health-West's policy or practice was neither job-related for the position in question nor consistent with business necessity.

---

[17] "Non Discrimination Notice," University of Michigan Health-West (2022), https://perma.cc/EH37-ZBCZ.

309.     Less discriminatory alternatives existed to achieve Defendants' stated business purposes, including but not limited to permitting the use of patients' names in place of pronouns, which Ms. Kloosterman had previously done without incident, scheduling other providers to see patients when they seek "gender reassignment" drugs or procedures, or posting a written notice to all patients allowing them to obtain referrals for any missed services by calling a phone number for the Wyoming or Ann Arbor hospitals.

310.     This policy or practice has a disparate impact on religious employees and Christian employees in particular, including Ms. Kloosterman.

311.     This policy or practice has a disparate impact on employees like Ms. Kloosterman with traditional religious views on sex or gender.

312.     As a direct, legal and proximate result of the discrimination, Ms. Kloosterman has sustained, and will continue to sustain, economic injuries, resulting in damages in an amount to be proven at trial.

313.     Because of University of Michigan Health-West's policies and actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of monetary damages and equitable relief.

314.     Pursuant to 42 U.S.C. § 2000e-5(g), Ms. Kloosterman is entitled to a declaration that University of Michigan Health-West violated her right to be free from religious discrimination under 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-2(k) and an injunction prohibiting future such policies and actions by University of Michigan Health-West.  Additionally, pursuant to 42 U.S.C. § 2000e-5(g) and (k), Ms. Kloosterman is entitled to reinstatement, backpay and front pay with interest, value of lost benefits, actual and nominal damages, costs, and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**All Defendants**
<u>**Violation of the Michigan Constitution: Free Exercise of Religion**</u>

315.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

316.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

317.    Defendants violated the Michigan Constitution when they compelled Ms. Kloosterman to speak biology-obscuring pronouns and to make referrals for drugs and medical procedures that violate her religious conscience.

318.    As set forth above, Defendants Pierce and Smith set Ms. Kloosterman's accommodation denial and termination into motion by recommending to Defendants Cole and Booker that Ms. Kloosterman's accommodation request be denied and that her employment be terminated; Defendants Booker and Cole made the decision to deny Ms. Kloosterman's accommodation request and terminate her employment; and Defendant Pai ratified the decision that Defendants Booker and Cole made.  In taking each of these actions against Ms. Kloosterman, each Defendant substantially burdened Ms. Kloosterman's exercise of religion by forcing her to choose between her job and adherence to her Christian faith.  Therefore, each Defendant violated Article I, § 4 of the Michigan Constitution.

319.    Article I, § 4 of the Michigan Constitution provides that "[e]very person shall be at liberty to worship God according to the dictates of his own conscience."  M.C.L.A. Const. Art. I, § 4.  This "guarantee of religious freedom" "is at least as protective of religious liberty as the United States Constitution."  *Winkler by Winkler v. Marist Fathers of Detroit, Inc.,* 500 Mich. 327, 338 (2017) (quoting *People v. DeJonge (After Remand)*, 442 Mich. 266, 273 n. 9, 501 N.W.2d 127 (1993)).

320. The Michigan Constitution is even more protective than the federal Free Exercise Clause, because Michigan courts subject burdens on religious exercise to the "compelling state interest test developed by the United States Supreme Court in *Wisconsin v. Yoder* and *Sherbert v. Verner*." *McCready v. Hoffius*, 459 Mich. 131, 143–44 (1998), *opinion vacated in part*, 459 Mich. 1235 (1999) (finding Free Exercise right under state and federal law for religious landlord to decline renting to unmarried couples).

321. This test examines whether the party's belief is "sincerely held" and "religious in nature," whether the state has "imposed a burden" on that religious belief or exercise, whether a "compelling state interest justifies the burden," and "whether there is a less obtrusive form of regulation available to the state." *Id.* (citing *Wisconsin v. Yoder*, 406 U.S. 205, 214–30 (1972)).

322. Here, under the Michigan Supreme Court's compelling-interest test, there is no question that Ms. Kloosterman's beliefs are sincerely held and religious in nature.

323. Defendants substantially burdened Ms. Kloosterman's religious exercise by denigrating her religion, refusing to provide an accommodation, attempting to coerce her to violate her religious convictions, and ultimately terminating her because of her religious beliefs.

324. Defendants cannot show a compelling interest in imposing these substantial burdens, and less intrusive solutions abound.

325. During Ms. Kloosterman's 17 years of employment by University of Michigan Health-West, no patient ever asked her for a referral for "gender reassignment surgery" or other related drugs or procedures. Nor did any patient ask her to use gender-identity-based pronouns.

326. Defendants therefore cannot show that it is likely Ms. Kloosterman ever would be placed in a situation calling for such referrals or pronouns.

327. But even if they could show that such a situation would arise, Defendants could have granted any of several possible accommodations, such as allowing the use of patients' names instead of pronouns, modifying Ms. Kloosterman's schedule for patient visits to obviate the need for any referrals (as University of Michigan Health-West does for employees with secular

objections to far more common drugs and procedures), or posting notices that allow patients to call the Wyoming or Ann Arbor hospitals for referrals.

328.    The absence of any past incident and the availability of these accommodations preclude Defendants from justifying their substantial burdens on Ms. Kloosterman's religious exercise.  Thus, Defendants' actions and policies violated Article I, § 4 of the Michigan Constitution.

329.    Punishing Ms. Kloosterman for her religious beliefs is not narrowly tailored to serve a compelling governmental interest, nor did Defendants use the least restrictive means when they refused to grant an accommodation and terminated her instead.

330.    Because of Defendants' actions and policies, Ms. Kloosterman has suffered, and continues to suffer, irreparable harm.  She is entitled to an award of equitable relief.

331.    Ms. Kloosterman is entitled to a declaration that Defendants violated her liberty to worship God under Article I, § 4 of the Michigan Constitution, to an order against Defendants directing them to reinstate Ms. Kloosterman, and to an injunction prohibiting future such actions by Defendants.

<div align="center">

**SEVENTH CAUSE OF ACTION**
**All Defendants**
**Violation of the Michigan Constitution: Freedom of Speech**

</div>

332.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

333.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker Cole, Pierce, and Smith, in both their individual and official capacities.

334.    Article I, § 5 of the Michigan Constitution provides: "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press." M.C.L.A. Const. Art. I, § 5.

335.     The Michigan Court of Appeals and the Sixth Circuit have held that "[t]he rights of free speech under the Michigan and federal constitutions are coterminous."  *In re Contempt of Dudzinsk*i, 667 N.W.2d 68, 72 (Mich. Ct. App. 2003) (citing *Woodland v. Michigan Citizens Lobby*, 378 N.W.2d 337 (Mich. Ct. App. 1985)); *Lucas v. Monroe Cnty.*, 200 F. 3d 964, 972 n.4 (6th Cir. 2000).

336.     Defendants violated Article I, § 5 of the Michigan Constitution, by compelling Ms. Kloosterman to speak biology-obscuring pronouns.  Defendants Booker and Cole compelled Ms. Kloosterman to speak biology-obscuring pronouns by denying Ms. Kloosterman's religious accommodation request and by making her failure to speak such pronouns a basis for their decision to terminate Ms. Kloosterman's employment.  Defendant Pai compelled Ms. Kloosterman to speak biology-obscuring pronouns by ratifying the accommodation denial and termination decision of Defendants Booker and Cole.  Defendant Pierce compelled Ms. Kloosterman to speak biology-obscuring pronouns by threatening and berating her for not using such pronouns at the July 29 meeting, and by recommending to Defendants Booker and Cole the denial of Ms. Kloosterman's accommodation request and the termination of her employment.  Defendant Smith compelled Ms. Kloosterman to speak biology-obscuring pronouns by recommending to Defendants Booker and Cole the denial of Ms. Kloosterman's accommodation request and the termination of her employment.

337.     Compelling Ms. Kloosterman to speak messages that she disagrees with is not narrowly tailored to serve a compelling governmental interest, nor did Defendants use the least restrictive means when they refused to grant an accommodation and terminated her, instead.

338.      Because of Defendants' actions and policies, Ms. Kloosterman has suffered, and continues to suffer, irreparable harm.  She is entitled to an award of equitable relief.

339.     Ms. Kloosterman is entitled to a declaration that Defendants violated her freedom of speech under Article I, § 5 of the Michigan Constitution, to an order against Defendants directing them to reinstate Ms. Kloosterman, and to an injunction prohibiting future such actions by Defendants.

**EIGHTH CAUSE OF ACTION**
**All Defendants**
**Violation of the Michigan Constitution: Equal Protection**

340.     Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Amended Complaint as if fully set forth herein.

341.     Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in both their individual and official capacities.

342.     Article I, § 2 of the Michigan Constitution provides: "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."  M.C.L.A. Const. Art. I, § 2.

343.     The Michigan Supreme Court has held that "Michigan's equal protection provision is coextensive with the Equal Protection Clause of the United States Constitution."  *Shepherd Montessori Ctre. Milan v. Ann Arbor Charter Twp.*, 783 N.W.2d 695, 698 (Mich. 2010) ("Michigan case law makes it clear that [§ 2] was intended to afford the same rights as the Federal equal protection clause.").

344.     Michigan's equal protection provision also "goes beyond [the federal Equal Protection Clause] and further proclaims that no person is to be discriminated against."  *Smith v. Gibson*, 524 F. Supp. 664, 670 (E.D. Mich. 1981).

345.     The anti-discrimination provision of Article I, § 2 contains no intent requirement. *Berry v. Sch. Dist. of City of Benton Harbor*, 467 F. Supp. 721, 732 (W.D. Mich. 1978) ("If this court were to read an intent requirement into the anti-discrimination clauses of Article I, section 2, and Article VIII, section 2, it would violate basic principles of constitutional interpretation which require that this court give effect to the plain meaning of the words used in the constitutional provision, as these words were understood by the people who adopted the Constitution.").

346.    Defendants violated Article I, § 2, by discriminating against Ms. Kloosterman because of her religion.  As set forth above, Defendants Pierce and Smith set Ms. Kloosterman's accommodation denial and termination into motion by recommending to Defendants Cole and Booker that Ms. Kloosterman's accommodation request be denied and that her employment be terminated; Defendants Booker and Cole made the decision to deny Ms. Kloosterman's accommodation request and terminate her employment; and Defendant Pai ratified the decision that Defendants Booker and Cole made.  In taking each of these actions against Ms. Kloosterman, each Defendant discriminated against Ms. Kloosterman because of her sincerely held religious beliefs.  Therefore, each Defendant violated Article I, § 2 of the Michigan Constitution.

347.    In the alternative, Defendants violated Article I, § 2, by implementing and enforcing University of Michigan Health-West's policies in such a way that disparately impacted religious employees including Ms. Kloosterman.

348.    By treating similarly situated employees disparately on the basis of a suspect classification, religion, the Defendants' actions trigger strict scrutiny.

349.    Defendants' actions in discriminating against Ms. Kloosterman were not narrowly tailored to serve a compelling governmental interest, nor did they use the least restrictive means when they refused to grant an accommodation and terminated her instead.

350.     Because of Defendants' actions and policies, Ms. Kloosterman has suffered, and continues to suffer, irreparable harm.  She is entitled to an award of equitable relief.

351.    Ms. Kloosterman is entitled to a declaration that Defendants violated her right to equal protection under Article I, § 2 of the Michigan Constitution, to an order against Defendants directing them to reinstate Ms. Kloosterman, and to an injunction prohibiting future such actions by Defendants.

### NINTH CAUSE OF ACTION
### Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West
### Violation of the Elliott-Larsen Civil Rights Act of 1974

352.    Ms. Kloosterman incorporates and adopts by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

353.    Ms. Kloosterman brings this cause of action against Defendant Metropolitan Hospital, d/b/a University of Michigan-Health West.

354.    The Elliott-Larsen Civil Rights Act prohibits employers from "discharg[ing], or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202.

355.    Courts find Title VII precedent "highly persuasive when interpreting this statute," finding direct evidence of discrimination or using the *McDonnell Douglas* burden-shifting framework where the evidence is circumstantial. *Meyer v. City of Center Line*, 619 N.W.2d 182, 188 (2000); *Robinson v. JCIM, LLC*, No. 342487, 2018 WL 6185570, at *5 (Mich. Ct. App. Nov. 27, 2018).

356.    Section 37.2701(a) prohibits employers from retaliating against employees engaged in protected activity such as requesting religious accommodations, and it prohibits employers from "[c]oerc[ing], indimidat[ing], threaten[ing], or interfer[ing] with a person in the exercise or enjoyment of . . . any right granted or protected by this act," including religious rights. Mich. Comp. Laws § 37.2701(a), (f); *see also Meyer*, 619 N.W.2d at 188 (finding retaliation where employee engaged in protected activity known by employer, and employer took adverse action that was causally connected to that protected activity); *Robinson*, 2018 WL 6185570, at *7.

357.    Section 37.2102 defines "[t]he opportunity to obtain employment . . . without discrimination because of religion" as a "civil right." Mich. Comp. Laws § 37.2102.

358.    Here, University of Michigan Health-West violated Section 37.2202 when it terminated Ms. Kloosterman because of her religious beliefs.   Her termination and the conversations leading up to it constitute direct evidence of discrimination.

359.    University of Michigan Health-West also violated Section 37.2701(a) when it retaliated against Ms. Kloosterman for requesting a religious accommodation after she completed the mandatory training segment on gender identity training.

360.    Because she disclosed her religious beliefs and requested an accommodation, University of Michigan Health-West held hostile meetings and set her termination process in motion.

361.    By depriving Ms. Kloosterman of her employment and future employment opportunities, University of Michigan Health-West violated Section 37.2102, subjecting her to religious discrimination that violated her civil right to access employment and employment opportunities.

362.    Because of University of Michigan Health-West's actions, Ms. Kloosterman has suffered, and continues to suffer, economic injury and irreparable harm.  She is entitled to an award of monetary damages and equitable relief.

363.    Pursuant to Mich. Comp. Laws § 37.2801, Ms. Kloosterman is entitled to a declaration that University of Michigan Health-West violated her right rights under Mich. Comp. Laws §§ 37.2102 and 37.2701, and an injunction prohibiting future such actions by University of Michigan Health-West.  Additionally, pursuant to Mich. Comp. Laws §§ 37.2801, 37.2802, Ms. Kloosterman is entitled to front pay, back pay, restitution, compensatory damages, and reinstatement.  Additionally, Ms. Kloosterman is entitled to the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Kloosterman prays for relief and judgment as follows:

A.    Declare that the acts and practices of all Defendants complained of herein are in violation of Title VII of the Civil Rights Act of 1964, the United States Constitution, the Michigan Constitution, and the Elliott-Larsen Civil Rights Act, as set forth above;

B.    Enjoin and permanently restrain these violations of Title VII, the United States Constitution, the Michigan Constitution, and the Elliott-Larsen Civil Rights Act, to prohibit all Defendants from future violations;

C.    Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker, Cole, Pierce, and Smith, in their official and individual capacities, to comply with their legal obligations and fully consider religious accommodation requests from employees, and to eradicate the effects of their past and present unlawful employment practices;

D.    Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and Defendants Pai, Booker, and Cole, in their official and individual capacities, to place Ms. Kloosterman in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment of her.

