**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

VALERIE KLOOSTERMAN,

        *Plaintiff,*

  v.

METROPOLITAN HOSPITAL, d/b/a University
of Michigan Health-West, et al.,

        *Defendants.*

No. 1:22-cv-00944-JMB-SJB
Hon. Jane M. Beckering

## BRIEF IN OPPOSITION TO DEFENDANT UNIVERSITY OF MICHIGAN HEALTH WEST'S MOTION TO DISMISS PLAINTIFF'S CORRECTED FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

    A.     Ms. Kloosterman's Exemplary Employment Record ...................................2

    B.     Ms. Kloosterman's Sincere Religious Beliefs ............................................3

    C.     Events Leading to Ms. Kloosterman's Termination ...................................4

    D.     The Hospital's Willingness to Accommodate Other Providers ...................7

STATEMENT OF LAW ......................................................................................................9

    I.  Ms. Kloosterman States a Viable Claim for Title VII Disparate Treatment (Count IV) Under Two Independent Theories: Discriminatory Termination and Failure to Accommodate ................................................................................................10

        A.     Ms. Kloosterman Pleaded Both Direct and Circumstantial Evidence to Show that the Hospital Fired Her Because of Her Religious Beliefs .............................12

        B.     The Hospital Failed to Reasonably Accommodate Ms. Kloosterman's Religious Beliefs, and It Cannot Credibly Argue that an Accommodation Would Violate Federal or State Law ...................................................................17

           i.   Ms. Kloosterman's Termination Is an Adverse Employment Action...................21

           ii.  The Hospital Could Have Granted Ms. Kloosterman's Proactive Accommodation Request, Demonstrated by the Myriad Accommodations It Grants to Her Coworkers ...................................................................22

           iii. During the Relevant Time Period, the Federal Regulations and Guidance that the Hospital Cites Were Not Operative and Thus Could Not Have Justified Its Refusal to Accommodate ...................................................................24

           iv. A Nationwide Federal Court Injunction in Favor of CMDA Members Protects Ms. Kloosterman from Enforcement of Section 1557 ...........................................28

    II. Ms. Kloosterman States a Claim for Title VII Disparate Impact (Count V) ....................30

        A.     Ms. Kloosterman Exhausted This Claim in Her Amended EEOC Charge, Which the Hospital's Motion Neglects to Acknowledge ...................................30

B.      The Complaint Alleges that the Hospital Maintains a Policy or Practice of
         Respecting Independent Medical Judgment on Myriad Issues but Not on "Gender
         Reassignment" Issues, and that this Policy or Practice Disparately Impacts
         Christian Employees ........................................................................................31

III.   Because the Hospital Has Invoked Its Eleventh Amendment Immunity, Ms.
        Kloosterman Agrees to Dismiss the State Constitutional and ELCRA Claims Against
        It, But She Will Continue to Assert These Claims Against the Other Defendants...........35

CONCLUSION....................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adeyeye v. Heartland Sweeteners, LLC*,
    721 F.3d 444 (7th Cir. 2013) ......................................................................... 34

*Ansonia Bd. of Educ. v. Philbrook*,
    479 U.S. 60 (1986)........................................................................................ 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................... 9

*Back v. Hall*,
    537 F.3d 552 (6th Cir.2008) ......................................................................... 10

*Bean v. Sprint/United Management Co.*,
    No. 1:18-cv-413, 2021 WL 5451493 (W.D. Mich. March 31, 2021)................................ 12, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................... 9, 10

*Blalock v. Metals Trades, Inc.*,
    775 F.2d 703 (6th Cir. 1985) ............................................................... 12, 13, 14

*Bledsoe v. Tennessee Valley Authority Bd. of Directors*,
    42 F.4th 568 (6th Cir. 2022) ......................................................................... 13

*Bolden v. Lowes Home Centers, LLC*,
    783 F. App'x 589 (6th Cir. 2019) ................................................................ 14

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)............................................................................ 10, 11, 26

*Burlington Industries v. Ellerth*,
    524 U.S. 742 (1998)....................................................................................... 21

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006)......................................................................................... 22

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)....................................................................................... 20

*Chattman v. Toho Tenax Am., Inc.*,
    686 F.3d 339 (6th Cir. 2012) ......................................................................... 12

*Clark v. Hamilton Mortg. Co.*,
    No. 1:07-CV-252, 2008 WL 919612 (W.D. Mich. Apr. 2, 2008) ................................ 9

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
    406 F. Supp. 3d 1258 (M.D. Ala. 2019) ................................................................ 34

*Crider v. Univ. of Tennessee, Knoxville*,
    492 F. App'x 609 (6th Cir. 2012) ................................................................ 18, 19

*Dixon v. The Hallmark Companies, Inc.*,
    627 F.3d 849 (11th Cir. 2010) ................................................................ 34

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S 768 (2015) ................................................................ 10, 11, 16, 18

*EEOC v. Arlington Transit Mix, Inc.*,
    957 F.2d 219 (6th Cir. 1991) ................................................................ 16, 18, 19, 24

*EEOC v. Peoplemark, Inc.*,
    732 F.3d 584 (6th Cir. 2013) ................................................................ 30, 31

*EEOC v. Robert Bosch Corp.*,
    169 F. App'x 942 (6th Cir. 2006) ................................................................ 16, 22

*EEOC v. Univ. of Detroit*,
    904 F.2d 331 (6th Cir. 1990) ................................................................ 19

*Ercegovich v. Goodyear Tire & Rubber Co.*,
    154 F.3d 344 (6th Cir. 1998) ................................................................ 15, 16

*Fisher v. Fed. Bureau of Prisons*,
    484 F.Supp.3d 521 (N.D. Ohio 2020) ................................................................ 33

*Franciscan Alliance, Inc. v. Azar*,
    414 F. Supp. 3d 928 (N.D. Tex. 2019) ................................................................ 27

*Franciscan All., Inc. v. Becerra*,
    553 F. Supp. 3d 361 (N.D. Tex. 2021) ................................................................ *passim*

*Franciscan All., Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ................................................................ 28

*Furnco Const. Corp. v. Waters*,
    438 U.S. 567 (1978) ................................................................ 13

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971) ................................................................ 30

*Groff v. DeJoy*,
    35 F.4th 162 (3d Cir. 2022), *cert. granted*, (No. 22-174, 2022 term) ................................................................ 24

*Hernandez v. C.I.R.,*
  490 U.S. 680 (1989)................................................................................................. 19

*Holt v. Hobbs,*
  574 U.S. 352 (2015)................................................................................................. 27

*Int'l Brotherhood of Teamsters v. U.S.,*
  431 U.S. 324 (1977)................................................................................................. 30

*Johnson v. Michigan State Univ.,*
  547 F.Supp 429 (W.D. Mich. 1982) ........................................................................ 30

*Johnson v. U.S. Dep't of Health and Human Servs.,*
  30 F.3d 45 (6th Cir. 1994) ...................................................................................... 31

*Keys v. Humana,*
  684 F.3d 605 (6th Cir. 2012) ...................................................................... 10, 13, 17

*King v. Borgess Lee Mem'l Hosp.,*
  No. 1:13-CV-397, 2015 WL 852324 (W.D. Mich. Feb. 26, 2015) ......................... 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  140 S. Ct. 2367 (2020)......................................................................................... 20, 21

*McDaniel v. Essex Int'l, Inc.,*
  571 F.2d 338 (6th Cir. 1978) ......................................................................... 19, 20, 34

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973)............................................................................................ *passim*

*Meyer v. City of Center Line,*
  619 N.W.2d 182 (2000) ............................................................................................ 12

*Mitchell v. Toledo Hospital,*
  964 F.2d 577 (6th Cir. 1992) ................................................................................... 15

*Ondricko v. MGM Grand Detroit, LLC,*
  689 F.3d 642 (6th Cir. 2012) ................................................................................... 12

*Pacific Shores Properties, LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013) ................................................................................. 13

*Pedreira v. Kentucky Baptist Homes for Children, Inc.,*
  579 F.3d 722 (6th Cir. 2009) ................................................................................... 10

*Ricci v. DeStefano,*
  557 U.S. 557 (2009)................................................................................................. 30

*Serrano v. Cintas Corp.*,
   699 F.3d 884 (6th Cir. 2012) ........................................................ 31

*Slater v. Douglas County*,
   743 F. Supp. 2d 1188 (D. Or. 2010) ............................................. 19

*Smith v. Pyro Mining Co.*,
   827 F.2d 1081 (6th Cir. 1987) ............................... 19, 21, 23, 34

*Stanley v. Lawson Co.*,
   993 F. Supp. 1084 (N.D. Ohio 1997) ...................................... 18, 23

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) ...................................... 9, 10, 12, 13

*Texas Dept. of Community Affairs v. Burdine*,
   450 U.S. 248 (1981) ...................................................... 13, 14

*Trans World Airlines, Inc. v. Thurston*,
   469 U.S. 111 (1985) .......................................................... 12

*Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*,
   615 F.3d 622 (6th Cir. 2010) .......................................... 9

