## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VALERIE KLOOSTERMAN,

       *Plaintiff,*

  v.

METROPOLITAN HOSPITAL, d/b/a University of Michigan Health-West, et al.,

       *Defendants*.

No. 1:22-cv-00944-JMB-SJB
Hon. Jane M. Beckering

## BRIEF IN OPPOSITION TO DEFENDANTS PAI, BOOKER, COLE, PIERCE, AND SMITH'S MOTION TO DISMISS PLAINTIFF'S CORRECTED FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................... 1

STATEMENT OF RELEVANT FACTS ................................................................... 2

ARGUMENT ........................................................................................................... 7

I.      Ms. Kloosterman's Individual Claims for Monetary Damages Are Not Barred by the Eleventh Amendment ...................................................................... 7

II.     Each Individual Defendant in His or Her Individual Capacity Personally Participated in the Constitutional Violations Against Ms. Kloosterman ............................... 10

        A.      Defendants Speak and Act on Behalf of the Hospital and Its Management Team ....................................................................................................... 11

        B.      Defendants' Policy Regarding Pronouns and Referrals ........................ 12

        C.      Accommodations .................................................................................. 14

        D.      Ms. Kloosterman's Termination ........................................................... 15

        E.      Hostility and Anti-Religious Animus .................................................... 15

        F.      Defendants Pierce and Smith Are Liable for Their Recommendations ... 16

        G.      Defendants Have the Authority to Grant Ms. Kloosterman's Requested Relief ..................................................................................................... 18

III.    Qualified Immunity Does Not Bar Ms. Kloosterman's Claims ......................... 20

IV.     Defendants Violated Ms. Kloosterman's Free Exercise Rights ........................ 21

V.      Defendants Violated Ms. Kloosterman's Right to Free Speech ....................... 25

        A.      Compelled Speech ................................................................................ 26

        B.      Government Speech .............................................................................. 26

VI.     Defendants Violated Ms. Kloosterman's Equal Protection Rights ................... 29

        A.      Ms. Kloosterman Alleges Direct Evidence of Discrimination .............. 31

B.      Ms. Kloosterman Alleges Circumstantial Evidence of Disparate Treatment ........32

VII.    Ms. Kloosterman's Non-Monetary Claims for Relief .........................................................34

A.      Nominal Damages......................................................................................34

B.      Individual Capacity - Injunctive Relief......................................................34

C.      Reinstatement...........................................................................................35

D.      Declaratory Relief.....................................................................................35

CONCLUSION.........................................................................................................36

LOCAL RULE 7.2 CERTIFICATE OF COMPLIANCE ..........................................37

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ........................................................................................ 20

*Bad Frog Brewery, Inc. v. New York State Liquor Authority,*
  134 F.3d 87 (2d Cir. 1997) ............................................................................... 8

*Baynes v. Cleland,*
  799 F.3d 600 (6th Cir. 2015) ..................................................................... 20, 21

*Bean v. Sprint/United Mgmt. Co.,*
  No. 1:18-cv-413, 2021 WL 5451493 (W.D. Mich. Mar. 31, 2021) ........................ 31

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................ 7

*Bellamy v. Bradley,*
  729 F.2d 416 (6th Cir. 1984) ............................................................... 11, 13, 14

*Blalock v. Metals Trades, Inc.,*
  775 F.2d 703 (6th Cir. 1985) ........................................................................... 31

*Bolden v. Lowes Home Centers, LLC,*
  783 F. App'x 589 (6th Cir. 2019) ..................................................................... 32

*Bostock v. Clayton Cnty., Ga.,*
  140 S. Ct. 1731 (2020) ................................................................................... 30

*Braswell v. United States,*
  487 U.S. 99 (1988) ......................................................................................... 12

*Brewer v. New Era, Inc.,*
  564 F. App'x 834 (6th Cir. 2014) ..................................................................... 31

*Brown v. Chappelle,*
  659 F. App'x 458 (10th Cir. 2016) ................................................................... 34

*Brown v. Strickland,*
  No. 2:10-cv-166, 2010 WL 2629878 (S.D. Ohio June 28, 2010) ........................... 36

*Chattman v. Toho Tenax Am., Inc.,*
  686 F.3d 339 (6th Cir. 2012) ........................................................................... 31

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................ 21, 22, 24

*Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd. Serving Belmont,*
    *Harrison & Monroe Ctys.*, 150 F. App'x 389 (6th Cir. 2005) .................................. 34

*D.E. & J. Ltd. P'ship v. Conaway,*
    284 F.Supp.2d 719 (6th Cir. 2003) ................................................................ 9

*Diaz v. Michigan Dept. of Corrections,*
    703 F.3d 956 (6th Cir. 2013) ................................................................ 35

*Abercrombie & Fitch Stores, Inc.,*
    575 U.S 768 (2015) ................................................................ 30

*Eckford-El v. Toombs,*
    760 F. Supp. 1267 (W.D. Mich. 1991) ................................................................ 10

*Elezovic v. Ford Motor Co.,*
    697 N.W.2d 851 (2005) ................................................................ 9

*Ercegovich v. Goodyear Tire & Rubber Co.,*
    154 F.3d 344 (6th Cir. 1998) ................................................................ 32, 33

*Ex parte Young,*
    209 U.S. 123 (1908) ................................................................ 35, 36

*Ezekiel v. Michel,*
    66 F.3d 894 (7th Cir. 1995) ................................................................ 28

*Fulton v. City of Philadelphia,*
    141. S. Ct. 1868 (2021) ................................................................ 21, 22, 23, 24

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ................................................................ 26, 27

*Green v. Johnson,*
    977 F.2d 1383 (10th Cir. 1992) ................................................................ 8

*Green v. Mansour,*
    474 U.S. 64 (1985) ................................................................ 36

*Guertin v. State,*
    912 F.3d 907 (6th Cir. 2019) ................................................................ 20

*Guillemard-Ginorio v. Contreras-Gomez*,
    585 F.3d 508 (1st Cir. 2009) ......................................................................... 8

*Gutzwiller v. Fenik*,
    860 F.2d 1317 (6th Cir. 1988) ............................................................... 30, 33

*Harris-Reese v. United States*,
    615 F. Supp. 3d 336 (D. Md. 2022) ............................................................ 28

*Hartman v. Thompson*,
    931 F.3d 471 (6th Cir. 2019) ...................................................................... 18

*Heard v. Strange*,
    No. 17-13904, 2018 WL 4178496 (E.D. Mich. Aug. 31, 2018) ................. 11

*Hickman v. Valley Loc. Sch. Dist. Bd. of Ed.*,
    619 F.2d 606 (6th Cir. 1980) .......................................................... 11, 16, 17

*Hickman v. Valley Loc. Sch. Dist. Bd. of Ed.*,
    513 F. Supp. 659 (S.D. Ohio 1981) ............................................................ 16

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ................................................................................... 20

*Horacek v. Heyns*,
    No. 2:13-CV-280, 2016 WL 11263235 (W.D. Mich. Dec.

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ................................................................................... 29

*In re Contempt of Dudzinski*,
    667 N.W.2d 68 (Mich. Ct. App. 2003) ...................................................... 25

*In re Flint Water Cases*,
    960 F.3d 303 (6th Cir. 2020) ................................................................ 10, 36

*In re Ohio Protocol Litigation*,
    709 Fed. Appx. 779 (6th Cir. 2017) ........................................................... 8, 9

*InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*,
    534 F. Supp. 3d 785 (E.D. Mich.

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emp., Council 31*,
    138 S. Ct. 2448 (2018) .......................................................................... 26, 29

*Johnson v. Livingston,*
    779 F. App'x 254 (5th Cir. 2019) ................................................................. 34, 35

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) .................................................................................. 22, 23

*Kerr v. Hurd,*
    694 F. Supp. 2d 817 (S.D. Ohio 2010) ........................................................ 26, 27

*Keys v. Humana, Inc.,*
    684 F.3d 605 (6th Cir. 2012) .............................................................................. 31

*Ladach v. City of Romulus,*
    No. 17-10554, 2018 WL 5077181 (E.D. Mich. Aug. 24, 2018) ......................... 11

*Lautermilch v. Findlay City Schools,*
    314 F.3d 271 (6th Cir. 2003) ......................................................................... 30, 33

*League of Women Voters of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) .............................................................................. 36

*Lilly v. Fieldstone,*
    876 F.2d 857 (10th Cir. 1989) ............................................................................ 28

*Little v. BP Exploration & Oil Co.,*
    265 F.3d 357 (6th Cir. 2001) .............................................................................. 31

*Lurch v. United States,*
    719 F.2d 333 (10th Cir. 1983) ............................................................................ 28

*Maben v. Thelen,*
    887 F.3d 252 (6th Cir. 2018) ................................................................................ 8

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ....................................................................... 21, 22, 23, 24

*Matthews v. Jones,*
    35 F.3d 1046 (6th Cir. 1994) .............................................................................. 10

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ............................................................................................ 32

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ......................................................................... 28, 29

*Mitchell v. Toledo Hosp.*,
    964 F.2d 577 (6th Cir. 1992) ................................................................. 33

*Moncier v. Jones*,
    557 F. App'x 407 (6th Cir. 2014) ...................................................... 34, 35

*Nat'l Inst. of Family & Life Advocates v. Becerra (NIFLA)*,
    138 S. Ct. 2361 (2018) ....................................................................... 26, 29

*New Orleans Towing Ass'n v. Foster*,
    248 F.3d 1143 (5th Cir. 2001) ................................................................. 8

