UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALERIE KLOOSTERMAN,

     Plaintiff,

                               Case No. 1:22-cv-944

v.

                               HON. JANE M. BECKERING

METROPOLITAN HOSPITAL, et al.,

     Defendants.

_____/

## OPINION AND ORDER

Plaintiff Valerie Kloosterman initiated this 42 U.S.C. § 1983 employment discrimination action against Defendants Metropolitan Hospital and its employees and/or officers.  Invoking this Court's federal question jurisdiction, Plaintiff alleges that Defendants violated her First and Fourteenth Amendment rights to free exercise of religion, freedom of speech, and equal protection, as well as Title VII of the Civil Rights Act of 1964, when she was terminated from her job.  Now pending before the Court are Defendants' motions to dismiss (ECF Nos. 34 & 36).  In addition, Plaintiff filed a motion for leave to amend the operative pleading (ECF No. 50, corrected by ECF No. 51).  For the reasons that follow, the Court grants in part and denies in part Defendants' motions to dismiss and grants in part and denies in part Plaintiff's motion for leave to amend.

## I. BACKGROUND

### A. Factual Background[1]

### 1. The Parties

Plaintiff worked as a physician assistant at UMHW or its predecessor from 2004 until her termination in 2021 (Corrected First Amended Complaint (FAC ¶¶ 1, 20). Plaintiff is a "devout Christian and longtime member of a United Reformed Church" and her "vibrant faith informs how she does her work as a medical professional" (*id.* ¶¶ 31–32).

Metropolitan Hospital doing business as University of Michigan Health–West and/or Metro Health–University of Michigan Health ("UMHW") was previously an independent local health care system (FAC ¶ 51). According to Plaintiff, the University of Michigan Board of Regents, "by virtue of the affiliation agreement or otherwise," has exercised its "authority to direct or to require the creation and implementation of policies" at UMHW, including the "policies at issue in this case" such as "diversity, equity, and inclusion policies" (*id.* ¶ 71).

Individual Defendants are employees or officers of UMHW, and include Rakesh Pai, the President and the Medical Group & Chief Population Health Officer (CHO); Rhae-Ann Booker, the Vice President (VP) of Diversity, Equity, and Inclusion (DEI); Marla Cole, the Director of Human Resources (HR); Thomas Pierce, the DEI Program Coordinator; and Catherine Smith, a Nurse Practitioner and a member of the Advanced Practice Providers' Council (FAC ¶¶ 25–29).

### 2. Plaintiff's Religious Beliefs and Medical Judgment

Plaintiff alleges that, among other beliefs, she and her church believe "that the Bible is the inspired Word of God" and "hold to several confessions that they believe faithfully summarize

---

[1] For purposes of a motion to dismiss, the Court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014).

Biblical teachings"; "that all humans are created in God's image and thus deserving of love and respect"; and "that God created humans male and female as a unique expression of His image" (FAC ¶¶ 34–37).  Moreover, Plaintiff represents that, "[a]s a devout Christian," she "believes that one's sex is ordained by God, that one should love and care for the body that God gave him or her, and that one should not attempt to erase or to alter his or her sex, especially through drugs or surgical means" (*id.* ¶ 38).  Plaintiff "believes that she must not speak against these truths by using pronouns that contradict a person's biological sex" (*id.* ¶ 39).  Plaintiff also believes that "God has ordained the sexual function for procreation, that children are a gift from God, and that 'gender reassignment' drugs and procedures have a permanently sterilizing effect that cannot be justified by the desire to erase or alter one's sex" (*id.* ¶ 40).  Plaintiff also states that, "[a]s a Christian medical professional, [she] believes that it would be sinful to assist a patient in procuring sterilizing drugs or surgical procedures designed to erase or alter his or her sex.  This religious objection has nothing to do with the background or identity of the patient, but rather the nature of the drugs and procedures that the patient might request" (*id.* ¶ 41).

Plaintiff acknowledges that, as a Christian medical professional, her religious beliefs "are intertwined with her medical judgment" (FAC ¶ 42).  Plaintiff has "taken the Hippocratic oath to 'do no harm' to her patients" and her "Christian faith compels her both to honor her Hippocratic oath and to be honest and compassionate in her dealings with others" (*id.* ¶ 43).  Thus, Plaintiff "believes that it would be dishonest and sinful to violate her conscience and oath by knowingly facilitating a drug or procedure that—in her independent medical judgment—will bring to a patient more harm than benefit" (*id.*).

### 3.      Plaintiff's Employment with UMHW

Plaintiff worked specifically at Metro Health Caledonia (now called Caledonia Health Center), an outpatient clinic specializing in internal, family, and pediatric medicine located in Wyoming, Michigan (FAC ¶¶ 49–50).  Plaintiff "cared for patients of all ages and backgrounds" and received "consistently … exemplary performance reviews and was never once subject to discipline" (*id.* ¶¶ 52–53).  Plaintiff had a "stellar" reputation among her patients, many of whom "specifically request[ed]" Plaintiff and "were willing to wait for an appointment with her" (*id.* ¶¶ 56–57).  Plaintiff also had an "excellent reputation among her fellow staff members" and "had strong working relationships with everyone on staff at her clinic" (*id.* ¶ 58).  Plaintiff's "excellent performance reviews indicate" that she "gladly served people of all beliefs and backgrounds and was committed to giving the best possible care to all her patients, including those who identified as lesbian, gay, or experiencing gender dysphoria" (*id.* ¶ 59).

Plaintiff's employment contract required her to "exercise [her] independent medical judgment consistent with the clinical needs and consent of each patient," and her contract stated that "the Hospital shall not have the right to direct [her] to take or omit any act which conflicts with such medical judgment in the care of patients" (FAC ¶ 44) (citing Pl.'s Ex. D to FAC, ECF No. 32-4 at PageID.592–602).  Plaintiff represents that her "independent medical judgment is that 'puberty blockers,' 'hormone therapy,' and 'gender reassignment surgery' are experimental, lack validation in methodologically rigorous long-term studies, and often lead to negative clinical outcomes such as bone density loss, infection, nerve damage, chronic pain, loss of sexual and urinary functions, psychological trauma, and other serious complications" (*id.* ¶ 45).  Her medical judgment also "counsels against entering in documentation pronouns that obscure or misrepresent

a person's biological sex, as doing so can cause patients to miss potentially life-saving screenings and procedures like pregnancy tests, mammograms, and testicular exams" (*id.* ¶ 46).

According to Plaintiff, she treated two patients "who may have used preferred pronouns other than those that would correspond to the patients' biological sex" who came to Plaintiff "for a potential brain tumor and a respiratory issue," respectively, "and she cared for both of them to the best of her ability" (FAC ¶ 62). Plaintiff used the patients' names (without pronouns) "without any disruption to the patient's care"—including conducting follow-up phone calls and visits (*id.* ¶ 64). Last, Plaintiff states that she "never used pronouns that went against a patient's wishes[,]" "no patient ever asked her for a referral to another provider for 'gender reassignment' drugs or procedures[,]" and "she never discussed with any patient her views—religious or otherwise—on human gender or sexuality" (*id.* ¶¶ 66–68).

### 4.   Completion of Training Module on Serving LGBTQ+ Patients

In 2018, Plaintiff was required to complete a "training segment on serving LGBTQ+ patients" (FAC ¶ 73). Plaintiff "had no religious objection to this, as she was not required to affirm any statement during the training, which was merely for education purposes" (*id.*). However, between May and June 2021, UMHW required Plaintiff "to complete another mandatory training module" that contained "a requirement to affirm statements concerning sexual orientation and gender identity that her Christian faith prohibited her from affirming" (*id.* ¶ 74). Plaintiff needed to check boxes affirming the statements and pledging her agreement with UMHW's "express and implied positions on gender, sex, and sexual orientation" to complete the training (*id.* ¶ 75). Plaintiff alleges that she could not "explain her position" or "request a religious accommodation" (*id.*). Completion of the training was due on June 30, 2021, and if Plaintiff "did not complete the module by July 15, 2021, she would be terminated" (*id.*).

As a result, Plaintiff consulted with Defendant Smith, "who was in a liaison role connecting the providers with HR, her supervising physician, and her office manager" (FAC ¶ 76).  Plaintiff "prayed about the matter for three weeks," and "[b]oth Defendant Smith and [Plaintiff's] supervising physician told her to do what she felt was right in her heart" (*id.* ¶¶ 76–77).  Amy DeGood, office manager of the Caledonia clinic, instructed Plaintiff to speak with UMHW's DEI representatives (*id.* ¶ 78).

On or about July 1, 2021, Plaintiff met with Defendant Booker to explain why her faith precluded her from affirming the statements in the training module and to request a religious accommodation (FAC ¶ 82).  According to Plaintiff, Booker "indicated her assumption that [Plaintiff] was 'uncomfortable' seeing gay and lesbian patients," causing Plaintiff to correct her and explain that she has treated "several LGBTQ patients during her 17 years of employment and that she would gladly continue seeing these patients" (*id*. ¶ 83).