E.    Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, to place Ms. Kloosterman in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment of her, and award to Ms. Kloosterman all earnings that she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, reinstatement, backpay and front pay with interest, seniority, and other lost benefits, including interest pre-judgment and post-judgment, in amounts to be determined at trial;

F.      Order Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, to inform its employees of its violation of the law and also inform its employees of their right to request and receive religious accommodations;

G.      Award to Ms. Kloosterman, against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, compensation for past and future pecuniary losses resulting from the unlawful employment practices complained of herein, including relocating expenses and job search expenses, in amounts to be determined at trial;

H.      Award nominal damages to Ms. Kloosterman against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, and against Defendants Pai, Booker, Cole, Pierce, and Smith, in their individual capacities, in recognition of their violations of Ms. Kloosterman's rights;

I.      Award actual and compensatory damages to Ms. Kloosterman against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, for its violations of Ms. Kloosterman's rights;

J.      Award punitive damages to Ms. Kloosterman against Defendant Metropolitan Hospital, d/b/a University of Michigan Health-West, for its malicious, oppressive, or reckless conduct, in amounts to be determined at trial;

K.      Award Ms. Kloosterman the costs of this action together with reasonable attorneys' fees, against all Defendants, jointly and severally, as provided by 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), Mich. Comp. Laws § 37.802, and any other legal provisions that authorize fees and costs; and

L.      Grant such other and further relief as this Court may deem just and proper in the public interest.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 30th day of January, 2023.

_____/s/  Jordan E. Pratt_____

David J. Williams
Michigan Bar # P76932
Bossenbrook Williams PC
1600 Abbot Road, Ste. 200
East Lansing, MI 48823
Tel. (517) 333-5789
david@bossenbrook.com

James R. Wierenga
Michigan Bar # P48946
99 Monroe Ave, NW
Suite 1210
Grand Rapids, MI 49503
Tel. (616) 454-3883
jim@dwlawpc.com

Michael D. Berry
Michigan Bar # P69206
David J. Hacker
Andrew W. Gould
First Liberty Institute
2001 W. Plano Pkwy. #1600
Plano, TX 75075
Tel. (972) 941-4444
mberry@firstliberty.org
dhacker@firstliberty.org
agould@firstliberty.org

Jordan E. Pratt
Kayla Toney
First Liberty Institute
1331 Pennsylvania Ave. NW
Suite 1410
Washington, DC 20004
Tel. (972) 941-4444
jpratt@firstliberty.org
ktoney@firstliberty.org

*Counsel for Plaintiff*

EXHIBIT A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | **471-2022-01435** |

| Michigan Department Of Civil Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| Valerie Kloosterman | ▇▇▇▇▇▇▇ | |

| Street Address |
|---|
| ▇▇▇▇▇▇▇▇ |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| UNIVERSITY OF MICHIGAN HEALTH WEST | 501+ Employees | (616) 252-5300 |

| Street Address |
|---|
| 5900 BYRON CENTER AVE SW |
| WYOMING, MI 49519 |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest | Latest |
| Religion | 07/29/2021 | 08/24/2021 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began working for the above-named employer on or about August 01, 2004. I was last employed as a Physician Assistant. In or around July 2021, I had a discussion with my employer about my religious beliefs in relation to my employment. My employer was compelling me to use speech that violated my sincerely held religious beliefs that are in the Bible (which is the Word of God) and taught by my church. I was forced to affirm and participate in activities instead of being accommodated in a very narrow fashion and in such a way that would have little to no impact on patients. An accommodation would not have been an undue hardship on the employer. I was subsequently terminated.I believe I was discriminated against due to my religion, Christianity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Valerie Kloosterman**<br>05/16/2022<br><br><center>*Charging Party Signature*</center> | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EXHIBIT B



**First Liberty Institute**
2001 W. Plano Parkway, Suite 1600, Plano, TX 75075
972-941-4444 | 972-423-6162 | www.firstliberty.org

# FAX

| | | | |
|---|---|---|---|
| TO: EEOC – DETROID FIELD OFFICE | | FROM: | CAROL CARRILLO, Paralegal |
| FAX#: (313) 226-4610 | | PAGES : 6 | (including this cover sheet) |
| PHONE: | | DATE: | June 17, 2022 |
| RE:  VALERIE KLOOSTERMAN | | CC: | FIRST LIBERTY 972-941-4457 |

Comments:  Attached is the Amended Charge with Attachment.

**HP Officejet Pro 8600 N911a Series**

**Fax Log for**
Liberty Institute
9724236162
Jun 17 2022 12:38PM

**Last Transaction**

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|------------|----------|-------|--------|
| | | | | Digital Fax | | |
| Jun 17 | 12:32PM | Fax Sent | 13132264610 | 2:48 N/A | 6 | OK |
| Jun 17 | 12:35PM | Fax Sent | 9729414457 | 3:04 N/A | 6 | OK |

EEOC Form 5 (11/09)

| | |
|---|---|
| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other Information before completing this form. | **Charge Presented To:**  **Agency(ies) Charge No(s):**<br>☒ FEPA    Amended<br>☒ EEOC    471-2022-01435 |

| | | |
|---|---|---|
| Michigan Department of Civil Rights | | and EEOC |
| *State or local Agency, if any* | | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Valerie Kloosterman | ▇▇▇▇▇▇ | ▇▇▇ |

| Street Address | City, State and ZIP Code |
|---|---|
| ▇▇▇▇▇▇ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(if more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| University of Michigan Health West (aka Metro Health - University of Michigan Health) | 501+ Employees | (616) 252-5300 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5900 Byron Center Ave. SW, Wyoming, MI 49519 | |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☒ RELIGION  ☐ NATIONAL ORIGIN

☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

**DATE(S) DISCRIMINATION TOOK PLACE**

Earliest 07/29/2021   Latest 08/24/2021

☐ CONTINUING ACTION

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*

See attached Statement of Valerie Kloosterman, MPAS, PA/C.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 06/17/2022        *[signature] MPAS, PAc*<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

This amended charge relates back to the original charge of discrimination # 471-2022-01435 that I filed on my own without counsel on May 16, 2022.

University of Michigan Health West (also known as "Metro Health – University of Michigan Health"), my former employer, discriminated against me because of my Christian beliefs and religious exercise in violation of Title VII of the Civil Rights Act.

## Background

From August 2004 until August 2021, with the exception of a few months immediately following the birth of my triplets, I worked for University of Michigan Health West. I was last employed by University of Michigan Health West as a physician assistant in Caledonia, Michigan. Until my termination, I never was subject to discipline, and I consistently received exemplary performance reviews. For example, in one performance review, my supervisor commented: "Valerie goes way beyond the call of duty when dealing with patients, follow up and professional responsibility. She is *very* ethical [and] responsible and treats all with respect . . . ." The review went on to state that my documentation, clarity, and dictation were "extremely accurate[,] complete & timely." Another performance review contained the comment: "A pleasure to work with[,] excellent knowledge, ethics, respect, communication, and skills."

Throughout my employment, I gladly served people of all beliefs and backgrounds. I was committed to giving the best possible care to all of my patients, including those who were lesbian, gay, or experiencing gender dysphoria. For instance, I provided ongoing care for approximately a dozen patients who I knew to be lesbian.

I also treated two patients who may use preferred pronouns other than those that correspond to the patients' biological sex. They came to me for a potential brain tumor and a respiratory issue, and I cared for both of them to the best of my ability. Neither patient requested a different provider or otherwise expressed dissatisfaction with the care I provided. For both patients, in both my medical notes and in the examination room, I used the patient's name (without pronouns) without any disruption to the patient's care. Indeed, I conducted at least one follow-up phone call and one follow-up visit with one of the patients, while the other did not need a follow-up visit. In medical charts, I never changed or edited the pre-filled gender field, nor did I have the ability to change that information. I never used pronouns that went against a patient's wishes, whether in the examination room or in my medical notes. Moreover, during the entire duration of my employment, no patient ever asked me to refer the patient to another provider for gender dysphoria-related medical services.

Throughout my employment, I never discussed with any patient my views—religious or otherwise—on human gender or sexuality.

## My Religious Beliefs

I am a Christian and longtime member of a United Reformed Church and of the Christian Medical and Dental Association. I believe that God created humankind male and female, that one's sex is ordained by God, that one should love and care for the body that God gave him, and

Statement of Valerie Kloosterman, MPAS, PA/C

that one should not attempt to erase or alter his sex, especially through drugs or surgical means. I believe that I must not speak against these truths by using pronouns that contradict a person's biological sex. As a Christian, I also believe that God has ordained our sexual function for procreation, that children are a gift from God, and that—absent compelling reasons—one should not sterilize oneself. Moreover, as a Christian medical professional, I believe that it would be sinful to assist a patient in procuring sterilizing drugs or surgical procedures designed to erase or alter his sex.

Separately, my faith—not to mention my Hippocratic oath and my employment contract with my former employer—forbids me from assisting patients in procuring experimental drugs and surgical procedures that, in my independent medical judgment, pose greater harm than benefit for a patient. Indeed, during the duration of my employment, my employment contract required me to "exercise [my] independent medical judgment consistent with the clinical needs and consent of each patient," and it stated that "the Hospital shall not have the right to direct [me] to take or omit any act which conflicts with such medical judgment in the care of patients."

My independent medical judgment is that "hormone therapy" and "gender reassignment surgery" are experimental, lack validation in methodologically rigorous long-term studies, and often lead to negative clinical outcomes such as bone density loss, infection, nerve damage, chronic pain, loss of sexual and urinary functions, psychological trauma, and other serious complications. My independent medical judgment also counsels against entering in documentation pronouns that obscure or misrepresent a person's sex, as doing so can cause patients to miss potentially life-saving screening and procedures like pregnancy tests, mammograms, and testicular exams.

**My Former Employer's Ability and Willingness to Accommodate for Secular Reasons**

My former employer often accommodated other medical professionals in my office who, because of their independent medical judgment or for other secular reasons, were uncomfortable with providing or otherwise helping patients obtain certain kinds of medical care. These accommodations often obviated the need for any referral. For example, a male provider who did not wish to perform female pelvic examinations was not scheduled to see patients who requested that service. Those unwilling to perform toenail removals or prescribe diet pills likewise were not scheduled to see patients who requested those services.

Even when providers saw patients who asked in the examination room for services that the providers were unwilling to provide, they were permitted to refuse without making referrals, even where other providers might be willing to provide the service. For example, a provider who refused to prescribe opioids was permitted to tell patients that opioids are clinically unnecessary or that he does not prescribe them, without making a referral to another provider. Even when patients specifically requested referrals for services that providers thought medically inappropriate—such as an MRI, back surgery, tonsillectomy, antibiotics, or insertion of ear tubes—providers were permitted to refuse the referral request and instead discuss other treatment options with the patient. In other words, University of Michigan Health West honored their independent medical judgment and did not require them to provide referrals for services that went against that judgment. And it maintained a policy or practice of respecting providers' independent medical judgment except on issues related to gender dysphoria.

Statement of Valerie Kloosterman, MPAS, PA/C                                                     2

In any event, accommodations that obviate the need for referrals were easily achieved, given the number of medical professionals in my office who could be scheduled to see a patient, and given the scheduling and intake process. Patients were asked, either at the time of scheduling or upon their arrival, what the purpose of their visit was. If a patient indicated interest in a procedure or a medication that a provider did not offer or thought medically inappropriate, the patient was scheduled (or rescheduled) to see a different provider.

### My Former Employer's Discrimination Against My Religious Beliefs and Exercise

Between May and June 2021, I was required to complete a training module that contained statements concerning sexual orientation and gender identity that my Christian faith prohibits me from affirming. I could not complete the training unless I checked boxes that affirmed the statements. There was no option within the training for me to explain my position or request a religious accommodation. I therefore decided to complete the training module and explain my position to my employer separately. I arranged a meeting with the head of the Department of Diversity, Equity, and Inclusion (DEI) to inform my employer that my faith precluded me from agreeing with the statements. My faith compelled me to seek a reasonable accommodation for my religious beliefs.

On or about July 1, 2021, I met with Dr. Rhea Booker, the head of DEI. During the meeting, I explained why my faith precludes me from affirming the statements in the training module. When she indicated that I was "uncomfortable" seeing gay and lesbian patients, I corrected her and explained that I have seen several such patients during my 17 years of employment, and I would gladly continue seeing such patients. Dr. Booker indicated that she would speak with HR and get back to me.

On or about July 29, 2021, the second meeting occurred. Those present included representatives of both HR and DEI: Marla Cole, HR Director; Thomas Pierce, DEI Program Director; Catherine Smith, the Advanced Practice Providers' Liaison; and perhaps Amy Degood, Caledonia Office Manager (other attendees indicated she was on the phone, but she did not speak or identify herself during the meeting). The meeting focused on whether I would use gender identity-based pronouns and be willing to refer patients for gender reassignment surgery. When I respectfully indicated that I could not do so because of my religious beliefs and because of my independent medical judgment, but that I would use patients' names in place of pronouns to respect their wishes, the DEI representative grew hostile and attacked my religious beliefs. Among other things, he told me that I could not take the Bible or my religious beliefs to work with me, either literally or figuratively; that given my religious beliefs against gender identity-based pronouns, I am to blame for transgender suicides; and that I am "evil" and abusing my power as a health care provider.

My next meeting concerning the issue occurred on August 24, 2021, when Marla Cole and Catherine Smith handed me a termination notice and informed me that I was no longer permitted on the employer's property. I had no prior notice that I would be terminated at the meeting. In a later letter memorializing the reasons for my termination, my former employer listed my unwillingness to refer patients for certain gender dysphoria-related drugs and procedures, my

Statement of Valerie Kloosterman, MPAS, PA/C                                    3

unwillingness to use pronouns that do not correspond to a patient's biological sex, and my alleged alteration of medical records to change patients' pronouns (a charge that I deny).

## Conclusion

University of Michigan Health West violated Title VII of the Civil Rights Act when it:

- derided my religious beliefs and exercise and pressured me to abandon them;
- failed to engage with me about possible reasonable accommodations;
- failed to grant me available reasonable accommodations, such as using patients' names in place of pronouns, scheduling other providers to see patients who seek gender dysphoria-related services, or posting a written notice to all patients allowing them to obtain referrals for any missed services by calling a phone number;
- accommodated the independent medical judgment and other secular objections of other providers in my office but refused to accommodate my independent medical judgment and religious beliefs and exercise;
- retaliated against me for requesting a religious accommodation;
- created and maintained a work environment hostile to my religious beliefs and exercise;
- maintained a rule that providers' independent medical judgment would be respected unless it concerned treatment of gender dysphoria, which rule disparately impacts Christians and other employees with traditional religious beliefs about the biological differences between the sexes; and
- terminated me because of my religious beliefs and exercise and because of my request for a religious accommodation.

EXHIBIT C

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Detroit Field Office**
477 Michigan Avenue, Room 865
Detroit, MI 48226
(313) 378-2470
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On:  7-14-2022

**To:** Valerie Kloosterman

Charge No: 471-2022-01435

EEOC Representative and email:   Adwya Saeed
Investigator
adwya.saeed@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 471-2022-01435.

On behalf of the Commission,

For Michelle Eisele - Jamie Dickinson, Enforcement Supervisor

Digitally signed by For Michelle Eisele - Jamie Dickinson, Enforcement Supervisor
Date: 2022.07.14 10:45:57 -04'00'

Michelle Eisele
District Director

**Cc:**
Peter VanLaan
University of Michigan
pete.vanlaan@metrogr.org


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 471-2022-01435 to the District Director at Michelle Eisele, 1010 West Ohio St Suite 1900

Indianapolis, IN 46204.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

EXHIBIT D

## PHYSICIAN ASSISTANT
## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** is made this $\underline{19^{th}}$ day of November, 2009, between **METRO HEALTH HOSPITAL**, a Michigan nonprofit corporation, of 5900 Byron Center Avenue SW, Wyoming, Michigan 49519 (the "Hospital"), and **VALERIE KLOOSTERMAN** of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (the "Physician Assistant").