*United States v. Seeger*,
   380 U.S. 163 (1965) .......................................................... 19

*Walker v. Azar*,
   480 F. Supp. 3d 417 (E.D.N.Y. 2020) .................................. 25, 26

*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ............................................ 20

*Wards Cove Packing Co., Inc. v. Atonio*,
   490 U.S. 642 (1989) .......................................................... 31

*Watkins v. Healy*,
   986 F.3d 648 (6th Cir. 2021) .............................................. 9

*Wexler v. White's Fine Furniture, Inc.*,
   317 F.3d 564 (6th Cir. 2003) .......................................... 12

*White v. Baxter Healthcare Corp.*,
   533 F.3d 381 (6th Cir. 2008) .......................................... 21

*White v. Burlington N. & Santa Fe R. Co.*,
   364 F.3d 789 (6th Cir. 2004) .......................................... 22

*Whitman-Walker v. HHS*,
    No. CV 20-1630 (JEB), 2021 WL 4033072 (D.D.C. Sept. 3, 2021) ........................................ 26

*Winchester v. Wal-Mart Stores, Inc.*,
    No. 16-5890, 2017 WL 11489879 (6th Cir. Mar. 2, 2017) ................................................ 22, 23

*Young v. UPS*,
    575 U.S. 206 (2015) ............................................................................................................. 13, 15

**Statutes**

42 U.S.C. § 18116(a) ....................................................................................................... *passim*

42 U.S.C. § 2000e(j) ...................................................................................................... 10, 18, 34

42 U.S.C. § 2000e-2(a)(1) ...................................................................................................... 10

**Rules**

Fed. R. Civ. P. 8(a)(2) ....................................................................................................... 9, 31

**Regulations**

29 C.F.R. § 1605.1 ....................................................................................................... 10, 34

29 C.F.R. § 1605.2 ................................................................................................................ 19

84 Fed. Reg. 37,207 ....................................................................................................... 11, 27

86 Fed. Reg. 27,984 ................................................................................................................ 28

**Other Authorities**

EEOC Religion Guidance § 12- I-A-2 ................................................................................ 19

Executive Order 13,988 ....................................................................................................... 27

## INTRODUCTION

Valerie Kloosterman, an exemplary and beloved physician assistant who served her community for 17 years, was fired by University of Michigan Health-West ("the Hospital") for no reason other than her sincerely held religious beliefs. Ms. Kloosterman's well-pleaded complaint states a viable claim for religious discrimination under Title VII based on disparate treatment. She provides undisputed facts showing direct discrimination: Hospital management officials called her "evil" and a "liar," mockingly told her that she could not take her religious beliefs to work with her, and issued a termination letter explaining that the Hospital fired her because of her religious beliefs about gender identity. The pleadings sufficiently establish that Ms. Kloosterman's religious beliefs were the but-for cause of her termination. Ms. Kloosterman also states a claim for failure-to-accommodate under Title VII, because the Hospital refused to accommodate her religious beliefs, even though it routinely accommodated her coworkers' secular preferences in medical decision-making. Ms. Kloosterman provided excellent care to LGBTQ patients, none of whom had ever made any complaints or requested gender-transition drugs or procedures. But when the Hospital learned of Ms. Kloosterman's religious beliefs, and when its pressure on her to betray those beliefs failed, the Hospital fired her instead of working toward a mutually agreeable solution. Ms. Kloosterman also states a claim for disparate impact under Title VII, because the Hospital's policy harms employees who share her religious beliefs.

The Hospital's briefing reveals its weak position. Instead of offering a legitimate reason for terminating Ms. Kloosterman, where there is none, the Hospital attempts to skirt the motion-to-dismiss standard and prematurely apply the summary judgment standard. The Hospital suggests that the law requires Ms. Kloosterman to fully prove all her claims before discovery, and the Hospital's overly restrictive view of comparators would require her to find that another religious

1

employee with different beliefs *was* accommodated with regard to referrals or pronouns. Title VII jurisprudence requires no such thing. Worse, the Hospital faults Ms. Kloosterman's moderate approach, arguing that she should have refused to treat LGBTQ patients altogether. Yet this extreme approach undermines the Hospital's purported rationale of patient health. The Hospital should have granted Ms. Kloosterman a reasonable accommodation similar to what it granted Dr. Michael Kogut, whom it excused from providing intimate exams to female patients he continued to otherwise treat.

Notably, the Hospital's only undue hardship defense is that accommodating Ms. Kloosterman may have violated Section 1557; yet the operative version of that Rule contained strong religious liberty protections and prevented any liability risk. Contrary to the Hospital's characterization, Ms. Kloosterman's religious beliefs are shared by thousands of healthcare professionals from a diverse group of faiths, including fellow members of the Christian Medical & Dental Associations ("CMDA"), who are permanently protected from enforcement of Section 1557 by a nationwide injunction in *Franciscan Alliance, Inc. v. Becerra*.

## STATEMENT OF FACTS

### A. Ms. Kloosterman's Exemplary Employment Record

Ms. Valerie Kloosterman served her community for 17 years as a third-generation healthcare professional at her local clinic, long before its affiliation with University of Michigan Health. (PageID.520, ¶48, ¶51). As a physician assistant beloved by her patients and coworkers, she provided excellent care for all ages, including children whose parents she had also treated. (PageID.521, ¶52). Ms. Kloosterman consistently received exemplary performance reviews and was never once subject to discipline or a patient complaint. (PageID.521, ¶¶53-55) ("Valerie goes way beyond the call of duty when dealing with patients, follow up and professional responsibility.

She is *very* ethical [and] responsible and treats all with respect.") Ms. Kloosterman gladly served people of all beliefs and backgrounds and was committed to giving the best possible care to all her patients, including her LGBTQ patients. (PageID.521-22, ¶¶60-63).

### B.  Ms. Kloosterman's Sincere Religious Beliefs

Ms. Kloosterman is a devout Christian and member of a United Reformed Church, which she has attended since infancy. (PageID.517, ¶31). Ms. Kloosterman's vibrant faith informs her work as a medical professional, using her God-given gifts and training to help others. (PageID.517, ¶32). Ms. Kloosterman believes, consistent with the Bible and church teaching, that all humans are created in God's image and thus deserving of love and respect. (PageID.518, ¶35). She believes that one's sex is ordained by God, and that one should not attempt to erase or to alter his or her sex, especially through drugs or surgical means. (PageID.518, ¶38). Ms. Kloosterman believes that it would be sinful for her to assist a patient in procuring drugs or surgical procedures designed to erase or alter biological sex.[1] (PageID.519, ¶41). Her faith compels her to honor her Hippocratic oath to "do no harm" and to be honest and compassionate toward her patients. (PageID.519, ¶43). She therefore believes that it would be dishonest and sinful to violate her conscience and oath by knowingly facilitating a drug or procedure that—in her independent medical judgment—will bring a patient more harm than benefit. (PageID.519, ¶43).

Thousands of religious healthcare professionals share Ms. Kloosterman's views, which are grounded in both her religious faith and her medical judgment. (PageID.538, ¶168). Since 2013, Ms. Kloosterman has been an active member of the Christian Medical and Dental Associations ("CMDA"), an organization of over 19,000 Christian healthcare professionals. (PageID.538,

---

[1] This religious objection has nothing to do with the background or identity of the patient, but rather the nature of the drugs and procedures that the patient might request. (PageID.519, ¶41).

¶169). CMDA believes that "healthcare professionals should not be forced to violate their conscientious commitment to their patients' health and welfare by being required to accept and participate in harmful gender-transition interventions, especially on the young and vulnerable." (PageID.538, ¶171; PageID.618).

Ms. Kloosterman's religious beliefs have never prevented her from providing excellent medical care to LGBTQ patients. (PageID.521, ¶¶59-61). None of these patients requested a different provider or expressed dissatisfaction with Ms. Kloosterman's care. (PageID.522, ¶63). For her two patients who may have used preferred pronouns not corresponding to biological sex, Ms. Kloosterman used the patient's names without any disruption, and she never used pronouns that went against a patient's wishes. (PageID.522, ¶64, ¶66). In medical charts, Ms. Kloosterman never changed or edited the pre-filled sex or gender field, nor did she ever have the ability to change that information. (PageID.522, ¶65). During the entire duration of her employment, no patient ever asked her for a referral to another provider for "gender reassignment" drugs or procedures. (PageID.522, ¶67). Ms. Kloosterman did not violate any policy, written or unwritten, requiring her to use preferred pronouns or refer patients for gender-transition drugs or procedures. Nor did any such policy appear in her employment contract. (PageID.591-99). On the contrary, her contract guaranteed that "the Physician Assistant shall exercise her independent medical judgment consistent with the clinical needs and consent of each patient, and the Hospital shall not have the right to take or omit any act which conflicts with such medical judgment in the care of patients." (PageID.593).

### C.  Events Leading to Ms. Kloosterman's Termination

In May 2021, the Hospital's management team mandated a training module that required employees to affirm the Hospital's views on sex, gender identity, and sexual orientation.