*Pena v. Gardner*,
    976 F.2d 469 (9th Cir. 1991) ................................................................... 8

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ............................................................................... 7, 8

*Quilico v. Kaplan*,
    749 F.2d 480 (7th Cir. 1984) ............................................................. 27, 28

*S & M Brands, Inc. v. Cooper*,
    527 F.3d 500 (6th Cir. 2008) ................................................................. 36

*Saint Michael Acad., Inc. v. Hertel*,
    No. 22-1054, 2022 WL 14707052 (6th Cir. Oct. 26, 2022) ................... 34

*Shepherd Montessori Ctre. Milan v. Ann Arbor Charter Twp.*,
    783 N.W.2d 695 (Mich. 2010) ............................................................... 30

*Sims v. City of Madisonville*,
    894 F.3d 632 (5th Cir. 2018) ................................................................. 11

*Sullivan v. Miller*,
    637 B.R. 723 (E.D. Mich. 2022) ............................................................ 12

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002) ............................................................................... 31

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ....................................................................... 23, 24

*Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*,
    615 F.3d 622 (6th Cir. 2010) ................................................................... 7

*Verizon Maryland, Inc. v. Public Service Com'n of Maryland*,
535 U.S. 635 (2002) ................................................................................ 36

*Ward v. Polite*,
667 F.3d 727 (2012) ................................................................ 24, 25, 27, 29

*Watkins v. Healy*,
986 F.3d 648 (6th Cir. 2021) ....................................................................... 7

*Wexler v. White's Fine Furniture, Inc.*,
317 F.3d 564 (6th Cir. 2003) ..................................................................... 31

*Williams v. Mehra*,
186 F.3d 685 (6th Cir. 1999) ..................................................................... 20

*Winkler by Winkler v. Marist Fathers of Detroit, Inc.*,
901 N.W.2d 566 (Mich. 2017) ................................................................... 21

*Woodland v. Michigan Citizens Lobby*,
378 N.W.2d 337 (Mich. Ct. App. 1985) .................................................... 25

*Yerkes v. Ohio State Highway Patrol*,
No. 22-3030, 2022 WL 17753528 (6th Cir. Dec. 19, 2022) ...................... 11

*Young v. United Parcel Service, Inc.*,
575 U.S. 206 (2015) .................................................................................. 32

## Constitutions and Statutes

42 U.S.C. § 1983 .............................................................................. *passim*

Mich. Const. Art. I, § 2 ............................................................................. 30

Mich. Const. Art. I, § 5 ............................................................................. 25

## Rules

Fed. R. Civ. P. 8(a)(2) ................................................................................ 7

## INTRODUCTION

This case involves astonishing acts of anti-religious bigotry by the management team at Metropolitan Hospital d/b/a University of Michigan Health-West (the "Hospital") against a long-time, beloved physician assistant, Valerie Kloosterman. The Hospital's management team, consisting of Defendants Pai, Booker, Cole, Pierce, and Smith, created and enforced a draconian policy directed at Ms. Kloosterman. As alleged in the First Amended Complaint, each of the defendants personally participated in the deprivation of Ms. Kloosterman's constitutional and civil rights. Ms. Kloosterman states a claim under 42 U.S.C. § 1983 that Defendants violated the Free Exercise Clause when they expressed open hostility toward her religious beliefs, refused to consider accommodating her beliefs, and attempted to force her to participate in and make referrals for gender-transition drugs and procedures. (Count I). Ms. Kloosterman also states a claim that Defendants violated the Free Speech Clause when they created and enforced a policy requiring her to use patient-preferred pronouns, regardless of biological sex, even though this practice violated her religious beliefs and medical ethics. (Count II). Ms. Kloosterman also states a claim that Defendants violated the Equal Protection Clause when they refused to accommodate her religious beliefs while making accommodations for the secular preferences and medical judgment of her coworkers. (Count III). Not only did Defendants' policy violate Ms. Kloosterman's constitutional rights, but it also prevented her from ethically exercising her independent medical judgment in treating her patients, while permitting other providers to use their medical judgment. Ms. Kloosterman likewise states viable claims under the Michigan Constitution for Defendants' violations of her free exercise of religion (Count VI), free speech (Count VII), and equal protection (Count VIII), and under the Elliott-Larsen Civil Rights Act when they terminated her because of her religious beliefs (Count IX). The Court should deny the Individual Defendants' motion to dismiss.

## STATEMENT OF RELEVANT FACTS

Ms. Kloosterman is a devout Christian and member of a United Reformed Church. (PageID.517, ¶31).  She has tirelessly served her community for 17 years as a third-generation healthcare professional (PageID.520-521, ¶¶51-52).  Throughout her career, she consistently received exemplary performance reviews and has never been subject to discipline or a patient complaint. (PageID.521, ¶¶53-55).

Ms. Kloosterman's religious beliefs have never prevented her from providing excellent medical care to LGBTQ patients. (PageID.521, ¶¶59-61). Rather, as a physician assistant, she has been committed to ethically providing the best care possible for patients of all ages and backgrounds. (PageID.521, ¶52).

The events leading to Ms. Kloosterman's termination began in May and June 2021. At that time, Defendants Rhae-Ann Booker, the Hospital's Vice President of Diversity, Equity, and Inclusion ("DEI"), and Marla Cole, the Hospital's Director of Human Resources, required all Hospital employees to complete a mandatory training module. (PageID.523-524, ¶¶74-75; PageID.532, ¶133). The module could not be completed unless an employee checked the boxes affirming management's views on sex, gender identity, and sexual orientation. (PageID.524, ¶75). However, for Ms. Kloosterman, to affirm these statements would violate her sincerely held religious beliefs. (PageID.523, ¶74). Worse yet, Hospital management told employees that the training was due June 30, 2021, and that failure to complete it was grounds for termination. (PageID.524, ¶75).

Concerned that she was being forced to either reject her faith or lose her job, Ms. Kloosterman reached out to management. First, she spoke to Defendant Catherine Smith, who was a member of the Advanced Practice Provider's Council at the Hospital. (PageID.516, ¶29; PageID.524, ¶76). Defendant Smith was an important manager for the Hospital, serving as a liaison

between management and providers such as Ms. Kloosterman. (PageID.524, ¶76; PageID.525, ¶85; PageID.527, ¶100). She also spoke to Defendant Booker. (PageID.516, ¶26; PageID.524, ¶79). Ms. Kloosterman told Booker that her faith precluded her from affirming the statements in the training module, and that she was seeking a religious accommodation. (PageID.516, ¶26; PageID.524, ¶79). In response, Booker scheduled a meeting for July 1. (PageID.524, ¶¶79-82). However, concerned that her failure to timely complete the training module would place her job in jeopardy, Ms. Kloosterman completed the module before her meeting with Booker. (PageID.524, ¶79).

At the July 1 meeting, Ms. Kloosterman explained to Booker her religious concerns about the gender and sexuality questions in the training module, and stated that she was seeking a religious accommodation regarding those questions. (PageID.524, ¶82). Booker immediately misinterpreted her request, construing Ms. Kloosterman's simple *expression* of faith as an intention to refuse to treat gay and lesbian patients altogether. (PageID.524-525, ¶83). Ms. Kloosterman corrected Booker, stating that throughout her career, she has served people of all beliefs and backgrounds, and she has always been committed to providing the best possible care to her patients, including those who identified as lesbian, gay, or were experiencing gender dysphoria. (PageID.524-525, ¶83; PageID.521, ¶59; PageID.526, ¶94). Booker indicated that she would speak with management about Ms. Kloosterman's concerns, and following the meeting, Defendants Booker and Cole scheduled a meeting with Ms. Kloosterman and management for July 29, 2021. (PageID.524, ¶¶83-84; PageID.532, ¶131).

At the July 29 meeting the Hospital was represented by the management team of Defendants Smith and Cole, as well as Defendant Thomas Pierce. (PageID.525, ¶¶84-85). Pierce represented the Hospital as its DEI Coordinator. (PageID.516, ¶¶26-28). Based on her meeting

with Booker, Ms. Kloosterman expected to discuss her request for a religious accommodation regarding the training module. (PageID.524, ¶¶79-83). However, during the meeting, the management team raised new issues that had never come up with her patients – specifically, whether Ms. Kloosterman would use gender identity-based pronouns with patients and be willing to refer patients for "gender reassignment surgery." (PageID.525, ¶88). When Ms. Kloosterman stated that she could not do so based on either her religious beliefs or her independent medical judgement, Pierce grew hostile and visibly angry, with tight fists and a flushed demeanor, and openly attacked Ms. Kloosterman's religious beliefs. (PageID.525, ¶89). Pierce told her that she could not take the Bible or her religious beliefs to work, either literally or figuratively, and that she was abusing her power as a healthcare provider to manipulate patients. (PageID.525, ¶90).

Pierce continued to berate Ms. Kloosterman, rhetorically asking if she knew "what would happen if we let every provider" take their religious beliefs to work, suggesting that religious beliefs do not belong in the workplace. (PageID.525, ¶90). Ms. Kloosterman respectfully explained that she never sought power over a patient but merely served as part of each patient's care team with his or her best interests in mind. (PageID.525, ¶91). Pierce interrupted her and called her "evil" for not giving patients exactly what they wanted because of her religious beliefs. (PageID.525-526, ¶91). Ms. Kloosterman responded that medical providers have multiple ways of treating most conditions and are not necessarily obligated to give patients everything they asked for if doing so went against the providers' medical judgment. (PageID.526, ¶92). She also explained some of the reasons behind her medical objections to facilitating "gender reassignment surgeries." (PageID.526, ¶93).