### 5.     July 29, 2021 Meeting with HR and DEI Departments

On or about July 29, 2021, Plaintiff met with representatives from the HR and DEI departments, including HR Director Cole, DEI Director Pierce, and Advanced Practice Provider's Council Smith (FAC ¶ 84).  Amy DeGood also attended the meeting telephonically (*id.* ¶ 87).  The meeting focused on whether Plaintiff "would use gender identity-based pronouns and be willing to refer patients for 'gender reassignment surgery'" (*id.* ¶ 88).  Plaintiff indicated that she could not do so because of her religious beliefs and independent medical judgment, "but that she would use patients' names in place of pronouns to respect their wishes" (*id.* ¶ 89).  Plaintiff alleges that Pierce "grew hostile" and attacked Plaintiff's religious beliefs, stating that Plaintiff "could not take the Bible or her religious beliefs to work with her" and "that she was abusing her power as a health care provider to manipulate patients" (*id*. ¶¶ 89–90).  Plaintiff attempted to explain that "medical

providers have multiple ways of treating most conditions and are not necessarily obligated to give patients everything they asked for, such as antibiotics for viral infections, opioids, or surgery for non-chronic back pain, if doing so went against the providers' medical judgment" (*id.* ¶ 92). Plaintiff respectfully explained the reasons informing her objection to facilitating gender reassignment surgeries (*id.* ¶ 93). Pierce remained hostile, for example, by calling Plaintiff "evil" and a "liar" and asking whether Plaintiff knew "that by using a patient's name instead of his or her preferred pronouns, she would cause him or her to commit suicide" (*id.* ¶¶ 91–94).

When asked how Plaintiff would treat "pronouns on patient charts," Plaintiff explained that pronouns are not always given for charting, and if pre-formulated pronouns were provided, "she could use the patient's first name, as she had done in the past without any complaints or disruption to patient service" (FAC ¶ 97). Plaintiff explained that she "was not seeking to impose her beliefs on … anyone" and that "she did not … have the ability to change a patient's sex or gender on his or her chart because only administrative office staff" could do so (*id.* ¶¶ 97–98).

Pierce eventually departed the meeting, and Cole noted that the discussion with Pierce "had been intense" and suggested that "everyone should take a breath" (FAC ¶ 99). Plaintiff indicated that she would gladly continue the conversation if helpful (*id.*). Plaintiff also alleges that Smith "did nothing to support [Plaintiff] or to contradict the hostile statements" by Pierce despite Smith's role as a liaison to help Plaintiff during interactions with HR (*id.* ¶ 100).

### 6. Plaintiff's Termination

Following this meeting, Plaintiff heard nothing from UMHW until August 23, 2021, "when a meeting for August 24 appeared on her calendar" (FAC ¶ 101). The meeting was with Defendants Cole and Smith, scheduled during a time Plaintiff "would normally be seeing patients[,]" and was located at UMHW and not the Caledonia clinic where Plaintiff worked (*id.*).

The subject line was "touch base" (*id.*).  Plaintiff attempted to contact HR, Cole, and Smith to inquire about the purpose of the meeting, but she did not receive any answers (*id.* ¶ 102).

On August 24, 2021, Plaintiff arrived at the meeting room where Defendant Cole was present with an envelope on the table containing Plaintiff's termination notice (FAC ¶ 105).  The termination notice indicated an effective termination date of November 22, 2021 (*id.*) (citing Pl.'s Ex. F to FAC, ECF No. 32-6 at PageID.612).  The notice was signed by Defendant Pai, and "did not disavow the statements" made by Pierce at the July 29 meeting (*id.*).

Smith entered and informed Plaintiff that she "no longer worked" at UMHW because she "refused to use preferred pronouns and because she refused to refer for 'gender reassignment surgeries'" (FAC ¶ 106).  Plaintiff responded, "If this is about my Christian beliefs, I cannot abandon them. But I will always treat patients appropriately" (*id.* ¶ 107).  Smith answered that, "despite the fact that [Plaintiff] had a 'work around' for preferred pronouns, it had been decided that" she no longer worked at UMHW and "was not allowed on its property" (*id.* ¶ 108).  Plaintiff handed over her badge and was told her patient charts would be completed for her and was told that DeGood "would call her when her personal items were boxed up" (*id.* ¶ 109).[2]

On September 3, 2021, ten days following Plaintiff's termination, she received a letter signed by Defendant Smith, "memorializing the reasons for her termination" (FAC ¶ 128).  Smith listed Plaintiff's "unwillingness to refer 'gender transitioning' patients for certain drugs and procedures," or to "use pronouns that do not correspond to a patient's biological sex," as well as

---

[2] Following her termination, Plaintiff alleges that DeGood sent a "group text to eight of the providers" at the clinic, calling for a mandatory meeting (FAC ¶ 115).  At that meeting, Smith informed the providers that Plaintiff "no longer works for the University of Michigan" and asked if there were any questions (*id.* ¶ 119).  Defendant Pai and others indicated that Plaintiff committed a "clear violation" of her contract but that they could not disclose what the violation was (*id.* ¶¶ 121–124).

"a newly fabricated and baseless allegation that [Plaintiff] had altered medical records to change patients' templated pronouns" (*id.*) (citing Pl.'s Ex. H, ECF No. 32-8 at PageID.616).  Plaintiff states that the termination letter also "did not disavow the statements that Defendant Pierce made in attacking [her] religious beliefs at the July 29 meeting" (*id.* ¶ 130).  Plaintiff alleges that all Defendants conferred in drafting the termination letter, and "in making the decision to terminate" her because they "shared the same anti-religious motives that Defendant Pierce made explicit during the July 29 meeting" (*id.* ¶¶ 129–131).

## B. Procedural Posture

Plaintiff initiated this action on October 11, 2022 (ECF No. 1).[3]  In her First Amended Complaint (ECF No. 30, corrected by ECF No. 32), Plaintiff asserts the following nine claims:

I.   First and Fourteenth Amendments: Free Exercise of Religion (42 U.S.C. § 1983) (against Individual Defendants in their Official and Individual Capacities);

II.  First and Fourteenth Amendments: Freedom of Speech (42 U.S.C. § 1983) (against Individual Defendants in their Official and Individual Capacities);

III. Fourteenth Amendment: Equal Protection (42 U.S.C. § 1983) (against Individual Defendants in their Official and Individual Capacities);

IV.  Title VII: Religious Discrimination, Disparate Treatment (42 U.S.C. § 2000e) (against UMHW); and

V.   Title VII: Religious Discrimination, Disparate Impact (42 U.S.C. § 2000e) (against UMHW).

VI.  Michigan Constitution: Free Exercise of Religion (M.C.L.A. Const. Art. I, § 4) (against all Defendants);

VII. Michigan Constitution: Freedom of Speech (M.C.L.A. Const. Art. I, § 5) (against all Defendants);

VIII. Michigan Constitution: Equal Protection (M.C.L.A. Const. Art. I, § 2) (against all Defendants);

---

[3] Defendants waived service (*see* ECF Nos. 7–11) and the parties stipulated to a response deadline of January 9, 2023 (ECF Nos. 12 & 13).

IX.  Elliot-Larsen Civil Rights Act of 1974 (ELCRA) (Mich. Comp. Laws
§ 37.2202) (against UMHW).

(FAC [ECF No. 32] at PageID.543–563).

On February 20, 2023, Individual Defendants filed a motion to dismiss (ECF No. 34), to
which Plaintiff filed a response (ECF No. 55), and Individual Defendants filed a reply (ECF No.
64).  That same day, UMHW also filed a motion to dismiss (ECF No. 36), to which Plaintiff filed
a response (ECF No. 49), and UMHW filed a reply (ECF No. 65).

On May 9, 2023, before the deadline for the parties' reply briefs to the pending motions to
dismiss, Plaintiff filed a motion to amend or correct the First Amended Complaint (ECF No. 50,
corrected by ECF No. 51).  Defendants filed responses in opposition (ECF Nos. 56 & 61).  In turn,
Plaintiff filed a motion for leave to file a reply brief in support of her motion to amend/correct the
First Amended Complaint (ECF No. 59).

Having considered the parties' submissions, the Court concludes that oral argument is not
necessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Defendants' Motions to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim

Construing the First Amended Complaint in the light most favorable to Plaintiff and
accepting all well-pleaded factual allegations in the First Amended Complaint as true, the Court
determines that Plaintiff has stated claims on which relief may be granted as to Counts I, III, and
IV.  The Court grants Defendants' motions to dismiss Counts II and V through IX.

#### 1.  Motion Standard

Defendants' motions are filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and
12(b)(6).  Rule 12(b)(1) authorizes the court to dismiss a claim for relief in any pleading if the

court "lack[s] subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1).  "A motion to dismiss on the ground that sovereign immunity bars the plaintiff's claims is properly treated as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)." *Odom v. Univ. of Mich.*, No. 16-12791, 2017 WL 2117978, at *2 (E.D. Mich. May 16, 2017).  "When a defendant raises the issue of subject matter jurisdiction, the plaintiff generally bears the burden of establishing jurisdiction." *Id.*  "However, 'the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity.'" *Id.* (quoting *Nair v. Oakland Cty. Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006)); *see also Guertin v. State*, 912 F.3d 907, 936 (6th Cir. 2019) ("The entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, i.e., that it is an arm of the state.").