## RECITALS

The Hospital operates a general acute care hospital in Grand Rapids, Michigan. It desires to secure the services of a Physician Assistant trained as a Family Medicine Physician Assistant who will staff a practice in the greater Grand Rapids, Michigan area.

The Physician Assistant is licensed and certified to practice medicine under the supervision of the Physician in the State of Michigan (or shall be duly licensed and certified by the date of the commencement of this Agreement) and is qualified to practice as a Physician Assistant in the area of Family Medicine. The Physician Assistant desires to enter into an Employment Agreement with the Hospital to provide the professional services required by the Hospital.

This Agreement shall supersedes and replace any previous Employment Agreement between the parties and any and all amendments, which shall be deemed terminated upon the commencement of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants in this Agreement, the parties agree as follows:

1. **Employment**. The Hospital shall employ the Physician Assistant, and the Physician Assistant shall work for the Hospital upon the terms and conditions set forth in this Agreement. The Physician Assistant shall adhere to the Hospital policies and procedures, including but not limited to, those noted below:

- Corporate Compliance Program and Code of Conduct
- Corporate Compliance Education - #RM-21
- Medicaid/Medicare Sanction Check - #RM-22
- Grievance Procedure - HR-27
- Sexual Harassment - HR-33

All business the Physician Assistant develops and secures during the term of this Agreement shall be the Hospital's property. The Physician Assistant may need to request appointment as a Medical Assistant of the Hospital, having achieved such status by application as provided in the Bylaws of the medical staff of the Hospital. This Agreement does not vest the Physician Assistant with medical staff membership.

-1-

2.     **Exclusive Agreement**.  The Physician Assistant shall devote a minimum of four (4) hours per month for the benefit of the Hospital during the term of this Employment Agreement. Among the other obligations imposed by this Employment Agreement, the Physician Assistant shall not be involved financially or otherwise with any competing business organization and shall not engage, directly or indirectly, in any other medical or surgical activities unless approved by her supervisor.  The Physician Assistant represents and warrants that her is not bound by any restrictive covenant or agreement that prevents or restricts her from performing her duties hereunder and agrees to indemnify and hold the Hospital harmless from any liability arising out of her breach of such covenant or agreement or the failure to disclose the existence of such covenant or agreement to the Hospital.

3.     **General Duties**.  The Physician Assistant shall be employed by the Hospital and perform such duties and occupy those positions as the Board of Directors of the Hospital may determine, including without limitation, the treatment and diagnosis of patients assigned to him/her by the Hospital and the participation in such third party payment or managed care programs as the Hospital may recommend from time to time.  With respect to patient treatment, which shall be under the supervision of a physician, the Physician Assistant shall exercise her independent medical judgment consistent with the clinical needs and consent of each patient, and the Hospital shall not have the right to direct the Physician Assistant to take or omit any act which conflicts with such medical judgment in the care of patients.  The Physician Assistant shall at all times act in a manner which furthers the professional image of the Hospital, and shall take such actions as may be necessary to maintain and encourage the Hospital's relationship with its patients and other professionals.  The Physician Assistant shall maintain a current knowledge on developments in the field of Family Medicine by attending a reasonable number of seminars or conventions each year.

4.     **Fees and Billing**.  The Hospital shall establish a written schedule of fees and charges for all services provided by the Physician Assistant.  This schedule of fees and charges may be amended by the Hospital at any time and from time to time during the term of this Agreement.  The Hospital or its appointed agent shall have the sole right to bill and collect from patients and third party payers (as applicable) for clinical services provided by the Physician Assistant hereunder.  The Hospital shall be entitled to retain all proceeds of those bills.  The Physician Assistant shall not bill separately for any such services.  Upon the Hospital's request, the Physician Assistant shall execute and deliver agreements and other documents necessary for the Hospital to bill and be reimbursed directly for the Physician Assistant's services under this Agreement.  Any sums paid to the Physician Assistant (by check, in cash, or otherwise) by any patient or third party payer (Blue Cross/Blue Shield of Michigan, Medicare, or otherwise) for services provided by the Physician Assistant pursuant to this Agreement shall be promptly remitted and delivered by the Physician Assistant to the Hospital or its appointed agent.  The obligations of the Physician Assistant set forth in this Section shall continue even after this Agreement has terminated for services provided while an employee of the Hospital.

5.     **Treatment of Patients**.  Under the supervision of a physician, **either the site Medical Director or other supervising physician,** the Physician Assistant shall have control over the diagnosis and treatment of the patients assigned to her, except in such instances as other

-2-

physicians are "covering." The Physician Assistant agrees that her treatment and diagnosis of the patients will be consistent with applicable Hospital bylaws, rules and regulations dealing with the treatment of patients as a Physician Assistant and understands that upon failure to do so, she may be relieved from treating said patient.

6.   **Contracting**.   Physician Assistant shall not enter into contracts binding upon Employer without Employer's express approval.

7.   **Qualifications**.   At all times during the term of this Agreement, the Physician Assistant shall:   (i) maintain a permanent, unrestricted license and certification to practice medicine as a Physician Assistant in Michigan; (ii) be licensed and registered as necessary to dispense drugs, as required to be dispensed in connection with the provision of services as a Physician Assistant under this Agreement; (iii) function under rules and regulations of the Hospital in her performance of activities as directed by her supervising physician; and (iv) participate fully in all third party payment accepted by the Hospital.

8.   **Employment Term**.   The Physician Assistant's term of employment by the Hospital (the "Employment Term") shall commence **December 1, 2009** and **terminate June 30, 2011** (subject to earlier termination pursuant to Section 11 below).   At the end of the initial employment term, the employment term hereof shall be July 1st to June 30th and shall **automatically** be renewed for additional one (1) year periods unless either party gives written notice to the other of their intention not to renew at least ninety (90) days prior to the expiration of the initial employment term or any renewal term thereafter.   The contract may be renegotiated each year at the request of either party.   In the event the parties are unable to reach mutual agreement on such terms, either party may terminate this agreement by written notice, effective not less than ninety (90) days after the date of such notice.

9.   **Compensation**.

   (a)   **Hourly Salary**.   The Hospital shall pay the Physician Assistant a salary of $45.00 per hour ("Hourly Salary").   At the end of the initial term, and any renewal term thereafter, the Physician Assistant shall be evaluated according to the Metro Health Appraisal Program (MAP) by the Physician Assistant's site Medical Director and/or Supervising Physician. (See attached **Schedule A**.)   Any merit increases shall be effective at the beginning of each contract year. The Physician Assistant's Salary shall be payable in accordance with the normal payroll practices of the Hospital.

10.   **Additional Benefits**.   In addition to the compensation described in Section 9, the Physician Assistant shall be entitled during the Employment Term to receive the following additional benefits:

   (a)   **Insurance**.   The Hospital shall provide the Physician Assistant with the following insurance coverage:

      (i)   **Professional Liability Insurance**.   The Hospital will provide professional liability insurance to the Physician Assistant from its self-insurance

-3-

plan with limits of $3,000,000/$6,000,000 and any excess policy in effect at such time. The Hospital may change the self-insurance plan and/or any excess insurance, including its limits, at any time as determined by the Hospital.  Such insurance will cover Physician Assistant's services under this Agreement.  The Hospital shall maintain appropriate "tail" insurance coverage through its self-insurance plan in the event the Physician Assistant's employment terminates for any reason.

The Hospital and Physician Assistant each agree to promptly notify the other of claims or incidents, which may result in claims.  Physician Assistant agrees to fully co-operate with the Hospital in investigating any such claim or incident.  The Hospital shall have the right to settle any claim or suit without the Physician Assistant's consent.  The Hospital shall notify the Physician Assistant of any settlements.

11.    **Termination of Employment**.  Notwithstanding that the Employment Term or any Renewal Term has not expired, this Agreement may be terminated in accordance with the following:

a.    **Termination by the Hospital**.  The Hospital shall have the right to terminate this Agreement immediately under any one or more of the following circumstances, in which event no compensation or additional benefits shall be owed following the effective date of termination:

i.    **Breach**.  Breach of the terms of this Agreement by the Physician Assistant where such breach is not corrected within thirty (30) days after written notice is given to the Physician Assistant by the Hospital.

ii.    **Criminal Activity**.  Upon the Physician Assistant's conviction of any felony involving moral turpitude.

iii.    **Professional Standing**.  The Physician Assistant's appointment as a Medical Assistant of the Hospital ceases as a result of disciplinary action by any committee of the medical staff, or by the governing body, or if her license and/or certification to practice medicine as a Physician Assistant is suspended, denied, limited or revoked for any reason.

iv.    **Death**.  Upon the Physician Assistant's death.

v.    **Disability**.  Inability of the Physician Assistant to provide any professional medical services on a full-time basis by reason of a disability resulting from injury, sickness, disease, or other cause if such disability continues for a period of three (3) consecutive months.

b.    **Termination by Physician Assistant**.  The Physician Assistant shall have the right to terminate this Agreement immediately under any one or more of the following circumstances:

-4-

i. **Hospital Licensure**. If at any time the Hospital loses its license to operate as a hospital.

ii. **Breach**. Breach of the terms of this Agreement by the Hospital where such breach is not corrected within thirty (30) days after written notice is given to the Hospital by the Physician Assistant.

c. **Termination by Mutual Consent**. The parties can terminate this Agreement before the expiration of any term by mutual written consent. Provided, however, the parties agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term.

d. **Termination by Either Party**. Either party may terminate this Agreement for any reason at any time on ninety (90) days prior written notice to the other. Provided, however, the parties agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term.

12. **Duty of Physician Assistant Upon Termination**. The Physician Assistant shall, upon termination of this Agreement, return to the Hospital all the Hospital's records of any sort, including patient medical records, and all literature, supplies, letters, written or printed forms, and/or memoranda pertaining to the Hospital's business within forty-eight (48) hours of such termination and without the necessity of demand by the Hospital. In addition, the Physician Assistant shall have a continuing obligation to cooperate with the Hospital with respect to malpractice and other litigation regarding the services provided pursuant to this Agreement and to complete any outstanding medical records.

13. **Severability**. In the event any clause or provision of this Agreement shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provision herein, and this Agreement shall remain in full force and effect in all other respects. If a claim of invalidity or unenforceability of any provision of this Agreement is predicated upon the length of the term of any covenant or the area covered thereby, such provision shall not be deemed to be invalid or unenforceable; rather, such provision shall be deemed to be modified to the maximum area or the maximum duration as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

14. **Facilities, Equipment, Supplies and Support Personnel**. The Hospital shall provide all office facilities, equipment, supplies and support personnel reasonably required to provide services under this Agreement. The Physician Assistant shall not engage in any direct purchasing or otherwise contract any liability on behalf of the Hospital. The Hospital agrees, however, to consult with the Physician Assistant regarding the employment of support staff and the acquisition of equipment and furnishings.

15. **Quality of Services**. All services rendered by the Physician Assistant pursuant to this Agreement shall conform to: (i) all applicable federal, state and local governmental laws, rules and regulations; (ii) the Medical Staff Bylaws and Rules and Regulations of the Hospital Medical Staff; (iii) all applicable AOA Accreditation Requirements for Acute Care Hospitals or any other applicable accrediting agency; and (iv) all applicable standards established by third party payers, including Blue Cross/Blue Shield of Michigan, Medicare, and Medicaid; and (v) all applicable Hospital policies and procedures.

16. **Regulatory/Legislative Changes**. The Hospital shall have the right to terminate this Agreement at any time upon ninety (90) days prior written notice to the Physician Assistant in the event that state or federal legislation or regulations are enacted or interpretive statements issued which, in the opinion of independent legal counsel acceptable to both parties: bars referrals to the Hospital by the Physician Assistant; eliminates Medicare or Medicaid reimbursement for such referrals; subjects the Hospital to potential civil or criminal penalties for such referrals; jeopardizes the Hospital's continued participation in the Medicare or Medicaid programs; or jeopardizes the standing of the Hospital as a tax-exempt institution under applicable federal or state law.

17. **Benefit**. This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors and assigns.

18 **Amendment**. The Agreement may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be operative or valid, it shall be reduced to writing and signed by both parties.

19. **Entire Agreement**. The parties understand and agree that this Employment Agreement is the entire Agreement between the parties regarding the terms and conditions of the Physician Assistant's employment. The terms of this Agreement may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Hospital or its agents to the Physician Assistant.

20. **Governing Law**. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Michigan.

21. **Survival**. The Covenants of Sections 4, 12 and 29 shall survive the termination of this Agreement.

22. **Notice**. All notices, demands, requests, consents, reports, approvals, or other communications which may be or are required to be given, served, or sent pursuant to this Agreement shall be in writing and shall be mailed by first-class, postage prepaid U.S. mail, or transmitted by hand delivery to the respective addresses of the parties set forth above. Each party may designate by written notice a new address to which any notice or communication may thereafter be so given.

23     **Third Parties**.  This Agreement shall be enforceable only by the parties hereto and their successors in interest by virtue of an assignment which is not prohibited under the terms of this Agreement, and no other person shall have the right to enforce any of the provisions contained herein.

24.     **Comptroller Access**.  In the event that the Secretary of Health and Human Services or the Comptroller General of the United States or their representatives determine that this Agreement is a contract described in Section 1861(v)(1)(I) of the Social Security Act, Physician Assistant agrees that until the expiration of four (4) years after the furnishing of services, she shall make available, upon written request to the Hospital by the Secretary of Health and Human Services, or upon request of the Comptroller General, this Agreement, and books, documents and records that are necessary to certify the nature and extent of costs paid by the Hospital pursuant to this Agreement.

25.     **Assignment**.  This Agreement is personal to the Physician Assistant and her rights and obligations hereunder shall not be assignable unless the Hospital agrees, in writing, to such assignment.  The Hospital may, in its discretion, assign this Agreement as the Hospital deems necessary for future development.

26.     **Compliance with Laws, Rules and Regulations.**  The parties acknowledge that this Agreement is subject to, and agree to comply with, applicable local, state, and federal statutes, rules, and regulations.  Any such provisions that currently or in the future invalidate any term of this Agreement, that are inconsistent with any term of this Agreement, or that would cause one or both of the parties to be in violation of law while performing this Agreement shall be deemed to have superseded the terms of this Agreement.  The parties shall use their best efforts to accommodate the terms and intent of this Agreement consistent with the requirements of applicable statutes, rules and regulations.

27.     **Representations**.  The Physician Assistant represents and warrants that she is in full compliance with all applicable laws, including licensing laws, and in good standing under the Federal Medicare program.  The Physician Assistant shall promptly notify the Hospital of any action to suspend, revoke, or restrict her license or Federal Medicare program good standing status.  If Physician Assistant is sanctioned by the Federal Medicare program she may be terminated immediately.

28.     **Arbitration**.  Any controversy, dispute or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in accordance with the then existing rules of the American Arbitration Association and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The fees and expenses for such arbitration shall be paid equally by the Hospital and the Physician Assistant.