(PageID.523, ¶74). Ms. Kloosterman's sincere religious beliefs prevented her from affirming the statements, but Hospital management told her the training was due on June 30, 2021, and that failure to complete it was grounds for termination. (PageID.524, ¶75). Ms. Kloosterman contacted Defendants Catherine Smith and Rhae-Ann Booker and requested a religious accommodation from completing the training module. (PageID.523, ¶76, ¶79). Because Defendant Booker was not available until July 1, Ms. Kloosterman felt compelled to complete the training before then. (PageID.523, ¶79). When Ms. Kloosterman explained her religious concerns to Defendant Booker on July 1, Defendant Booker immediately misconstrued her simple expression of faith as an intention to refuse to treat LGBTQ patients altogether. (PageID.524-25, ¶¶82-83). Ms. Kloosterman explained that she would gladly continue serving LGBTQ patients, as she had been without incident, and Defendant Booker stated that she would speak with Hospital management. (PageID.524-25, ¶83).

On July 29, 2021, Ms. Kloosterman expected to discuss her religious accommodation request regarding the training module. But Defendants Smith, Cole, and Pierce attacked Ms. Kloosterman with a torrent of questions about whether she would use gender identity-based pronouns and be willing to refer patients for "gender reassignment surgery," even though her religious accommodation request did not involve those matters, and none of Ms. Kloosterman's patients had ever brought up these issues in her 17 years of service. (PageID.525, ¶88; PageID.522, ¶67). When Ms. Kloosterman explained her religious beliefs, Defendant Pierce grew hostile and visibly angry, with tight fists and a flushed demeanor, and openly attacked Ms. Kloosterman for her religious beliefs. (PageID.525, ¶89). Defendant Pierce told Ms. Kloosterman that she could not take the Bible or her religious beliefs to work, either literally or figuratively, and that she was abusing her power as a health care provider to manipulate patients. (PageID.525, ¶90). Defendant

Pierce asked if Ms. Kloosterman knew "what would happen if we let every provider" take their religious beliefs to work. (PageID.525, ¶90). Ms. Kloosterman respectfully explained that she served as part of each patient's care team with his or her best interests in mind. (PageID.525-26, ¶91). Defendant Pierce interrupted her and called her "evil" for not giving patients exactly what they wanted because of her religious beliefs. (PageID.525-26, ¶91). When Ms. Kloosterman explained that she had treated LGBTQ patients for several years without any complaints, Defendant Pierce called her a "liar" and said if he came to Ms. Kloosterman as a patient and she used his name rather than his preferred pronoun, he would never come back to see her. (PageID.526, ¶94). Defendant Pierce also asked Ms. Kloosterman whether she knew that by using a patient's name instead of his or her preferred pronouns, she would cause him or her to commit suicide. (PageID.526, ¶95). When Ms. Kloosterman cited some scientific studies that showed otherwise, Defendant Pierce—with no formal medical training, or license to practice medicine— told Ms. Kloosterman in a hostile tone that he had studies that would disprove her studies. (PageID.526, ¶¶95-96). After the Defendants brought up the issues of pronouns and referrals, Ms. Kloosterman requested an accommodation by raising multiple reasonable alternatives that would serve patients without violating her conscience. For example, she explained that if there were any pre-formulated pronouns, she could use the patient's first name, as she had done in the past without any complaints or disruption to patient service. (PageID.526, ¶97).

Instead of granting Ms. Kloosterman's religious accommodation request, the Hospital fired her. (PageID.527-32, ¶¶101-09, 118-25, 128-31; PageID.616). Ms. Kloosterman heard nothing further until Defendants Cole and Smith scheduled a meeting at the Hospital for August 24. (PageID.527, ¶101). When Ms. Kloosterman arrived, Defendants Cole and Smith delivered her written termination notice, signed by Defendant Pai. (PageID.527-28, ¶105; PageID.612).

Defendant Smith told Ms. Kloosterman that she was fired because she refused to follow the Hospital's policy on patient pronouns and its policy requiring providers to refer patients for "gender reassignment surgeries." (PageID.528, ¶106). When Ms. Kloosterman responded by stating that she could not abandon her religious beliefs, but that she "will always treat patients appropriately," Defendant Smith stated that Hospital management had decided that "today" was her last day. (PageID.529, ¶¶107-08).

The Hospital's sudden termination of Ms. Kloosterman caused an outcry from her coworkers. (PageID.530, ¶¶115-18). Yet the management team showed its hostility towards her religious beliefs by conveying to her coworkers that she had been fired for a very serious "violation," yet refusing to explain what it was. (PageID.530-31, ¶¶121-25). On September 3, 2021, Hospital management sent Ms. Kloosterman a letter explaining the reasons for her termination.  (PageID.531-32, ¶¶128-30; PageID.616). The letter stated that Ms. Kloosterman's "actions and refusals" that "led to *our* decision to separate" (emphasis added)" were the same issues raised by Hospital management on July 29. The letter stated that Ms. Kloosterman was fired for her: (1) "refusal to utilize a patient's preferred pronouns" based on her religious beliefs about gender and sexuality; and (2) her "refusal to provide a referral to another provider for gender transitioning" patients. (PageID.531-32, ¶¶128-130; PageID.616). This letter, which the Hospital has consistently cited, makes clear that but for Ms. Kloosterman's religious beliefs and accommodation request, the Hospital would not have fired her.

**D.  The Hospital's Willingness to Accommodate Other Providers**

The Hospital's refusal to accommodate Ms. Kloosterman contrasts dramatically with its willingness to accommodate other providers at her clinic with personal or medical objections to performing certain procedures. For example, Dr. Kogut has a personal objection to performing

female pelvic exams, breast exams, and prescribing hormones. (PageID.535, ¶¶145-46). The office staff knows about his objection and will often schedule female patients to meet with him for their physical but then to meet with a female provider for their pelvic and/or breast exam. (PageID.535, ¶¶145-46). Other providers would exercise their medical judgment to decline patient requests, if such requests were medically inappropriate or not in the patient's best interest. (PageID.537, ¶161). For example, if patients asked for narcotics or psychiatric refills, providers would sometimes exercise medical judgment to say no and suggest an alternative treatment. (PageID.537, ¶¶162-63). If a patient asked for a referral to a surgeon when the provider thought that surgery was not necessary, the provider could decline to make that referral. (PageID.537, ¶164). Many providers at Ms. Kloosterman's clinic object to prescribing stimulant diet pills, so if a patient requests them, he or she is scheduled with a nurse practitioner who is willing to discuss and prescribe them. (PageID.535, ¶¶147-49). None of the providers at Ms. Kloosterman's clinic are willing to do toenail removals, so the office staff directs those patients to a podiatrist. (PageID.535, ¶144). These simple scheduling accommodations obviate the need for referrals and ensure that providers' preferences are respected—but not Ms. Kloosterman's religious beliefs. (PageID.536, ¶150).

Given the clinic's patient intake and scheduling procedures, had the issue ever arisen, the Hospital easily could have accommodated Ms. Kloosterman by not scheduling her for any patient visit that related to "puberty blockers," "hormone therapy," or "gender reassignment surgery." (PageID.536, ¶152). Ms. Kloosterman's coworkers would have gladly stood in for her during the extraordinarily rare instances when such an accommodation might have become necessary. (PageID.536, ¶152). Ignoring all this, the Hospital fired her anyway.

8

## **STATEMENT OF LAW**

A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). A plaintiff "must allege 'enough facts to state a claim to relief that is plausible on its face'" to survive a motion to dismiss. *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in [the plaintiff's] favor." *Watkins v. Healy*, 986 F.3d 648, 660 (6th Cir. 2021) (internal quotations omitted). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. *Twombly* "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discover[y] will reveal evidence of [liability]." *Twombly*, 550 U.S. at 556. When a defendant's motion to dismiss "does not accept all well-pleaded allegations as true but attempts to controvert them by premature summary judgment practice," it is "procedurally flawed" and "does not comport with standards applicable to a motion to dismiss." *Clark v. Hamilton Mortg. Co.*, No. 1:07-CV-252, 2008 WL 919612, at *2 (W.D. Mich. Apr. 2, 2008).

Employment discrimination cases are subject to the same pleading standard in Federal Rule 8(a). The Supreme Court unanimously rejected an employer's attempt to apply the standard for a establishing a prima facie case under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to complaints in employment discrimination cases. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512

(2002). "Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case." *Id.* (describing prima facie case as "a flexible evidentiary standard," not "a rigid pleading standard"). *Twombly* confirmed that applying the "*McDonnell Douglas* prima facie case at the pleading stage was 'contrary to the Federal Rules' structure of liberal pleading requirements.'" *Keys v. Humana*, 684 F.3d 605, 609 (6th Cir. 2012). *See also Pedreira v. Kentucky Baptist Homes for Children, Inc.,* 579 F.3d 722, 728 (6th Cir. 2009) (same); *Back v. Hall,* 537 F.3d 552, 558 (6th Cir.2008) (same).