During the meeting, Ms. Kloosterman emphasized that she was not seeking to impose her beliefs on anyone. (PageID.526, ¶97). However, when she explained that she had treated patients

who were gay and lesbian for several years without any complaints, Pierce called her a "liar" and said if he came to her as a patient and she used his name rather than his preferred pronoun, he would never come back to see her. (PageID.526, ¶94). Pierce also asked Ms. Kloosterman whether she knew that by using a patient's name instead of his or her preferred pronouns, she would cause a patient to commit suicide. (PageID.526, ¶95). When he claimed that his assertion was well-documented, Ms. Kloosterman cited some scientific studies that showed otherwise. (PageID.526, ¶95). In a hostile tone, Pierce told her that he had studies that would disprove her studies. (PageID.526, ¶96).

Ms. Kloosterman's initial accommodation request pertained only to the mandatory training module, (PageID.524, ¶82) However, when Defendants confronted her about their pronoun and referral policy, Ms. Kloosterman respectfully asked them to accommodate her beliefs regarding those issues as well. (PageID.525-26, ¶¶88-97). For example, when the management team asked her what she would do about noting pronouns on patient charts, she explained that pronouns are not always given for charting and if there were any pre-formulated pronouns, she could use the patient's first name, as she had done in the past without any complaints or disruption to patient service. (PageID.526, ¶97). She also stated that as to referrals, patients could easily be scheduled with other providers. (PageID.525, ¶¶88-96). After an hour, the meeting finally ended. (PageID.526, ¶88; PageID.527, ¶101).

Following the July 29 meeting, the Hospital's management team of Defendants Pai, Booker, Cole, Smith, and Pierce decided that, based on Ms. Kloosterman's religious beliefs (as well as her commitment to exercising her independent medical judgment), they would deny her request for a religious accommodation and fire her. (PageID.527-528, ¶¶101-109; PageID.530-531, ¶¶118-125; PageID.531-532, ¶¶128-131; PageID.612, Ex. F; PageID.616, Ex. H).

Specifically, three weeks after the July 29 meeting, on August 24, 2021, Defendants Cole and Smith met with Ms. Kloosterman at the Hospital. (PageID.527, ¶101). When she arrived at the meeting, Defendants Cole and Smith gave her a written termination notice. (PageID.527-528, ¶105; PageID.612, Ex. F).  The notice was signed by Defendant Pai. (PageID.527-528, ¶105; PageID.612, Ex. F). Smith advised Ms. Kloosterman that she was fired because she had refused to follow management's policy on patient pronouns and referring patients for "gender reassignment surgeries." (PageID.528, ¶106). Ms. Kloosterman responded by stating that while she would not abandon her religious beliefs, she "will always treat patients appropriately"; in response, Smith stated that it had been decided by management that "today" was her last day. (PageID.528, ¶¶107-108).

Based on Ms. Kloosterman's sudden departure, there was an outcry from her coworkers, and, as a result, Smith held a meeting with her coworkers on August 25, 2021. (PageID.530, ¶¶115-118). In response to the anger and confusion expressed by Ms. Kloosterman's coworkers over her termination, Defendants Pai and Cole spoke on behalf of the management team. (PageID.530, ¶¶118-121).  When coworkers asked why Ms. Kloosterman had been terminated, the team displayed its hostility towards her religious beliefs by indicating she had been fired for a serious violation. (PageID.530-531, ¶¶121-125; PageID.545, ¶204).

Following the August 25 meeting, the management team sent Ms. Kloosterman a letter on September 3, 2021, explaining the reasons for her termination. (PageID.531-532, ¶¶128-130; PageID.616, Ex. H). The letter, signed by Smith, stated that Ms. Kloosterman's "actions and refusals…led to *our* decision to separate." (PageID.531-532, ¶¶128-131; PageID.616, Ex. H) (emphasis added). These reasons were, in essence, the very same issues raised by Defendants at the July 29 meeting: (1) Ms. Kloosterman's "refusal to utilize a patient's preferred pronouns"

based on her religious beliefs about gender and sexuality; and (2) her "refusal to provide a referral to another provider for gender transitioning" patients. (PageID.531-532, ¶¶128-131; PageID.616, Ex. H).[1]

## ARGUMENT

Under the notice pleading requirements, a complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff "must allege 'enough facts to state a claim to relief that is plausible on its face'" to survive a motion to dismiss. *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To determine facial plausibility, the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in [the plaintiff's] favor." *Watkins v. Healy*, 986 F.3d 648, 660 (6th Cir. 2021) (internal quotations omitted).

## I.    Ms. Kloosterman's Individual Claims for Monetary Damages Are Not Barred by the Eleventh Amendment.

Defendants move to dismiss Ms. Kloosterman's claims against them in their official and individual capacities under the Michigan Constitution (Counts VI-VIII). To the extent these state law claims are alleged against Defendants in their official capacity, Defendants correctly assert the claims are barred by the Eleventh Amendment. (PageID.650-653). *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).

---

[1] Further showing their anti-religious animus towards Ms. Kloosterman, the letter added a newly fabricated allegation that she had changed her medical charts from reflecting a patient's preferred pronouns to pronouns that she believed reflected their "sex at birth." (PageID.531, ¶¶128-129; Page.ID545, ¶¶202-203; PageID.616, Ex. H). Ms. Kloosterman strongly disputes this claim. (PageID.531, ¶128; PageID.533-534, ¶138; PageID.538, ¶166; PageID.545, ¶¶202-203).

Defendants concede, however, that the Eleventh Amendment does not bar state law claims against them in their *individual* capacities for *monetar*y damages. (PageID.675 n.8). It is well-established that "[t]he Eleventh Amendment … does not bar suits for damages against officers in their personal capacity under § 1983." *Maben v. Thelen*, 887 F.3d 252, 270 (6th Cir. 2018). Likewise, courts have held that the Eleventh Amendment does not bar state law claims for monetary damages against state officials in their individual capacities. *See, e.g.*, *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 530 (1st Cir. 2009) (stating that "the Eleventh Amendment, and by implication, *Pennhurst* [,] do [ ] not bar federal suits challenging state action under both state *and* federal law if the relief sought is not of the kind barred by the Eleventh Amendment—as is true…of damages to be paid out of the official's pocket.") (citation and internal quotes omitted); *New Orleans Towing Ass'n v. Foster*, 248 F.3d 1143 (5th Cir. 2001) (holding that plaintiff's damage claim against  state official in his individual capacity for a violation of his rights under Louisiana law was not barred by the Eleventh Amendment); *Bad Frog Brewery, Inc. v. New York State Liquor Authority*, 134 F.3d 87, 102 (2d Cir. 1997) (same); *Green v. Johnson*, 977 F.2d 1383, 1388 (10th Cir. 1992) (same); *Pena v. Gardner*, 976 F.2d 469, 473–74 (9th Cir. 1991) (same).

Defendant's reliance on *In re Ohio Protocol Litigation*, 709 Fed. Appx. 779 (6th Cir. 2017), is misplaced. (PageID.653). There, the court never decided whether an individual capacity claim for monetary damages was barred by the Eleventh Amendment. Rather, the court noted that while there are cases recognizing this exception, they did not apply in plaintiff's case because the court was first required to determine "the nature of the [plaintiff's] immunity" under Ohio law. *Id*. at 784. As a result, the court declined jurisdiction because Ohio law required, "as a condition precedent to asserting a cause of action against a state employee in his individual capacity," that

the Ohio Court of Claims first determine whether the employee was "entitled to the immunity." *Id.*(internal citations omitted).

In her current Complaint, Ms. Kloosterman alleges state law claims against Defendants in both their individual and official capacities. (PageID.565 ¶331; PageID.566 ¶338; PageID.568 ¶351). In light of Defendants' claim of Eleventh Amendment immunity from state law claims for equitable relief, Ms. Kloosterman seeks leave to amend her Complaint and allege state law claims for monetary damages against Defendants solely in their individual capacities. Ms. Kloosterman has filed a separate Motion to Amend and a proposed Second Amended Complaint addressing these amendments. (PageID.824-825 (Motion to Amend); PageID.881-888 (proposed Second Amended Complaint)); *D.E. & J. Ltd. P'ship v. Conaway*, 284 F.Supp.2d 719, 751 (6th Cir. 2003) (stating that the Sixth Circuit disfavors a "bare request" for leave to amend in a response to a motion to dismiss; the correct procedure is a "properly filed motion for leave to amend.").

Although not raised by Defendants here, Ms. Kloosterman concedes in her Response to the Hospital's Motion to Dismiss (PageID.822) that because the Hospital is a state entity, her state law claim against it under the Elliot-Larsen Civil Rights Act (ELCRA) is barred by the Eleventh Amendment. Accordingly, Ms. Kloosterman's Motion to Amend also seeks leave to amend her ELCRA claim to allege monetary damage claims against Defendants in their individual capacities. *See also Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 853 (2005) (holding that defendants can be sued in their individual capacity under the ELCRA).

## II.  Each Individual Defendant in His or Her Individual Capacity Personally Participated in the Constitutional Violations Against Ms. Kloosterman.[2]

Defendants challenge the factual sufficiency of Ms. Kloosterman's Complaint on the grounds she fails to allege they personally participated in the decisions to: (1) implement or enforce the Hospital's pronoun and referral policy, (2) deny Ms. Kloosterman's request for a religious accommodation, (3) grant secular accommodations, and (4) fire Ms. Kloosterman based on her religious beliefs. (PageID.654-63; PageID.674-75). Based on this assertion, Defendants argue that Ms. Kloosterman has failed to allege they violated her state or federal constitutional rights (Counts I-III, and VI-VIII), and even if she has stated a claim, the Defendants do not have personal authority to remedy the constitutional violations she alleges, including reinstatement. (PageID.653-654).