In turn, Rule 12(b)(6) authorizes the court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual

allegations in the complaint as true.  *Thompson*, 773 F.3d at 750.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

2.   Plaintiff's Federal Claims

The Court's analysis first focuses on Plaintiff's federal claims in Counts I through V, which are brought under 42 U.S.C. § 1983, as these counts form the basis of this Court's exercise of original jurisdiction under 28 U.S.C. § 1331 (Federal Question Jurisdiction).  Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]"  42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a statutory vehicle for vindicating rights found in the United States Constitution.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1160 (6th Cir. 2021).  To bring a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law."  *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) (citation omitted).

***a.   First and Fourteenth Amendments:  Free Exercise of Religion
(Count I–Individual Defendants)***

In Count I, Plaintiff alleges a free exercise of religion claim under the First and Fourteenth Amendments.  Individual Defendants argue that Plaintiff fails to state a claim that they terminated Plaintiff's employment as a result of their hostility to her religious beliefs under Count I because Plaintiff's "allegations reflect that Defendants carefully considered and reviewed Plaintiff's objections [to their policy] with fairness" (ECF No. 35 at PageID.664).  Individual Defendants

assert that "[t]here are no allegations in the Amended Complaint which connect the alleged

[hostile] statements or lack of statements" by Cole, Pierce, Booker, and Smith[4] in July 2021 to

UMHW's August 24, 2021 decision to terminate Plaintiff's employment (*id.* at PageID.664–665).

Further, Individual Defendants argue that the alleged disparate treatment exhibited by Defendants

"between her and other providers who expressed their objections to procedures or referrals" are

likewise insufficient to demonstrate hostility towards Plaintiff's religious beliefs (*id.* at

PageID.666).

In response, Plaintiff argues that each Individual Defendant "targeted her religious beliefs

as the cause of her termination …," showed "blatant hostility toward her religious beliefs …," and

"refused to accommodate her beliefs while treating her coworkers' secular preferences more

favorably" (ECF No. 55 at PageID.996).

The Court determines that, at the dismissal stage, Plaintiff has sufficiently stated a free

exercise of religion claim against Individual Defendants.

The Free Exercise Clause of the First Amendment protects an individual's "right to believe

and profess whatever religious doctrine one desires." *Emp. Div., Dep't. of Hum. Res. of Oregon

v. Smith*, 494 U.S. 872, 877 (1990).  The First Amendment's Free Exercise Clause applies to States

through the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  In

*Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021), the Sixth Circuit held that "laws that

burden religious exercise are presumptively unconstitutional unless they are both neutral and

---

[4] Plaintiff's hostility theory arises from the statements made at the July 29, 2021 meeting, where Pierce called Plaintiff "evil" and a "liar" and Booker suggested Plaintiff's religious beliefs "equate with discrimination" (*see* FAC ¶¶ 82–84, 90–91, 94–95, 200).  Individual Defendants highlight that Plaintiff's allegations indicate only that Cole suggested that "everyone should take a breath" at the meeting when discussions became "intense" (ECF No. 35 at PageID.665) (citing FAC ¶¶ 84, 99).  Plaintiff does not assert any allegations that Pai made hostile statements regarding Plaintiff's religious beliefs.

generally applicable."  "[A] law that is neutral and of general applicability need not be justified by a compelling state interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531 (1993).  If a law is not neutral and of generally applicability, then it "must undergo the most rigorous of scrutiny."  *Id*. at 546.

Plaintiff does not allege that Defendants applied a non-neutral policy.  Plaintiff does not allege that those who received 'secular' accommodations requested an accommodation from the supposed pronoun and referral policies; rather, "Plaintiff claims they had accommodations from other, unrelated customs" (ECF No. 64 at PageID.1094).  While UMHW's policy may have burdened Plaintiff's religious rights, Plaintiff also does not allege that UMHW has created exceptions that either necessitate consideration of UMHW's intent or that UMHW has exempted conduct for secular reasons but is unwilling to exempt Plaintiff for religious reasons.  *See Fulton*, 141 S. Ct. at 1877.  Defendants have provided a compelling reason for the policy that existed at the time UMHW enacted the policy, which is to ensure that all patients have the right to impartial access to medical treatment.  *See* ECF No. 35 at PageID.671; *see also Fox v. Washington*, 949 F.3d 270, 283 (6th Cir. 2020) ("[B]ecause the government's asserted interest must be genuine, not hypothesized or invented *post hoc* in response to litigation, [the government] will be limited to raising justifications it cited at the time it made the decision" (internal citations and quotations omitted)).

Although Plaintiff does not allege a non-neutral policy, a "plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [the Supreme Court has] 'set aside' such policies without further inquiry."  *Kennedy v. Bremerton Sch. Dist.*, ___ U.S. ___; 142 S. Ct. 2407,

n.1 (2022) (citing *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Com'n*, ___ U.S. ___; 138 S. Ct. 1719, 1732 (2018)).  Evaluation of governmental neutrality requires courts to "look beyond the text and scrutinize the history, context, and application of the challenged law."  *Meriwether*, 992 F.3d at 512.  As the Supreme Court held in *Masterpiece,* 138 S. Ct. at 1732, a plaintiff is "entitled to a neutral decisionmaker who would give full and fair consideration to [her] religious objection as [s]he sought to assert it in all of the circumstances in which this case was presented, considered, and decided."  *See also Lukumi*, 508 U.S. 531–32; *see Fulton v. City of Philadelphia, Pennsylvania*, ___ U.S. ___; 141. S. Ct. 1868, 1877 (2021) ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.").

Accepting as true all allegations in Plaintiff's Amended Complaint, as the Court must at the dismissal stage, the Court finds that UMHW and Individual Defendants' "treatment of [Plaintiff's request for accommodation] has some elements of … hostility toward the sincere religious beliefs that motivated h[er] objection" to the training module.  *Masterpiece*, 138 S. Ct. at 1729.  This hostility was manifested at the July 29, 2021 meeting through the alleged statements of Pierce, Booker, and Smith.  Plaintiff alleged that when she stated that she could not refer patients for gender-reassignment surgery or refer to patients using their preferred pronouns based on her religious beliefs, Defendant Pierce became hostile, telling her that her religious beliefs did not belong in the workplace (FAC ¶ 90) and calling her "evil" and a "liar" (*id.* ¶¶ 91–94).  Plaintiff also plausibly indicates that Pierce spoke on behalf of other Individual Defendants (*id.* ¶ 84).  Finally, Plaintiff plausibly alleges that Defendants' hostility toward her religious beliefs motivated them to terminate her employment (*id.* ¶¶ 277–280).

Accordingly, at this stage in the litigation, Plaintiff has plausibly alleged a free exercise violation, and the Individual Defendants' motion as to Count I is denied.

### b.  First and Fourteenth Amendments:  Freedom of Speech (Count II–Individual Defendants)

In Count II, Plaintiff alleges that Defendants violated her freedom of speech under the First and Fourteenth Amendments.  Individual Defendants argue that Plaintiff's speech was not subject to First Amendment protections because her objection to using patients' preferred pronouns arose *after* UMHW required her to complete a mandatory training module as part of her official duties, and thus, her objection was to government speech (ECF No. 35 at PageID.668).  Individual Defendants contend that, as "[t]he Sixth Circuit recognized in *Meriwether*, 992 F.3d at 503–04, [] 'free-speech rules apply differently when a government is doing the speaking.  And that remains true even when a government employee is doing the talking'" (*id*. at PageID.667).  Defendants also argue that Plaintiff's allegations concerning Defendants' speech code, claiming that it is "content and viewpoint based, overbroad, and vague," are conclusory and without factual support (*id* at PageID.668).

Plaintiff contends in response that Defendants violated her free speech rights by denying her request for accommodation from UMHW's policy, and "by firing her for her refusal to follow their discriminatory, anti-religious pronoun policy" (ECF No. 55 at PageID.1000).  Plaintiff counters that characterizing her use of patient pronouns as government speech demonstrates a "novel approach to medical care" that "ignores [Plaintiff's] ethical duty to exercise her independent medical judgment in caring for patients" (*id.*).

The Court determines that Plaintiff has not plausibly stated a freedom of speech claim against the Individual Defendants.