29.     **HIPAA Compliance**.  To the extent a party provides to the other any information regarding or pertaining to its patients or to the extent a party receives information about a patient of the other as an incidental or accidental consequence of the parties fulfilling their respective obligations under this Agreement, and in accordance with and pursuant to federal and state laws and regulations, including the Administrative Simplification provisions of the Health Insurance

Portability and Accountability Act of 1996, 45 CFR Part 160 and 164, providing for the protection of patient health information, the parties hereby agree to appropriately use and safeguard patient health information provided or disclosed to each other and to keep such information in strictest confidence in order to protect the privacy of all patients to the extent required by law.  The business affairs and information of the parties, including, and without limitation to, information shared pursuant to this Agreement, are confidential and neither party will discuss such matters with or disclose the contents of this Agreement to anyone who is not a trustee, officer, agent, or a fiduciary of either party having a need to know such information in performance of her duties, all of whom shall be subject to this provision concerning confidentiality.  The obligations of confidentiality set forth in this Section are intended to carry on beyond the term of this Agreement, irrespective of whether this Agreement is terminated as provided herein or expires on its own terms.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date set below their respective names.

**METRO HEALTH HOSPITAL**

By: _Michael D. Faas_
Its President: _Michael D. Faas_

Date: _12 / 10 / 09_

**PHYSICIAN ASSISTANT**

_____
VALERIE KLOOSTERMAN, PA-C

Date: _11 / 19 / 09_

Approved for signature
Legal Department

- 8 -

**SCHEDULE A**

**METRO HEALTH CORPORATION**
**AND RELATED SUBSIDIARIES**
PHYSICIAN ASSISTANT MAP
JOB CLASSIFICATION: 7501 OR 7500

1.    **GENERAL RESPONSIBILITIES/EXPECTATIONS    WEIGHT: 45**

1.1    Basic Medical Knowledge  - The Physician Assistant possesses medical knowledge/skills comparable to that normally found in the medical community for the applicant's specialty.

1.2    Professional Knowledge/Judgment  - Physician Assistant is able to apply medical knowledge in establishing accurate diagnosis and appropriate treatment plans.

1.3    Responsibility/Dependability  - Patients, colleagues and supervising physician can depend on Physician Assistant/nurse practitioner to fulfill commitments. Physician Assistant accepts responsibility for her own professional decisions.

1.4    Ethical Conduct  - Physician Assistant upholds standards of ethics, as defined by her affiliated professional organizations.  Physician Assistant places patient care above personal gain.

1.5    Clinical Competence  - Physician Assistant's patient outcomes are generally positive.

1.6    Cooperativeness/Interpersonal Relations  - Physician Assistant cooperates with and listens to the opinions of others.  Physician Assistant treats patients, colleagues and staff with respect and courtesy.

1.7    Compliance with Metro Health Corporation and Related Subsidiaries Policies – Physician Assistant is familiar with and complies with Metro Health Corporation and Related Subsidiaries standards and/or policies and procedures.

1.8    Respect  - Physician Assistant has a favorable reputation in the professional and lay communities for quality of medical practice.

1.9    Accuracy/Timeliness  - Physician Assistant's medical record documentation and/or verbal reports are accurate and comply with Metro Health Corporation and Related Subsidiaries policy.

1.10    Initiative  - Physician Assistant takes independent initiative to successfully follow through on tasks assigned to him/her.

1.11    Communication  - Physician Assistant is able to effectively communicate with

- 9 -

others, including subordinates, peers and superiors.

1.12    HIPPA – Physician Assistant complies with Metro Health Corporation and
        Related Subsidiaries Policies HIPAA policies and guidelines.

1.13    Confidentiality  - Physician Assistant appropriately maintains patient
        confidentiality and does not publicly discuss private patient information.

1.14    Attendance  - Physician Assistant attends all required training and business
        meetings.

## 2.    CLINICAL SKILLS                          WEIGHT: 20

2.1     Physician Assistant seeks consultations with the supervising physician, as
        appropriate, on complex cases in which she is unable to reach a conclusive
        diagnosis.

2.2     Based on quality assessment findings, Physician Assistant's performance exceeds
        or meets standards of the medical community and/or her peers in the same
        specialty area.

## 3.    DOCUMENTATION                            WEIGHT: 25

3.1     Physician Assistant provides concise, accurate and timely dictations.

3.2     Physician Assistant's dictated reports are to follow Metro Health Corporation's
        and related subsidiaries' protocols.

3.3     Physician Assistant utilizes standard, consistent terminology in her dictated
        reports.

## 4.    EQUIPMENT/SUPPLY UTILIZATION/HUMAN RESOURCES/TIME
        MANAGEMENT                               WEIGHT: 10

4.1     Physician Assistant appropriately utilizes Metro Health Corporation and Related
        Subsidiaries equipment and instrumentation.

4.2     Physician Assistant appropriately uses Metro Health Corporation and Related
        Subsidiaries resources such as office supplies, clerical support, and or phone
        equipment.

4.3     Physician Assistant possesses time management skills appropriate for completion
        of the tasks assigned.

**5.   CUSTOMER SERVICE**                    **WEIGHT:  20**

5.1   Physician Assistant works as a team with other members of the
office site to assist patients of Metro Health Corporation and Related Subsidiaries
with their health care needs.

5.2   Physician Assistant works extra time, as needed, to achieve excellent customer
service to her peers, subordinates and/or superiors.

5.3   Physician Assistant is considerate of the unique personal needs of patients and
others with whom she interacts

EXHIBIT E

Schedule A
# Metro Health Corporation
&
Related Subsidiaries
Physician Assistant/Nurse Practitioner Map
Job Classification:  7501 or 7500

Using a score of 1 to 3 (3 being the highest), score each of the following areas.
*Scores of 1 or 3 require a comment.

## 1.  General Responsibilities/Expectations (Weight = 45)

**Basic Medical Knowledge:**  The Physician Assistant/Nurse Practitioner possesses medical knowledge/skills comparable to that normally found in the medical community for the applicant's specialty.

1 **(2)** 3

**Professional Knowledge/Judgment:**  The Physician Assistant/Nurse Practitioner is able to apply medical knowledge in establishing accurate diagnosis and appropriate treatment plans.

1 **(2)** 3

**Responsibility/Dependability:**  Patients, colleagues and supervising physician can depend on Physician Assistant/Nurse Practitioner to fulfill commitments.  Physician Assistant/Nurse Practitioner accepts responsibility for his/her own professional decisions.

1 2 **(3)**

**Ethical Conduct:**  Physician Assistant/Nurse Practitioner upholds standards of ethics, as defined by his/her affiliated professional organizations.  Physician Assistant/Nurse Practitioner places patient care above personal gain.

1 2 **(3)**

**Clinical Competence:**  Physician Assistant's/Nurse Practioner's patient outcomes are positive.

1 **(2)** 3

**Cooperativeness/Interpersonal Relations:**  Physician Assistant/Nurse Practitioner cooperates with and listens to the opinions of others.  Physician Assistant/Nurse Practitioner treats patients, colleagues and staff with respect and courtesy.

1 2 **(3)**

**Compliance with Metro Health Corporation and Related Subsidiaries Policies:**  Physician Assistant/Nurse Practitioner is familiar with and complies with Metro Health Corporation and Related Subsidiaries standards and/or policies and procedures.

1 **(2)** 3

**Respect:**  Physician Assistant/Nurse Practitioner has a favorable reputation in the professional and lay communities for quality and medical practice.

1 **(2)** 3

**Accuracy/Timeliness:**  Physician Assistant's/Nurse Practioner's medical record documentation and/or verbal reports are accurate and comply with Metro Health Corporation and Related Subsidiaries policy.

1 2 **(3)**

**Initiative:**  Physician Assistant/Nurse Practitioner takes independent initiative to successfully follow through on tasks assigned to him/her.

1 2 **(3)**

**Communication:**  Physician Assistant/Nurse Practitioner is able to effectively communicate with others, including subordinates, peers and superiors.

1  2  ③

**HIPAA:**  Physician Assistant/Nurse Practitioner Complies with Metro Health Corporation and Related Subsidiaries Policies HIPAA policies and guidelines.

1  ②  3

**Confidentiality:**  Physician Assistant/Nurse Practitioner appropriately maintains patient confidentiality and does not publicly discuss private patient information.

1  ②  3

**Attendance:**  Physician Assistant/Nurse Practitioner attends all required training and business meetings.

1  2  ③

**Comments:** *Valerie goes way beyond the call of duty when dealing with patients, follow up and professional responsibility. She is very ethical responsible and treats all with respect & caring. Documentation reports, charting & dictation are extremely accurate, complete & timely*

## 2. Clinical Skills (Weight = 20)

Physician Assistant/Nurse Practitioner seeks consultations with the supervising physician, as appropriate, on complex cases in which he/she is unable to reach a conclusive diagnosis.

1  ②  3

Based on quality assessment findings, Physician Assistant's/Nurse Practitioner's performance exceeds or meets standards of the medical community and/or his/her peers in the same specialty area.

1  ②  3

Comments:

_____
_____
_____
_____
_____

## 3. Documentation (Weight = 25)

Physician Assistant/Nurse Practitioner provides concise, accurate and timely dictations.

1  2  ③

Physician Assistant's/Nurse Practitioner's dictated reports comply with Metro Health Corporation and Related Subsidiaries protocol.

1  2  ③

Physician Assistant/Nurse Practitioner utilizes standard, consistent terminology in his/her dictated reports.

1  2  ③

**Comments:** Valerie's dictation / documentation is always complete accurate & timely. She always has paperwork completed on time

## 4. Equipment / Supply Utilization / Human Resources / Time Management (Weight = 10)

Physician Assistant/Nurse Practitioner appropriately utilizes Metro Health Corporation and Related Subsidiaries equipment and clinical supplies.    1 **②** 3

Physician Assistant/Nurse Practitioner appropriately uses Metro Health Corporation and Related Subsidiaries staff resources.    1 **②** 3

Physician Assistant/Nurse Practitioner possesses time management skills appropriate for completion of the tasks assigned.    1  2 **③**

**Comments:** Valerie is able to see patients, do paperwork assist others and still find time to volunteer to do additional tasks including PIP, etc

## 5. Customer Service (Weight = 20)

Physician Assistant/Nurse Practitioner works as a team with other members of the office site to assist patients of Metro Health Corporation and Related Subsidiaries with their health care needs.    1 **②** 3

Physician Assistant/Nurse Practitioner works extra time, as needed, to provide excellent customer service to his/her peers, subordinates and/or superiors.    1  2 **③**

Physician Assistant/Nurse Practitioner is considerate of the unique personal needs of patients and others with whom he/she interacts.    1 **②** 3

**Comments:** I have never had a complaint about customer service and Val does all of PIP etc frequently on her own time

Employee Signature _____ PAC    Date 7/6/06        Medical Director Signature _____    Date 6/30/06

SCHEDULE A
METROPOLITAN HEALTH CORPORATION
AND RELATED SUBSIDIARIES
PHYSICIAN ASSISTANT/NURSE PRACTITIONER MAP
JOB CLASSIFICATION:   7501 OR 7500

**1. GENERAL RESPONSIBILITIES / EXPECTATIONS**
**WEIGHT: 45**

1.1     Basic Medical Knowledge –The  Physician Assistant/Nurse Practitioner possesses medical knowledge/skills comparable to that normally found in the medical community for the applicant's specialty.

1.2     Professional Knowledge/Judgment – Physician Assistant/Nurse Practitioner is able to apply medical knowledge in establishing accurate diagnosis and appropriate treatment plans.

1.3     Responsibility/Dependability – Patients, colleagues and supervising physician can depend on Physician Assistant/Nurse Practitioner to fulfill commitments.  Physician Assistant/Nurse Practitioner accepts responsibility for his/her own professional decisions.

1.4     Ethical Conduct – Physician Assistant/Nurse Practitioner upholds standards of ethics, as defined by his/her affiliated professional organizations. Physician Assistant/Nurse Practitioner places patient care above personal gain.

1.5     Clinical Competence – Physician Assistant's/Nurse Practitioner's patient outcomes are positive.

1.6     Cooperativeness/Interpersonal Relations – Physician Assistant/Nurse Practitioner cooperates with and listens to the opinions of others.  Physician Assistant/Nurse Practitioner treats patients, colleagues and staff with respect and courtesy.

1.7     Compliance with Metropolitan Health Corporation and Related Subsidiaries Policies – Physician Assistant/Nurse Practitioner is familiar with and complies with Metropolitan Health Corporation and Related Subsidiaries standards and/or policies and procedures.

| 3 |

1.8     Respect – Physician Assistant/Nurse Practitioner has a favorable reputation in the professional and lay communities for quality of medical practice.

| 3 |

1.9     Accuracy/Timeliness – Physician Assistant's/Nurse Practitioner's medical record documentation and/or verbal reports are accurate and comply with Metropolitan Health Corporation and Related Subsidiaries policy.

| 3 |

1.10    Initiative – Physician Assistant/Nurse Practitioner takes independent initiative to successfully follow through on tasks assigned to him/her.

| 3+ |

1.11    Communication – Physician Assistant/Nurse Practitioner is able to effectively communicate with others, including subordinates, peers and superiors.

| 3 |

1.12    HIPAA - Physician Assistant/Nurse Practitioner complies with Metropolitan Health Corporation and Related Subsidiaries Policies HIPAA policies and guidelines.

| 3 |

1.13    Confidentiality – Physician Assistant/Nurse Practitioner appropriately maintains patient confidentiality and does not publicly discuss private patient information.

| 3 |

1.14    Attendance –Physician Assistant/Nurse Practitioner attends all required training and business meetings.

| 3 |

COMMENTS:

A pleasure to work with
'excellent knowledge Ehics, respect, communication,
And skills'

## 2.  CLINICAL SKILLS                    WEIGHT:  20

2.1     Physician Assistant/Nurse Practitioner seeks consultations with the supervising physician, as appropriate, on complex cases in which he/she is unable to reach a conclusive diagnosis.

2.2   Based on quality assessment findings, Physician Assistant's/Nurse Practitioner's performance exceeds or meets standards of the medical community and/or his/her peers in the same specialty area.

COMMENTS:

KNOWS Her Limits

## 3.  DOCUMENTATION                    WEIGHT: 25

3.1     Physician Assistant/Nurse Practitioner provides concise, accurate and timely dictations.

3.2     Physician Assistant's/Nurse Practitioner's dictated reports comply with Metropolitan Health Corporation and Related Subsidiaries protocol.

3.3     Physician Assistant/Nurse Practitioner utilizes standard, consistent terminology in his/her dictated reported.

COMMENTS:

EXCELLENT USE OF EPIC AND
SHARES WAYS OF USING SYSTEM

## 4. EQUIPMENT/SUPPLY UTILIZATION / HUMAN RESOURCES / TIME MANAGEMENT          WEIGHT: 10

4.1     Physician Assistant/Nurse Practitioner appropriately utilizes Metropolitan Health Corporation and Related Subsidiaries equipment and clinical supplies.

3

4.2     Physician Assistant/Nurse Practitioner appropriately uses Metropolitan Health Corporation and Related Subsidiaries staff resources.

3

4.3     Physician Assistant/Nurse Practitioner possesses time management skills appropriate for completion of the tasks assigned.

3

COMMENTS:

excellent time management skills.
Very competent & use of resources
& and equipment.

## 5. CUSTOMER SERVICE          WEIGHT: 20

5.1     Physician Assistant/Nurse Practitioner works as a team with other members of the office site to assist patients of Metropolitan Health Corporation and Related Subsidiaries with their health care needs.

3

5.2     Physician Assistant/Nurse Practitioner works extra time, as needed, to achieve excellent customer service to his/her peers, subordinates and/or superiors.

3

5.3     Physician Assistant/Nurse Practitioner is considerate of the unique personal needs of patients and others with whom he/she interacts.

3

COMMENTS:

excellent team player.
Well respected
wonderful provider.