## I.   Ms. Kloosterman States a Viable Claim for Title VII Disparate Treatment (Count IV) Under Two Independent Theories: Discriminatory Termination and Failure to Accommodate.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Religion is broadly defined to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j). The EEOC defines "religious practices" to "include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. § 1605.1. "[R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated." *EEOC. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S 768, 774-75 (2015). Title VII demands more than "mere neutrality with regard to religious practices," it requires "favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's' 'religious observance and practice.'" *Abercrombie*, 575 U.S. at 775. As the Supreme Court held in *Bostock v. Clayton County*, but-for causation triggers liability even if the employer cites other reasons for the termination; "[s]o long as the plaintiff's [religion] was one but-for cause of that decision, that is

enough to trigger the law." 140 S. Ct. 1731, 1739 (2020). The Hospital engaged in unlawful disparate treatment in two ways.

First, the Hospital violated Title VII when it fired Ms. Kloosterman because of her religious beliefs about sex and gender. Ms. Kloosterman pleaded both direct and circumstantial evidence of this intentional discrimination. Her religious beliefs, which created her conscientious objection to providing treatment or referrals for sex-obscuring drugs and procedures, were the but-for cause of her termination. If Ms. Kloosterman had different beliefs, or if she had not raised her religious beliefs to her employer and requested an accommodation, she would not have been fired.

Second, the Hospital violated Title VII when it refused to accommodate Ms. Kloosterman's religious beliefs and practices. Ms. Kloosterman suggested and requested multiple accommodations which would not have unduly burdened her employer. (Page.ID.526, ¶97). Her coworkers would gladly have accommodated her religious beliefs through schedule changes, just as they commonly did for coworkers with secular preferences without any disruption to patient care. (PageID.536, ¶152). Accommodating Ms. Kloosterman would not have put the Hospital at risk of violating federal law, because the operative version of Section 1557[2] when Ms. Kloosterman was terminated included religious liberty protections and assurances that HHS would not enforce the regulation against healthcare facilities who accommodated religious beliefs. Thus, the Hospital violated Title VII when it refused to accommodate Ms. Kloosterman.

---

[2] Section 1557 of the Affordable Care Act discusses discrimination in the healthcare context. The 2016 version defined "sex" to include "sexual orientation and gender identity," and threatened religious healthcare providers and institutions with penalties for not providing gender-transition drugs and procedures. The 2020 version, in place at Ms. Kloosterman's termination, defined sex traditionally and included strong protections for religious healthcare providers. 84 Fed. Reg. 37,207.

### A. Ms. Kloosterman Pleaded Both Direct and Circumstantial Evidence to Show that the Hospital Fired Her Because of Her Religious Beliefs.

The Hospital does not contest that it fired Ms. Kloosterman because of her religious beliefs. (PageID.616) Instead, it attempts to impose the wrong standard on Ms. Kloosterman, expecting her to fully prove her claims without discovery and focusing on whether her coworkers were "similarly-situated." The Hospital's argument is flawed in three ways. First, comparator evidence is not necessary because Ms. Kloosterman has pleaded facts that show direct evidence of discrimination. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985) (*McDonnell Douglas* inapplicable where plaintiff shows direct discrimination); *Bean v. Sprint/United Management Co.*, No. 1:18-cv-413, 2021 WL 5451493 (W.D. Mich. March 31, 2021) (requiring no comparators where employee fired for posting Bible verses in response to Pride Month article);[3] *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 708 (6th Cir. 1985) (finding direct evidence where employer treated Plaintiff "differently . . . depending upon [his] current religious views"); *Ondricko v. MGM Grand Detroit, LLC,* 689 F.3d 642, 650 (6th Cir. 2012) (finding manager's racist statement direct evidence of discrimination); *Chattman v. Toho Tenax Am., Inc*., 686 F.3d 339, 347 (6th Cir. 2012) (same); *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570-72 (6th Cir. 2003) (finding direct evidence where statements revealed age was motivating factor in demotion decision).

Second, if Ms. Kloosterman had pleaded only circumstantial evidence, the *McDonnell Douglas* framework would become relevant only at the summary judgment stage. *Swierkiewicz,*

---

[3] The plaintiff in *Bean* brought an Elliott-Larsen Civil Rights Act (ELCRA) claim, which is very similar to a Title VII claim. *Meyer v. City of Center Line*, 619 N.W.2d 182, 188 (2000) (finding Title VII precedent "highly persuasive" when interpreting the ELCRA). Ms. Kloosterman separately moves to amend her ELCRA claim as against Defendants Pai, Booker, Cole, Pierce, and Smith.

534 U.S. at 508 (*McDonnell Douglas* test does not apply at motion to dismiss stage); *Keys,* 684

F.3d at 606 (prima facie case and comparators unnecessary at pleading stage). Even then, Ms.

Kloosterman could prove her case without comparators. *Young v. UPS*, 575 U.S. 206, 228 (2015)

("plaintiff may establish a prima facie case by 'showing actions taken by the employer from which

one can infer, if such actions remain unexplained, that it is more likely than not that such actions

were based on a discriminatory criterion'"); *Furnco Const. Corp. v.* Waters, 438 U.S. 567, 577

(1978) ("*McDonnell Douglas* . . . was never intended to be rigid, mechanized, or ritualistic.");

*Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013)

("*McDonnell Douglas* . . . is not a straightjacket *requiring* the plaintiff to demonstrate that such

similarly situated entities exist."). *McDonnell Douglas* itself did not require comparators in its

statement of the prima facie case. 411 U.S. at 802.

Third, whether Ms. Kloosterman's comparators are sufficiently similarly-situated would

properly be a fact question for the jury. *Bledsoe v. Tennessee Valley Authority Bd. of Directors*, 42

F.4th 568, 586 (6th Cir. 2022). To defeat summary judgment, Ms. Kloosterman need only show

that she belonged to a protected class, was qualified, and experienced an adverse employment

decision "under circumstances which give rise to an inference of unlawful discrimination." *Texas*

*Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Ms. Kloosterman has pleaded

those facts, which are more than sufficient to demonstrate a plausible Title VII claim and defeat

the Hospital's motion to dismiss. *Keys*, 684 F.3d at 610.

Here, Ms. Kloosterman's complaint includes multiple allegations of hostile statements

demonstrating animus to her religious beliefs, and the Hospital has not contested that Defendant

Pierce called Ms. Kloosterman "evil" and a "liar" because of her religious beliefs. (Page.ID.665;

PageID.512, ¶4; PageID.525-26, ¶¶91-94). Like the religiously charged language in *Blalock*, these

epithets make clear that the management team disagreed with Ms. Kloosterman's religious beliefs and made negative value judgments about her and them, giving rise to an inference of religious discrimination. (PageID.525-27, ¶¶88-100). All five individual Defendants were involved in the decision to terminate Ms. Kloosterman, and thus their hostile statements show direct discrimination. (PageID.532-34, ¶¶132-41). Like the defendant in *Blalock*, the Hospital refused to discuss Ms. Kloosterman's concerns apart from her religious beliefs, and no inference is required to conclude that her religious beliefs was the but-for cause of her termination. (PageID.527-28, ¶¶105-08; PageID.616). It is undisputed that if Ms. Kloosterman did not hold the religious beliefs at issue, or if she had not raised her beliefs to her employer and requested an accommodation, she would not have been fired. (PageID.557-58, ¶¶277-80).

While Ms. Kloosterman's facts showing direct discrimination are more than sufficient to survive this motion to dismiss, she has also alleged a circumstantial claim. Under the *McDonnell Douglas* framework, the "plaintiff's burden at the prima facie stage is 'not onerous'" and the "plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589, 594 (6th Cir. 2019) (internal citations omitted). It is undisputed that Ms. Kloosterman (i) was a member of a protected class (religion), (PageID.517-19, ¶¶31-41; PageID.557, ¶274); (ii) she suffered an adverse employment action (termination), (PageID.527-28, ¶¶101-09; PageID.616) and (iii) she was fully qualified for her position (17 years of tenure, beloved by her patients, only positive performance reviews). (PageID.521, ¶¶52-59). Ms. Kloosterman has satisfied the fourth prong by showing "circumstances which give rise to an inference of unlawful discrimination," *Burdine*, 450 U.S. at 253, and by showing she was treated differently from

similarly-situated employees whose secular preferences and right to medical decision-making were accommodated without repercussions. (PageID.534-37, ¶¶142-64).

The Hospital relies on *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992), a summary-judgment case about an employee who misused hospital property, to argue that Ms. Kloosterman must show that a coworker in her exact position with opposite religious beliefs was accommodated when she was not. (PageID.698). Not only is this impossible at the motion-to-dismiss stage, but the Sixth Circuit has clarified since *Mitchell* that "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *see also Young*, 575 U.S. at 228 ("Neither does [*McDonnell Douglas*] require the plaintiff to show that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways.").