For claims against Defendants in their individual capacities, Ms. Kloosterman must allege that Defendants were personally involved in committing an act that violated her constitutional rights.[3] *Eckford-El v. Toombs*, 760 F. Supp. 1267, 1272 (W.D. Mich. 1991). For liability to lie for

---

[2] Defendants do not directly address Ms. Kloosterman's claims against them in their official capacities. Rather, as discussed below, they assert she fails to allege they were *personally* involved in implementing or enforcing the Hospitals' pronoun/referral policy. "[A]n official-capacity suit for prospective relief [against state officials] is simply the vehicle by which the state can be compelled to fix a constitutional violation." *In re Flint Water Cases*, 960 F.3d 303, 334 (6th Cir. 2020). Such claims require a plaintiff to show her rights were violated due to a government policy. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (stating that official capacity claims against government officials are the equivalent of suing the government entity; as a result, the government entity "may be held liable for [a plaintiff's] injuries only if those injuries were the result of an unconstitutional policy or custom"). The Complaint clearly alleges the Hospital's  unlawful policies regarding pronouns and referrals, and that Ms. Kloosterman's rights were violated due to Defendants' implementation and enforcement of those policies. See *infra*, pgs. 15-16 (policy), 24 (policy as Free Exercise violation), 27 (policy as to Free Speech violation), and 34 (policy as to Equal Protection violation).

[3] In their motion, Defendants assume that the standards for proving causation for Ms. Kloosterman's state constitutional claims are the same as those under 42 U.S.C. § 1983. (*See*

supervisory officials, they must have "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). This showing requires that Defendants "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct." *Id.*

"[I]ndividual liability for a government official who violates constitutional rights . . . turns on traditional tort principles of 'but-for' causation." *Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018); *id.* at 639–640 (collecting cases); *see Hickman v. Valley Loc. Sch. Dist. Bd. of Ed.*, 619 F.2d 606 (6th Cir. 1980). "If an individual defendant's animus against a plaintiff's exercise of First Amendment rights is a link in the causal chain that leads to the adverse action, the individual defendant may be liable [under § 1983] even if he is not the final decisionmaker." *Heard v. Strange*, No. 17-13904, 2018 WL 4178496, at *2 n.1 (E.D. Mich. Aug. 31, 2018); *Ladach v. City of Romulus*, No. 17-10554, 2018 WL 5077181, at *11 (E.D. Mich. Aug. 24, 2018) (same). *See also Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 WL 17753528, at *5 (6th Cir. Dec. 19, 2022) (collecting cases).

As explained below, a fair and reasonable reading of the Complaint shows that each Defendant personally participated in all the above decisions, and they each have authority to remedy the subject constitutional violations.

### A. Defendants Speak and Act on Behalf of the Hospital and Its Management Team

Defendants ask this Court to narrowly construe the Complaint and take a myopic view of their roles. Specifically, they argue that the actions and statements of each Defendant should be

---

PageID.653-55). Assuming, without conceding that this is the case, Ms. Kloosterman addresses the causation standard for § 1983.

viewed in isolation, and that none of them had the authority to represent the position of the Hospital or its management team—here, Defendants Pai, Booker, Cole, Pierce, and Smith.

This is an absurd reading of the Complaint and contrary to law. Each Defendant holds a position as a high-level manager and supervisor for the Hospital. (PageID.516, ¶¶25-29). Thus, by their actions and words, each Defendant represents the position of Hospital and its management team. *See Braswell v. United States*, 487 U.S. 99, 110 (1988) ("[a]rtificial entities such as corporations may act only through their agents"); *Sullivan v. Miller*, 637 B.R. 723, 728–29 (E.D. Mich. 2022) (because a corporation can only speak or act through its agents, management speaks and acts on behalf of the corporation).

### B.  Defendants' Policy Regarding Pronouns and Referrals

The Complaint alleges that each Defendant either personally, or by participating in the acts of their co-Defendants, implemented and enforced a discriminatory, anti-religious policy against Ms. Kloosterman. This policy consisted of (1) prohibiting her from using pronouns corresponding with a patient's biological sex if the patient preferred a different pronoun (PageID.528-529, ¶¶111-113; PageID.532-533, ¶¶132-134), and (2) mandating that she, in violation of her religious beliefs and independent medical judgment, prescribe or give referrals for "gender-transition" drugs and procedures. (PageID.529, ¶¶114; PageID.532-33, ¶¶132-134).

Several allegations in the Complaint support this claim. Ms. Kloosterman faced termination unless she completed Defendants Booker and Cole's training module, which required her to check the "correct" boxes affirming the Hospital's policy on sex, gender identity, and sexual orientation. (PageID.523-24, ¶¶74-75; PageID.532, ¶133). Additionally, at the July 29 meeting, Defendants Pierce, Cole, and Smith clearly sought to enforce the Hospital's policy by pressing Ms. Kloosterman on whether she would use sex-obscuring pronouns and refer patients for "gender

reassignment surgery." (PageID.525, ¶88). When Ms. Kloosterman stated that she could not do so based on her religious beliefs, as well as her independent medical judgement, the management team became hostile (PageID.525, ¶89), telling her that her religious beliefs did not belong in the workplace. (PageID.525, ¶90). Pierce called her "evil" for not giving patients exactly what they wanted because of her religious beliefs. (PageID.525, ¶91), and when she explained that this was untrue, Pierce called her a "liar." (PageID.526, ¶94). Pierce also stated that if he came to Ms. Kloosterman as a patient and she used his name rather than his preferred pronoun, he would never come back to see her. (PageID.526, ¶94). Pierce also asked her whether she knew that by using a patient's name instead of his or her preferred pronouns, she would cause him or her to commit suicide, claiming that his assertion was well-documented. (PageID.526, ¶95).

Although Defendants *now* would like to distance themselves from Pierce's statements, the Complaint, as pled, does not permit this. Not only were Smith and Cole present when Pierce made his hostile statements at the July 29 meeting, but it is reasonable to infer, based on Pierce's position as a manager with the Hospital, that he spoke and acted on their behalf—as well the rest of the management team. And at a minimum, by attending the meeting and neither correcting Pierce nor speaking up on Ms. Kloosterman's behalf, Smith and Cole "at least implicitly authorized, approved or knowingly acquiesced in" Pierce's statements. *Bellamy*, 729 F.2d at 421.

There is no question that Pierce spoke for Defendants at the July 29 meeting, given the fact Defendants fired Ms. Kloosterman three weeks later *for the very same reasons expressed by Pierce at the meeting*. Specifically, at the August 24 meeting, Smith and Cole told Ms. Kloosterman that she was fired because she refused to use patient's preferred pronouns and make referrals for "gender reassignment surgeries"; Pai, as President, signed the termination notice. (PageID.527-528, ¶¶101-109; PageID.530-531, ¶¶118-125; PageID.531-532, ¶¶128-131; PageID.612, Ex F;

PageID.616, Ex. H). Further, the September 3, 2021 letter explained that she was fired for same issues raised by Pierce at the July 29 meeting: (1) her "refusal to utilize a patient's preferred pronouns" based on her religious beliefs about gender and sexuality; and (2) her "refusal to provide a referral to another provider for gender transitioning" patients. (PageID.531-532, ¶¶128-130; PageID.616, Ex. H).

### C.  Accommodations

Each Defendant, by their words and actions, participated in the management team's decisions to refuse Ms. Kloosterman's religious accommodation request. (PageID.512-514, ¶¶4-7, 10; PageID.524, ¶¶75, 81-82; PageID.528, ¶110; PageID.532-533, ¶¶132-139; PageID.536-538, ¶¶151-160, 167; PageID.544-556, ¶¶198, 200, 205-206, 209-211, 216-225, 228-230, 237; PageID.554-55, ¶¶259-262; PageID.563, ¶318; PageID.564-565, ¶¶ 327-328; PageID.566, ¶336; PageID.568, ¶¶346-349). Ms. Kloosterman first requested an accommodation regarding the training module from Booker (who responded negatively), and then requested an additional accommodation when Cole, Pierce, and Smith brought up pronouns and referrals at the July 29 meeting. *Supra*, at pgs. 5-8. Cole, Smith, and Pierce made it clear at the July 29 meeting that they would not accommodate her religious (or medical) objections to their pronoun/referral policy, and all of the Defendants enforced this decision three weeks later when they fired her. *Supra*, at 6-9.

Further, it is reasonable to infer, given Defendants' personal participation in the decision to deny Ms. Kloosterman's accommodation request, that, at a minimum, they "at least implicitly authorized, approved, or acquiesced in" the Hospital's policy to freely grant non-religious accommodation requests for prescriptions, procedures, and referrals. *See Bellamy*, 729 F. 2d at 421; *see also* (PageID.512-513, ¶¶5, 10; PageID.534-537, ¶¶139, 142-150, 161-164; PageID.545-549, ¶¶205-206, 210-211, 213-219, 224-225, 228; PageID.555-556, ¶¶260-262). This inference is

supported by the fact that numerous providers were allowed accommodations based on secular objections to performing certain procedures and prescribing certain drugs. Based on Defendants' role as supervisors and managers for the Hospital, which included oversight and management of local clinics (including Ms. Kloosterman's clinic), they knew or reasonably should have known that her coworkers' secular preferences and right to medical decision-making were routinely accommodated while her religious beliefs were not. (*See* PageID.794-795; PageID.534-38, ¶¶142-67).