16

The parties do not dispute that Plaintiff worked for UMHW, an agency of the state of Michigan.  Government actors may not force citizens to speak messages that violate their beliefs. *303 Creative LLC v. Elenis*, ___ U.S. ___; 143 S. Ct. 2298, 2314 (2023).  However, the Supreme Court held in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[5]  Moreover, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id*. at 421–422.  The Sixth Circuit has held that in analyzing employee speech to determine whether employees are speaking pursuant to their official duties or as citizens, courts should consider the following context-driven factors: "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter," as well

---

[5]  The Supreme Court in *Kennedy v Bemerton School District* describes a two-step process to account for the complex interplay between free speech rights and government employment:

> The first step involves a threshold inquiry into the nature of the speech at issue.  If a public employee "speaks pursuant to [his or her] official duties," this Court has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech.
> At the same time and at the other end of the spectrum, when an employee "speaks as a citizen addressing a matter of public concern," our cases indicate that the First Amendment may be implicated and courts should proceed to a second step.  At this second step, our cases suggest that courts should attempt to engage in "a delicate balancing of the competing interests surrounding the speech and its consequences."  *Kennedy v Bremerton Sch. Dist*., 142 S.Ct. 2407, 2423 (2022) (citations omitted).

Given the nature of the speech at issue in the instant case, the Court need not proceed to the second step, as Plaintiff takes issue with speech she did not wish to make when engaging in her official duties at UMHW.

as whether the speech was "an explicit or implied part of an employee's job description" and the "motivations behind the speech." *Fledderjohann v. Celina City Sch. Bd. of Educ.*, 825 F. App'x 289, 294 (6th Cir. 2020) (citation omitted).  In the public employment setting, "laudable intent alone is not enough to secure First Amendment protection." *DeWyse v. Federspiel*, 831 F. App'x 759, 764 (6th Cir. 2020).

Here, all of the context-driven factors point to a conclusion that Plaintiff was speaking pursuant to her official duties, not as a citizen.  The impetus for the speech—both Plaintiff's allegedly compelled pronoun use and her protestation against the UMHW policy—was the patient/physician relationship existing as part of Plaintiff's employment with UMHW (FAC ¶¶ 75–82).  The setting of the speech was confined to UMHW (*id.*).  The audience for the speech was the staff of UMHW and the patients for whom Plaintiff cared in her employment by UMHW (*id.*). The general subject matter for the speech was the identity and medical care of UMHW patients. How Plaintiff addressed those patients and to which procedures Plaintiff referred those patients were explicitly or implicitly central to Plaintiff's job description (*id.*).  Finally, Plaintiff was motivated to speak as a result of her position as a provider of medical care at UMHW.

None of the cases that Plaintiff cites in support of her argument for a healthcare exception to *Garcetti* concerned freedom of speech claims.  The freedom of speech cases that Plaintiff cites, such as *Kerr v. Hurd*, 694 F.Supp.2d 817 (S.D. Ohio 2010), and the Sixth Circuit's decision in *Meriwether,* 992 F.3d at 503, recognize an "academic freedom exception," rather than one for medical professionals (ECF No. 55 at PageID.1001–04).  As Plaintiff acknowledges, this Court, is bound by the holdings of the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit, neither of which have held that *Garcetti* applies in a different manner to healthcare providers at public institutions (*id.* at PageID.1003).  Given the context and purpose

of the speech as set forth in these allegations, which the Court accepts as true, the Court determines that Plaintiff's speech does not qualify as speech "as a citizen" entitled to First Amendment Protection.  Plaintiff has not plausibly alleged that she was involved in constitutionally protected activity.  Accordingly, Count II is properly dismissed.

### c. Fourteenth Amendment:  Equal Protection (Count III–Individual Defendants)

In Count III, Plaintiff alleges an equal protection claim under the Fourteenth Amendment. Individual Defendants argue that Plaintiff fails to state an equal protection claim because she failed to sufficiently allege that Defendants treated her accommodation request differently than others' secular accommodation requests (ECF No. 35 at PageID.670).  Defendants further argue that Plaintiff fails to allege that Defendants' actions were accomplished for a discriminatory purpose or with discriminatory intent (*id.*).

In response, Plaintiff argues that comparing similarly-situated employees is unnecessary where, as here, there is direct evidence of discrimination (ECF No. 55 at PageID.1006), and that even though such direct evidence is sufficient for her equal protection claim to survive Defendants' motion to dismiss, Plaintiff has also alleged circumstantial evidence of disparate treatment (*id.* at PageID.1007).

The Court determines that Defendants' argument for dismissal of Count III lacks merit.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws."  U.S. CONST. Am. XIV, § 1.  The Clause embodies the principle that "all persons similarly situated should be treated alike." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  The threshold element of an equal protection claim is disparate treatment.  *Id.*

In order to prevail on a Fourteenth Amendment Equal Protection claim under 42 U.S.C. § 1983, a plaintiff must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964.  *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).  A plaintiff may prove disparate treatment either by direct evidence of discriminatory motive or through circumstantial evidence based on a prima facie showing of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  To make out a prima facie case of disparate treatment based on religious beliefs, a plaintiff must establish that she: (i) was a member of a member of a protected class, (ii) suffered an adverse employment action, (iii) was qualified for the position, and (iv) was treated differently from similarly situated employees of an unprotected class for same or similar conduct.  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012); *Perry v. Universal Med. Staffing, Inc.*, 62 F.Supp.3d 666, 671 (W.D. Mich. 2014).

As Plaintiff states, however, at the motion to dismiss stage, the Court need not assess whether a plaintiff has established the elements of the prima facie case.  *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) ("This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."); *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) ("[I]t was error for the district court to require [the plaintiff] to plead a prima facie case under *McDonnell Douglas* in order to survive a motion to dismiss.").  Moreover, where a plaintiff alleges direct evidence of discrimination, it is not necessary for the plaintiff to establish a prima facie case. *Swierkiewicz*, 534 U.S. at 508 (explaining that *McDonnell Douglas* sets an evidentiary standard, not a pleading requirement).  A plaintiff alleges direct evidence of discrimination where they allege statements "reveal[ing] an adherence to a stigmatizing belief . . .

20

that was a motivating factor" in the employer's decision. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003).

Here, Plaintiff alleges that statements made by Defendant Pierce, namely at the July 29 meeting—at which Defendant Pierce told Plaintiff that she "could not take the Bible or her religious beliefs to work with her," called Plaintiff "evil for not giving patients exactly what they wanted because of her religious beliefs," and asked Plaintiff "whether she knew that by using a patient's name instead of his or her preferred pronouns, she would cause him or her to commit suicide"—demonstrated animus to her religious beliefs (FAC ¶¶ 90–95).

Plaintiff alleges that all five Defendants participated in the decision to terminate Plaintiff's employment three weeks following the July 29 meeting, displaying hostility toward her religious beliefs by characterizing her reason for having been fired as a "serious" policy violation (FAC ¶¶ 204, 121–25). Plaintiff states that Defendant Pai, as the President of the University of Michigan Health-West, is the "final decision-maker and policy-maker" and "implements and enforces" UMHW policies, and that Defendant Pai signed Plaintiff's termination notice (*id.* ¶ 132). Plaintiff states that Defendants Booker and Cole required the training that prompted Plaintiff's religious accommodation request, convened the July 29 and August 24 meetings, and made the decision not to grant Plaintiff's request and to terminate her employment (*id.* ¶ 133). Plaintiff alleges that Booker's discriminatory motive was explicit because she "falsely accused [Plaintiff] of wishing not to treat LGBTQ patients, thereby equating with discrimination [Plaintiff's] sincerely held religious beliefs" (*id.* ¶ 134). Defendant Pierce "openly mocked and derided" Plaintiff's beliefs at the July 29 meeting, and "intensely pressured her to abandon them" (*id.* ¶ 137). Booker's and Cole's decision to terminate Plaintiff's employment was "ratified" by Pai (*id.* ¶ 133). Plaintiff further alleges that Defendant Smith "set [Plaintiff's] termination into motion by recommending"

that Defendants Cole and Booker deny her accommodation request and terminate her employment, and "failed to advocate" for Plaintiff (*id.* ¶ 138).  Defendant Smith also signed the Termination letter (*id.*).  At the dismissal stage, Plaintiff's allegations, though scant as to each Defendant's role in the discrimination, plausibly state an Equal Protection claim.  Accordingly, Defendants' motion to dismiss Count III is properly denied.

### d.   *Individual Defendants' Motion to Dismiss Plaintiff's Claims for Lack of Jurisdiction (Pertaining to Counts I–III)*

Individual Defendants argue that the Court should dismiss Plaintiff's first three federal claims against them on several jurisdictional grounds: (1) that Plaintiff's claims for nominal damages should be dismissed against Defendants in their official capacities because such claims are not permitted by § 1983, and the doctrine of qualified immunity shields Defendants from Plaintiff's claims against them for nominal damages in their individual capacities; (2) that Plaintiff's claims for injunctive relief against Defendants in their individual capacities should be dismissed because the injunctions sought are job-related; (3) that Plaintiff's claims for injunctive relief against Defendants Booker, Cole, Pierce, and Smith in their individual and official capacities should be dismissed because Plaintiff did not plead that Defendants have the power to remedy the alleged violations; and (4) that dismissal of Plaintiff's claims for injunctive relief mandate dismissal of Plaintiff's claims for declaratory relief.  The Court will address each claim in turn.

### 1.   Claims for Nominal Damages

First, Individual Defendants argue that the Court should dismiss Plaintiff's claims for nominal damages in Counts I through III because § 1983 does not permit such relief against Defendants in their official capacities and qualified immunity protects them from nominal damages in their individual capacities (ECF No. 35 at PageID.672).