EXHIBIT F



# METRO HEALTH
## UNIVERSITY OF MICHIGAN HEALTH

August 24, 2021

Valerie Kloosterman, PA

*Via Hand Delivery*

Re: Notice of Termination of Employment Agreement

Dear Ms. Kloosterman:

Pursuant to the Section 11(d) of the Physician Assistant Employment Agreement ("Agreement") between you and Metro Health – University of Michigan Health ("Metro Health") entered into effective November 19, 2009, this letter serves as Metro Health's 90-day notice of its intent to terminate the Agreement. The Agreement and your employment with Metro Health will end on November 22, 2021. During the notice period, you will continue to be paid consistent with normally scheduled payroll. We will not require you to work during the notice period.

You are hereby reminded of your obligations to Metro described at, without limitation, paragraphs 12 (Duty of Physician Assistant Upon Termination) and 29 (HIPAA Compliance) of the Agreement.

If you have any questions concerning the information contained in this letter, please contact me directly.

Sincerely,

Raki K. Pai, MD, MBA
President Medical Group /
Chief Population Health Officer
Metro Health – University of Michigan Health

EXHIBIT G

DeGood, Amy | Baker, Cassie S; Brown, Brenda L; COLE, MICHELLE L DeGood, Amy J; Fuentes, Adriana M; Green, Emily R; Haney, Casey J; + 20 ▾

## Apology

Retention Policy 7 Year Delete (7 years)                              Expires 8/28/2028

ⓘ You forwarded this message on 9/30/2022 3:55 PM.

I wanted to send out an apology to any staff members I was unable to connect directly with last week about the separation of Valerie from our practice. As you all know, this is a huge loss to our team. She was/is an amazing provider. She will be missed tremendously. I also want you to know that this was not a sudden decision made by our leadership, yet involved many discussions with Valerie over the past couple months. Unfortunately this was the final decision made. I can not disclose many of the details surrounding this decision, however, if you need any follow up discussions regarding this situation, please know that I am here to listen. I know Valerie is very saddened by the fact that she can not say goodbye to all of you. If you have the ability to reach out to her, please do. I know she would appreciate the call.

Again, I am sorry if I didn't reach you in person. It was a whirlwind of a week.

Amy

**Amy DeGood**

Office Manager II

METRO HEALTH
UNIVERSITY OF MICHIGAN HEALTH

EXHIBIT H



## METRO HEALTH
UNIVERSITY OF MICHIGAN HEALTH

September 3, 2021

Valerie Kloosterman

Valerie,

This letter is in response to your request to have documented reasons and rationale for the separation of our employment agreement. As we discussed on August 24th, 2021, Metro Health – University of Michigan Health is committed to ensuring all of our patients have the opportunity to access respectful appropriate evidence-based medical care. Our organization serves a diverse population of patients and we believe all patients have the right to an inclusive level of care. The decision to separate your employment was based on your refusal to provide respectful evidence-based care to our diverse patient population, specifically the LGBTQIA+ population, including:

- The refusal to utilize a patient's preferred pronouns due to your belief that a person's gender and gender identity are determined only by sex at birth.
- The intentional alteration of the medical record to change the patient's preferred pronouns from the templated pronoun selected by the patient to a different pronoun which you believe better aligns with the patient's outward physical appearance and sex at birth.
- The refusal to provide a referral to another provider for a gender transitioning patient seeking consultation, discussion, and shared-decision making about their evidence-based treatment options. This refusal is in violation of the American Academy of Physician Assistants' Guidelines for Ethical Conduct, which states
  - *"While PA's are not expected to ignore their own personal values, scientific or ethical standards, or the law, they should not allow their personal beliefs to restrict patient access to care. A PA has an ethical duty to offer each patient the full range of information on relevant options for their healthcare. If personal moral, religious, or ethical beliefs prevent a PA from offering the full range of treatments available or care the patient desires, the PA has an ethical duty to refer a patient to another qualified provider."*

We respect that your personal beliefs may differ from that of the patient, and we would never ask you to change or abandon those. We also would not require you to personally provide care to a patient that you were not comfortable providing, whether that discomfort was due to lack of professional knowledge and experience, or personal, religious, or other ethical beliefs. However, our obligation to provide inclusive care to patients is clear. Your actions and refusals fundamentally alter the nature of the services we are trying to provide, which led to our decision to separate.

Respectfully,

*Catherine S. Smith*

EXHIBIT I



## <u>CMDA Ethics Statement</u>

# Transgender Identification

**Preamble**

A novel way of thinking about one's body has entered into popular culture. "Transgender" individuals refer to their "gender" as a sexual identity that may be male or female, something in between, or neither. This self-identification differs from, and takes priority over, their biological sex as recognized in their chromosomal DNA and innate physical sexual characteristics. The naming of gender as a category set apart from sex is an idea foreign to the holistic view of the person as understood within Christianity. Christians affirm the biblical understanding of humankind as having been created male and female, with the two sexes having equal dignity and a complementary relationship to each other.

At the heart of disagreement over transgenderism is a difference in worldviews. If the human body is nothing more than the product of mindless, random, purposeless physical forces, then one may do with it what one wishes, even to demand medical and surgical cooperation in projects to alter, amputate, or reconstruct normal tissue to conform to the patient's revised psychological sense of identity. If, on the other hand, our bodies are an inseparable aspect of our true selves and are a good gift from God, who has designed the sexes to be wonderfully paired, and who has a purpose for humanity, then respecting the gift of given sexual identity and the ensuing moral obligations to our neighbors is the surest path to human flourishing.

Both worldviews share the recognition that humanity is broken and in need of renewal, but they look to different answers for healing. Christians seek not a reconfiguring of the body, but a spiritual transformation of the mind to become more like Christ; not rejecting the gifts of God, but welcoming God's purposes and demonstrating God's love by loving our neighbors. This love of neighbors includes loving our transgender neighbors as persons who, like all people, are created in God's image. However, loving them and validating them as people does not mean agreeing with their ideologies or use of language.

The Christian Medical & Dental Associations (CMDA) believes that healthcare professionals should not be forced to violate their conscientious commitment to their patients' health and welfare by being required to accept and participate in harmful gender-transition interventions, especially on the young and vulnerable. CMDA affirms the obligation of Christian healthcare professionals caring for patients struggling with gender identity to do so with sensitivity and compassion, consistent with the humility and love that Jesus modeled and commanded us to show all people.

**Introduction**

CMDA affirms that all human beings are created in the image of, and beloved by, God. All human beings are our "neighbors", and are to be loved by us as we love ourselves. All human beings possess intrinsic dignity and are worthy of equal respect and concern from Health Care Professionals.

CMDA considers "sex" (i.e., male or female) to be an objective biological fact (see section B.1. below). CMDA affirms the historic understanding of gender as referring to biological sex and the enduring biblical understanding of humankind as having been created male and female and that this is good. CMDA acknowledges the current cultural use of the word "gender" to refer to one's sense of identity as male or female. CMDA cannot support the recent usage of the term "gender" to emphasize an identity other than one's biological sex, that is, a subjective sense of self based on feelings or desires leading to identifying somewhere on a fluid continuum of gender identity.[1,2,3,4] (See Glossary at the end of this document)

CMDA cannot support the prevailing culture's acceptance of an ideology of unrestrained sexual self-definition that, in celebrating gender fluidity and gender transition efforts, is indifferent to biological reality and opposed to the biblical understanding of human sexuality. Further, CMDA is alarmed that some proponents of transgender ideology, through activism and intimidation, are insisting that healthcare professionals cooperate with and affirm their beliefs in gender fluidity, even if the healthcare professionals believe that such cooperation and affirmation would be doing harm to their patients. This violates the most fundamental core value of medicine since Hippocrates, that of caring only for the good and benefit of the patient while abstaining from all unnecessary harm. The evolving scientific and medical facts demonstrate that the mutilation of normal tissue and profound disruption of normal physiology that occur during gender transition procedures are very difficult to justify, as this constitutes deliberate harm.

CMDA affirms the obligation of Christian healthcare professionals caring for patients struggling with gender identity to do so with sensitivity and compassion. CMDA holds that attempts to radically reconstruct one's body surgically or hormonally for psychological indications, however, are medically, ethically, and psychologically inappropriate. These measures alter healthy tissue and increasingly are not supported by scientific research evaluating behavioral, medical, and surgical outcomes.[5,6,7,8,9,10,11]

Accordingly, CMDA opposes medical assistance with gender transition on the following grounds:

## A. Biblical

1. God created humanity as male and female (Gen 1:27, 5:2; Matt 19:4; Mark 10:6). God's directives – to have dominion over the earth and to fulfill his goals of procreation, union, fellowship, and worship – are given to men and women together (Gen 1:26-28, 2:18-24).
2. Men and women are morally and spiritually equal (Gal 3:28) and are created to have roles that are in some respects alike and in other respects wonderfully complementary (Eph 5).
3. All people are loved by God (John 3:16-17). All struggle with moral failure and fall short of God's standards (Rom 3:10-12) and, therefore, need the forgiveness that God provides through Christ alone (John 3:36; Rom 3:22-24; Col 1:15-22; 1 Tim 2:5-6).
4. For the Christian, all of ethics, grounded in God's moral law, is based upon the first and

second greatest commandments: to love God with all our heart, soul, and mind, and to love our neighbors as ourselves (Matt 22: 37-40). If we encourage others to sin sexually, just as if we sin sexually ourselves, we are violating these two commandments. We violate the first greatest commandment by failing to love God in his holiness, wisdom, and rightful place as our Creator, and we violate the second greatest commandment as we fail to respect ourselves and each other by abetting lives of disobedience, deception and unholiness (1 Cor 6: 13b-20). Love may include a corrective component that should be applied in an appropriate and timely manner; affirmation can be enablement.

5. We live in a fallen world (Gen 3), and we all come into this world as fallen creatures with a sinful nature. (Rom 3:9-12). The fall is expressed in nature and in humanity in many ways, including sexuality. Confusion of gender identity is but one example of the fall, as are also marital breakdown and sexual immorality (Rom 1:24-32; Eph 5:3).

6. A lifestyle that is directed by pursuing sexual desires, or driven by personal sexual fulfillment, misses the divinely ordained purpose of sex, which is for procreation, bond creation, and re-creation[12] and for facilitating unity in the lifelong commitment of marriage, which is defined as being between one man and one woman. Heterosexual marriage fosters a secure and nurturing environment for children and it reflects the unity of Christ and the Church (Exod 20:1-18; Lev 20:10-21; Rom 1; Eph 5:23-33) (see also CMDA Statement on Homosexuality).

7. Believers in Christ, though having inherited the sinful nature common to all humanity, also receive a new nature in Christ. As the old nature, being crucified with Christ, dies, our new redeemed nature, sealed by Christ's bodily resurrection, is actively transforming our minds and hearts to be more and more like Christ. This transformation is spiritual, not sexual, and is God's work, not something of our own design (Psalm 100:3; Rom 12:2; Col 1:27).

## B. Biological

1. Sex is an objective biological fact that is determined genetically at conception by the allocation of X and Y chromosomes to one's genome, is observable at birth, is found in every nucleated cell, and is immutable throughout one's lifetime. Sex is not a social construct arbitrarily assigned at birth and cannot be changed at will.[2,3,13]

2. Human beings are sexually dimorphic. Male and female phenotypes are the outworking of sex gene expression, which shapes sex anatomy, determines patterns of sex hormone secretion, and influences sex differences in the development of the central nervous system and other organs.[2,3,14]

3. Procreation requires genetic contributions from both one man and one woman.[15,16]

4. CMDA recognizes that exceedingly rare congenital abnormalities exist in which phenotypic sex characteristics are not what is expected from the genotype.[1,2] These disorders of sex development are of a diverse nature, but usually impair fertility.[3] Treatment (including non-intervention) of these disorders differs categorically from transgender interventions, which are performed on persons with no inherent defect in sex organ development, function, or fertility. Anomalies of human biological sex are conditions rather than identities, something one has rather than who one is.[4] Disorders of sex development are not the fault of the patient, do not invalidate God's design in creation, and do not constitute a third sex.[17,18,19,20]

5. Gender dysphoria[21], the condition of experiencing discomfort or distress at one's sex and preferring a different "gender" identity, has not to date been linked to a genetic cause and

is a psychological disorder of unclear and complex origin.[22,23,24] Gender dysphoria may cause profound distress. It should not be confused with transient gender-questioning that can occur in early childhood.[25,26,27,28,29,30]

## C. Social

1. CMDA recognizes that gender identity issues are complex. The inclination to identify with the opposite sex or as some other gender identity along a spectrum may have non-genetic biological,[31] familial,[32,33] and social [27,28,34] causes that are not personally generated by particular individuals.[21-30]

2. In our current social context, there is a prevailing view that removing traditional definitions and boundaries is a requirement for self-actualization. Thus, Christian healthcare professionals find themselves in the position of being at variance with evolving views of gender identity in which patients or their subcultures seek validation by medical professionals of their transgender desires and choices through medical or surgical solutions to gender dysphoria. Although such desires may be approved by society at large, they are contrary to a biblical worldview and to biological reality and thus are disordered.

3. In contrast to the current culture, CMDA believes that finding one's identity within God's design will result in genuine human flourishing. CMDA believes, moreover, that social movements which assert that gender is a choice are mistaken in defining gender as something independent of sex. Authentic personal identity consists in social gender expression that is congruent with one's natural biological sex but not limited to stereotypes. CMDA recognizes that this traditional view has become counter-cultural; however, CMDA affirms that God's design transcends culture.

4. CMDA opposes efforts to impose transgender ideology on all society by excluding, suppressing, marginalizing, intimidating, or portraying as hateful those individuals and organizations that disagree on scientific, medical, moral, or religious grounds. Such attacks are contrary to the freedoms of speech and religious liberty that lie at the very foundation of a just and democratic society.

5. There is a social contagion phenomenon luring young people into the transgender culture.[32,33]

6. CMDA opposes efforts to compel healthcare professionals to grant medical legitimacy to transgender ideologies.[35,36,37,38,39,40] Cooperation with requests for medical or surgical gender reassignment threatens professional integrity by undermining our respect for biological reality, evidence-based medical science, and our commitment to non-maleficence (see CMDA Statement on Healthcare Right of Conscience).

7. Promotion of transgender ideology by educational institutions and teachers to children as young as 5 years of age is a danger to the health and safety of minor children (for medical reasons elaborated in the next section).[41,42,43,44,45,46,47] Education should respect the value of every human being; in supporting and affirming the student, it need not affirm every desire.

8. No educational institution or teacher should ever block parents from supervising their child's education or withhold from them knowledge of the educational content.

## D. Medical

1. Transient gender questioning can occur during childhood. Most children and adolescents who express transgender tendencies eventually come to identify with their biological sex

during adolescence or early childhood.[48,49,50,51,52,53] There is evidence that gender dysphoria is influenced by psychosocial experiences and can be exacerbated by promoters of transgender ideology.[27,33] Early counseling for children expressing gender dysphoria is critical to treat any underlying psychological disorders, including depression, anxiety, or suicidal tendencies, and should be done without promoting attempts for gender transitioning.