Further, the Hospital cannot avoid liability by defining comparators so narrowly that none can possibly exist. What matters here is that the Hospital accommodated Ms. Kloosterman's coworkers whose secular preferences and medical decision-making prevented them from providing certain treatments, while refusing to accommodate Ms. Kloosterman's religious beliefs and medical decision-making which would prevent her from providing certain treatments. (PageID.534-38, ¶¶142-67). The law requires an accommodation only for the latter. The Hospital was perfectly willing to accommodate Dr. Kogut, whom it excused from examining female patients even though sex is a protected class under its nondiscrimination policy. (PageID.700, n.12, PageID.535, ¶¶145-46). Thus, Ms. Kloosterman has properly alleged that a "comparable nonprotected person was treated better." *Mitchell*, 964 F.2d at 582–83. And the Sixth Circuit has clarified since *Mitchell* that "[t]he plaintiff need not demonstrate an exact correlation with the

employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Here, Ms. Kloosterman alleged that multiple coworkers in her clinic at the same or higher level commonly declined to provide certain services and were not fired as a result. (PageID.534-37, ¶142-64). That is sufficient for her prima facie case. Indeed, a "contrary approach would undermine the remedial purpose of the anti-discrimination statutes." *Ercegovich,* 154 F.3d at 352.

The Hospital conflates the "similarly-situated" comparator standard with the undue hardship inquiry at issue in a failure to accommodate theory. (PageID.709-10). Ms. Kloosterman has properly pled that she had sincere religious beliefs that conflicted with an employment practice, she notified the Hospital of her need for an accommodation, and she was terminated for failing to comply with the practice. *EEOC v. Arlington Transit Mix, Inc*., 957 F.2d 219, 222 (6th Cir. 1991). Comparator evidence is not an element of a religious discrimination theory based on failure-to-accommodate, as the Hospital suggests (PageID.709-10). Instead, the accommodations granted to other providers, like Dr. Kogut, negate any undue hardship argument potentially proffered by the Hospital. *EEOC v. Robert Bosch Corp.*, 169 F. App'x 942, 944 (6th Cir. 2006). Whether these comparators formally requested accommodations from the DEI Department, (PageID.709-10), is irrelevant.

Not only does the Hospital's argument fail because it misapplies *McDonnell Douglas*, but it also ignores Title VII's requirement of favorable treatment for religion in the workplace. Title VII does not "limit disparate-treatment claims to only those employer policies that treat religious practices less favorably than similar secular practices." *Abercrombie,* 575 U.S. at 775. On the contrary, the unanimous Supreme Court held that Title VII gives religious employees "*favored* treatment, affirmatively obligating employers not 'to. . . discharge any individual . . . because of

16

such individual's 'religious observance and practice.'" *Id.* (emphasis added). Thus, "Title VII requires otherwise-neutral policies," including nondiscrimination policies, "to give way to the need for an accommodation." *Id.* As in *Bean* and *Keys*, where the courts found direct evidence of discrimination and did not require the plaintiffs to show similarly-situated employees at the pleading stage, this Court should not require that heightened pleading standard and should find direct discrimination here.

Thus, the Court should deny the Hospital's motion to dismiss because (1) Ms. Kloosterman has pleaded facts showing direct discrimination, (PageID.558, ¶282), and (2) Ms. Kloosterman has pleaded that the Hospital treated her coworkers' secular preferences regarding medical decision-making more favorably than her religious beliefs and medical decision-making. (PageID.559-60, ¶¶292-94).

### B. The Hospital Failed to Reasonably Accommodate Ms. Kloosterman's Religious Beliefs, and It Cannot Credibly Argue that an Accommodation Would Violate Federal or State Law.

The Hospital made no attempt to accommodate Ms. Kloosterman's religious beliefs. (PageID.559, ¶289). Instead, it fired her for holding the very beliefs that led to her request. PageID.559, ¶290). The Hospital now criticizes Ms. Kloosterman for not seeking an accommodation that would have been broader and harder for the Hospital – refusing to treat LGBTQ patients altogether. (PageID.697, 701). Yet Ms. Kloosterman's proven track record of providing excellent healthcare to LGBTQ patients without any complaints, and her request for a moderate accommodation that would resolve the conflict between her religious beliefs and the Hospital's policies without any disruption to patient care, were met with hostility, resulting in her termination. (PageID.570, ¶¶359-60).

For a prima facie case under the failure-to-accommodate prong of Title VII, an employee must show only "that he holds a sincere religious belief that conflicts with an employment requirement, he has informed his employer of the conflict, and he was discharged for failing to comply with the conflicting employment requirement." *Arlington Transit Mix, Inc*., 957 F.2d at 221; *see also Crider v. Univ. of Tennessee, Knoxville*, 492 F. App'x 609, 610 (6th Cir. 2012) (religious beliefs prevented from working on Sabbath); *see also Stanley v. Lawson Co*., 993 F. Supp. 1084, 1091 (N.D. Ohio 1997) (religious beliefs prevented from selling pornographic magazines); *King v. Borgess Lee Mem'l Hosp*., No. 1:13-CV-397, 2015 WL 852324, at *4 (W.D. Mich. Feb. 26, 2015) (religious beliefs prevented from touching male patients).

The Hospital disputes none of these elements: Ms. Kloosterman's sincere religious beliefs conflicted with her employer's requirement that she affirm the Hospital's views on gender identity, and she informed her employer of the conflict in a reasonable attempt to find a solution. (PageID.523-24, ¶74, ¶¶76-82). Instead of accommodating her simple request,[4] Hospital management attacked her religious beliefs and imposed new requirements that she use preferred pronouns and make referrals for gender-transition drugs and procedures, then fired her for allegedly failing to comply with their requirement. (Page.ID.525-27, ¶¶84-100, PageID.616). Thus, Ms. Kloosterman has shown a prima facie case of failure-to-accommodate under Title VII.

Title VII affirmatively requires employers to "reasonably accommodate" an employee's religious beliefs, observances, and practices unless the accommodation would pose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). An employee's

---

[4] While Ms. Kloosterman made a formal accommodation request, (PageID.524, 526, ¶¶81-82, ¶97), she was not required to do so. Under *Abercrombie*, once the Hospital was aware of her beliefs, it had the duty to accommodate whether she formally requested accommodations or not. 575 U.S. at 774 (finding no "actual knowledge" requirement because Title VII "prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice.")

"sincerely held" religious objection to a workplace policy or job duty qualifies for a religious accommodation. EEOC Religion Guidance § 12- I-A-2 (citing *United States v. Seeger*, 380 U.S. 163, 184–85 (1965)); 29 C.F.R. § 1605.2. Employers must make at least "a reasonable attempt to accommodate [the employee's] sincere religious needs." *Arlington Transit Mix, Inc*., 957 F.2d at 222; *see also EEOC v. Univ. of Detroit*, 904 F.2d 331, 335 (6th Cir. 1990) ("an employer may not be excused for failing to make some effort to accommodate an employee's religious needs"); *McDaniel v. Essex Int'l, Inc.*, 571 F.2d 338, 342 (6th Cir. 1978) ("[N]one of our opinions may be read as excusing an employer from making any effort to accommodate the religious beliefs of an employee."); *see also Slater v. Douglas County*, 743 F. Supp. 2d 1188, 1193 (D. Or. 2010) (rejecting summary judgment where county made "no inquiry" of plaintiff's colleagues to see if they could handle domestic partnership duty for clerk with religious objection). Adopting a "wait-and-see posture that amounted to no accommodation at all" is unacceptable and constitutes a violation of Title VII. *Arlington Transit Mix, Inc*., 957 F.2d at 222.

To count as "reasonable" under the statute, an accommodation must "resolve the inherent conflict between the employee's religious beliefs and his work obligations." *Univ. of Detroit*, 904 F.2d at 335. Importantly, "cooperation is not synonymous with compromise." *Crider*, 492 F. App'x at 610 (reversing summary judgment where employer may have "frustrated, inhibited, or impeded [plaintiff's] efforts at obtaining" religious accommodation). In *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1088 (6th Cir. 1987), where the employee believed that working on Sunday was morally wrong and that it was "a sin to induce another to work in his stead," requiring the employee to find his own replacement was not a reasonable accommodation. And it is not "within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds," *Hernandez v. C.I.R.,* 490 U.S. 680, 699 (1989), or—as

the Hospital did here—to "tell the plaintiffs that their beliefs are flawed." *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 724 (2014); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (requiring the government to "accept the sincerely held complicity-based objections of religious entities" who could not comply with contraceptive mandate); *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012) (counseling student "was willing to work with all clients" but could not affirm sexual practices of LGBTQ clients).