### D.  Ms. Kloosterman's Termination

Each Defendant participated in the decision to fire Ms. Kloosterman. (PageID.529, ¶¶114; PageID.532-534,  ¶¶132-133,  137-139;  PageID.544,  ¶¶197-198;  PageID.546,  ¶¶206,  209; PageID.550, ¶237; PageID.554-555, ¶¶259-260; PageID.563-564, ¶¶318, 323; PageID.568, ¶346; PageID.612, Ex. F; PageID.616, Ex. H). When Ms. Kloosterman told Booker that she had religious objections to the gender and sexuality questions in the training module, Defendant Booker scheduled the July 29 meeting.  At that meeting, Cole, Smith, and Pierce told Ms. Kloosterman that they would not accommodate her religious or medical objections to their pronoun/referral policy. *Supra*, at 6-8. Three weeks later, Defendants fired Ms. Kloosterman because of her religious beliefs which they refused to accommodate. *Supra*, at pgs. 8-17.

### E.  Hostility and Anti-Religious Animus

Defendants' refusal to grant Ms. Kloosterman's accommodation request and their decision to fire her instead were based on their hostility to her religious beliefs. (PageID.512-513, ¶¶3-4, 9; PageID.525-526, ¶¶75, 82-84, 88-96; PageID.532-534, ¶¶132-140; PageID.544-546, ¶¶197, 199-204, 207-209; PageID.564, ¶323; PageID.568, ¶¶347-348). Booker's meeting with Ms. Kloosterman on July 1, and Pierce's statements at the July 29 meeting, clearly show that

Defendants were aware of, and hostile to, her religious beliefs.  *Supra*, at pgs. 5-8. And ultimately, Defendants' animus was shown by their decision to deny Ms. Kloosterman's accommodation request and fire her for expressing her religious beliefs.  *Supra*, at pgs. 8, 16.

> **F.      Defendants Pierce and Smith Are Liable for Their Recommendations**

Defendants' attempt to absolve Defendants Pierce and Smith from any liability on the grounds they simply "recommended" denying Ms. Kloosterman's accommodation and terminating her is not supported by law. (PageID.654, 657-659, 661-663, 665).

In *Hickman*, school officials recommended non-renewal of a teacher's contract because of their disapproval of the teacher's First Amendment protected union activities. 619 F.2d at 609–10. The teacher sued the school board and officials under 42 U.S.C § 1983 in their official and individual capacities. *Id.* at 607; *Hickman v. Valley Loc. Sch. Dist. Bd. of Ed.*, 513 F. Supp. 659, 660 (S.D. Ohio 1981). The Sixth Circuit found that the "reasons for [the] nonrenewal on their face [were] closely linked with, and colored by, [the officials'] reactions to [the teacher's] protected activities." *Hickman*, 619 F.2d at 609. The school board was not "insulated" from the officials' unlawful reasoning, nor was the teacher let go "on the basis of independent, intervening factors." *Id.* at 610. Thus, the Court explained, where such a "line of causation exists," the officials' unlawful reasoning for the adverse employment action became "the bases of the decision by the Board members," and, as a result, the school district's decision to terminate the teacher was "constitutionally impermissible."  *Id.*

The Court ultimately extended the same reasoning to the individual liability of the school official: "[b]ecause [the official] *recommended* nonrenewal to the Board and the majority of the Board members acted on the basis of his *recommendation*, there is a sufficient causal link between

[the official's] actions and [the teacher's] injury to warrant [the official's] liability." *Id.* (emphasis added).

Ms. Kloosterman's allegations against Defendants Pierce and Smith fit squarely within *Hickman*. She alleges that Defendants failed to grant her a religious accommodation and then terminated her based on the recommendations of Defendants Pierce and Smith. (PageID.533-534, ¶¶137-139; PageID.544, ¶198).  Ms. Kloosterman also alleges that Defendants Pierce and Smith's recommendations were based on their unlawful animus toward, discrimination against, and unlawful targeting of her religious beliefs. (PageID.525-526, ¶¶90-91, 94-95; PageID.532, ¶131; PageID.534, ¶140; PageID.544-545, ¶¶198-201; PageID.545-546, ¶¶205-209). Absent from the Complaint is *any* allegation the other Defendants were insulated from the unlawful reasoning of Pierce and Smith or that their decisions were based on independent factors. Rather, Ms. Kloosterman's allegations show a direct line of causation from the recommendations of Pierce and Smith to Defendants' decision to terminate Ms. Kloosterman and deny her religious accommodation. Namely, at the July 29 meeting the management team – consisting of Pierce, Smith and Cole – met to investigate "whether [Ms. Kloosterman would use gender identity-based pronouns and be willing to refer patients for 'gender reassignment surgery,'" (PageID.525-27, ¶¶88, 89-100), derogated her religious beliefs, (PageID.525-26, ¶¶90, 91, 94, 95; PageID.534, ¶140), and pressured her to abandon her beliefs to comply with Hospital policy. (PageID.533, ¶135). During the next three weeks, Pierce and Smith recommended terminating Ms. Kloosterman and denying her accommodation due to her religious beliefs, and she was fired three weeks later based on her religious beliefs. (PageID.527-529, ¶¶101, 105-106, 110-114; PageID.531, ¶¶128-29; PageID.533-534, ¶¶137-140; PageID.546, ¶211; PageID.555, ¶260; PageID.616, Ex. H).

Defendants' reliance on *Hartman v. Thompson*, 931 F.3d 471 (6th Cir. 2019), for their assertion that a recommendation is not a basis for liability under § 1983, is misplaced. (PageID.658). *Hartman* failed to cite *Hickman* and is clearly distinguishable. In *Hartman*, the state Fairgrounds Board established a protest zone during a fairground event. At the Board's request, the defendant, a state trooper, suggested a location for the protest zone. During the event, protestors left the protest zone, disrupted the event, and were arrested by the defendant and other law enforcement personnel.  The protestors sued for constitutional violations under § 1983. The Sixth Circuit affirmed summary judgment, finding that the defendant did not decide to put the protestors in the protest zone but merely recommended its placement in response to the Board's request, nor did he have decision-making authority. *Id.* at 478.

Here, Defendants Pierce and Smith clearly had decision-making authority. Ms. Kloosterman alleges that they personally participated in her termination and accommodation denial.  She alleges they had the authority to terminate her and deny her accommodation, that their unlawful recommendations "set into motion" the accommodation denial and termination, and that the other Defendants relied upon and acted on their recommendations. (PageID.533, ¶¶137-138; PageID.544, ¶198).

**G.  Defendants Have the Authority to Grant Ms. Kloosterman's Requested Relief.**

Defendants assert Ms. Kloosterman "did not plausibly allege that Defendants Cole, Booker, Pierce and Smith can reinstate her, change [the Hospital's] policies, grant her accommodations and/or direct others as to how policies should be enforced," and so the Court should dismiss her requests for injunctive relief for her constitutional claims. (PageID.677; PageID.679).

Defendants allege three deficiencies in the Complaint to support their assertion.  First, Defendants claim the Complaint fails to allege which of Defendants Pai, Booker and Cole "can reinstate [Plaintiff], rescind [the relevant] polic[ies], ensure a non-discriminatory enforcement [of hospital policies], and/or grant [Plaintiff's] accommodation requests." (PageID.678).  The Complaint, however, plainly alleges that Pai, Booker and Cole *each* did these things.   The Complaint alleges that Pai, Booker and Cole terminated Plaintiff and can reinstate her. (PageID.532, ¶¶132-33; PageID.534, ¶¶139, 141; PageID.544, ¶198; PageID.550, ¶237; PageID.554, ¶259; PageID.563, ¶318; PageID.566, ¶336; PageID.568, ¶346). The Complaint also alleges that Pai, Booker and Cole are responsible for the policies at issue in this lawsuit, can rescind them, and can ensure they are lawfully enforced. (PageID.528-529, ¶¶110-114; PageID.532, ¶¶132-133; PageID534, ¶141). Finally, the Complaint alleges, directly and by reasonable inference, that Pai, Booker and Cole can grant Plaintiff's accommodation requests. (PageID.534, ¶¶139, 141; PageID.544, ¶198; PageID.546, ¶211; PageID.550, ¶¶236-37; PageID.554-55, ¶¶259-60; PageID.563, ¶318; PageID.566, ¶336; PageID.568, ¶346).

Second, Defendants assert that all claims for injunctive relief against Defendants Pierce and Smith should be dismissed.  They assert Ms. Kloosterman failed to allege they have the authority to grant her requested relief.  Though far from clear, they appear to rely primarily on the absence of Pierce and Smith's names in Paragraph 141 of the Complaint (PageID.534), which alleges the authority of Defendants Pai, Booker and Cole.  (PageID.678).

But this argument fails because when the Complaint is read as a whole, Ms. Kloosterman's requested relief cannot be accomplished without enjoining Defendants Pierce and Smith, because they both directly participated in, and were critical actors in violating, Ms. Kloosterman's rights. Specifically, they were directly involved in implementing the pronoun/referral policy and

enforcing it by recommending that her accommodation be denied, and that she be fired for refusing to abide by the policy. *Supra*, § II. Thus, based on the Complaint as a whole, it is clear that Pierce and Smith are empowered, along with their co-Defendants, to rescind the pronoun/referral policy and reinstate Ms. Kloosterman.