In response, Plaintiff concedes that she cannot pursue nominal damages against Defendants

in their official capacities (ECF No. 64 at PageID.1097).  But she argues that each Individual Defendant violated her constitutional rights and that the laws that Defendants allegedly violated were clearly established at the time the violations occurred; therefore, qualified immunity doctrine does not shield Defendants from nominal damages in their individual capacities (ECF No. 55 at PageID.995).

Defendants' argument that they are entitled to qualified immunity with respect to claims against them in their individual capacity lacks merit.

"[T]he ability to go forward on a § 1983 claim against an officer for a violation of the Fourth Amendment is 'limited by the qualified immunity exception.'"  *Shumate v. City of Adrian, Mich.*, 44 F.4th 427, 439 (6th Cir. 2022) (citation omitted).  In *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021), the Sixth Circuit held that while "a plaintiff is generally not required to negate an affirmative defense [like qualified immunity] in a complaint[,] ... the validity of such defenses may be apparent from the face of the complaint, rendering a [Rule 12] motion appropriate."  The United States Supreme Court has held that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Hence, the Sixth Circuit has instructed that district courts have a "duty to address" qualified immunity when it is "properly raised prior to discovery."  *Myers v. City of Centerville, Oh.*, 41 F.4th 746, 758 (6th Cir. 2022) (citation omitted).  Qualified immunity shields government defendants from not only liability but also litigation and discovery because "[i]nquiries of this kind can be peculiarly disruptive of effective government."  *Id.* (quoting *Harlow*, 457 U.S. at 817).

"A defendant is not entitled to qualified immunity at the pleadings stage if (1) 'the facts alleged make out a violation of a constitutional right' and (2) that right 'was clearly established

when the event occurred so that a reasonable offic[ial] would have known that his conduct violated it.'"  *Myers*, 41 F.4th at 757 (quoting *Crawford*, 15 F.4th at 762–63).  Courts may address these two prongs in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  While analyzing the second prong of the qualified immunity analysis is "sometimes difficult" on the pleadings because that "inquiry may turn on case-specific details that must be fleshed out in discovery," the Sixth Circuit's decision in "*Crawford* made crystal clear that that general preference does not at all cover qualified immunity's first prong—whether the complaint plausibly alleged a constitutional violation."  *Myers*, 41 F.4th at 758–59.  "[T]o establish liability and to overcome a qualified immunity defense, an individual must show that his or her own rights were violated, and that the violation was committed personally by the defendant."  *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (emphases omitted).

In failing to plausibly allege a constitutional violation of her free speech rights, Plaintiff concomitantly fails to overcome the Individual Defendants' qualified immunity defense with respect to Count II.  *See Myers*, 41 F.4th at 758–59; *Robertson*, 753 F.3d at 615.  In contrast, while Plaintiff's allegations against some Individual Defendants are sparse, Plaintiff has sufficiently alleged at this stage that each Individual Defendant violated her constitutional rights in Counts I and III.  Plaintiff has alleged facts sufficient to plausibly show that Defendants violated her clearly established freedom of religion and Equal Protection rights, and thus to overcome qualified immunity as to Counts I and III against Defendants in their individual capacities for nominal damages.  *Baynes v. Cleland*, 799 F.3d 600, 611 (6th Cir. 2015); *accord Guertin*, 912 F.3d at 932 ("[T]he precise factual scenario need not have been found unconstitutional" to defeat qualified immunity).  Thus, qualified immunity does not shield Individual Defendants against Plaintiff's claims.

2.   Claims for Injunctive Relief:  Job-Related

Second, Defendants argue that the Court should dismiss all of Plaintiff's claims against them in their individual capacities in Counts I through III because the injunctions sought relate only to their jobs (ECF No. 35 at PageID.675).  In response, Plaintiff contends that job-related injunctive relief is, in fact, available against Defendants (ECF No. 55 at PageID.1009).

Defendants' argument has merit.

Authority on the availability of job-related injunctive relief against individuals is mixed. The Sixth Circuit has, in some instances, expressed that claims for injunctive relief against state officials in their individual capacities relating only to the officials' jobs should not be sustained, *see, e.g.*, *Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd. Serving Belmont, Harrison & Monroe Ctys.*, 150 F. App'x 389, 401 (6th Cir. 2005), but has implied the existence of such relief in other circumstances, *see, e.g.*, *Moncier v. Jones*, 557 F. App'x 407, 410 (6th Cir. 2014) (affirming the dismissal of the plaintiff's claims as moot, but questioning why plaintiff did not allege a claim for equitable relief against the defendant's successor in her individual capacity).

Here, Plaintiff seeks injunctive relief against Defendants in "an order . . . directing them to reinstate" Plaintiff and "prohibiting future such [unconstitutional] acts by Defendants" (FAC ¶¶ 223, 252, 265, 331, 339, 351).  As Defendants note, the allegedly unconstitutional acts at issue took place within the workplace, and injunctive relief would pertain to Defendants' job duties.  In accordance with the Sixth Circuit's declaration that "injunctions run against the office, not the individual," this Court determines that Plaintiff may not maintain claims for job-related injunctive relief against Defendants in their individual capacities in this case.  *Gay v. Cabinet for Health & Fam. Servs. Dep't for Cmty. Based Servs.*, No. 18-5285, 2019 WL 1338524, at *5 (6th Cir. Jan.

25

23, 2019).  Therefore, the requests for injunctive relief in Counts I and III against Defendants in their individual capacities are properly dismissed.

### 3.   Claims for Injunctive Relief:  Defendants' Power to Remedy

Third, Defendants argue that the Court should dismiss Plaintiff's claims for injunctive relief against Defendants Booker, Cole, Pierce, and Smith in their individual and official capacities in Counts I–III because Plaintiff did not plead that they possess the power to reinstate her or to remedy the other alleged violations (ECF No. 35 at PageID.677).  Plaintiff responds that all Individual Defendants do have such authority (ECF No. 55 at PageID.993).  Plaintiff withdraws her claims for reinstatement against Defendants in their individual capacities (*id.* at PageID.1010).

Given the Court's conclusion regarding the claims for job-related injunctive relief against Defendants in their individual capacities, *supra*, Defendants' power to remedy the alleged violations pertains to Plaintiff's claims for injunctive relief against Defendants in their official capacities only.

Plaintiff's Amended Complaint alleges that "[o]n information and belief, Defendants Pai, Booker, and Cole have the authority to reinstate [Plaintiff], to rescind the unlawful policies at issue, to ensure the hospital's policies are not enforced or implemented in a discriminatory manner against religious employees, and to grant employees' religious accommodation requests" (FAC ¶ 141).  Plaintiff also alleges that Defendants Pai, Booker, and Cole terminated Plaintiff (*id.* ¶¶ 13–33), and that they are responsible for the policies at issue and can implement and enforce them, as well as rescind them (*id.* ¶¶ 110–114, 141).  Plaintiff states that Defendants Pierce and Smith were involved in implementing the policy at issue and enforcing it by recommending Plaintiff's termination (*id.* ¶ 237).  At this stage, such allegations are enough to plausibly show that each Defendant has the authority to grant Plaintiff's requested injunctive relief, and the claims in Counts I and III for injunctive relief against Defendants in their official capacities survive.

26

4.   Claims for Declaratory Relief

Finally, Defendants contend that Plaintiff's federal claims for declaratory relief against Defendants in their official capacities must be dismissed because her claims are retrospective in nature, and *Ex parte Young*, 209 U.S. 123 (1908), permits only prospective relief against state officers in their official capacities (ECF No. 35 at PageID.680).  In response, Plaintiff argues that because her claims for declaratory relief are tied to her claims for prospective injunctive relief—to remedy the continuing effects on her employment situation—they are not barred by the Eleventh Amendment (ECF No. 55 at PageID.1011).  The Court determines that as Plaintiff's claims for prospective injunctive relief remain against Defendants in their official capacities, her claims for declaratory relief also survive Defendants' motion to dismiss.

In summary, as for Plaintiff's federal claims against Individual Defendants, Plaintiff's claims against Defendants in their individual capacities in Count I and Count III for nominal damages survive, Plaintiff's claims against Defendants in their official capacities for reinstatement survive, and Plaintiff's claims against Defendants for injunctive and declaratory relief in their official capacities survive as to Counts I and III.  Plaintiff's claims as to Count II, Plaintiff's claims for nominal damages against Defendants in their official capacities, and Plaintiff's claims for reinstatement and injunctive relief against Defendants in their individual capacities are all properly dismissed.

### e.   Title VII:  Religious Discrimination, Disparate Treatment (Count IV–UMHW)

Plaintiff alleges both a discriminatory termination and failure to accommodate theory under her Title VII disparate treatment claim in Count IV.  The Court will address each in turn.