2. Hormones prescribed to a previously biologically healthy child for the purpose of blocking puberty inhibit normal growth and fertility, cause sexual dysfunction, and may aggravate mental health issues. Continuation of cross-sex hormones, such as estrogen and testosterone, during adolescence and into adulthood, is associated with increased health risks including, but not limited to, high blood pressure, blood clots, stroke, heart attack, infertility, and some types of cancer.[51,54,55,56,57,58,59,60]

3. Although some individuals report a sense of relief as they initiate the transitioning process, this is not always sustained or consistent over time. Some patients regret having undergone the transitioning attempt process and choose to detransition, which involves additional medical risk and cost.[56,61,62,63,64]

4. Among individuals who identify as transgender, use cross-sex hormones, and undergo attempted gender reassignment surgery, there are well-documented increased incidences of depression, anxiety, suicidal ideation, substance abuse, and risky sexual behaviors in comparison to the general population.[21,22,23,61,65,66,67] These health disparities are not prima facie evidence of healthcare system prejudice. These mental health co-morbidities have been shown to predate transgender identification.[24,25,26,27,28,34,68] Patients' own gender-altering attempts and sexual encounter choices (or, in the case of children, their parents' choices on their behalf) are among the factors relevant to adverse outcomes in transgender-identified patients.

5. Although current medical evidence is incomplete and open to various interpretations, some studies suggest that surgical alteration of sex characteristics has uncertain and potentially harmful psychological effects and can mask or exacerbate deeper psychological problems.[7,8,9,69] Evidence increasingly demonstrates that there is no reduction in depression, anxiety, suicidal ideation, or actual suicide attempts in patients who do undergo surgical transitioning compared to those who do not.[7,70] The claim that sex-reassignment surgery leads to a reduction in suicide and severe psychological problems is not scientifically supported.[64,71,72,73]

6. A patient has died because the medical records conveyed only the individual's gender preference, and not their biological sex, leading to misdiagnosis and medical catastrophe.[7474]

## E. Ethical

1. Restoring and preserving physical and mental health are goals of medicine, but assisting with or perpetuating psychosocial disorders are not. Accordingly, treatment of anomalous sexual anatomy is restorative.[75] Interventions to alter normal sexual anatomy and physiology to conform to identities arising from gender dysphoria are disruptive to health.[9,76]

2. Medicine rests on science and should not be held captive to desires or demands that contradict biological reality. Sex reassignment operations are physically harmful because they disregard normal human anatomy and function. Normal anatomy is not a disease; dissatisfaction with natural anatomical and genetic sexual makeup is not a condition that

can be successfully remedied medically or surgically.

3. The medical status of gender identity disorder (currently termed gender dysphoria) as a mental or psychosocial disorder should not be discarded.

4. The inability of men, including men who identify as women, to bear children is not an illness to be remedied by medical or surgical means, such as uterine transplantation.[77] Uterine transplantation into biological men cannot be justified medically (See CMDA Statement on Enhancement and CMDA Statement on Transplantation).

5. Fundamentally, it is unrealistic to remove or mutilate normal organs and tissue and to disrupt normal physiology, and then to expect normal function. This illustrates the reality that complete gender transitioning is not medically possible.

6. Christian patients struggling with transgender inclinations face not only the psychological distress of a desire for a gender identity different from their biological sex, but may also face the spiritual distress that comes to anyone who follows a path in life that departs from God's design for humanity. Hormonal or surgical interventions cannot resolve spiritual distress but may lead to further spiritual turmoil. These, our neighbors, need and deserve the spiritual, psychological, and social support of the Christian community.

7. CMDA is especially concerned about the increasing phenomenon of parents enabling their gender-questioning children or adolescent minors to receive hormones to inhibit normal adolescent development. Children and adolescents lack the developmental cognitive capacity to assent or request such interventions, which have lifelong physical, psychological, and social consequences.[56] Facilitating hormonal or surgical transitioning interventions for those who have not reached the age of majority is a form of child endangerment and abuse.[64] Highly affirming parents have been shown to not improve the mental health statistics of transgender-identified children.[78]

8. Many diseases affect men and women differently, according to biological sex phenotype. Transgender designations may conceal biological sex differences relevant to medical risk factors, the recognition of which is important for effective healthcare and disease prevention. As accurate documentation is necessary for good patient care, healthcare professionals should document the patient's biological sex and any alterations of gender characteristics in the medical record.[2,13,54,57,79,80,81] It is appropriate and should not be interpreted as disrespectful for healthcare professionals to discuss their patients' biological sex with them as part of their medical care.[80,81]

9. For the overall health of the patient, the healthcare professional should be forthright with the patient that addressing the individual's sexual reality is necessary for appropriate medical care and should not be interpreted as disrespect.

**CMDA Recommendations for the Christian Community**

1. A person questioning or struggling with gender identity should evoke neither scorn nor enmity, but rather the Christian's concern, compassion, help, and understanding. Christians must respond to the complex issues surrounding gender identity with grace, civility, and love.

2. Christians should avail themselves of opportunities to help the larger society understand that male/female sexes are complementary and permanent. Both are good and part of the created order. For the reasons elaborated above, CMDA believes that attempting to define gender as fluid and changeable through technical means will have grave spiritual, emotional, cultural, and medical repercussions.

3. The Christian community, beginning with the Christian family, must resist stereotyping or

rejecting individuals who do not fit the popular norms of masculinity and femininity. At the same time, parents should guide their children and adolescent minors in appropriate gender identity development. For children and adolescents experiencing gender dysphoria, the Christian community should provide appropriate role models and biblically informed guidance.

4. The Christian community must condemn hatred and violence directed against those struggling with questions of gender identity.

5. Since Christians are to love their neighbors as themselves, they are to love those struggling with gender dysphoria or incongruence of desired gender with biological sex. Love for the person does not condone or facilitate gender transitioning treatments.

6. In obedience to God who commands his followers to love one another, and for the sake of the common good, Christians should welcome inclusion of transgender-identified individuals into their communities, as we are all broken and sinners, not more or less valuable than each other. Transgender-identified individuals have the same rights shared by all other humans. We oppose granting special rights and privileges based on transgender identification. These special rights can negatively impact the rights of others (e.g., bathroom designations that allow biological males access to shared female restrooms or showers, female athletic competitions that give participating biological males an unfair physiologic advantage, affirmative actions, or claims for unnecessary medical interventions).

7. The Christian community is to be a refuge of love for all who are broken – including the sexually broken – not to affirm their sin, nor to condemn, but to shepherd them to Jesus, who alone can forgive, heal, restore, and redirect to a godly, honorable, and virtuous way of life. God provides the remedy for all moral failure through repentance and faith in Jesus Christ and the life-changing power of the Holy Spirit. Though healing may be incomplete on earth, the promise of complete healing for those who are in Christ will ultimately be fulfilled in heaven.

**CMDA Recommendations for Christian Healthcare Professionals**

1. CMDA advocates that all Christian healthcare professionals provide ethically and medically competent care to all patients, including those who identify as transgender. Such care requires compassion, an open and trusting dialogue, a genuine effort to understand and respond to the patient's psychological distress when present, and acceptance of the person without agreeing with the person's ideology or providing a requested sex-altering intervention.

2. CMDA believes that the appropriate medical response to patients with gender dysphoria is to help them understand that they are people God loves and who are made in his image, even when their choices cannot be validated. Christian healthcare professionals should validate their right as individuals in a free society to make decisions for themselves. This right, however, does not extend to obligating Christian and other healthcare professionals to prescribe medication or perform surgical procedures that are harmful (see CMDA Statement on Healthcare Right of Conscience).

3. CMDA believes that Christian healthcare professionals should not initiate hormonal and surgical interventions that alter natural sex phenotypes. Such interventions contradict one of the basic principles of medical ethics, which is that medical treatment is intended to restore and preserve health, and not to harm.

4. CMDA believes that prescribing hormonal treatments to children or adolescents to

disrupt normal sexual development for the purpose of attempting gender reassignment is ethically impermissible, whether requested by the child, the adolescent, or the parent (See CMDA Statement on Limits to Parental Authority in Medical Decision-Making, and CMDA Statement on Abuse of Human Life).

5. Supporting a patient's pursuit of gender transitioning procedures is neither loving nor the best means to help that individual who is experiencing gender dysphoria.

**CMDA Recommendations Regarding Nondiscrimination**

1. Mutual respect and civil discourse are cornerstones of a free society, and so is truthfulness. In the context of health care, identification of sex and gender has both interpersonal and medical implications. In regard to medical documentation, the medical record should document the sex observed at birth even when the patient expresses a different gender preference or has obtained a legal change in gender status.

2. Christian healthcare professionals, in particular, must care for their patients with gender identity disorders in a non-judgmental and compassionate manner, consistent with the humility and love that Jesus modeled and commanded us to show all people. When questioning transgender ideology, Christian healthcare professionals should do so with an attitude of humility and love.

3. Those who hold to a biblical or traditional biological view of human sexuality, including CMDA members, should be permitted to question transgender ideology free from exclusion, oppression, or unjust discrimination. Healthcare professionals who hold the position that transgender identification is harmful and inconsistent with the will of God should not be stigmatized or accused of being bigoted, phobic, unprofessional, or discriminatory because of their desire to adhere to biological and medical reality as a sincerely held (and widely shared) belief.

4. To decline to provide a requested gender-altering treatment that is harmful, or is not medically indicated, does not constitute unjust discrimination against persons. CMDA affirms that Christian and other healthcare professionals should not be coerced or mandated to provide or refer for services they believe to be morally wrong or medically harmful to patients (See CMDA Statement on Healthcare Right of Conscience).

5. Healthcare professionals must not be prevented from providing counseling and support to patients with gender dysphoria and who request assistance with accepting and maintaining their biologic sex and gender identity.


## GLOSSARY

### Person and Image of God

According to the Bible, human persons (as opposed to divine and angelic persons) are embodied from conception onward. At conception, at least one genetically unique human person is formed (twinning may occur during the first two weeks of pregnancy). So the psalmist offers a hymn to God in Psalm 139, "you created my inmost being, you knit me together in my mother's womb. I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well. My frame was not hidden from you when I was made in the secret place, when I was woven together in the depth of the earth, Your eyes saw my unformed body; all the days ordained for me were written in your book before one of them came to be" (13-16 NIV). Human persons are, however, the only persons who are made in the *imago Dei* (image of God). Thus,

Jesus—fully God and fully human—is "image of the invisible God, the firstborn over all creation" (Colossians 1:15). Likewise, according to Genesis, "God created mankind in his own image, in the image of God he created them, male and female he created them" (Genesis 1:27).

## Sex
Human sex and sexuality are aspects of God's good, well-ordered creation. From the beginning he made humans sexual beings (Genesis 2:15-25). Humans are sexual beings who procreate through sexual reproduction. Sex is objective, identifiable, immutable, determined at conception, stamped on every nucleated cell, and highly consequential. [82,83,84,85]
There are 2 sex cells or gametes, sperm and ova. There is no third. Human fallenness incurred pervasive distortions in humanity, including disorders of sexual biology, none of which limits either God's love for each of us, or the inestimable value of creation in His image.

## Sexuality
Human sexuality is a "very good" component of God's well-ordered creation (Genesis 2:15-25). Sexuality is a broad and easily confusing term usually requiring contextualization for clear communication. As noted by McHugh and Mayer, sexuality incorporates desires, attractions, behaviors, and/or identity.[16] Furthermore, sexuality may vary regarding timing, intensity, consistency, and exclusivity. Its elements may be sporadic, temporary, pervasive, or long-term. Sexual expression may be healthful or unhealthful.
Because of human fallenness, sexuality has become disordered. The goods of sexuality are often distorted by pathologies in biology, psychology (e.g., sexual addiction or adultery), and society (e.g., sexual revolution and polyamory). Redeeming sex requires the reordering of human desires and practice. Celibacy outside of marriage, sexual fidelity within heterosexual marriage between one man and one woman, and the presumption in favor of procreation are ways human sex and sexuality may be redeemed.

## Christian Worldview
A worldview is a way of seeing and understanding the phenomenon of the world around us. Like lenses of eyeglasses, one's worldview provides a set of interpretive assumptions that enable us to make sense of our experience. One's worldview is how one answers the big questions of life, such as: Is the world real? What is the nature of reality? Is there a God? What can we know about God? How do I know anything at all? Is matter all there is? Is there a supernatural? The orthodox Christian worldview is grounded on certain theological affirmations found in the Bible, which Christians believe to be the revealed word of God, and summarized in the great confessions in the history of Christianity, for instance, in the Nicene (325 AD) and Apostles (390 AD) Creeds.

## The Fall and Human Fallenness
Rather than remaining faithful to God's will and purposes, Adam and Eve fell from their original righteous state through disobedience (i.e., sin). Their sin brought with it not only immediate deleterious consequences for them (Genesis 3), but for the entire created order thereafter. Those well-ordered desires to love God and love another have become disordered by human depravity. Love for God and others was replaced with hatred, envy, and murder (as in the case of Cain and Abel). The goods of honest labor were turned into toil and struggle in a creation that is now filled with corruption, death, disease, pain, and hardship. After the fall, human beings are born with a propensity to disobedience, selfishness, and sin.

**Intrinsic Dignity**

Because human beings are made in God's image, they possess an intrinsic dignity. They should never be used as a means to an end, but as ends in themselves. Their lives have sacred value and they should not be harmed without just cause. This dignity is intrinsic and equal for all human beings, not varied and dependent on level of function, cognitive or physical, presence of absence of injury or disability, age, or other traits or features for which human beings tend to impute upon others value or worth. Human dignity has been the foundation of Western ethics and jurisprudence and has been enshrined in secular language in the Nuremberg Code and global treaties in science, medicine, and public policy since that time.

**Love**

Christians are called to love God with all their hearts, souls, minds, and body and to love their neighbors as themselves (Deut 6:5; Lev 19:18; Mark 12:29-31). Love is a disposition of heart and life that impels one person to treat another person with respect and dignity quite apart from ethnicity, economic, social status, or what the individual can exploit or receive from the other. Furthermore, love seeks the best for another individual without the expectation any kind of recompense or remuneration.

**Holiness**

With respect to God, holiness is the supreme attribute of all of God's attributes, setting the God of the Bible apart from all other deities. The Triune God is holy in his love, righteousness, justice, wrath, and mercy (among other attributes). With respect to human beings and objects, holiness is being set apart for sacred use (as with the Old Testament Temple). Christian holiness is the aspiration to live a life "set apart" from the corruptions of the world, and instead committed to fidelity, trust, and dependence on God, patterning ourselves after Jesus Christ.

**Repentance**

Repentance is a response to the recognition of harm done, either by commission or omission. The word used in the New Testament (metanoia) means to "turn and go in the other direction." To repent, then, is to acknowledge one's sin and turn back toward God. Turning back toward God may include ceasing to perform or pursue sinful acts, reconciling with those who have been harmed, or restoring items or relationships that have been damaged through one's behavior. Repentance is not a one-time event, but a disposition of character.

**Faith**

Faith is the virtue of trust and dependence on God and his promises, believing and acting in ways consistent with that confidence (Hebrews 11).

**Sexual Orientation**

Orientation essentialism – the belief that a person has a given sexual orientation, be it innate or resulting from various combinations of biology and environment -- is an ideological position that has gained strong purchase in modern culture.