The Hospital did not make "any effort whatsoever" to accommodate Ms. Kloosterman; in fact, it fired her for requesting one. *McDaniel*, 571 F.2d at 342; (PageID.570, ¶¶359-60). This Court should reject the Hospital's attempts to discredit her good-faith attempt to find a workable solution that would not disrupt patient care. Indeed, Congress amended Title VII precisely to avoid this result and "requir[e] some form of accommodation." *Id.* The Hospital's backhanded claim that it accommodated Ms. Kloosterman by not requiring her to provide care to LGBTQ patients in the first place, (PageID.697), is ill-founded for four reasons. First, Hospital management never offered her that option. (PageID.512-13, ¶5). Second, the Hospital faults Ms. Kloosterman for not seeking a much broader accommodation that would result in more scheduling changes and potential disruptions than Ms. Kloosterman's moderate request (which resulted in zero, since no patient ever requested such a gender-transition drug or procedure). (PageID.522, ¶67). Like the counseling student in *Ward*, Ms. Kloosterman gladly served LGBTQ patients but merely could not affirm or provide procedures she believed were harmful. Third, given the DEI Department's emphasis on LGBTQ rights, it is disingenuous to suggest that they would have tolerated a healthcare provider who declined to serve that patient population altogether. Fourth, requiring Ms. Kloosterman to make referrals for procedures that violated her conscience—even if she did not have to perform those procedures herself—would still require her to participate in and approve of such procedures

in a way that would make her morally complicit. (PageID.519, ¶41, ¶43; PageID.538, ¶165). Like the employee in *Pyro Mining* whose conscience was burdened by asking a coworker to do something he believed was morally wrong, 827 F.2d at 1088, or like the Little Sisters of the Poor who could not participate in a scheme that dispensed abortion-inducing contraceptives, 140 S. Ct. at 2383, making a referral here would involve a level of complicity that prevents such "accommodation" from resolving the conflict with Ms. Kloosterman's sincerely held beliefs. (PageID.538, ¶165).

The Hospital could easily have granted Ms. Kloosterman the same accommodation as Dr. Kogut. As Defendants acknowledge, "the office staff knows about his objection and will often schedule female patients to meet with him for their physical but then to meet with a female provider for their pelvic and/or breast exam." (PageID.700, n.12, PageID.535, ¶¶145-46). The Hospital did not require Dr. Kogut to stop seeing female patients altogether, but accommodated his personal preference to not provide intimate exams to female patients by proactively making other providers available for that service. (PageID.535, ¶¶145-46). Knowing Ms. Kloosterman's religious beliefs, the office staff could have easily scheduled LGBTQ patients who were interested in gender-transition drugs or procedures to have those discussions with other providers without any disruption to patient care. (PageID.536, ¶152).

### i.  Ms. Kloosterman's Termination Is an Adverse Employment Action.

The Hospital appears to argue that Ms. Kloosterman did not face an adverse employment action when they failed to accommodate her religious beliefs. (PageID.705-06). Yet termination is the quintessential adverse employment action. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (quoting *Burlington Industries v. Ellerth,* 524 U.S. 742, 761 (1998)).

21

Ms. Kloosterman need not show any additional adverse employment action to bring her failure-to-accommodate claim. The Sixth Circuit makes clear that its definition of "materially adverse change in the terms of her employment" applies "equally to all Title VII claims," because "[h]aving a different standard for different provisions of Title VII would be burdensome and unjustified by the text of the statute." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 799 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see, e.g., Winchester v. Wal-Mart Stores, Inc.,* No. 16-5890, 2017 WL 11489879, at *4 (6th Cir. Mar. 2, 2017) (plaintiff brought multiple Title VII claims including religious discrimination, failure-to-accommodate, and retaliation claim, from same event). Ms. Kloosterman's failure-to-accommodate claim and religious discrimination claims arise from the same adverse event—her termination in August 2021. (PageID.556-60, ¶¶266-98).

### ii. The Hospital Could Have Granted Ms. Kloosterman's Proactive Accommodation Request, Demonstrated by the Myriad Accommodations It Grants to Her Coworkers.

Again, the Hospital skirts the motion-to-dismiss standard and applies the summary judgment standard to Ms. Kloosterman's failure-to-accommodate claim. But the Hospital's willingness to accommodate secular preferences and right to medical decision-making of Ms. Kloosterman's coworkers undercuts any undue hardship argument.

Once an employee establishes a prima facie case of religious discrimination under the failure-to-accommodate prong of Title VII, the burden is on the employer "to (1) conclusively rebut one or more elements of the plaintiff's *prima facie* case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship." *Robert Bosch Corp.,* 169 F. App'x at 944. If an employer grants accommodations for non-religious reasons but not religious reasons, this gives rise to an

inference of pretextual religious discrimination. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71 (1986) ("unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes except religious ones . . . . [because] [s]uch an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness"). Furthermore, courts are "skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice. The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted." *Pyro Min. Co.*, 827 F.2d at 1089; *see also Stanley*, 993 F. Supp. at 1091 (rejecting employer's undue hardship defense regarding manager whose religious beliefs prevented her from selling pornography because "it offer[ed] no proof" it could not have transferred her); *Winchester*, 2017 WL 11489879, at *4 (upholding religious accommodation claim where employer failed to show any "consequences" "would necessarily follow from accommodating" Sabbath observance).

Here, the Hospital admitted that any hardship from accommodating Ms. Kloosterman was purely hypothetical, citing Ms. Kloosterman's complaint: "no patient ever asked her for a referral to another provider for 'gender reassignment' drugs or procedures." (PageID.718, n.36). This does not make *Ms. Kloosterman's* claim speculative as the Hospital contends; the harm she experienced was very real. It shows that any potential harm to patients—*the Hospital's* rationale for their refusal to accommodate her beliefs—was based on speculation.

The Hospital's willingness to accommodate the nonreligious preferences of Ms. Kloosterman's coworkers, like in *Ansonia*, gives rise to an inference of pretextual discrimination. Like the schedule swaps in *Pyro Mining*, the Hospital already had a system in place where coworkers accommodated each other's preferences via scheduling changes. The Hospital does not dispute that Dr. Kogut was excused from performing breast or pelvic exams on female patients,

even though this was technically *discrimination on the basis of sex*, or that multiple providers declined to prescribe diet pills *even when patients requested them*. (PageID.535, ¶¶145-49). The Hospital excused other providers from performing procedures that made them uncomfortable or were not within their respected medical judgment, from prescribing every drug that patients requested, and from making formal accommodation requests because their preferences were accommodated informally. (PageID.534-38, ¶¶142-67). Yet Ms. Kloosterman received no such accommodation but was attacked for her religious beliefs. (PageID.525-27, ¶¶89-100) Had she never requested the religious accommodation that Title VII requires employers to provide, she would still be employed by the Hospital today. (PageID.558, ¶280). Thus, the Hospital violated Title VII when it refused to accommodate Ms. Kloosterman's religious beliefs. (PageID.559-60, ¶¶288-95).

### iii. During the Relevant Time Period, the Federal Regulations and Guidance that the Hospital Cites Were Not Operative and Thus Could Not Have Justified Its Refusal to Accommodate.

Because the Hospital never attempted to accommodate Ms. Kloosterman's religious beliefs, it can hardly claim undue hardship now. *Arlington Transit Mix, Inc*., 957 F.2d at 222 ("After failing to pursue this or any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [the employee's] religious needs without undue hardship."). Notably, the Hospital does *not* claim that accommodating Ms. Kloosterman would have caused undue hardship due to scheduling changes, potential disruption to patient care, or any sort of cost.[5]

---

[5] The undue hardship standard from *TWA v. Hardison*, which three sitting Supreme Court justices have criticized, is currently under review in *Groff v. DeJoy*, 35 F.4th 162 (3d Cir. 2022), *cert. granted*, (No. 22-174, 2022 term). The Hospital cannot show—nor has it tried—that accommodating Ms. Kloosterman's religious beliefs would have adversely impacted its business.

The Hospital's only undue hardship argument is that accommodating Ms. Kloosterman *may* have put them at risk of violating federal or state law.[6] But that is false for two reasons. First, the version of Section 1557 when the Hospital terminated Ms. Kloosterman was the 2020 Rule, which did not include gender identity as a protected category, included a broad religious exemption, and recognized that the Religious Freedom Restoration Act ("RFRA") prevented the government from enforcing the regulation in a way that harmed conscience rights for healthcare providers. Second, subsequent proposed rule changes and statements by the Biden Administration are irrelevant because they occurred *after* Ms. Kloosterman was fired.

First, the version of Section 1557 when Ms. Kloosterman was fired did not threaten the Hospital with any negative repercussions from accommodating her religious beliefs. On June 15, 2020, the Administration published a revised version of Section 1557 (hereinafter "the 2020 Rule"). "[T]here is no question that the 2020 Rules repeal[ed] the 2016 definition of discrimination on the basis of sex," which had added sexual orientation and gender identity to that definition. *Walker v. Azar*, 480 F. Supp. 3d 417, 422 n.2 (E.D.N.Y. 2020). The 2020 Rule was very different, making clear that "gender identity is not set forth as a protected category," and that "reasonable distinctions on the basis of sex, as the biological binary of male and female, may, and often must, play a part in the decision-making process— especially in the field of health services." 84 Fed. Reg. at 37,175, 37,185. HHS made clear that "[t]he Department declines to interfere in these

---

On the contrary, simple scheduling changes which obviated the need for referrals were already commonplace at Ms. Kloosterman's clinic. (PageID.534-38, ¶¶142-67).