## III. Qualified Immunity Does Not Bar Ms. Kloosterman's Claims.

Defendants contend that they have committed no constitutional violation against Ms. Kloosterman, and that they are protected by qualified immunity for any actions they may have taken in this case. (PageID.674-675).

Ms. Kloosterman's Complaint shows that (1) each individual Defendant violated her constitutional rights, and (2) the constitutional rights were "clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). "[A]n action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 742–44 (2002). "[T]he precise factual scenario need not have been found unconstitutional." *Baynes*, 799 F.3d at 611; *accord Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). Plaintiffs are not required to show "fundamentally similar" or "materially similar facts." *Hope*, 536 U.S. at 741.

Here, Ms. Kloosterman has clearly alleged that each Defendant violated her constitutional rights when they targeted her for discriminatory treatment under the Free Exercise Clause, (PageID.544, ¶198; PageID.546, ¶211), compelled her to speak in violation of her conscience under the Free Speech Clause, (PageID.550-51, ¶237), and treated her less favorably than similarly-situated coworkers under the Equal Protection Clause. (PageID.554-55, ¶259-60). The

constitutional law in each of these areas was clearly established so that reasonable officials would have known that their conduct was unlawful, regardless of whether the "precise factual scenario" had arisen before. *Baynes,* 799 F.3d at 611. Thus, this Court should not dismiss Ms. Kloosterman's individual claims for nominal damages against the individual Defendants on Counts I-III and Counts VI-VIII, and if the Court grants Ms. Kloosterman's Motion to Amend, the Court should allow her claims for monetary damages on these claims to proceed as well.

## IV.    **Defendants Violated Ms. Kloosterman's Free Exercise Rights**

Ms. Kloosterman states a claim under the Free Exercise Clause of the First Amendment. (PageID.543-44, ¶¶191-233).[4] Defendants violated her rights when they targeted her religious beliefs as the cause of her termination (as in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)), when they showed blatant hostility toward her religious beliefs (as in *Masterpiece Cakeshop*), and when they refused to accommodate her beliefs while treating her coworkers' secular preferences more favorably (as in *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), and *Fulton v. City of Philadelphia*, 141. S. Ct. 1868, 1877 (2021)).

First, Ms. Kloosterman alleges that Defendants unlawfully targeted her for unfavorable treatment because of her religion. *See Lukumi*, 508 U.S. at 533-34, 537. Defendants' statements at the July 29 meeting and their decision to deny her accommodation request and fire her three weeks later clearly show a profound hostility towards her religious beliefs. *See supra*, at pgs. 6-8. Defendants also targeted Ms. Kloosterman by creating a draconian policy requiring her to

---

[4] Defendants make no specific arguments regarding the sufficiency of Ms. Kloosterman's Free Exercise claim under Article I, § 4 of the Michigan Constitution (Count VI). Because the Michigan Constitution "is at least as protective of religious liberty as the United State Constitution," (*Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, 901 N.W.2d 566, 573 n.4 (Mich. 2017)), by addressing the protections of the First Amendment Free Exercise Clause, Ms. Kloosterman necessarily addresses the protections of the Michigan Constitution.

personally participate and refer patients for gender-transition drugs and procedures, when this policy appeared nowhere in her employment contract. (PageID.532-33, ¶¶132-36; PageID.591-99) State actors violate the Free Exercise Clause when they take action that burdens religion but is not neutral, generally applicable, or narrowly tailored to achieve a compelling government interest. *Lukumi*, 508 U.S. 531–32; *see Fulton*, 141. S. Ct. at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). Ms. Kloosterman alleges that Defendants engaged in this conduct.  Their actions were not neutral because they singled her out because of her religious beliefs and refused to accommodate her while accommodating secular preferences of other providers. *Supra*, at pgs. 5-8.

Defendants also violated the Free Exercise Clause when they attacked Ms. Kloosterman's religious beliefs. When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise . . . [the Court] has 'set aside such policies without further inquiry.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018)) (state commissioner violated Free Exercise Clause when he called cakeshop owner's faith "despicable" and "merely rhetorical"; this demonstrated "a clear and impermissible hostility toward [his] sincere religious beliefs").  Again, the Complaint alleges Defendants engaged in this conduct.  *Supra*, at pgs. 5-8. Indeed, Defendants' bald assertion that they "carefully considered and reviewed [her] objections with fairness" strains credulity. Defendants do not contest the fact that Pierce aggressively attacked Ms. Kloosterman religious beliefs at the July 29 meeting, including calling her "evil" and a "liar" because of those beliefs. Additionally, any question about Defendant's animus was removed when they fired her because of her religious beliefs. (PageID.664-666).

Defendants' claim that, based on *Masterpiece*, the Complaint "does not allege discriminatory treatment sufficient to demonstrate hostility toward her beliefs," is also unfounded. (PageID.666). Specifically, Defendants claim that unlike *Masterpiece*, the comparable medical procedures and prescriptions for which Defendants granted accommodations to other employees "are not the same" as the pronoun/referral policy from which Ms. Kloosterman requested an accommodation.  (*Id*.).  The focus of *Masterpiece*, however, was the government's "clear and impermissible hostility toward the sincere religious beliefs" of the plaintiff, 138 S. Ct. at 1729, and, as later explained in *Kennedy*, such animus, by itself, violates the Free Exercise Clause without even proceeding to strict scrutiny analysis. 142 S. Ct. at 2422 n.1.

Ms. Kloosterman has more than sufficiently alleged clear and impermissible hostility toward her religious beliefs. (PageID.532, ¶131; PageID.544, ¶197; PageID.545, ¶¶200-201). Indeed, the primary reasons the Court in *Masterpiece* found the government acted with unlawful hostility toward the plaintiff were the government actors' anti-religious statements against the plaintiff's beliefs, the failure by other government actors to object to those statements, and the failure by the government in general to disavow those statements. *Masterpiece*, 138 S. Ct. at 1729–30.

Defendants also violated Ms. Kloosterman's free exercise rights when they refused to accommodate her religious beliefs while permitting numerous accommodations for her coworkers' secular preferences. Under Supreme Court precedent in *Fulton*, a government policy or practice "is not neutral and generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." 141 S. Ct. at 1877; *see also Tandon*, 141 S. Ct. at 1296 (regulations "trigger strict scrutiny under the

Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise") (emphasis in original).

Here, Defendants claim that Ms. Kloosterman fails to show employees who were granted secular accommodations were similarly situated. (PageID.666-67). But Ms. Kloosterman need not show disparate treatment to support her Free Exercise claim; that framework, and allegations regarding similarly situated employees, is part of the Equal Protection framework discussed in § V, below.  Nevertheless, she has shown disparate treatment, as the Hospital Response discusses in detail. (PageID.797-816; PageID.534-38, ¶¶142-67). Defendants also try to dodge their involvement in the decision(s) to grant secular accommodations to Ms. Kloosterman's coworkers, (PageID.657-661), yet they cite no authority that their personal involvement with other accommodation requests is necessary to establish a free exercise violation. On the contrary, the management team knew or reasonably should have known that other providers' secular preferences and independent medical judgment were routinely accommodated at Ms. Kloosterman's clinic---yet they refused to even consider accommodating Ms. Kloosterman's religious beliefs. That conduct triggers strict scrutiny and violates the Free Exercise Clause under *Fulton* and *Tandon*.

Qualified immunity does not bar Ms. Kloosterman's claims (Counts I and VI), because free exercise jurisprudence under *Lukumi* and *Masterpiece* was clearly established when Defendants acted.  "The Sixth Circuit and Supreme Court have repeatedly held that government actions are not neutral and generally applicable for purposes of the Free Exercise Clause when they treat religious activities more harshly than similar secular activities." *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 833 (E.D. Mich. 2021), *reconsideration denied*, 542 F. Supp. 3d 621 (E.D. Mich. 2021) (citing *Lukumi* and *Ward*

*v. Polite*, 667 F.3d 727, 740 (2012) (finding that university enforced its anti-discrimination policy unequally, permitting secular exemptions but not religious one for Christian student who could not affirm same-sex relationships).

## V.   Defendants Violated Ms. Kloosterman's Right to Free Speech

Ms. Kloosterman alleges that Defendants violated her free speech rights by denying her request for an accommodation, and by firing her for her refusal to follow their discriminatory, anti-religious pronoun policy.[5] (PageID.528-529, ¶¶111-113; PageID.532-533, ¶¶132-134).  This policy violated her religious beliefs because she believes God created humans male and female, and therefore it is sinful to obscure or misrepresent a patient's biological sex by using gender-obscuring pronouns. Additionally, based on her independent medical judgment, she believes the use of such pronouns is medically unethical and harmful to patients. (PageID.512, ¶3; PageID.514, ¶¶11, 13; PageID.518, ¶36; PageID.519-520, ¶¶41-47; PageID.525-526, ¶¶88-96; PageID.538-543, ¶¶168-190; PageID.552-553, ¶¶247-248; PageID.555, ¶261). Specifically, Ms. Kloosterman is concerned that using biology-obscuring pronouns could cause patients to miss health-supporting or even life-saving sex-specific screenings such as mammograms, pregnancy tests, prostate exams, and exams for sexually transmitted diseases that differ based on biological sex. (PageID.540, ¶¶176-177, 180). She is also concerned that using such pronouns could result in potentially inappropriate prescriptions, such as medications that are harmful during pregnancy. (*Id.*).