1.   Discriminatory Termination

Defendant UMHW argues that Plaintiff cannot establish a prima facie case of disparate treatment religious discrimination regarding her termination because she did not allege that she engaged in the same or similar conduct to similarly-situated employees who were treated differently (ECF No. 37 at PageID.697).   Defendant contends that because Plaintiff objected to using patients' preferred pronouns and referring patients to providers of gender-affirming care "AFTER she was engaged in ongoing care with patients *that she knew* were 'lesbian, gay, or experiencing gender dysphoria,'" her actions were not the same or similar to other providers who did not engage with patients who would require referrals to other providers and then refuse to make such referrals (*id.* at PageID.700) (emphasis in original) (citing FAC ¶¶ 59–60).   Defendant also argues that Plaintiff was not treated differently than other providers because Plaintiff's conduct, unlike that of other providers, would likely "subject UMHW to violation of federal law and regulations" (*id.* at PageID.702).

In response, Plaintiff disputes that she must establish a prima facie case of disparate treatment to survive a motion to dismiss (ECF No. 49 at PageID.797).   In addition, Plaintiff argues that she has alleged direct evidence that Defendant terminated her employment because of her religious beliefs, or in the alternative, Plaintiff has shown sufficient circumstantial evidence to survive Defendant's motion to dismiss (*id.* at PageID.799–804).

Defendant UMHW's argument for dismissal of Plaintiff's claim of religiously discriminatory termination under Title VII lacks merit.

Title VII of the Civil Rights Act of 1964 prohibits, in pertinent part, religious discrimination against individuals in the context of the employment relationship.   Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's religion."   42 U.S.C. § 2000e-2(a)(1).   The scope of Title VII "include[s] the

decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Hall v. Baptist Mem'l Health Care Corp.,* 215 F.3d 618, 624 (6th Cir. 2000).

Despite the parties' extensive briefing on whether Plaintiff has successfully alleged a prima facie case, the Supreme Court has held that *McDonnell Douglas* sets an evidentiary standard, not a pleading requirement. *James v. Hampton*, 592 F. App'x 449, 460 (6th Cir. 2015) (citing *Swierkiewicz*, 534 U.S. at 510). As the Sixth Circuit has consistently held, "the ordinary rules for assessing the sufficiency of a complaint apply." *Swierkiewicz*, 534 U.S. at 511; *see Lindsay v. Yates,* 498 F.3d 434, 439 (6th Cir. 2007) (noting *Swierkiewicz*'s holding that "an employment-discrimination plaintiff satisfies her pleading burden by drafting a short and plain statement of the claim consistent with Federal Rule of Civil Procedure 8(a)" (internal quotation marks omitted)); *Pedreira v. Ky. Baptist Homes for Child., Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (requiring Plaintiff to plead a "a claim of relief that is plausible on its face," that would allow an inference that she was discriminated against on account of her religion) (quoting *Twombly,* 550 U.S. at 570). To withstand a motion to dismiss, Plaintiff need only provide "an adequate factual basis" for a discrimination claim. *James*, 592 F. App'x 449 at 450. "To show that the termination was based on her religion, [a plaintiff] must show that it was the *religious* aspect of her [conduct] that motivated her employer's actions." *Hall,* 215 F.3d at 627.

The Court concludes that Plaintiff plausibly alleges that the religious aspect of her conduct motivated Defendant to terminate her employment. Plaintiff's allegations concerning Defendant Pierce's remarks at the July 29, 2021 meeting (*see* FAC ¶¶ 90–95) show hostility toward Plaintiff's religious beliefs. Plaintiff alleges that Defendant Pierce told her that "she could not take the Bible or her religious beliefs to work with her, either literally or figuratively" (*id.* ¶ 90) and that Defendant Smith "did nothing to support [Plaintiff] or to contradict the hostile statements by

Defendant Pierce" (*id.* ¶ 100).  Plaintiff alleges that Defendant Smith told her that because she refused to use preferred pronouns and to refer for "gender reassignment surgeries" her employment was terminated (*id.* ¶ 106).  Plaintiff further alleges that she never received communication from any Defendant disavowing Defendant Pierce's July 29 statement attacking her religious beliefs, and that she believed Defendants shared the same sentiments as expressed by Defendant Pierce on July 29, which motivated their actions in terminating her (*id.* ¶ 131).  As with Plaintiff's equal protection claim, her discriminatory termination claim lacks significant detail of the alleged misconduct of Defendants other than Pierce and how sentiments embodied in Pierce's statements impacted Defendants' decision to terminate her, but the Complaint, on its face, provides enough facts to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570.  To be sure, Plaintiff's "allegations do not have to give rise to the *most* plausible explanation [for Defendant's termination of Plaintiff's employment]—they just have to give rise to one of them." *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018) (emphasis in original) (citing *Iqbal*, 556 U.S. at 678).

In short, viewing the Complaint in the light most favorable to Plaintiff, accepting as true all well-pled factual allegations, and drawing all reasonable inferences in favor of Plaintiff, Plaintiff states a plausible Title VII disparate treatment claim based on religiously discriminatory termination in Count IV.

### 2.  Failure to Accommodate

Defendant UMHW argues that Plaintiff cannot establish a prima facie case of Title VII religious discrimination disparate treatment claim based on Defendant's failure to grant her accommodations (ECF No. 37 at PageID.705).  Defendant argues that Plaintiff's allegations fail because she does not allege an adverse employment action, Defendant's accommodation of Plaintiff's religious beliefs would have increased Defendant's risk of legal liability or of violating

federal law, and Plaintiff does not allege that she was similarly situated to other providers (*id.* at 705–710).

Plaintiff argues in response that her termination constitutes an adverse employment action for purposes of Title VII disparate treatment for failure to accommodate (ECF No. 49 at PageID.808).  Plaintiff further argues that Defendant could have accommodated her without any hardship, and that any harm that Defendant would incur was "purely hypothetical" (*id.* at PageID.810).  Finally, Plaintiff argues that Defendant would not have been subject to legal liability for accommodating her because the laws and regulations referenced by Defendant were not operative during the time period at issue (*id.* at PageID.812), and that Plaintiff's membership in the Christian Medical and Dental Association (CMDA) protected Defendant from enforcement of the U.S. Department of Health and Human Services' proposed rule, per a nationwide permanent injunction (*id.* at PageID.815).

Defendant's argument for dismissal lacks merit.

Title VII requires employers to "reasonably accommodate" an employee's religious beliefs, observances, and practices unless the accommodation would pose an "undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  To establish a prima facie case of religious discrimination under the failure-to-accommodate theory of Title VII, an employee must show that she: (1) holds a sincere religious belief that conflicts with an employment requirement; (2) has informed the employer about the conflicts; and (3) was discharged or disciplined for failing to comply with the conflicting employment requirement." *Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363 (6th Cir. 2015).  As noted, to survive a motion to dismiss, a plaintiff's complaint need only provide "an adequate factual basis" to support these elements. *James*, 592 F.

App'x 449 at 450; *see also Groff v. DeJoy*, 600 U.S. ____ ;143 S.Ct. 2279 (2023) (analyzing the undue hardship of the employer at the summary judgment stage).

Defendant focuses its arguments on how accommodating Plaintiff's religious beliefs would increase its risk of legal liability (ECF No. 37 at PageID.706–709).  This focus is misplaced at this stage of the proceedings.  Plaintiff sufficiently alleges that she holds a sincere religious belief that conflicted with Defendant's employment requirement, that she informed Defendant about the conflicts, and that she was discharged for failing to comply with the conflicting employment requirement.  Plaintiff alleges that her beliefs regarding gender-affirming medical care and the use of pronouns "that contradict a biological sex," are derived from her Christian faith and the teachings of the Bible (FAC ¶¶ 34–41).  Plaintiff also alleges that she could not complete Defendants' mandatory training unless she affirmed statements that her faith prohibited her from affirming (*id.* ¶¶ 74–75).  Plaintiff further alleges that she made a formal accommodation request "and explained why her faith precluded her from affirming the statements in the training module" (*id.* ¶¶ 81–82), and that Defendant UMHW terminated her employment for not complying with the training requirements (*id.* ¶¶ 84–100, 359–60).   In addition, Plaintiff alleges that "[m]any providers" at the Metro Health Caledonia clinic had personal or medical objections to performing certain procedures that "were accommodated without any issues" (*id.* ¶ 143).  Plaintiff alleges that the providers "simply delegate[d]" conducting any such procedure to a willing provider (*id.*).  As examples, Plaintiff cites "toenail" and "hemorrhoid removals" or prescription "stimulant diet pills" as well as a male doctor who is believed to have a personal objection to and "does not perform female pelvic exams, breast exams, or prescribe hormones" (*id.* ¶ 143–145).  These patients are simply referred to another provider without interruption in patient care (*id.*).

In all, the factual statements presented by Plaintiff are enough to "nudge[] [her] claims across the line from conceivable to plausible[.]" *Mosholder v. Lowe's Cos., Inc.*, 2019 WL 1116009, at *2 (N.D. Ohio Mar. 11, 2019) (quoting *Twombly*, 550 U.S. at 570; citing *Iqbal*, 556 U.S. at 683). Accordingly, Defendant UMHW's motion to dismiss Plaintiff's failure to accommodate theory of her Title VII disparate treatment claim is denied.