Per academics McHugh and Diamond, polar opposites in many ways:

Psychiatry professor Paul McHugh states, "Sexual orientation is a complex and amorphous phenomenon . . . . There is no scientific consensus on how to define sexual orientation, and the various definitions proposed by experts produce substantially different classes.[83]

Psychology professor Lisa Diamond, "There is currently no scientific or popular consensus . . . that definitively 'qualify' an individual as lesbian, gay, or bisexual."[85]

Genetic essentialism, like its orientation counterpart, is similarly ideological.
- In a 2011 *Psychological Bulletin* Dar-Nimrod and Heine define genetic essentialism as, "The tendency to infer a person's characteristics and behaviors from his or her perceived genetic makeup" (p. 801).[84]  "Much of the ways that genes relate to human conditions can be described as weak genetic explanations" (p. 802).
- Eric Turkheimer of UVA states, "…the amount of influence that genes have on behaviors is considerably smaller than one might think."[84]  And, "…genetic essentialists were wrong about gay genes and similar nonsense."[3] Diamond and Rosky: "In essence, the current scientific revolution in our understanding of the human epigenome challenges the very notion of being "born gay," along with the "born" with *any* complex trait. Rather, our genetic legacy is dynamic, developmental, and environmentally embedded."[85]

### Same-sex attraction
Sexual attraction to members of the same sex. The propensity and degree may vary from near exclusive to occasional attraction, and is shown to potentially change over time. It does not preclude the same individual from experiencing varying degrees of attraction to members of the opposite sex.

### Fornication
Per theologian Robert Gagnon "fornication," likewise *porneia* in Greek, is frequently an overarching reference to sexual sin as defined in Torah. In more common usage, fornication is sexual intercourse between two people not married to each other. Sex between male and female is implied in the term's reference to anatomy, fornix being the curved vaginal recess created by the cervix and the term also being Latin for "arch."
Fornication is separate from adultery or rape.

### Temptation
A trial, being put to the test.
It is not yet sin, but an invitation to it.
　　Jesus "was in all *points* tempted as *we are, yet* without sin." Hebrews 4:15.
It is inherent to the fallen human condition.
　　"No temptation has overtaken you except such as is common to man; …" I Corinthians 10:13.
God tests individuals.
　　Abraham (Genesis 22:1), Job (Job 23:10), I Corinthians 11:32, Hebrews 12:4-11, etc.
Satan tempts individual to sin.
　　Matthew 4:3, I Thessalonians 3:5.
God provides means of rescue.
　　"*then* the Lord knows how to deliver the godly out of temptations…" 2 Peter 2:9.
　　"…but God *is* faithful, who will not allow you to be tempted beyond what you are able, but with the temptation will also make the way of escape, that you may be able to bear *it*." I Corinthians 10:13.
Scripture describes temptation as something to be avoided if possible:
　　"And do not lead us into temptation…" Matthew 6:13.

"Watch and pray, lest you enter into temptation." Mark 14:38.

## Sexual Fantasy - when does it cross into sin?

Temptation is not yet sin. Everyone has a sex drive and the duty to manage it.
Experiencing sexual thoughts is not yet fantasy, or lust, unless willingly pursued. Some have compared the appearance of sexual thoughts to a bird flying over one's head, thus out of our control; and fantasy or lust is compared to the equivalent of allowing that bird to build a nest on our head, something clearly in our power to resist.

## Same-sex attraction chaste life - does it include avoidance of kissing? Is this equal to homosexual celibacy?

This is a multi-faceted question.
1. Scripture speaks of greeting each other with "a holy kiss" (Romans 16:16, I Corinthians 16:20), which is a salutation, something non-sexual.
Greeting with a kiss is a pervasive practice in the general cultures of several nations to this day.
2. The kissing implicit in the stated question is sexual, romantic.
There is no part of homosexual practice that is endorsed in scripture; it is condemned without exception.
3. Though we mean abstinence from homosexual practices when we say, "homosexual celibacy," the application of the term "celibate" to same-sex sexual practice is Biblically problematic.
Lifetime celibacy is referred to as a "gift" by the Apostle Paul in I Corinthians 7:7-9.
A Celibate person is giving up the God-ordained institution of marriage (exclusively between one man and one woman in scriptural standards) along with its God-ordained sexual practice. God gifts, or graces, that person with something else God-ordained in its place. But a person setting aside same-sex sexual practice is abstaining from or repenting of a sinful practice, which is both commanded and its own benefit. We wish to avoid canonizing homosexual temptation.

## Same-sex lifestyle

The willing practice of same-sex sexuality.

## Gay culture

Any assemblage of like-minded people creates a culture. Culture itself is a neutral term that gains a moral dimension in its practice. Gay culture endorses the ideological concept of gay identity along with its practices.
Scripturally and scientifically, we hold that sexuality is a verb and not just a noun. Gay and straight are category errors and false identities. Homosexuality by any name is a practice and not an identity, what one does and not who one is.
Likewise, "gay Christian" language canonizes temptation behind a false identity.  Any name preceding "Christian" is an implicit priority, contravening Paul's instruction to the Galatian church (Gal. 3:28).

## Homophobia, -ic

Homophobia is an ideological and pejorative term that has gained common usage.  It is often an accusation made against an individual failing to sufficiently celebrate same-sex sexuality, practices and politics.

But per MayoClinic.org: "A phobia is an overwhelming and unreasonable fear of an object or situation . . . a phobia is long lasting, causes intense physical and psychological reactions, and can affect your ability to function normally at work or in social settings."

Disagreement is clearly not a phobia.

Linguistically, "homophobia" is somewhat nonsensical, meaning "fear of the same thing."

## Gender vs Sex

Sex is biological and stamped on every nucleated cell in a person's body from conception onward. It is immutable down to the level of brain cells, so it is impossible to have "a man's brain in a woman's body," for example.

Gender, in its common current usage, is an engineered term leveraging linguistics against biology; it is ideological and self-declared.

Historically, however, per theologian Christopher West:

"The root "gen"—from which we get words such as generous, generate, genesis, genetics, genealogy, progeny, gender, and genitals—means "to produce" or "give birth to." A person's gen-der, therefore, is based on the manner in which that person is designed to gen-erate new life. Contrary to widespread secular insistence, a person's gender is not a malleable social construct. Rather, a person's gender is determined by the kind of genitals he or she has." [86]

But ideology does not bow to history. Sex is biology, and gender is ideology.

## Gender Identity

Gender identity is a feeling, a self-perception, of how one identifies with their biological sex or not, and it is often a sex stereotype. It is subjective, self-declared and fluid. Psychologist Dr. John Money of Johns Hopkins initiated its use in professional journals in 1955, referring to "the identity of the inner sexed self."[87]

## Gender Confusion/Dysphoria

Gender identity confusion/dysphoria is a feeling/self-perception that one's biology is not as one wishes it to be or not as one identifies most comfortably as. Sechner notes, "A gender-dysphoric youth experiences a sense of incongruity between the gender expectations linked to her or his biological sex and her or his biological sex itself."[88]

The greater the discomfort/dissonance, the greater the dysphoria. Gender dysphoria is not synonymous with transgenderism, the latter being an umbrella term within which gender dysphoria fits, but to which transgenderism is not limited.

## Gender -  Should we be using that term or is there a better term? If so, how is it best defined?

The answer to that depends on the application and one must be careful.

Gender is an engineered term leveraging linguistics against biology; it is ideological and self-declared. Sex is biological, right down to each human cell containing a nucleus.

Though gender is sometimes used synonymously with sex (e.g., in forms asking if someone is male or female), ideologically it is considered separate and distinct from sex (e.g., "your sex is irrelevant to your gender identity") in a manner that is quite Gnostic (i.e., the "higher knowledge" that transcends lowly biology).

Therefore, it is best to mean what you say and say what you mean in context. Using phrases like "identified gender," "identifies as," "gender incongruence," "gender dysphoria," "transgender identified," etc. work well, don't surrender reality to a claim, and do not imply agreement.

**Best terminology for gender transition?**
That depends on the intended usage.
"Transition efforts" or "transition-affirming treatments/procedures" are both quite clear and do not surrender to ideology as compared to terms like "gender-affirming" or "gender confirming" treatments and procedures.

**Best terminology for transgender identity?**
"Transgender-identified" or "transgender identification" are well understood and non-capitulating.

**A final comment on language**
Terms should be as descriptively accurate as possible while avoiding ideological programming. For instance, because an individual's intrinsic sex cannot be changed, and gender is essentially a biologically meaningless term or concept aside from biological sex, terms such as "transgender identity," as if it were an objective reality, should be replaced by "transgender-identified, -identifying, or -identification," which are descriptively accurate. Similarly, because "gender transition" is not ontologically or biologically possible, more descriptively accurate terms, such as, "attempted transition efforts," or "attempted transition-affirming treatments or procedures," are more accurate and preferred.

*Revised from 2016 CMDA Statement Approved by Board on January 30, 2021*
*Approved by the House of Representatives*
*Passed with 54 approvals, 0 opposed, 0 abstention*
*October 30, 2021, virtual*

**References**
1. Hyde JS, Bigler RS, Joel D, Tate CC, van Anders SM. The future of sex and gender in psychology: Five challenges to the gender binary. *Am Psychol*. 2019;74(2):171-193. doi:10.1037/amp0000307
2. Cretella MA, Rosik CH, Howsepian AA. Sex and gender are distinct variables critical to health: Comment on Hyde, Bigler, Joel, Tate, and van Anders (2019). *Am Psychol*. 2019;74(7):842-844. doi:10.1037/amp0000524
3. Institute of Medicine (US) Committee on Understanding the Biology of Sex and Gender Differences, Wizemann, T. M., & Pardue, M. L. (Eds.). (2001). *Exploring the Biological Contributions to Human Health: Does Sex Matter?*. National Academies Press (US).
4. Sullivan, A. (2020). Sex and the census: why surveys should not conflate sex and gender identity. *International Journal Of Social Research Methodology*, 23(5), 517-524. https://doi.org/10.1080/13645579.2020.1768346
5. Anckarsäter, H., & Gillberg, C. (2020). Methodological Shortcomings Undercut Statement in Support of Gender-Affirming Surgery. *American Journal of Psychiatry*, 177(8), 764–765. https://doi.org/10.1176/appi.ajp.2020.19111117
6. Hruz P. W. (2020). Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria. *The Linacre Quarterly*, 87(1), 34–42. https://doi.org/10.1177/0024363919873762
7. Dhejne C, Lichtenstein P, Boman M, Johansson AL, Långström N, Landén M. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PLoS One*. 2011;6(2):e16885. Published 2011 Feb 22. doi:10.1371/journal.pone.0016885
8. Kalin NH. Reassessing Mental Health Treatment Utilization Reduction in Transgender Individuals After Gender-Affirming Surgeries: A Comment by the Editor on the Process. *Am J Psychiatry*. 2020;177(8):764. doi:10.1176/appi.ajp.2020.20060803

9.  Van Mol A, Laidlaw MK, Grossman M, McHugh PR. Gender-Affirmation Surgery Conclusion Lacks Evidence. *Am J Psychiatry*. 2020;177(8):765-766. doi:10.1176/appi.ajp.2020.19111130

10. Biggs M. Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria. *Arch Sex Behav*. 2020;49(7):2227-2229. doi:10.1007/s10508-020-01743-6

11. Davis SR, Baber R, Panay N, et al. Global Consensus Position Statement on the Use of Testosterone Therapy for Women. *J Clin Endocrinol Metab*. 2019;104(10):4660-4666. doi:10.1210/jc.2019-01603

12. Giovannetti, B., 2014. *Four Letter Words: Conversations On Faith's Beauty And Logic*. San Francisco: Endurant Press, p.178.

13. Bartz D, Chitnis T, Kaiser UB, et al. Clinical Advances in Sex- and Gender-Informed Medicine to Improve the Health of All: A Review. *JAMA Intern Med*. 2020;180(4):574-583. doi:10.1001/jamainternmed.2019.7194

14. 2013. *Diagnostic And Statistical Manual Of Mental Disorders*. Arlington, VA: American Psychiatric Association, p.829.

15. Tournaye H. Is there any reproductive future left for men?. *Facts Views Vis Obgyn*. 2012;4(4):255-258.

16. Mayer LS, McHugh PR. Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences. *New Atlantis* (2016); 50:10-143. At pp.89-90.

17. Beale JM, Creighton SM. Long-term health issues related to disorders or differences in sex development/intersex. *Maturitas*. 2016;94:143-148. doi:10.1016/j.maturitas.2016.10.003

18. Sax L. How common is intersex? a response to Anne Fausto-Sterling. *J Sex Res*. 2002;39(3):174-178. doi:10.1080/00224490209552139

19. Slowikowska-Hilczer J, Hirschberg AL, Claahsen-van der Grinten H, et al. Fertility outcome and information on fertility issues in individuals with different forms of disorders of sex development: findings from the dsd-LIFE study. *Fertil Steril*. 2017;108(5):822-831. doi:10.1016/j.fertnstert.2017.08.013

20. Van Mol, A., 2019. *Intersex: What It Is And Is Not – Christian Medical & Dental Associations*. [online] Christian Medical & Dental Associations. Available at: <https://cmda.org/intersex-what-it-is-and-is-not/> [Accessed 11 November 2020].

21. Some professional organizations appear to acknowledge the same, even if they generally claim gender-sex discordance is normal. The World Professional Association for Transgender Health says in its Standards of Care that "gender dysphoria" may be "secondary to, or better accounted for by, other diagnoses." (Wpath.org. 2012. *Standard Of Care For The Health Of Transsexual, Transgender, And Gender Nonconforming People*. [online] Available at: <https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care%20V7%20-%202011%20WPATH.pdf?_t=1604581968> [Accessed 11 November 2020]. p24) The British Psychological Society says, "In some cases the reported desire to change sex may be symptomatic of a psychiatric condition for example psychosis, schizophrenia or a transient obsession such as may occur with Asperger's syndrome...." (Shaw L, Butler C, Langdridge D, et al. Guidelines and literature review for psychologists working therapeutically with sexual and gender minority clients. British Psychological Society Professional Practice Board. Leicester, UK, 2012, p. 26 [Accessed online 16 January 2021 at: https://beta.bps.org.uk/sites/beta.bps.org.uk/files/Policy%20-%20Files/Guidelines%20and%20Literature%20Review%20for%20Psychologists%20Working%20Therapeutically%20with%20Sexual%20and%20Gender%20Minority%20Clients%20%282012%29.pdf]) The American Psychological Association's APA Handbook of Sexuality and Psychology allows for the possibility that pathological family of origin dynamics may be causal. (Tolman, D., Diamond, L., Bauermeister, J., George, W., Pfaus, J. and Ward, L., 2014. *APA Handbook Of Sexuality And Psychology*. American Psychological Association, p.743.)

22. Bechard M, VanderLaan DP, Wood H, Wasserman L, Zucker KJ. Psychosocial and Psychological Vulnerability in Adolescents with Gender Dysphoria: A "Proof of Principle" Study. *J Sex Marital Ther*. 2017;43(7):678-688. doi:10.1080/0092623X.2016.1232325

23. Dhejne C, Van Vlerken R, Heylens G, Arcelus J. Mental health and gender dysphoria: A review of the literature. *Int Rev Psychiatry*. 2016;28(1):44-57. doi:10.3109/09540261.2015.1115753

24. Hanna B, Desai R, Parekh T, Guirguis E, Kumar G, Sachdeva R. Psychiatric disorders in the U.S. transgender population. *Ann Epidemiol*. 2019;39:1-7.e1. doi:10.1016/j.annepidem.2019.09.009

25. Kaltiala-Heino R, Sumia M, Työläjärvi M, Lindberg N. Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development. *Child Adolesc Psychiatry Ment Health*. 2015;9:9. Published 2015 Apr 9. doi:10.1186/s13034-015-0042-y

26. Becerra-Culqui TA, Liu Y, Nash R, et al. Mental Health of Transgender and Gender Nonconforming Youth Compared With Their Peers. *Pediatrics*. 2018;141(5):e20173845. doi:10.1542/peds.2017-3845

27. Zucker KJ, Lawrence AA, Kreukels BP. Gender Dysphoria in Adults. *Annu Rev Clin Psychol*. 2016;12:217-247. doi:10.1146/annurev-clinpsy-021815-093034

28. Littman L. Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria [published correction appears in PLoS One. 2019 Mar 19;14(3):e0214157]. *PLoS One*. 2018;13(8):e0202330. Published 2018 Aug 16. doi:10.1371/journal.pone.0202330

29. Bps.org.uk. 2012. *Guidelines And Literature Review For Psychologists Working Therapeutically With Sexual And Gender Minority Clients*. [online] Available at: <https://www.bps.org.uk/files/Policy%20-%20Files/Guidelines%20and%20Literature%20Review%20for%20Psychologists%20Working%20Therapeutically%20with%20Sexual%20and%20Gender%20Minority%20Clients%20%282012%29.pdf> [Accessed 11 November 2020].