[6] The Hospital fails to identify a state law that accommodating Ms. Kloosterman may have violated, because none existed at the time. The Hospital cannot rely on the Elliott-Larsen Civil Rights Act, which was amended in March 2023 to include sexual orientation and gender identity, because this amendment occurred nearly two years after it fired Ms. Kloosterman. Thus, this Response focuses on federal law, which in fact *requires* the Hospital to accommodate Ms. Kloosterman.

[medical] practices," and "changes in the proposed rule may minimize litigation risk." 84 Fed. Reg. at 37,185, 27,849. HHS also stated its goal of "avoid[ing] regulatory requirements that would have forced [individual objectors] to provide such procedures in the first place." 84 Fed. Reg. at 37,206. Based on this clear language from the 2020 Rule, the Hospital had no reason to fear enforcement from HHS in June 2021, when Ms. Kloosterman requested a religious accommodation.[7] The 2020 Rule included strong protections for religious healthcare providers such as Ms. Kloosterman, and it removed the private right of action for individuals to sue for damages under Section 1557. Thus, the Hospital's speculative argument that accommodating Ms. Kloosterman would have increased liability falls flat, because *it could not have been sued* under the operative version of Section 1557.[8]

The version of Section 1557 in place when the Hospital fired Ms. Kloosterman made clear that HHS would enforce it in compliance with RFRA. Because RFRA "operates as a kind of super-statute, displacing the normal operation of other federal laws," *Bostock*, 140 S. Ct. at 1754, HHS is still bound by RFRA even under the Biden Administration's proposed changes to Section 1557.

---

[7] Again, the Hospital applies the improper standard, as if Ms. Kloosterman needs to prove that her actions or *inactions* would not increase the risk of legal liability for the Hospital. (PageID.708-09) Not only is that impossible to prove, but it is unnecessary. There was no liability risk because Ms. Kloosterman never refused care to her patients, and no patients ever complained. (PageID.521-22, ¶¶59-68). It is the Hospital's burden to prove that a legitimate, nondiscriminatory reason for Ms. Kloosterman's termination, and it has not.

[8] The two injunctions that the Hospital cites do not excuse its actions in violating Ms. Kloosterman's rights. In *Walker v. Azar*, 480 F.Supp.3d 417, the Eastern District of New York enjoined only the provision of Section 1557 about sex-stereotyping but left the rest of the 2020 Rule intact. In *Whitman-Walker v. HHS*, No. CV 20-1630 (JEB), 2021 WL 4033072, at *2 (D.D.C. Sept. 3, 2021), the D.C. District Court enjoined the sex-stereotyping provision and the religious exemption. These were not permanent injunctions like the one protecting Ms. Kloosterman as a member of the CMDA. *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 366–67 (N.D. Tex. 2021), *amended*, No. 7:16-CV-00108-O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021), *and aff'd in part, dismissed in part*, 47 F.4th 368 (5th Cir. 2022).

RFRA was passed by a bipartisan Congress to provide "very broad protection for religious liberty," and it requires government actors who substantially burden religious claimants to meet strict scrutiny, the most difficult standard in constitutional law. *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). The 2020 Rule correctly recognized that HHS "is bound to enforce Section 1557 in compliance with RFRA." 84 Fed. Reg. 37,207. HHS also agreed with multiple federal courts, including the court in *Franciscan Alliance*, who found that the Obama Administration's version of the rule violated RFRA as applied to members of CMDA. *Id.*; *Franciscan All.*, 553 F. Supp. 3d at 366–67. Thus, the Hospital should not fear enforcement by HHS but is instead bound by federal law to accommodate its employees' religious beliefs.

Second, the Hospital cites later policy statements by the Biden Administration to excuse its unlawful actions toward Ms. Kloosterman. Yet any statements made after Ms. Kloosterman's termination on August 24, 2021, are irrelevant. The Hospital mentions only two statements which precede her termination. Executive Order 13,988, from January 2021, does not mention the Affordable Care Act or Section 1557 but is merely a general policy statement about the Biden Administration's support for LGBTQ rights.[9] The Notification published in May 2021 explicitly states that when enforcing Section 1557, HHS will comply with RFRA "and all other legal requirements," and that it "will comply with any applicable court orders that have been issued in litigation involving the Section 1557 regulations, including *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019)."[10] In the *Franciscan Alliance* case, the Court granted a

---

[9] "Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation," Jan. 20, 2021, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-preventing-and-combating-discrimination-on-basis-of-gender-identity-or-sexual-orientation/.

[10] Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and

preliminary injunction protecting current and future members of the CMDA in 2016, and in 2019 it vacated the former Rule using similar reasoning. Thus, the May 2021 Notification is no excuse for the Hospital's hostility toward Ms. Kloosterman's religious beliefs. If anything, it makes clear that the injunction protecting her is still in effect and that HHS would not fault the Hospital for accommodating her.

> ### iv. A Nationwide Federal Court Injunction in Favor of CMDA Members Protects Ms. Kloosterman from Enforcement of Section 1557.

Even if HHS attempted to enforce its proposed Rule against the Hospital, Ms. Kloosterman is protected by a nationwide permanent injunction because she has been an active member of the CMDA since 2013. (PageID.538, ¶169); *Franciscan All.*, 553 F. Supp. 3d at 366–67. In *Franciscan Alliance*, the Fifth Circuit and Northern District of Texas held multiple times that the 2016 Rule violated RFRA. The CMDA, along with two religious hospitals, claimed that the Rule violated RFRA by forcing religious medical providers to perform abortions and gender-reassignment surgeries in violation of their religious beliefs. The district court found the RFRA violation so severe that it granted a preliminary injunction in 2016, vacated the rule provisions in 2019, and granted a permanent injunction in 2021 that prohibits HHS from ever enforcing Section 1557 against the plaintiffs "'in a manner that would require [them] to perform' or insure gender-reassignment surgeries or abortions." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 373 (5th Cir. 2022). The Fifth Circuit affirmed, and the Biden Administration declined to seek certiorari. Thus, the permanent injunction protects current and future members of the CMDA by preventing:

> HHS, Secretary Becerra . . . and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), or any implementing regulations thereto against Plaintiffs, their current and future members, and those acting in concert or

---

Title IX of the Education Amendments of 1972 ("Notification"), 86 Fed. Reg. 27,984, 27,985 (May 25, 2021).

participation with them . . . in a manner that would require them to perform or provide insurance coverage for gender-transition procedures or abortions, including by . . . pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions. . . . As used in this order, the term "gender-transition procedures" includes surgery, counseling, provision of pharmaceuticals, or other treatments sought in furtherance of a gender transition.

*Franciscan All.*, 553 F. Supp. 3d at 378. In place before Ms. Kloosterman's termination, the injunction provides her ongoing protection and demonstrates that the Hospital would not have violated federal law or increased liability by accommodating her religious beliefs.

The Hospital attempts to downplay this injunction by arguing that it was not affirmed by the Fifth Circuit until after Ms. Kloosterman's termination. (PageID.696, n.4) Yet the most important ruling, granting a permanent injunction to protect current and future members of CMDA, occurred on August 9, 2021, three weeks before the Hospital fired Ms. Kloosterman. *Franciscan All.*, 553 F. Supp. at 376–77. Thus, the injunction protects Ms. Kloosterman and undercuts any argument that the Hospital could have incurred liability for accommodating her religious beliefs. Because the preliminary injunction protecting CMDA members had been in place since 2016, the Hospital had five years' notice and reasonably should have known that Ms. Kloosterman was protected. *Franciscan All.*, 553 F. Supp. 3d at 378 (injunctive relief "has been sufficiently adversarially tested for nearly five years so as to provide meaningful notice to the government and to be a legally permitted remedy").

Thus, the Hospital's only undue hardship argument collapses for three reasons: (1) the version of Section 1557 in place at Ms. Kloosterman's termination respected religious liberty, dissolving any threat of enforcement by HHS if the Hospital accommodated her, (2) later policy statements by the Biden Administration are irrelevant, and (3) a permanent nationwide injunction protects Ms. Kloosterman and thousands of other providers who share her beliefs.

## II.    Ms. Kloosterman States a Claim for Title VII Disparate Impact (Count V).

Title VII prohibits some "facially neutral practices that, in fact, are 'discriminatory in operation.'" *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). A disparate impact claim "'involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Johnson v. Michigan State Univ.*, 547 F.Supp 429, 437 (W.D. Mich. 1982) (quoting *Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15 (1977)). To survive a motion to dismiss, a plaintiff is required to simply allege a specific employment practice that plausibly causes a disparate impact on a protected group. *EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 591–92 (6th Cir. 2013).

### A.    Ms. Kloosterman Exhausted This Claim in Her Amended EEOC Charge, Which the Hospital's Motion Neglects to Acknowledge.