---

[5] Although Defendants do not directly address the standards for a Free Speech claim under Article I, § 5 of the Michigan Constitution, they apply the standards for a federal Free Speech claim to Ms. Kloosterman's state constitutional claim. Thus, without waiving any arguments to the contrary, Ms. Kloosterman addresses the federal standard argued in Defendants' motion. The Michigan Court of Appeals and the Sixth Circuit have held that "[t]he rights of free speech under the Michigan and federal constitutions are coterminous." *In re Contempt of Dudzinski*, 667 N.W.2d 68, 72 (Mich. Ct. App. 2003) (citing *Woodland v. Michigan Citizens Lobby*, 378 N.W.2d 337 (Mich. Ct. App. 1985)).

### A. Compelled Speech

Under the compelled speech doctrine, a person's autonomy over their speech is guaranteed by the First Amendment, and therefore government may not force a person to speak a message they do not wish to say. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emp., Council 31*, 138 S. Ct. 2448, 2463 (2018) ("[c]ompelling individuals to mouth support for views they find objectionable violates" the "cardinal constitutional command" that individuals have autonomy over their speech); *Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2368–69, 2378 (2018) (state law unconstitutionally compelled speech by requiring crisis pregnancy centers, which were established to prevent abortions, to disseminate prescribed government notices about public funding for abortion services).

Defendants argue, however, that Ms. Kloosterman's compelled speech claim fails because she did not allege that they personally participated in either the decision to deny her accommodation request, or the decision to fire her based on her refusal to follow the pronoun policy. (PageID.661-663). As noted above, both claims lack merit; the Complaint clearly alleges that Defendants personally participated in both decisions. *Supra*, at pgs. 6-9.

### B.   Government Speech

Defendants next argue, based on *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), that the pronouns they would require Ms. Kloosterman to use in treating her patients are government speech, and therefore not protected by the First Amendment. (PageID.667-669). This novel approach to medical care ignores Ms. Kloosterman's ethical duty to exercise her independent medical judgment in caring for patients.

The law protects Ms. Kloosterman's speech. For example, in *Kerr v. Hurd*, 694 F. Supp. 2d 817 (S.D. Ohio 2010), the court recognized the unique nature of medical speech for medical

professionals. There, Kerr, a gynecologist, was employed by Wright State School of Medicine as an assistant professor.  When he was terminated by the university, he alleged that his rights of free expression and speech in academic areas were violated when he was subjected to "harassment, unwarranted disciplinary action, and false allegations of professional misconduct in retaliation for [his] insistence on teaching certain gynecological surgery techniques, advocation [sic] of vaginal delivery over unnecessary cesarian procedures, and lecturing [] residents on the proper and appropriate use of forceps."  *Kerr*, 694 F. Supp. 2d at 834. The university argued that it "had the right to regulate that speech" because "Dr. Kerr's speech about forceps and vaginal delivery was within his role as an employee of Wright State School of Medicine." *Id*. at 843.

The Court recognized that, "[w]ithout doubt, Dr. Kerr's speech as to vaginal deliveries was within his 'hired' speech as a teacher of obstetrics." *Id*. at 844. However, it stated that "Dr. Kerr's advocacy of forceps-assisted vaginal delivery as opposed to Cesarian section delivery is a matter of public concern." *Id*. at 842. Further, the court concluded that Kerr's speech "should certainly receive First Amendment protection, particularly at the university level," because just as "an academic freedom exception to the *Garcetti* analysis is important to protecting First Amendment values," the same holds true "where, as here, the expressed views are well within the range of accepted medical opinion." *Id*.

Several other courts have recognized that healthcare professionals who work as a government employees must be allowed to exercise their independent medical judgment in treating patients.  In *Ward*, the Sixth Circuit held that a university could not compel a counseling student to affirm same-sex relationships because that speech would violate her religious faith. 667 F.3d at 735–36 (reasonable jury could find that university dismissed Ward from its counseling program because of her faith-based speech). In *Quilico v. Kaplan*, the court had to determine whether a

physician providing medical services for a government entity was an employee or independent contractor. 749 F.2d 480 (7th Cir. 1984). The court recognized that "physicians and surgeons have an ethical obligation to exercise independent judgment that prevents the [state] from strictly controlling or supervising the specific judgments made by the professional when performing surgery or providing other medical care treatment." *Id.* at 483–85; *see Harris-Reese v. United States*, 615 F. Supp. 3d 336, 362 (D. Md. 2022) (government physicians must not "always be deemed an independent contractor simply because of the necessity that a physician exercise independent professional judgment in providing medical treatment to his or her patients") (citation omitted); *Ezekiel v. Michel*, 66 F.3d 894, 902 (7th Cir. 1995) ("each and every licensed physician, regardless of his status, must fulfill his ethical obligations to exercise independent judgment when providing treatment and patient care, and his conduct may not exceed the bounds of his oath or canons of medical ethics"); *Lilly v. Fieldstone*, 876 F.2d 857, 858–59 (10th Cir. 1989) (the "control" test is subject to a doctor's medical and ethical obligations…"[a] myriad of doctors become employees by agreement without surrendering their professional responsibilities."); *Lurch v. United States*, 719 F.2d 333, 337–38 (10th Cir. 1983) ("the control test [for determining employee status] should be subject to special considerations when a physician's employment status is at issue" because "[a] physician's professional ethics require that he have 'free and complete exercise of his medical judgment and skill.").

Although the Sixth Circuit has not directly addressed the issue of medical speech, the Court's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) is instructive. In *Meriwether*, the Court held that a public university violated a professor's freedom of speech when it compelled him to speak against his conscience by addressing students with gender-identity-based pronouns. *Id.* at 505–07. The Court stressed the First Amendment's fundamental command

that "the government 'may not compel affirmance of a belief with which the speaker disagrees.'" *Id.* at 503 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)).

Just as the academic enterprise is inconsistent with a speech code for professors, *see Meriwether*, 992 F.3d at 507–12, the practice of medicine is inconsistent with a speech code for medical professionals. Indeed, the stakes are much higher in medicine than in the university context. When universities coerce professors to use sex-obscuring pronouns, the consequences are "ideological conformity" and a loss of the free exchange of ideas. *Id.* at 506. But when universities coerce medical professionals to use sex-obscuring pronouns, the consequences can be confusion over a patient's biological sex and missed life-saving screenings such as mammograms, testicular exams, and pregnancy tests, or potentially inappropriate prescriptions, such as medications that are harmful during pregnancy. (*See*, *e.g.*, PageID.540, ¶¶176-177, 180).

Thus, Defendants violated Ms. Kloosterman's free speech rights when they attempted to compel her to speak biology-obscuring pronouns that violated her conscience and medical judgment. Qualified immunity does not bar Ms. Kloosterman's claims (Counts II and VII), because compelled speech jurisprudence under *Janus*, 138 S. Ct. at 2463, *NIFLA*, 138 S. Ct. at 2368–69, and *Ward*, 667 F.3d at 735–36, was clearly established when Defendants acted. *See also Hurley*, 515 U.S. at 573 ("the government may not compel affirmance of a belief with which the speaker disagrees'").

## VI.  Defendants Violated Ms. Kloosterman's Equal Protection Rights

Defendants argue that Ms. Kloosterman's federal (Count III) and state (Count VIII) equal protection claims fail because (1) there are insufficient allegations showing that Defendants treated her differently than her similarly situated co-workers, and (2) the Complaint fails to show that

Defendants acted with discriminatory intent in either denying her accommodation request or their decision to fire her. (PageID.655-656; PageID.669-671).

Title VII's legal framework applies to Ms. Kloosterman's federal Equal Protection claim.[6] *Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir. 2003) ("[t]o prove a violation of the equal protection clause under § 1983, [a plaintiff] must prove the same elements as are required to establish a disparate treatment claim under Title VII") (citation and quotation marks omitted); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (same).

"[R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S 768, 774–75 (2015). Title VII demands more than "mere neutrality with regard to religious practices" but requires "favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's 'religious observance and practice.'" *Id.* at 775. Additionally, under Title VII but-for causation triggers liability even if the employer cites other reasons for the termination; "[s]o long as the plaintiff's [religion] was one but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1729 (2020).

As Ms. Kloosterman explains more fully in her response to the Hospital's Motion to Dismiss (PageID.799-804) Defendants improperly assert that the applicable standard here is

---

[6] Although Defendants do not directly address the standards for an Equal Protection claim under Article I, § 2 of the Michigan Constitution, they apply the standards for a federal Equal Protection claim to Ms. Kloosterman's state constitutional claim. Thus, without waiving any arguments to the contrary, Ms. Kloosterman addresses the federal standard argued in Defendants' motion. *Cf. Shepherd Montessori Ctre. Milan v. Ann Arbor Charter Twp.*, 783 N.W.2d 695, 698 (Mich. 2010) (stating that "Michigan's equal protection provision is coextensive with the Equal Protection Clause of the United States Constitution," and that "Michigan case law makes it clear that [§ 2] was intended to afford the same rights as the Federal equal protection clause.").

whether Ms. Kloosterman's coworkers who received accommodations were "similarly situated" to her. This is wrong, because the similarly-situated analysis does not apply at the motion to dismiss stage. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002); *Keys v. Humana, Inc.*, 684 F.3d 605, 606 (6th Cir. 2012). Additionally, comparing similarly-situated employees is not necessary where, as here, a plaintiff alleges direct evidence of discrimination. *Swierkiewicz*, 534 U.S. at 508; *Keys*, 684 F.3d at 606; *Bean v. Sprint/United Mgmt. Co.*, No. 1:18-cv-413, 2021 WL 5451493 (W.D. Mich. Mar. 31, 2021).