### f. Title VII: Religious Discrimination, Disparate Impact (Count V–UMHW)

In Count V, Plaintiff alleges a disparate impact theory of religious discrimination under Title VII. Defendant UMHW argues that "Plaintiff's EEOC Charge did not assert a claim of disparate impact" and that "[t]here was no allegation, nor even a suggestion, that a facially-neutral UMHW policy had a disparate impact on a particular group of employees" (ECF No. 37 at PageID.711). According to Defendant, for this reason, Plaintiff's Count V is properly dismissed (*id.*). Additionally, Defendant asserts that Plaintiff "claims that [Defendant] 'violated its own policy when it … treated her differently because of her religion,'" and not that Defendant's policy had a disparate impact on people with "traditional religious views of sex and gender" such as Plaintiff (*id.* at PageID.713–714).

Plaintiff responds that her EEOC Charge did, indeed, state a claim of disparate impact discrimination and that Defendant's policies of (1) respecting independent medical judgment on myriad issues but not on "gender reassignment" issues and (2) disciplining employees for "suggesting that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity" are facially neutral but disparately impact religious employees, particularly Christians (ECF No. 49 at PageID.818–819).

Defendant's argument has merit.

First, as to the EEOC Charge, a plaintiff seeking relief under Title VII cannot bring claims in a lawsuit that were not included in their EEOC charge.  *See* 42 U.S.C. § 2000e-5(f)(1); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).  Plaintiff here alleges that she asserted a disparate impact claim in her EEOC charge.  Plaintiff's Amended EEOC charge (ECF No. 32-2) states that Defendant's rule regarding independent medical judgment with respect to gender dysphoria "disparately impacts Christians and other employees with traditional religious beliefs about the biological differences between the sexes" (*id.* at PageID.585).

Next, as to the sufficiency of Plaintiff's disparate impact claim, "[b]y enacting § 2000e–2(k)(1)(A)(i), Congress allowed claims to be brought against an employer who uses a practice that causes disparate impact, whatever the employer's motives." *Lewis v. City of Chicago,* 560 U.S. 205, 217 (2010).  To establish a claim of disparate impact, a plaintiff must show that "a particular employment practice, although neutral on its face, has produced a significant adverse effect on a protected group to which the plaintiff belongs."  *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000).  To survive a motion to dismiss, a plaintiff is required to allege a specific employment practice that plausibly causes a disparate impact on a protected group.  *EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 591–92 (6th Cir. 2013).

Plaintiff's allegations in Count V fail to define the protected group that the policies disproportionately burden.  People with "traditional religious beliefs concerning sex and gender" (FAC ¶ 306) do not constitute a protected group, and Plaintiff has not plausibly alleged facts that would give rise to the conclusion that Defendant's policies have an adverse impact on Christians, if the Court were to read the relevant protected class alleged to be a Christian organization (*id.* ¶ 310) ("This policy or practice has a disparate impact on religious employees and Christian employees in particular, including Ms. Kloosterman").

Plaintiff alleges that Defendant maintained an overarching policy prohibiting discrimination in employment (FAC ¶ 303), but nowhere in the Complaint does she allege how this policy impacted people in Plaintiff's purported protected group differently than others. Instead, Plaintiff focuses on the two "narrower policies or practices" that Defendant maintained to "effectuate" the non-discrimination policy, discussed in turn (ECF No. 49 at PageID.819).

First, Plaintiff asserts that Defendant's policy against respecting independent medical judgment on "gender reassignment" treatments disproportionately impacts "those with traditional religious beliefs concerning sex and gender" (FAC ¶ 306).  However, as Defendant points out, Plaintiff also alleges that Defendant respected medical judgment on other treatment issues which would disparately impact employees with traditional religious beliefs (*id.* ¶ 307).  Defendant's differential, procedure-dependent approaches to respecting providers' independent medical judgment dismantles Plaintiff's claim of disproportionate impact, given that Defendant did not apply its policy neutrally.  Plaintiff has not identified with specificity how Defendant's approach to respecting, or not respecting, providers' independent medical judgment based on various procedures adversely impacts a protected group.

Second, Plaintiff's allegations that Defendant's policy of disciplining employees for suggesting that they hold traditional beliefs on issues related to sexual morality, sexual orientation, and gender identity (FAC ¶ 305) fail to state a claim of disparate impact.  Because Plaintiff does not identify the existence of this disciplinary policy with specificity, Plaintiff has failed to identify a specific employment practice that causes a disparate impact.  *Peoplemark*, 732 F.3d at 591 (where a plaintiff pleaded a specific employment practice, but the alleged "policy did not exist . . . the claim [] could not be proved").  Even if Plaintiff plausibly alleged that Defendant maintained

such a policy, the policy would not be facially neutral, but instead, overtly discriminatory, falling outside the scope of disparate impact liability.

Accordingly, Plaintiff has not stated a plausible disparate impact claim against Defendant, and Count V is properly dismissed.

3.  Plaintiff's State Law Claims

    a.  *Michigan Constitutional Claims*

Plaintiff alleges violations of Michigan's Constitution in Counts VI through VIII against Individual Defendants in both their official and individual capacities as well as UMHW.

As a threshold matter, the Court dismisses Counts VI through VIII against Individual Defendants in their official capacities because the Eleventh Amendment of the U.S. Constitution bars these claims. The parties do not dispute that each Individual Defendant works for UMHW, an agency of the state of Michigan (FAC ¶¶ 25–29). Under the Eleventh Amendment, States are generally immune from suit by private parties in federal court unless at least one of three exceptions apply: (1) abrogation by Congress; (2) waiver by the State; and (3) suits against state officers for prospective relief to end an ongoing violation of federal law. *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002). None of these exceptions apply to Plaintiff's state law claims in Counts VI–VIII against either Individual Defendants in their official capacities or UMHW. *See Martinson v. Regents of the Univ. of Michigan*, No. 09-13552, 2011 WL 13124122, at *4 (E.D. Mich. Sept. 28, 2011) (dismissing state-law claims against state officials in their official capacities), *aff'd sub nom. Martinson v. Regents of Univ. of Michigan*, 562 F.App'x 365 (6th Cir. 2014).

Given that Counts VI through VIII would then remain only against Individual Defendants in their individual capacities for damages, these counts must be dismissed. The Michigan Supreme

Court has held that no inferred damages remedy for a violation of a state constitutional right exists against individual government employees because other remedies are available against such defendants. *Jones v. Powell*, 612 N.W.2d 423 (2000); *accord Petties v. Caruso*, No. 06-72, 2007 WL 1032375, at *7 (W.D. Mich. Mar. 29, 2007) (no monetary damages can be sought against Michigan Department of Corrections employees sued in their individual capacities because "Michigan law does not provide a cause of action for monetary damages against individual government employees for alleged violations of Michigan's constitution."); *Mensah v. Caruso*, No. 10-13233, 2011 WL 4027307, at *6 (E.D. Mich. Sept. 12, 2011) (citing the holding in *Jones* that "there is no damage remedy for a violation of the Michigan Constitution against a municipality or an individual government employee. Because Plaintiff asks solely for money damages, his claims against [Michigan Department of Corrections employees,] Defendants Wolfenbarger and Haas in their individual capacities are dismissed"); *Crump v. Darling*, No. 06-20, 2007 WL 851750, at *14 (W.D. Mich. Mar. 21, 2007) (dismissing claims under the Michigan Constitution against MDOC employees sued in their individual capacities). Consistent with this authority, the Court dismisses Plaintiff's Counts VI through VIII.

### b. *The Elliot Larsen Civil Rights Act (ELCRA) of 1974 (Count IX–UMHW)*

Plaintiff alleged violations of ELCRA in Count IX against UMHW only, which Plaintiff has withdrawn based on Defendants' invocation of Eleventh Amendment immunity as a state entity (ECF No. 49 at PageID.822). Accordingly, Count IX is properly dismissed.[6]

## B. Plaintiff's Motion to Amend/Correct the First Amended Complaint

Plaintiff requests leave to amend the First Amended Complaint and requests that the Court grant leave to amend "and consider Plaintiff's Responses to the Hospital and Defendants' Motions

---

[6] Plaintiff has sought leave to amend the Complaint to allege ELCRA violations against Defendants in their individual capacities. The Court addresses these claims *infra*.

to Dismiss in light of the proposed amendments set forth in the [proposed] Second Amended

Complaint" (ECF No. 51 at PageID.827).  Specifically, Plaintiff seeks leave to amend to:

> (1)    Amend her state constitutional claims alleged in Counts VI–VIII … by dismissing her claims against the Defendants in their official capacities, and allege claims solely for monetary damages against the Defendants in their individual capacities; (2)
>
> (2)    [D]ismiss her claim against the Hospital under the Elliot-Larsen Civil Rights Act (ELCRA), as alleged in Count IX …, and allege an ELCRA claim for monetary damages against the Defendants in their individual capacities; (3)
>
> (3)    [C]larify that her claim for reinstatement is alleged against Defendants in their official capacity only; and
>
> (4)    [A]mend the FAC to clarify that her claim for nominal damages is made against Defendants in their individual capacities.