30. E. Coleman, W. Bockting, M. Botzer, P. Cohen-Kettenis, G. DeCuypere, J. Feldman, L. Fraser, J. Green, G. Knudson, W. J. Meyer, S. Monstrey, R. K. Adler, G. R. Brown, A. H. Devor, R. Ehrbar, R. Ettner, E. Eyler, R. Garofalo, D. H. Karasic, A. I. Lev, G. Mayer, H. Meyer-Bahlburg, B. P. Hall, F. Pfaefflin, K. Rachlin, R. Robinson, L. S. Schechter, V. Tangpricha, M. van Trotsenburg, A. Vitale, S. Winter, S. Whittle, K. R. Wylie & K. Zucker (2012) Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, International Journal of Transgenderism, 13:4, 165-232, DOI: 10.1080/15532739.2011.700873

31. Roselli CE. Neurobiology of gender identity and sexual orientation. *J Neuroendocrinol*. 2018;30(7):e12562. doi:10.1111/jne.12562

32. World. 2020. *Fighting to let a boy be a boy.* [online] Available at: https://wng.org/roundups/fighting-to-let-a-boy-be-a-boy-1617220961 [Accessed 26 April 2021].

33. Bradley SJ, Zucker KJ. Gender identity disorder and psychosexual problems in children and adolescents. *Can J Psychiatry*. 1990;35(6):477-486. doi:10.1177/070674379003500603

34. Lisa Marchiano (2017) Outbreak: On Transgender Teens and Psychic Epidemics, Psychological Perspectives, 60:3, 345-366, DOI: 10.1080/00332925.2017.1350804

35. Anderson, R., 2018. *Transgender Ideology Is Riddled With Contradictions. Here Are The Big Ones.*. [online] The Heritage Foundation. Available at: <https://www.heritage.org/gender/commentary/transgender-ideology-riddled-contradictions-here-are-the-big-ones> [Accessed 11 November 2020].

36. Hilton, C., 2020. *Opinion | The Dangerous Denial Of Sex*. [online] WSJ. Available at: <https://www.wsj.com/articles/the-dangerous-denial-of-sex-11581638089> [Accessed 11 November 2020].

37. Medium. 2017. *Transgender Ideology Does Not Support Women*. [online] Available at: <https://medium.com/@mirandayardley/transgender-ideology-does-not-support-women-2d00089e237a> [Accessed 11 November 2020].

38. Gender Health Query. n.d. *Many LGBT People Do Not Agree With Gender Queer Theory & Scientific Validity Taught In Schools — Gender Health Query*. [online] Available at: <https://www.genderhq.org/trans-youth-controversial-schools-lgbt-science-dysphoria> [Accessed 11 November 2020].

39. The Daily Signal. 2017. *I'M A Pediatrician. How Transgender Ideology Has Infiltrated My Field And Produced Large-Scale Child Abuse.*. [online] Available at: <https://www.dailysignal.com/2017/07/03/im-pediatrician-transgender-ideology-infiltrated-field-produced-large-scale-child-abuse/> [Accessed 11 November 2020].

40. Olver T. Disaffirming Gender: Somatic Incongruence as a Co-function of Ideological Congruity. *Psychoanal Rev*. 2019;106(1):1-28. doi:10.1521/prev.2019.106.1.1

41. Olsen H. 2019. *California Wants To Teach Kindergartners About Gender Identity. Seriously.*. [online] Available at: <https://www.washingtonpost.com/opinions/2019/05/13/california-wants-teach-kindergartners-about-gender-identity-seriously/> [Accessed 11 November 2020].

42. Doward, J., 2019. *Politicised Trans Groups Put Children At Risk, Says Expert*. [online] the Guardian. Available at: <https://www.theguardian.com/society/2019/jul/27/trans-lobby-pressure-pushing-young-people-to-transition> [Accessed 11 November 2020].

43. Jones A, Kao E. Heritage.org. 2019. *Sexual Ideology Indoctrination: The Equality Acts Impact On School Curriculum And Parental Rights*. [online] Available at: <https://www.heritage.org/sites/default/files/2019-05/BG3408.pdf> [Accessed 11 November 2020].

44. Omercajic K, Martino W. Supporting transgender inclusion and gender diversity in schools: a critical policy analysis. *Frontiers in Sociology* 2020; 5:27. https://doi.org/10.3389/fsoc.2020.00027

45. Friestad, T., 2018. *Being Mila: Creating An Lgbtq Curriculum That Is Authentic, Follows Policies And Ethics, And Teaches Acceptance*. [online] DigitalCommons@Hamline. Available at: <https://digitalcommons.hamline.edu/hse_cp/196?utm_source=digitalcommons.hamline.edu/hse_cp/196> [Accessed 11 November 2020].

46. Dee Knoblauch (2016) Building the Foundation of Acceptance Book by Book: Lesbian, Gay, Bisexual, and/or Transgender-Themed Books for Grades K–5 Multicultural Libraries, Multicultural Perspectives, 18:4, 209-213, DOI: 10.1080/15210960.2016.1228325

47. Christian Concern. 2020. *LGB Alliance Founder Criticises RSE Lessons*. [online] Available at: <https://christianconcern.com/comment/lgb-alliance-founder-criticises-rse-lessons/> [Accessed 11 November 2020].

48. 2013. *Diagnostic And Statistical Manual Of Mental Disorders*. Arlington, VA: American Psychiatric Association, p.455.

49. Tolman, D., Diamond, L., Bauermeister, J., George, W., Pfaus, J. and Ward, L., 2014. *APA Handbook Of Sexuality And Psychology*. Washington D.C: American Psychological Association, p.774.

50. Cohen-Kettenis PT, Delemarre-van de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med*. 2008;5(8):1892-1897. doi:10.1111/j.1743-6109.2008.00870.x

51. Ristori J, Steensma TD. Gender dysphoria in childhood. *Int Rev Psychiatry*. 2016;28(1):13-20. doi:10.3109/09540261.2015.1115754

52. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline [published correction appears in J Clin Endocrinol Metab. 2018 Feb 1;103(2):699] [published correction appears in J Clin Endocrinol Metab. 2018 Jul 1;103(7):2758-2759]. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658

53. Kenneth J. Zucker (2018) The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al. (2018), International Journal of Transgenderism, 19:2, 231-245, DOI: 10.1080/15532739.2018.1468293

54. Laidlaw MK, Van Meter QL, Hruz PW, Van Mol A, Malone WJ. Letter to the Editor: "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline". *J Clin Endocrinol Metab*. 2019;104(3):686-687. doi:10.1210/jc.2018-01925

55. Safer JD, Tangpricha V. Care of Transgender Persons. *N Engl J Med*. 2019;381(25):2451-2460. doi:10.1056/NEJMcp1903650

56. Levine SB. Informed Consent for Transgendered Patients. *J Sex Marital Ther*. 2019;45(3):218-229. doi:10.1080/0092623X.2018.1518885

57. Shatzel JJ, Connelly KJ, DeLoughery TG. Thrombotic issues in transgender medicine: A review. *Am J Hematol*. 2017;92(2):204-208. doi:10.1002/ajh.24593

58. Vumc.org. 2012. *Key Transgender Health Concerns | Program For LGBTQ Health*. [online] Available at: <https://www.vumc.org/lgbtq/key-transgender-health-concerns> [Accessed 12 November 2020].

59. Getahun D, Nash R, Flanders WD, et al. Cross-sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study. *Ann Intern Med*. 2018;169(4):205-213. doi:10.7326/M17-2785

60. Goodman, M., 2018. [online] Pcori.org. Available at: <https://www.pcori.org/sites/default/files/PCORI-Goodman076-English-Abstract.pdf> [Accessed 11 November 2020].

61. Heyer, W. 2019. Usatoday.com. 2019.Hor*mones, Surgery, Regret: I Was A Transgender Woman For 8 Years-Time I Can't Get Back.*. [online] Available at: <https://www.usatoday.com/story/opinion/voices/2019/02/11/transgender-debate-transitioning-sex-gender-column/1894076002/> [Accessed 11 November 2020].

62. International Association of Therapists for Desisters and Detransitioners. (2020). *Introduction to Detransition for Therapists*. [online]. Available at: https://iatdd.com/introduction-to-detransition-for-therapists/?fbclid=IwAR2bsQ-ojdFi7Zyzow_RNCDcD34eGU_flce_x8mfRpH3s0DRp91PwwONkto [Accessed 4/26/2021].

63. Sky News. (2019). *'Hundreds' of Young Trans People Seeking Help to Return to Original Sex*. [online]. Available at: https://news.sky.com/story/hundreds-of-young-trans-people-seeking-help-to-return-to-original-sex-11827740. [Accessed 4/26/2021].

64. Horvath H. "The Theatre of the Body: A Detransitioned Epidemiologist Examines Suicidality, Affirmation, and Transgender Identity". [online]. Available at: https://4thwavenow.com/2018/12/19/the-theatre-of-the-body-a-detransitioned-epidemiologist-examines-suicidality-affirmation-and-transgender-identity/. Assessed 4-26-2021.

65. Bränström R, Pachankis JE. Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study [published correction appears in Am J Psychiatry. 2020 Aug 1;177(8):734]. *Am J Psychiatry*. 2020;177(8):727-734. doi:10.1176/appi.ajp.2019.19010080

66. Schulman, J. K., & Erickson-Schroth, L. (2019). Mental Health in Sexual Minority and Transgender Women. *The Medical Clinics of North America*, *103*(4), 723–733. https://doi.org/10.1016/j.mcna.2019.02.005

67. Becasen JS, Denard CL, Mullins MM, Higa DH, Sipe TA. Estimating the Prevalence of HIV and Sexual Behaviors Among the US Transgender Population: A Systematic Review and Meta-Analysis, 2006-2017. *Am J Public Health*. 2019;109(1):e1-e8. doi:10.2105/AJPH.2018.304727

68. Levine SB, Solomon A. Meanings and political implications of "psychopathology" in a gender identity clinic: a report of 10 cases. *J Sex Marital Ther*. 2009;35(1):40-57. doi:10.1080/00926230802525646

69. Levine SB. Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria. *J Sex Marital Ther*. 2018;44(1):29-44. doi:10.1080/0092623X.2017.1309482

70. Malone WJ, Roman S. Calling Into Question Whether Gender-Affirming Surgery Relieves Psychological Distress. *Am J Psychiatry*. 2020;177(8):766-767. doi:10.1176/appi.ajp.2020.19111149

71. Tucker RP. Suicide in Transgender Veterans: Prevalence, Prevention, and Implications of Current Policy. *Perspect Psychol Sci*. 2019;14(3):452-468. doi:10.1177/1745691618812680

72. Wold A. Gender-Corrective Surgery Promoting Mental Health in Persons With Gender Dysphoria Not Supported by Data Presented in Article. *Am J Psychiatry*. 2020;177(8):768. doi:10.1176/appi.ajp.2020.19111170

73. Wiepjes CM, den Heijer M, Bremmer MA, Nota NM, deBlock CJM, Coumou BJG, Steensma TD. Trends in Suicide Death Risk in Transgender People: Results from the Amsterdam Cohort of Gender Dysphoria Study (1972-2017). *Acta Psychiatr Scand*. (2020); 141(6):486-491.

74. Stroumsa D, Roberts EFS, Kinnear H, Harris LH. The Power and Limits of Classification - A 32-Year-Old Man with Abdominal Pain. *N Engl J Med*. 2019;380(20):1885-1888. doi:10.1056/NEJMp1811491

75. Bangalore Krishna K, Houk CP, Lee PA. Pragmatic approach to intersex, including genital ambiguity, in the newborn. *Semin Perinatol*. 2017;41(4):244-251. doi:10.1053/j.semperi.2017.03.013

76. Dhejne, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960-2010: prevalence, incidence, and regrets. *Archives of Sexual Behavior*, *43*(8), 1535–1545. https://doi.org/10.1007/s10508-014-0300-8

77. Jones BP, Williams NJ, Saso S, et al. Uterine transplantation in transgender women. *BJOG*. 2019;126(2):152-156. doi:10.1111/1471-0528.15438

78. Schumm WR, Crawford DW. Is Research on Transgender Children What It Seems? Comments on Recent Research on Transgender Children with High Levels of Parental Support. *Linacre Q*. 2020;87(1):9-24. doi:10.1177/0024363919884799

79. Orwh.od.nih.gov. n.d. *Questions & Answers | Office Of Research On Women's Health*. [online] Available at: <https://orwh nih.gov/sex-gender/nih-policy-sex-biological-variable-sabv/questions-answers> [Accessed 11 November 2020].

80. Huey, N., 2018. *Treating Men And Women Differently: Sex Differences In The Basis Of Disease - Science In The News*. [online] Science in the News. Available at: <http://sitn hms harvard.edu/flash/2018/treating-men-and-women-differently-sex-differences-in-the-basis-of-disease/> [Accessed 11 November 2020].

81. Madsen, T., Bourjeily, G., Hasnain, M., Jenkins, M., Morrison, M., Sandberg, K., Tong, I., Trott, J., Werbinski, J. and McGregor, A., 2017. Article Commentary: Sex- and Gender-Based Medicine: The Need for Precise Terminology. *Gender and the Genome*, 1(3), pp.122-128.

82. Mayer, L.S and McHugh, PR. Sexuality and Gender: Findings from the Biological, Psychological and Social Sciences. *The New Atlantis*. Number 50, Fall 2016., pp 7-9.

83. McHugh, Paul R. Amicus Brief to the SCOTUS for *Obergefell v Hodges*.

84. Dar-Nimrod, I & Heine, SJ. "Some thoughts on essence placeholders, interactionism, and heritability: Reply to Haslam (2011) and Turkheimer (2011)." *Psychological Bulletin.* (2011) 137(5): 829 – 833.

85. Diamond, LM & Rosky, CJ. "Scrutinizing Immutability: Research on Sexual Orientation and US Legal Advocacy for Sexual Minorities." *Journal of Sex Research.* (2016) 00: 1-29.

86. West, Christopher. *Our Bodies Tell God's Story.* Grand Rapids: Brazos Press. 2020. p. 28.

87. Money, John. "Hermaphrodism, gender and precocity in hyperadrenocorticism: psychological findings." *Bulletin of the Johns Hopkins Hospital.* (1955) 95(6): 252-264.

88. Shechner, Tomer. "Gender Identity Disorder: A Literature Review from a Developmental Perspective." *Isr. J of Psychiatry & Related Sci.* (2010) 47: 132-138.

## CERTIFICATE OF SERVICE

I certify that on January 30, 2023, I electronically filed the foregoing through this Court's CM/ECF system, thereby effecting service on all Defendants.

Dated:  January 30, 2023                                 _____/s/____Jordan E. Pratt_____

                                                                        Attorney