The Hospital incorrectly argues that Ms. Kloosterman failed to exhaust her administrative remedies, because she did not assert a claim of disparate impact in her EEOC charge. (PageID.710). Although that legal theory need not be stated in a charge, Ms. Kloosterman's Amended EEOC Charge (PageID.581-585) expressly states a claim of disparate impact discrimination:

> University of Michigan Health West violated Title VII of the Civil Rights Act when it: . . . maintained a rule that providers' independent medical judgment would be respected unless it concerned treatment of gender dysphoria, which rule disparately impacts Christians and other employees with traditional religious beliefs about the biological differences between the sexes . . .. (PageID.585).

Therefore, Ms. Kloosterman properly exhausted her administrative remedies.

**B.** **The Complaint Alleges that the Hospital Maintains a Policy or Practice of Respecting Independent Medical Judgment on Myriad Issues but Not on "Gender Reassignment" Issues, and that this Policy or Practice Disparately Impacts Christian Employees.**

Ms. Kloosterman has properly alleged the Hospital maintains policies and practices that appear facially neutral, but have a significant adverse impact on members of a protected group. (PageID.560-62, ¶¶299-314). Ms. Kloosterman's complaint identifies the specific policies that cause the disparate impact on a particular protected group comprehended by Title VII. (PageID.561, ¶¶303-07).

Ms. Kloosterman identified a specific employment practice which disparately impacts certain religious employees. *Johnson v. U.S. Dep't of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994). Importantly, "so long as a complaint provides an adequate factual basis for a Title VII discrimination claim, it satisfies the pleading requirements of Federal Rule of Civil Procedure 8(a)(2)." *Serrano v. Cintas Corp.*, 699 F.3d 884, 897 (6th Cir. 2012). Although plaintiffs "must allege a specific employment policy in the complaint," the Supreme Court has recognized that requiring plaintiffs to pinpoint the specific cause of the disparate impact is unduly burdensome, so "liberal civil discovery rules give plaintiffs broad access to employers' records in an effort to document their claims." *Peoplemark*, 732 F.3d at 591; *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989). At the pleadings stage, a plaintiff is required to simply allege a specific employment practice that causes a disparate impact. *Peoplemark*, 732 F.3d at 591–92. Ms. Kloosterman has done so. (PageID.561, ¶¶303–07). She must prove that policy or practice exists and causes a disparate impact on a protected group only *after* she has had the benefit of discovery. *Id.*

Ms. Kloosterman's Complaint identified the Hospital's nondiscrimination policy:

> University of Michigan Health-West complies with applicable Federal civil rights
> laws and does not discriminate on the basis of race, color, national origin, age,
> disability, or sex. UM Health-West does not exclude people or treat them
> differently because of race, color, national origin, age, disability, sex, sexual
> orientation, gender identity or religion. (PageID.561, ¶ 303)

To effectuate this policy, Ms. Kloosterman's Complaint alleges that the Hospital maintains two narrower policies or practices: (1) the Hospital maintained a policy or practice of respecting independent medical judgment on myriad issues but not on "gender reassignment" issues, (PageID.561, ¶¶306–07), and (2) the Hospital has a policy or practice of disciplining employees for expressing, mentioning, or suggesting that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity. (PageID.561, ¶305). Both policies are facially neutral—no Hospital employee could use their independent medical judgment on gender reassignment issues, and no employee (religious or nonreligious) could express, mention, or suggest that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity. But the policies disparately impact religious employees, particularly Christians, including Ms. Kloosterman, who hold traditional religious beliefs concerning sex and gender.

Her disparate impact claim does not rest on a discriminatory enforcement theory, as the Hospital suggests. Regarding the Hospital's policy of respecting independent medical judgment on myriad issues but not on "gender reassignment" issues, Ms. Kloosterman does not allege that the Hospital granted nonreligious employees freedom to use their independent medical judgment on "gender reassignment" issues while refusing to grant the same freedom to religious employees. That would be discriminatory enforcement. The Hospital wrongly assumes that Ms. Kloosterman's protected group are the only professionals who would use their independent medical judgment on gender reassignment issues. On the contrary, medical professionals from a diverse array of faith traditions agree it may be necessary to exercise independent judgment on these issues.

(PageID.539–543, ¶¶175–190); *Fisher v. Fed. Bureau of Prisons*, 484 F.Supp.3d 521, 533–34 (N.D. Ohio 2020) (noting that "numerous physicians and medical professionals" determined that "in their professional opinion" a transgender inmate "did not require treatment by outside specialists"). Although this policy or practice applies to medical professionals with various belief systems and backgrounds, it has a disproportionate effect on religious employees, particularly Christians, who hold traditional religious beliefs concerning sex and gender. Thus, Ms. Kloosterman properly alleged that the Hospital's policy or practice of respecting independent medical judgment on myriad issues but not on "gender reassignment" issues disparately impacts religious employees, particularly Christians, who hold traditional religious beliefs concerning sex and gender. (PageID.560-62, ¶¶299-314).

The Hospital wrongly argues that Ms. Kloosterman fails to state a claim when alleging disparate impact related to its policy or practice of disciplining employees for expressing that they hold traditional beliefs concerning sex and gender. (PageID.713). The Hospital incorrectly concludes that this policy treats people differently on its face. (PageID.713) If so, the Hospital is liable for disparate treatment. But individuals outside of Ms. Kloosterman's protected group also hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity. Thus, this policy is facially neutral—no employee (religious or nonreligious) could express, mention, or suggest that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity. But that policy or practice disparately impacts religious employees, particularly Christians, who hold traditional religious beliefs concerning sex and gender, including Ms. Kloosterman.

The Hospital also insists religious employees who hold traditional religious beliefs concerning sex and gender are "not employees in a particular protected class."[11] (PageID.714). That is plainly wrong. Title VII broadly protects "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j); (PageID.557, ¶ 270). The EEOC further defines "religious practices" to "include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. § 1605.1; (PageID.557, ¶271). Courts, including Sixth Circuit precedent, have protected a wide variety of religious beliefs and practices under Title VII for decades. *See e.g.*, *McDaniel*, 571 F.2d 338 (Title VII protected employee's religious belief that she should not belong to or financially support labor unions); *Pyro Min. Co.*, 827 F.2d at 1088 (Title VII protected employee's Sabbatarian religious beliefs that asking another to work in his stead was sinful); *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444 (7th Cir. 2013) (Title VII protected employee's religious observance to lead funeral burial rites in Nigeria); *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854–57 (11th Cir. 2010) (Title VII could protect religious beliefs that require opposing efforts to remove God from public places).

The Hospital relies on a nonbinding footnote in *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1306 n.36 (M.D. Ala. 2019). Importantly, that case concerned Title II, not Title VII. And the *Coral Ridge* court expressly distinguished Title II from other statutes that broadly protect religious exercise and beliefs. *Id.* Religious employees,

---

[11] Perhaps it is unsurprising that the Hospital continues to show hostility toward Ms. Kloosterman's beliefs, calling them "ill-defined and limited subsets of a certain religions." (PageID.714). Title VII protects not only traditional religions but also idiosyncratic beliefs. Yet Ms. Kloosterman's beliefs are not idiosyncratic but are in fact shared by the nearly 20,000 members of the Christian Medical & Dental Associations, as well as religious healthcare professionals from many other faiths. (PageID.538-39, ¶¶168-74; PageID.617-35).

particularly Christians, who hold traditional religious beliefs concerning sex and gender are a particular protected group under Title VII.

Accepting Ms. Kloosterman's well-pleaded allegations as true, the Court should reject the Hospital's motion to dismiss as to her disparate impact claim. It is facially plausible that Title VII proscribes these policies or practices because they disparately impact religious employees, particularly Christians, who hold traditional religious beliefs concerning sex and gender. The Hospital even concedes this is plausible. (PageID.714) ("100% of whom would be disparately impacted by the supposed policies and practices"). Therefore, Plaintiff's Complaint states a claim for disparate impact religious discrimination under Title VII.

III.   **Because the Hospital Has Invoked Its Eleventh Amendment Immunity, Ms. Kloosterman Agrees to Dismiss the State Constitutional and ELCRA Claims Against It, But She Will Continue to Assert These Claims Against the Other Defendants.**

Ms. Kloosterman agrees to dismiss the state constitutional and ELCRA claims against the Hospital because it has invoked its Eleventh Amendment immunity as a state entity. Ms. Kloosterman will maintain her state constitutional claims against the other Defendants and has requested the Court's leave to amend her Complaint to allege ELCRA claims against the individual Defendants.

**CONCLUSION**

Ms. Kloosterman's well-pleaded Complaint makes clear that the Hospital discriminated against her when it terminated her because of her religious beliefs. This Court should deny the Hospital's motion to dismiss.

## **LOCAL RULE 7.2 CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of L. Civ. R. 7.2(b)(i), because, excluding the parts

exempted by L. Civ. R. 7.2(b)(i), it contains 10,785 words. The word count was generated using

Microsoft Word for Microsoft 365.

Respectfully submitted,

*/s/ James R. Wierenga*
James R. Wierenga
Michigan Bar # P48946
99 Monroe Ave, NW
Suite 1210
Grand Rapids, MI 49503
Tel. (616) 454-3883
jim@dwlawpc.com

May 9, 2023