### A.  Ms. Kloosterman Alleges Direct Evidence of Discrimination

In determining whether there is direct evidence of discrimination, this Court looks to whether hostile statements "reveal an adherence to a stigmatizing belief . . . that was a motivating factor" in the employer's decision. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003); *see Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 708–09 (6th Cir. 1985) (same); *see also Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346–47 (6th Cir. 2012) (racist comments were "direct evidence of discriminatory intent" because "no inference is required to gleam from those statements that [the speaker] harbored racial animus."). Temporal proximity between hostile statements and an adverse employment action is also relevant to showing direct discrimination. *Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 363–64 (6th Cir. 2001); *Brewer v. New Era, Inc.*, 564 F. App'x 834, 838–39 (6th Cir. 2014).

Ms. Kloosterman clearly alleges direct evidence of religious discrimination. The Complaint includes multiple allegations of hostile statements made by Defendants in enforcing their pronoun/referral policy—especially at the July 29 meeting—demonstrating their animus to her religious beliefs. *Supra*, at pgs. 6-9. All five Defendants participated in the decision to fire Ms.

Kloosterman three weeks after the management team attacked her at the July 29 meeting. *Supra*, p. 8-9; Page.ID.525, ¶84, PageID.527-28, 532-34, ¶¶105,132-41.

### B.  Ms. Kloosterman Alleges Circumstantial Evidence of Disparate Treatment

While Ms. Kloosterman's direct evidence of discrimination is sufficient on its own to survive Defendants' motion, she has also alleged circumstantial evidence of discrimination. Under the *McDonnell Douglas* framework for establishing disparate treatment, the "plaintiff's burden at the prima facie stage is 'not onerous' and the "plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589, 593–97 (6th Cir. 2019) (internal citations omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) (discussing the framework for a circumstantial disparate treatment case, and not requiring comparator evidence). Additionally, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated,' but that the employees must be similar in 'all of the relevant aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *see also Young v. United Parcel Service, Inc.*, 575 U.S. 206, 228 (2015) (*McDonnell Douglas* does not require comparators to be "similar in all but the protected ways.").

Here, Ms. Kloosterman has satisfied the fourth prong of *McDonnell Douglas*—the only prong that Defendants contest—by showing she was treated differently from similarly-situated employees whose secular preferences were accommodated without any negative repercussions. Specifically, Ms. Kloosterman alleges that Defendants treated her religious accommodation request differently than her coworkers' non-religious preferences. (PageID.534-38, ¶¶142-67). For example, Defendants were willing to accommodate Dr. Michael Kogut's personal preference not

to examine female patients. (PageID.700, n.12, PageID.535, ¶¶145-46). Based on this comparator alone, Ms. Kloosterman has properly alleged that a "comparable nonprotected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992).

Further, Ms. Kloosterman has alleged that several other coworkers in her clinic at her same level, or a higher level, commonly declined to provide certain services to patients for nonreligious reasons and were not fired as a result. (PageID.534-38, ¶¶142-67). Thus, she has properly alleged that she was treated differently in "all of the relevant aspects" than these similarly-situated coworkers in her clinic. *Ercegovich*, 154 F.3d at 352.

Qualified immunity does not bar Ms. Kloosterman's claims (Counts III and VIII), because equal protection jurisprudence under *Lautermilch*, 314 F.3d at 275, and *Gutzwiller*, 860 F.2d at 1325, was clearly established when Defendants acted.

Finally, Defendants cannot claim there was a "plausible reason" to treat Ms. Kloosterman differently based on their purported obligations under Section 1557 of the Affordable Care Act (PageID.671). The operative version of Section 1557 at the time of Ms. Kloosterman's termination protected religious healthcare providers and did not threaten any penalties on healthcare facilities who accommodated religious objections to gender-transition drugs and procedures. Furthermore, a nationwide federal court injunction protects Ms. Kloosterman from enforcement of Section 1557 because of her membership in the Christian Medical & Dental Associations.[7] *Franciscan Alliance*; (PageID.538, ¶169).

---

[7] This argument is addressed at length in Ms. Kloosterman's Response. (*See* PageID.811-816). Those arguments are incorporated herein.

## VII. <u>Ms. Kloosterman's Non-Monetary Claims for Relief</u>

### A. <u>Nominal Damages</u>

Defendants correctly assert that they are not liable for nominal damages in their official capacities. (PageID.672). "[S]tate officials sued in their official capacities [cannot] be sued for damages under [42 U.S.C.] § 1983" – "even nominal ones." *Saint Michael Acad., Inc. v. Hertel*, No. 22-1054, 2022 WL 14707052, at *3 (6th Cir. Oct. 26, 2022). Ms. Kloosterman seeks nominal damages against Defendants only in their individual capacities. (*See* PageID.572).   Further, to avoid any confusion on this issue, Ms. Kloosterman, her separate Motion to Amend, has withdrawn any claims for nominal damages against Defendants in their official capacities. *See supra*, § I.

### B. <u>Individual Capacity - Injunctive Relief</u>

Defendants incorrectly assert that injunctive relief is not available against them in their individual capacities under § 1983.  (PageID.676).  Their primary authority is an unpublished case in which a Sixth Circuit panel theorized such relief "should not be" available and refused to remand to the district court individual capacity claims for injunctive and declaratory relief. *Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd. Serving Belmont, Harrison & Monroe Ctys.*, 150 F. App'x 389, 401 (6th Cir. 2005). Almost ten years later, in another unpublished case, the Sixth Circuit recognized equitable relief against a state official in her individual capacity is available. There, the court dismissed as moot the equitable relief claims against an official in her individual capacity, explaining that mootness could have been cured by suing the state official's successor for the equitable relief in her individual capacity. *Moncier v. Jones*, 557 F. App'x 407, 410 (6th Cir. 2014).  Similarly, other courts have recognized the availability of individual capacity injunctive relief by affirming the mootness of the claims. *See Johnson v. Livingston*, 779 F. App'x 254, 255 (5th Cir. 2019); *Brown v. Chappelle*, 659 F. App'x 458, 461 (10th Cir. 2016). Indeed,

following and citing *Moncier*, this Court recognized the availability of individual capacity claims for declaratory and injunctive relief against a state official, when it dismissed them as moot. *See Horacek v. Heyns*, No. 2:13-CV-280, 2016 WL 11263235, at *2 (W.D. Mich. Dec. 15, 2016), *report and recommendation adopted*, No. 2:13-CV-280, 2017 WL 1190551 (W.D. Mich. Mar. 31, 2017).

As to Ms. Kloosterman's state constitutional claims (Counts VI - VIII), for the reasons set forth in § I above, she does not seek injunctive relief, but only monetary damages. *See* (PageID.824-825) (Motion to Amend), and Ex. 1, (PageID.881-888) (proposed Second Amended Complaint).

### C.   Reinstatement

The *Ex parte Young* exception for suits against state officials in their official capacity includes reinstatement. *Diaz v. Michigan Dept. of Corrections*, 703 F.3d 956, 964 (6th Cir. 2013).  However, because there is no authority supporting a reinstatement claim against a state officer in their individual capacity, Ms. Kloosterman agrees to withdraw her reinstatement claims against Defendants in their individual capacities.

### D.   Declaratory Relief

Defendants assert that Ms. Kloosterman's declaratory relief claims are barred by the Eleventh Amendment because she only seeks retrospective relief, not prospective relief; therefore, the *Ex parte Young* exception do not apply. *See* 209 U.S. 123, 159–161 (1908) (holding that suits for prospective declaratory or injunctive relief against state officers in their official capacities are not barred by the Eleventh Amendment).

As to Ms. Kloosterman's state constitutional claims, because she seeks leave to amend these counts to allege individual claims for monetary damages, if the court grants leave to amend, the issue is moot. *See supra*, § I.

As to Ms. Kloosterman's federal § 1983 claims set forth in Counts I, II, and III, Defendants are wrong. In each of those claims, Ms. Kloosterman's request for declaratory relief is tied to her claim for prospective injunctive relief against each Defendant in his or her official capacity — specifically, she asks the court to "fix a constitutional violation committed" against her that has "continuing effects" on her and other employees at the Hospital. *In re Flint Water Cases*, 960 F.3d 303, 334 (6th Cir. 2020); *see* (PageID.550, ¶233; PageID.553, ¶252; PageID.556, ¶265; PageID.571-572) (prayers for relief)). As a result, the Eleventh Amendment is not triggered. *See Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645 (2002) (stating that, even though declaratory relief might impose some retrospective financial liability on a private party, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective,") (citation and quotation marks omitted); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008) (same); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474–75 (6th Cir. 2008) (same). Thus, Defendants' cited cases which concern declaratory relief claims for retrospective relief are inapposite. *See Green v. Mansour*, 474 U.S. 64, 73 (1985) (holding that claim seeking only retrospective declaratory relief was barred by the Eleventh Amendment); *Brown v. Strickland*, No. 2:10–cv–166, 2010 WL 2629878, at *4 (S.D. Ohio June 28, 2010) (same).

## CONCLUSION

For each of the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

## <u>LOCAL RULE 7.2 CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of L. Civ. R. 7.2(b)(i), because, excluding the parts exempted by L. Civ. R. 7.2(b)(i), it contains 10,696 words. The word count was generated using Microsoft Word for Microsoft 365.

Respectfully submitted,

<u>/s/ James R. Wierenga</u>
James R. Wierenga
Michigan Bar # P48946
99 Monroe Ave, NW
Suite 1210
Grand Rapids, MI 49503
Tel. (616) 454-3883
jim@dwlawpc.com

May 9, 2023