(ECF No. 52 at PageID.958).  Plaintiff attaches a proposed Second Amended Complaint to the

motion (ECF No. 51-1).  For the reasons that follow, the Court grants in part and denies in part

Plaintiff's Motion to Amend, and the Court will address each proposed amendment in turn.

Although Federal Rule of Civil Procedure 15 directs that leave to amend "shall be freely

given when justice so requires," the Sixth Circuit has instructed that "the party requesting leave to

amend must 'act with due diligence if it wants to take advantage of the Rule's liberality.'"  *Parry*

*v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (citation omitted).  "Guided

by that overarching principle, the district court may weigh the following factors when considering

a motion to amend:  undue delay or bad faith in filing the motion, repeated failures to cure

previously-identified deficiencies, futility of the proposed amendment, and lack of notice or undue

prejudice to the opposing party."  *Knight Cap. Partners Corp. v. Henkel AG & Co., KGaA*, 930

F.3d 775, 786 (6th Cir. 2019).  "A motion to amend is futile 'where a proposed amendment would

not survive a motion to dismiss.'"  *Banerjee v. Univ. of Tenn.*, 820 F. App'x 322, 329 (6th Cir.

2020) (citation omitted).

"Ordinarily, if a district court grants a defendant's 12(b)(6) motion, the court will dismiss the claim without prejudice to give parties an opportunity to fix their pleading defects." *CNH Am. LLC v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 645 F.3d 785, 795 (6th Cir. 2011). Federal Rule of Civil Procedure 15(a)(2) permits a party to amend a pleading with leave of court and requires the court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). When a motion for leave to amend is filed before the court considers a motion to dismiss, the court should "consider[] the motion to dismiss in light of the proposed amendments to the complaint." *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000).

1.  Proposed Amendment of Michigan Constitution Claims

Plaintiff seeks to amend her state constitutional claims, alleged in Counts VI through VIII, by dismissing her claims against Individual Defendants in their official capacities and alleging claims solely for monetary damages against Individual Defendants in their individual capacities. Defendants argue that this amendment is futile with respect to Plaintiff's proposed Michigan Constitution claims because Plaintiff has sought to dismiss her state constitutional claims against Individual Defendants in their official capacities but seeks to add claims against those defendants for monetary damages in their individual capacities, and "Michigan constitutional tort claims are not available against an individual government actor" (ECF No. 56 at PageID.1019). Defendants' argument has merit.

Plaintiff's proposed amendment would be futile because, as discussed, *supra*, the Michigan Supreme Court has held that no inferred damages remedy for a violation of a state constitutional right exists against individual government employees. *Jones*, 612 N.W.2d at 423.

2.  <u>Proposed ELCRA Claim</u>

Plaintiff seeks to dismiss her claim against Defendant UMHW under the Elliot-Larsen Civil Rights Act (ELCRA), as alleged in Count IX, and allege an ELCRA claim for monetary damages against each of the Individual Defendants in their individual capacities.

Defendants argue that Plaintiff's proposed ELCRA claims against Individual Defendants Pierce, Smith, Cole, and Booker are futile because Plaintiff's proposed Second Amended Complaint does not plead a basis for individual liability as to these Defendants (ECF No. 56 at PageID.1022).  Specifically, Defendants contend that Plaintiff's proposed claims against these Defendants would be futile because Plaintiff did not plead facts that would give rise to the conclusion that Defendants Pierce, Smith, Cole, and Booker are "agents," of UMHW and thus potentially liable as "employers" for purposes of ELCRA (*id.*).  For purposes of the Motion to Amend, Defendants concede that Plaintiff may pursue her ELCRA claims against Defendant Pai for individual liability (*id.* at PageID.1021).

The Court grants Plaintiff's motion for leave to amend the First Amended Complaint on this issue.

The Michigan Supreme Court has held that ELCRA permits individual liability for an "agent" of the employer.  *Elezovic v. Ford Motor Co*., 697 N.W.2d 851, 854 (Mich. 2005).  The Michigan Court of Appeals defined "agent" as "persons to whom the employing agency delegates supervisory power and authority over subordinates."  *Elezovic v. Bennett*, 731 N.W.2d 452, 461 (Mich. 2007).  Although Plaintiff did not allege that Individual Defendants aside from Defendant Pai had official supervisory power over her, she has plausibly alleged each Individual Defendant's involvement in the decision to terminate her and alleged discriminatory acts leading up to that decision.  *See Droomer v. Flex-N-Gate Detroit, LLC*, No. 355117, 2021 WL 5019597, at *8 (Mich. Ct. App. Oct. 28, 2021) (determining that an employee was an "agent" under ELCRA because,

although he did not have the power to terminate the plaintiff, he conducted the investigation that led to the plaintiff's termination). Thus, at the motion to dismiss stage, Plaintiff has plausibly alleged that all Individual Defendants are "agents" for purposes of ELCRA liability. Consequently, Plaintiff's proposed amendment to allege an ELCRA claim for monetary damages against Defendants Pierce, Smith, Cole, and Booker in their individual capacities would not be futile, and the Court grants Plaintiff's Motion as to this proposed amendment.

3. Proposed Reinstatement Claims

Plaintiff seeks to clarify that her proposed claim for reinstatement is alleged against Defendants in their official capacity only.

Individual Defendants argue that Plaintiff's proposed clarification of claims for reinstatement in Counts I, II, III, VI, VII, and VIII against Individual Defendants in their official capacity, only, should be denied because the proposed claims are barred by the Eleventh Amendment and fail to state claims on which relief can be granted for the reasons advanced in their motion to dismiss (ECF. No. 56 at PageID.1026).

Plaintiff's request to amend the First Amended Complaint in order to clarify that her request for reinstatement is alleged against Individual Defendants in their individual capacities only (ECF No. 52 at PageID.961) is not futile as to those claims that have survived Individual Defendants' motion to dismiss. Plaintiff's request is generally sufficient to state a claim for prospective injunctive relief under the *Ex parte Young* doctrine because *Ex parte Young* applies to actions commenced against state officials acting in their official capacities for prospective relief to end an ongoing violation of federal law. *See Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011) (abrogated on other grounds in *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)) ("An *Ex parte Young* action may be commenced only against a state official acting in her official capacity and may 'seek [only] prospective relief to end a continuing violation of

federal law.'") (quoting *Carten*, 282 F.3d at 395).  Plaintiff's surviving claims identify alleged
ongoing violations of federal law that can be enjoined as to each of the Individual Defendants in
their official capacities, and the relief sought can properly be characterized as prospective, as she
requests that this Court remediate continuing economic injury and irreparable harm (FAC ¶¶ 252,
265).  Therefore, Plaintiff's proposed amendments to clarify her reinstatement claims are not futile,
subject to the rulings in this Opinion and Order, and the Court grants in part Plaintiff's Motion
regarding this proposed amendment.

        4.  Proposed Nominal Damages Claim

     Plaintiff seeks to amend the FAC to clarify that her claim for nominal damages is made
against Individual Defendants solely in their individual capacities.

     Defendants argue as to each of Plaintiff's proposed amended claims that Plaintiff has failed
to state claims on which relief can be granted (ECF No. 56 at PageID.1021, 1026, & 1027).

     Plaintiff's proposed nominal damages claims against Defendants in their individual
capacities are not futile.  Plaintiff sought nominal damages from Individual Defendants in their
individual and official capacities in her First Amended Complaint (FAC ¶¶ 233, 254, 265).
Although Plaintiff cannot seek nominal damages from Defendants in their official capacities, her
claims remain against Defendants in their individual capacities, so the proposed amendment would
provide clarity to the Complaint in accordance with this opinion.

     Accordingly, Plaintiff's motion to amend the First Amended Complaint is granted in part
and denied in part.  Specifically, Plaintiff's Motion to Amend the First Amended Complaint is
denied with respect to the Michigan constitutional claims, and the Motion is granted with respect
to the ELCRA, reinstatement, and nominal damages claims as set forth in the proposed Second
Amended Complaint (ECF No. 51-1) and consistent with this opinion.

     Consequently, Plaintiff's motion for leave to file a reply (ECF No. 59) is denied as moot.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Individual Defendants' motion to dismiss (ECF No. 34) and Defendant UMHW's motion to dismiss (ECF No. 36) are GRANTED IN PART and DENIED IN PART; specifically, the motions are granted as to Plaintiff's Count II (freedom of speech) and Counts V–IX (Title VII-Disparate Impact, Plaintiff's State Law Claims), which are DISMISSED WITH PREJUDICE.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to Amend the FAC (ECF No. 50, corrected by ECF No. 51) is GRANTED IN PART and DENIED IN PART.  The Court orders that Plaintiff shall file a Second Amended Complaint within 21 days of the date of this Opinion and Order in conformity with the directives herein.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File a Reply (ECF No. 59) is DENIED as moot.

Dated:  September 20, 2023               /s/ Jane M. Beckering
                                        JANE M. BECKERING
                                        United States District Judge